IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ELLIPSO, INC.,

Plaintiff,

v.

Case No. 05cv001186  (RCL)

JOHN B. MANN et al.,
Defendants.

**OPPOSITION OF DEFENDANTS JOHN B. MANN AND
MANN TECHNOLOGIES, L.L.C. TO THE PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION**

NOW COMES DEFENDANTS, John B. Mann and Mann Technologies, L.L.C.,

("Mann"), by their undersigned counsel, and  hereby file this Opposition to the Plaintiff's Motion

for Preliminary Injunction.

**The Standard for Preliminary Injunction**

This case was filed on June 14, 2005. Mann's location was known at all times to the

Plaintiff and the Mann defendants were available at all times to receive service of process. Yet

the Plaintiff made no effort to serve the Mann defendants for over two months, until August 17,

2005. Preliminarily, therefore, there is no "emergency" justifying the extraordinary relief the

Plaintiff is seeking by its Motion.

The standard for injunctive relief in the District of Columbia is well known. *District of

Columbia v. The Sierra Club*, 670 A.2d 354 (D.C. 1996).  The District of Columbia Court of

Appeals explained that to be entitled to a preliminary injunction, the moving party must clearly

demonstrate (1) that there is a substantial likelihood it will prevail on the merits; (2) that it is in

danger of suffering irreparable harm during the pendency of the action; (3) that more harm will

1

result to the Plaintiff from the denial of the injunction than will result to the Defendants from its grant; and in appropriate cases, (4) that the public interest will not be disserved by the issuance of the requested order. *Id.*

In this case, the Plaintiff entered into a collateralized loan agreement with Defendant Mann Technologies, L.L.C. on January 30, 2004. The Plaintiff concedes that the loan documents (Exhibit 1 to the Motion) provide that a default by Ellipso allows Mann Technologies, L.L.C. to take possession of the collateral. See, *inter alia*, Section 7.2 of the loan agreement (reprinted in the Mann Declaration attached at page 9, ¶22). Nevertheless, Plaintiff argues that the entire agreement must be rescinded because, the Plaintiff asserts: (a) it was not aware that Robert Patterson was a member of the LLC; (b) because Mr. Patterson has a criminal history; and (c) because the loan documents are "unconscionable". The Court cannot assume the truth of the first two assertions. The Declaration of John B. Mann ("Mann Dec."), attached to this Opposition, flatly contradicts them with the extensive facts of this case demonstrating the relationship among Patterson, Castiel and Mann. See Mann Dec., ¶¶ 3-7, 9, 12-14, 17-19. The Plaintiff, moreover, cites no support for the proposition that a consultant with a "dual role" or a criminal history constitute in themselves fraud or negate a contract in which that consultant played a part.

The record contradicts the third assertion that the contract is unconscionable. The loan agreement and subsequent agreements between the parties demonstrate that these were transactions entered into between knowledgeable and very sophisticated businessmen. Dr. Castiel and the Ellipso website[1] represented to John Mann that Castiel's Board and advisors consisted of

---

[1] www.Ellipso.com. According to this website, Mr. Castiel regularly transacts business with the likes of Craig McCraw and Bill Gates. The web site describes the company as follows:

2

captains of industry, high former government officials and major national law firms. The collateral for this modest loan, which Ellipso never made an attempt to pay back,[2] represented a reasonable and commercially acceptable multiple of the value of the loan versus the nominal value of the collateral under terms very well understood and accepted by Dr. Castiel. Mann Dec. ¶¶10, 17-19. Further still, Dr. Castiel knowingly signed the joint sale agreement – which Mr. Patterson signed for Mann Technologies – to implement what was required under the loan documents, i.e, the transfer the collateral (pledged shares) through Ellipso's own broker (UBS) to Mann Technologies, L.L.C. in response to Ellipso's Default. See the Attachment to the Mann Declaration; Mann Dec. ¶¶21-22. Indeed, when the value of the pledged stock fell to $.02 per share in October 2004 (making the total value of the collateral less than $10,000.00), Dr. Castiel's reaction to Mann's request for more security was simply to the effect that "a deal is a deal." Mann Dec., ¶19.

Plainly, what is good for the goose is good for the gander. Ellipso's belated shock and alleged dismay over Mr. Patterson does not constitute grounds for rescission, and certainly not for the extraordinary relief of a preliminary injunction.

A preliminary injunction is not warranted in this case, moreover, because the Plaintiff's alleged losses can be accurately measured by tracking the value of the stock. Thus, Plaintiff can

---

"Ellipso, Inc. holds controlling interests in Mobile Communications Holdings, Inc. ("MCHI"), ESBH and Virtual Geosatellite, LLC ("Virtual Geo"). ESBH is jointly owned with ICO Global Communications Holdings, a company counting Craig McCaw and Bill Gates as major shareholders.
Through its subsidiaries Ellipso has compiled a comprehensive portfolio of regulatory and intellectual property assets that give it a highly strategic position in emerging broadband services that join the Internet with a full spectrum of entertainment options. Most significantly, Virtual Geo's revolutionary IP provides a perfect fit for broadband hungry defense systems."

[2] Mann Dec, ¶20-23.

be adequately compensated in money damages. *Helene Curtis Industries, Inc. v. Church & Dwight Co.*, 560 F.2d 1324 (7th Cir. 1977), *cert. denied*, 374 U.S. 1070 (1978). Because there is an adequate remedy at law for the Plaintiff in this case, no injunction may issue. *Reed Enterprises v. Corcoran*, 122 U.S.App.D.C. 387, 390, 354 F.2d 519, 522 (1956).

**Applying the Standard for Preliminary Injunction**

1.    *Likelihood of Success*

Plaintiff is faced with the major burden in this case of proving that it did not understand the terms of the loan documents and that it was induced by fraud to enter into them. Not only are its allegations contradicted by the recorded facts, its own conduct demonstrates that it waived its claim of fraud and ignorance by the knowing conduct of its President who signed the loan documents after negotiating them with another potential loan provider (Mann Dec., ¶17) and later agreed in a written and simple one page sale memorandum[3] to transfer the pledged stock to Mann Technologies to resolve Ellipso's default under the loan agreement. Plaintiff cannot prove the facts it asserts to warrant rescission and cannot find authority justifying an injunction even if the asserted facts are proven to the satisfaction of the Court. For example, this joint sale agreement, which the Plaintiff has not provided to the Court, completely contradicts the Plaintiffs' numerous assertions that it had no notice that the stock was going to be transferred to Mann. Dr. Castiel not only had notice, he personally participated in the transfer![4] In addition, it is not at all clear how Mr. Patterson's allegedly hidden dual role in this case constitutes fraud.

Further, Plaintiff's claim against The Registry Solutions Company (TRSC) may not be

---

[3] See Attachment to Mann Dec. herein.

[4] The loan documents, nevertheless, did not require notice. See Mann Dec., ¶22.

4

heard by the Court. As demonstrated in the Complaint, the parties negotiated and agreed upon a

arbitration clause which provides that any dispute as to TRSC must be submitted to binding

Arbitration. The District of Columbia Arbitration Act, Section 16-4301 provides that "[a]

written agreement to submit any existing controversy to arbitration or a provision in a written

contract to submit to arbitration any controversy thereafter arising between the parties is valid,

enforceable and irrevocable…." It is quite likely, therefore, regardless of the facts in the case,

that the Plaintiff will not prevail on a major portion of its claim against the Mann defendants

because that claim does not belong before the Court.

2-3.    *Balance of Hardships*

It is abundantly clear from the Mann Declaration – indeed, from the Plaintiff's complete

default on the loan agreement – that Ellipso will not suffer any irreparable harm, or for that

matter harm of any nature, during the pendency of this matter. It failed to carry out any of its

promises to the Mann defendants, to pay back the loan or to provide the service necessary to

carry out its promises to The Registry Solutions Company. In fact, because of its default, the

Mann companies have spent thus far approximately $250,000.00 to try to salvage its agreements

with the Plaintiff. Mann Dec. ¶¶10 - 16, 23. Mann Technologies is extensively involved in

implementation of the 881 service that Ellipso has failed to provide under its Agreements. If the

assets of Mann Technologies are frozen, on the other hand, commitments for such business

activities could not be met, and Mann Technologies, and even Ellipso itself, would suffer

irreparable harm. Mann Dec. 24. The Plaintiff, which has done nothing to advance its 881

business and has deliberately breached the arbitration clause in its TRSC contract by bringing the

claim to the Court, will not be forced to incur any costs or bear any burden while this matter is

pending. The only "harm" that it can purport to allege is a failure to reap what its President apparently now believes is a windfall from recovery of the pledged stock which he voluntarily and freely abandoned (because the contract required that he deliver the pledged stock).

The balance of hardship, therefore, weighs in favor of the Mann Defendants in that they, not the Plaintiff, will suffer substantial harm should injunctive relief not be granted.

4.    *Public Interest*

The public has an interest in being able to rely on the enforceability of contracts that its members negotiate in good faith and which are valid, enforceable and irrevocable as a matter of law.  If injunctive relief is granted in this case, the public interest would be invalidated because the Plaintiff, who engaged in such negotiations to a binding contractual agreement, would be free to ignore its promises as it has done here, and when circumstances change in unforeseen ways simply claim fraud. At the same time, Mann Technologies and TRSC have carried out all of their duties under the agreements to their severe financial detriment. Especially for a company which has proclaimed its importance to the national defense (its "revolutionary intellectual property provides a perfect fit for broadband hungry defense systems," according to its web site), this would set an undesirable precedent in the matter of contract law in the District of Columbia. The public also has an interest in knowing that its binding contracts cannot be easily contravened for the sake of personal gain. Finally, the granting of injunctive relief would preclude the Mann Defendants from continuing their implementation of the registry service and thus deprive the public of this service.

The Plaintiff seems to suggest that the failure of Mann Technologies to file the necessary reports with the State of Nevada somehow harms the public. But this was a technical oversight,

which will be shortly remedied. Mann Dec., ¶2. More importantly, it provides no basis, and the Plaintiff has not relied on such, for the grant of a preliminary injunction.

      WHEREFORE, for the foregoing reasons, Defendants John B. Mann and Mann Technologies, L.L.C. respectfully request that this Honorable Court deny Plaintiff's Motion for a Preliminary Injunction. An Order is provided for consideration by the Court.

                            Respectfully submitted,

                    _____/s/_____
                    Thomas A. Mauro, Bar No. 184515
                    1020 Nineteenth Street, N.W.
                    Suite 400
                    Washington, D.C. 20036
                    Tel.: (202) 452-9865
                    Fax: (202) 452-0092
                    Attorney for Defendants   John B. Mann, Mann Technologies, L.L.C., and The Registry Solutions Co.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ELLIPSO, INC.,

                Plaintiff,

         v.                                 Case No. 05cv001186  (RCL)

JOHN B. MANN et al.,
        Defendants.

### DECLARATION OF JOHN B. MANN

JOHN B. MANN, under penalty of perjury, hereby states as follows:

1.      I am over eighteen years of age and otherwise competent to testify on all matters contained herein.

2.      I am an individual defendant in this case and a member of Mann Technologies, L.L.C. ("Mann Tech"). Mann Tech is a Limited Liability Company organized in the State of Nevada on February 25, 2004.  Although currently inactive in the State because of a mistaken belief that annual reports to the incorporating state were not necessary in Nevada for limited liability companies,[5] at all times pertinent to this case, Mann Tech was an active LLC capable of entering into any business transactions. I am not aware of whether Mann Tech, as an LLC, is required to qualify to do business in the District of Columbia or Virginia. If it is those qualifications will be obtained forthwith.

3.      I have known Dr. David Castiel, a principal in the Plaintiff corporation, since late 2003.  I understand that Dr. Castiel is 50 years old, resides in Washington, D.C., and holds a Ph.D. in solid state physics.  Born in Morocco, he was educated in Paris, Canada, and California.  He is

---

[5]  Mann Tech will shortly be reinstated retroactively to active status in Nevada.

1

married with three children still in secondary school.  After a career with several major corporations, he founded Ellipso, Inc. in the early 1980's, with his own money and that of friends and family.

4.      Dr. Castiel established Ellipso, Inc., a Delaware corporation, to develop and implement a communications satellite technology utilizing medium height elliptical orbits.  An explanation of this technology can be found on the company web site, www.Ellipso.com, together with other corporate and business information.  Ellipso has been granted a series of patents pertaining to this technology.

5.      Dr. Castiel and Ellipso are sophisticated and experienced entrepreneurs and are engaged in highly complex technologies and business ventures.  Dr. Castiel advised me that Ellipso obtained venture capital in the amount of $25,000,000.00 from several venture capital firms and cash investors, approximately $40,000,000.00 in engineering work from the Boeing Company, and investments from others for a total investment of approximately $90,000,000.00. At one point Ellipso's shares reached a high value of $70.00 per share.  Ellipso has filed for a spectrum license from the FCC for its satellite communications system. Ellipso is represented at the FCC by a national law firm.  In the Spring of 1999, Ellipso and Boeing executed an Memorandum of Understanding whereby Boeing would purchase a controlling interest in Ellipso for $750,000,000.00 and fund the launch of its satellite system.  Consistent with this level of capitalization, Dr. Castiel (and the Ellipso website) represented to me that his Board and advisors consisted of captains of industry, high government officials and major national law firms.

6.      I understand Ellipso's ownership structure is similarly complex. I have been told that Ellipso Private Holdings, Inc. (EPHI) holds 65% of the approximate 6,500,000 shares outstanding. Dr. Castiel holds 60% of the stock in EPHI, giving Dr. Castiel a personal interest in Ellipso of 38%.

2

Venture First, an investment banking firm, holds approximately 500,000 shares. Harbor Vest, another investment firm, has a 4% interest, or approximately 250,000 shares.

7.    I learned that in the spring of 2000 Ellipso secured an investment of $10,000,000.00 from Peter Sahagen.  The transaction involved establishing a new Delaware LLC, Virtual Geo Satellite, into which the satellite technology and spectrum license application were assigned. Sahagen held one third of the LLC and Ellipso two thirds.  The Board of ManAgers of the LLC consisted of Castiel, Sahagen, and a third person, who was a partner in another major national law firm. I understand that since this transaction, there has been much complex and extensive litigation between the Sahagen forces and Dr. Castiel and Ellipso.  Throughout this litigation, Ellipso and Dr. Castiel have had the benefit of legal representation from many national-level law firms. I do not believe defendant Patterson was ever hired to represent Ellipso in any of these cases.

8.    At the time I established Mann Technologies, L.L.C. in February 2004 and signed the loan agreement in January 2004 I did not know that Dr. Castiel personally and Ellipso generally were involved in numerous, on-going, extensive and financially draining litigation, in this Court, in Delaware and in the District of Columbia Superior Court. I was unaware of the status of any litigation, and unaware that pending litigation could threaten the business and financial viability of Ellipso.

9.    I have known defendant Robert Patterson socially for almost twenty years since our families met at social gatherings in our neighborhood. Prior to 2003, I had talked to him about once a year in a social context.  Professionally, I know defendant Robert Patterson as a management consultant to Ellipso, whose firm Ellipso hired in late 2002, to provide business consulting, and to find sources of funding for Ellipso. Although a graduate of Harvard Law School and a partner in

several major law firms, I did not believe he was hired to provide legal representation to Ellipso. A firm in which he was employed served as a management consultant to Ellipso. I was unaware of Mr. Patterson's alleged criminal history, which I now understand to have occurred at least two years before my January 2004 loan to Ellipso, until I was served with the complaint in this case. It is clear from Exhibit 1 to the Complaint – assuming this to be an accurate copy of the agreement between Ellipso and Consulting Management, Ltd – that the company was not hired to provide Ellipso with legal representation, but rather to act as a "finder" (Exhibit 1, ¶6) to assist Ellipso in obtaining financing and to consult with Ellipso concerning the financial aspects of certain affirmative legal claims Ellipso wished to make.  Moreover, it seems apparent from the agreement that it expired in September 2003, before I became involved with Ellipso.

THE CREATION OF THE REGISTRY SOLUTIONS COMPANY

10.    I was approached by Robert Patterson in December, 2003 to see if I was willing to make a loan to Ellipso in the principal amount of $90,000.00. After discussing the state of Ellipso's business I indicated I would be interested only in a loan secured by  Ellipso assets. In January 2004, the only available asset which Ellipso possessed was ICO stock.  I understand that Ellipso held about 2,200,000 shares, which were trading at about $0.40.  The problem was that these were mostly restricted (non-trading) shares that were held by Ellipso. They are "penny stocks", trading on the Pink Sheets, with a very thin trading volume. Any shares that could be sold would surely not sell in any volume for their listed value.

11.    Prior to my involvement, Dr. Castiel represented to me that Ellipso had filed an application at the ITU for permission for Ellipso to use its so-called "881" codes to create a "precursor service" prior to launch of its satellite system.  The application was granted, these so-

4

called "country codes" were assigned to Ellipso for its "pre-cursor service" and this is now the only active business opportunity which Ellipso has. At the time I provided the loan, Dr. Castiel persuaded me that the potential for this business was enormous and that arrangements for service with local telephone companies were simply a matter of being "switched on". Further, Dr. Castiel represented to me that the 881 codes had already been "loaded" in 23 separate countries. These representations proved to be materially false.

12.     In connection with the "881" business, Dr. Castiel, Mr. Patterson and I discussed ways in which to develop Ellipso's 881 business opportunity. We agreed with Dr. Castiel that Mr. Patterson and I would establish The Registry Solutions Company to act as a clearing house for the assignment of individual numbers within that 881 code. We were to fund the establishment of the company and Ellipso was to implement the telephone service necessary for Ellipso to provide a "vanity number" to customers who wished to secure a special number. The concept was that our new company would pay Ellipso for the exclusive right to perform this registry function and charge the customers using the Ellipso numbers a monthly use fee. The "vanity number" service could generate cash flow for Ellipso, and Ellipso would share in 60% of the profits generated by The Registry Solutions Company for its registry business. This appeared to offer the potential for a profitable business. Ellipso was unsuccessful in implementing the "vanity number service" it had touted as ready to go, however and since then, my company, The Registry Solutions Company, has invested over $200,000.00 and many man-years in an effort to carry out Ellipso's responsibilities to obtain such service. That work is on-going. From the beginning, it was always made clear to Dr. Castiel that Mr. Patterson was going to be involved in the new company.

13.     Discussions between me, Dr. Castiel and Mr. Patterson resulted in The Registry

5

Solutions Company ("TRSC") agreement, an annotated version of which is attached to the Complaint as Exhibit 4. During these negotiations, Dr. Castiel repeatedly represented that he could sell 50,000,000 numbers at $3.00/month and that service was imminent. I believe the agreement was executed sometime in January 2004, to be effective December 15, 2003, at Dr. Castiel's request.

14.     I had weekly meetings with Dr. Castiel and Mr. Patterson regarding this new business. In connection with the loan by Mann Technologies, which I discuss below, it never occurred to me that Dr. Castiel did not know that Mr. Patterson had an interest in that company. At some meetings with third parties Dr. Castiel himself explained the relationship between Mr. Patterson, myself and Ellipso, Dr. Castiel noting that Mr. Patterson and I, through TRSC, were going to provide the "registry function" for the service and that Mr. Patterson owned part of TRSC and was a consultant to Ellipso. There can be no doubt that Dr. Castiel knew that Mr. Patterson was an owner in TRSC, which was doing business with Ellipso. TRSC continued to pay, and Ellipso and Dr. Castiel continued to accept, moneys on these agreements after these public meetings.

15.     The TRSC agreement with Ellipso required TRSC to make monthly payments to Ellipso. These payments to Ellipso from TRSC were faithfully made in accordance with all of the written agreements between us. The payments approximate $100,000.00   There were two amendments to the TRSC/Ellipso agreement, one dated March 31, 2004, and another in June 2004. In both instances, Dr. Castiel negotiated the amendments with Mr. Patterson and me as principals in TRSC.

16.     The essence of the Ellipso/TRSC agreement was that TRSC would pay Ellipso a monthly fee for the exclusive right to be the registrar for the 881 numbers, for which a fee would be charged to the subscribers. Monthly, Ellipso would receive the greater of $12,500 or 60% of TRSC's

profits. Ellipso through Dr. Castiel, represented that the implementation of the 881 service was imminent. As spring turned into summer of 2004, it became clear that Ellipso was not able to provide the 881 service contemplated by the agreement with TRSC. To the best of my knowledge and belief, Ellipso has not provided the 881 service contemplated by the agreement, and consequently TRSC has no registry business. If it currently does provide 881 services, Ellipso has neither disclosed this fact to TRSC, nor has it made any payments to TRSC for this service, or any other service, as required under its Agreement with TRSC. Ellipso has failed to perform any of its obligations to a) establish the communication service promised as "imminent", or to b) pay a portion of revenues for use of 881 numbers as promised in the Ellipso/TRSC Amendment.

## THE MANN TECHNOLOGIES LOAN

17.     In January, 2004, Ellipso held one ICO stock certificate for 492,611 shares, which no longer bore the restrictive "non-transfer" legend. Mr. Patterson then made an offer to me to loan Ellipso $90,000.00 against the stock, which he said was identical to a loan transaction with Ellipso that failed when the lender (Argyle Investments, Inc, I believe) withdrew. The lender's standard margin loan was 40% of value, but it was a non-recourse loan with a reasonable interest rate of prime plus 100 base points (1.0%). Ellipso accepted these terms. In January 2004, I took the term sheet and margin loan documents that Ellipso had received from Argyle. I understood that they were reviewed and agreed to by Castiel and Ellipso after previous negotiations with Argyle, and that they had been printed out by Ellipso/David Castiel. I agreed to form a company to hold the loan. I understood that Dr. Castiel understood the arrangement, had negotiated the same terms and documentation with Argyle, and made no objection.

18.     Ellipso prepared the loan documents for signature and the transaction consummated.

7

Neither Mr. Patterson nor I made any secret that the money was coming from my companies, that the loan would be made by Mann Technologies, L.L.C. in which Mr. Patterson and I had ownership interests. Such interests were part of the public application for charter which was made in Nevada. Thus our ownership interests were a matter of public record. The Maturity Date of the loan is January 30, 2007. Interest payments were due quarterly. An event of default under the loan also occurred when the value of the collateral dropped to less that 80% of the loan amount. In fact, in October, 2004, the collateral stock traded at $,02 per share, or a total collateral value of less than $10,000.00.

19.    At all times Dr. Castiel demonstrated a detailed knowledge and understanding of the terms of the loan and the loan documents. For example, in October 2004, when the collateral stock was worth less than $10,000.00, I suggested additional security. Dr. Castiel declined, in effect responding to me that "a deal is a deal."

DEFAULT BY ELLIPSO OF THE LOAN AGREEMENT

20.    The first interest payment on the Mann Tech loan to Ellipso was due on April 15, 2004.  Ellipso failed to make that payment or any quarterly interest payments on the loan. Ellipso has missed six consecutive payments, with the seventh due October 15, 2005.

21.    The default prompted an August 2004, amendment to the loan agreements. We agreed that the 492,611 shares of ICO stock pledged as collateral for the loan would be sold by Mann Tech and the proceeds divided between Ellipso and Mann Tech in a manner that reflected the terms of the loan agreements.  However, when Mann Tech sought to sell these shares, it sought the required Board Resolution from Ellipso.  Despite repeated requests, Ellipso would not provide such a resolution.  The failure to provide the documents necessary to sell the collateral is a breach of the

requirements set forth in the loan documents. In September it was agreed that the shares would be placed in a Mann Tech account at UBS in Washington, D.C. where Ellipso had a long standing relationship. John Piper was the account manager on the account. Dr. Castiel and Defendant Patterson executed a sale authorization for the shares. Patterson executed that document on behalf of Mann Tech. Dr. Castiel's signature appears on that document about six inches from Patterson's. Thus it was clear that Dr. Castiel knew that Defendant Patterson had a financial interest in Mann Tech. A copy of this Joint Sale Order is attached to this Declaration. Only 25,000 shares were sold pursuant to the agreements mentioned above, because the ICO stock fell in price below $0.55, the strike price, and the Amendment to sell expired by its own terms in October 2004. The proceeds of the sale of this 25,000 shares of ICO stock were shared with Ellipso, as called for in the Amendment.

22.    In early October 2004, the ICO stock price fell to $0.02 per share. This decline, below 80% of the loan amount, constituted a separate default pursuant to section 7.1 (j) of the agreement. No notice of default to Ellipso is required, having been expressly waived, Section 7.2 of the loan agreement provides:

> "Upon the occurrence of an Event of Default, the Note, together with any accrued and unpaid interest thereon, shall be immediately due and payable **without notice** or demand; presentment, or protest, all of which are hereby expressly waived.
>
> "At any time after the date first above written, Lender shall thereupon have the rights, benefits, and remedies afforded to it under any of the Loan Documents with respect to the Collateral and may take, use, sell or otherwise, encumber or dispose of the Collateral **as if it were the Lender's own property**. Borrower agrees that Lender may or may not proceed, as it determines in its sole discretion, with any or all other rights, benefits, and remedies that it may be entitled against the Borrower."(Emphasis supplied.)

23.    Thus, in October 2004, Ellipso had failed to make a single payment on the ICO stock loan and the collateral had a market value of less than $10,000.00  Further, Ellipso had failed to provide any 881 service for the TRSC registry business. My companies expended approximately $250,000.00 and many man-years of time, with no recourse except perhaps to pursue a defaulting and defunct Ellipso.

24.    Mann Tech is extensively involved in other business activities, including implementation of the 881 service that Ellipso has failed to provide under its Agreements.  If the assets of Mann Tech are frozen, commitments for such business activities could not be met, and Mann Tech would suffer irreparable harm.

I declare, pursuant to 28 U.S.C. Sec. 1746 and under the penalty of perjury, that the foregoing is true and correct to the best of my personal knowledge and belief.


Date:  September 27, 2005

John B. Mann

11

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ELLIPSO, INC.,

                        Plaintiff,

        v.                                              Case No. 05cv001186  (RCL)

JOHN B. MANN et al.,
        Defendants.

## <u>ORDER</u>

This matter is before the Court upon the Motion of the Plaintiff for Preliminary Injunction.

Upon consideration of the Motion, and the Opposition thereto filed by John B. Mann and Mann

Technologies, L.L.C., and the entire record in this case, it is this _____ day of

_____, 200_, hereby

ORDERED, that the Motion of the Plaintiff for Preliminary Injunction be, and it hereby is,

DENIED.

                                        _____
                                        Royce C. Lamberth
                                        United States District Judge

Copies to:

Thomas A. Mauro, Esq.
1020 Nineteenth Street, N.W.
Suite 400
Washington, D.C. 20036

Mark S. Guberman, Esq.
1400 K Street, N.W.
Suite 1000
Washington, D.C. 20005

1