## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ELLIPSO, INC.                                  )
4410 Massachusetts Ave., Suite 385            )
Washington, D.C. 20016,                       )
                                              )
      Plaintiff,                           )
                                              )
v.                                            )
                                              )
JOHN B. MANN, et al.                          )     CASE NUMBER: 1:O5CV01186
9330 Harts Mill Road                          )
Warrenton, VA. 20186                          )     JUDGE: Royce C. Lamberth
                                              )
      Defendants.                          )
                                              )
_____)

## MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED
### or in the alternative
## MOTION FOR SUMMARY JUDGMENT
### or in the alternative
## MOTION FOR JUDGMENT AS A MATTER OF LAW
### or in the alternative
## FOR JUDGMENT ON THE PLEADINGS

Hearing Date: _____

Hearing Time: _____

Courtroom: _____

### Relief Sought

Robert B. Patterson, defendant, moves this court to dismiss the Complaint against

Patterson, to grant partial summary judgment, and to grant such other relief as may be

just and proper.

### Grounds for Relief

RECEIVED

NOV 2 1 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

I. Defendant Patterson is entitled to dismissal of, or summary judgment on, counts V, VI, and VII of the Complaint, because as is more fully shown in the Affidavit of Robert B. Patterson, there is no genuine issue of material fact that needs to be tried in this action because Ellipso, Inc. reaffirmed each of the three contracts at issue here with full knowledge of the alleged fraudulently concealed acts:

A.    Plaintiff, Ellipso, Inc., ("Ellipso"), knew of Patterson's criminal plea and disbarment from and after

1) April 11, 2004, when David Castiel ("Castiel") spoke with Patterson's parole officer; or

2) May 2003, when Castiel spoke with Ronald Patterson about it.

B. Ellipso knew of Patterson's financial interests in The Registry Solutions Company, ("TRSC"), from and after

1) June 2004, when Castiel admits he discussed it with Patterson; or

2) February 13, 2004, when the company was formed;

C.    Ellipso knew of Patterson's financial interest in Mann Technologies, LLC, ("MannTech") from and after

1) August 11, 2004, when Patterson executed a joint stock sale agreement on behalf of MannTech which was also signed by Castiel for Ellipso;

2) June 2004, when Castiel admits he discussed it with Patterson; or

3) February 25, 2004, when the company was formed and registered;

D. With the knowledge of the facts set forth in A, B, and C above, Ellipso reaffirmed the consulting contract of October 1, 2002 with Patterson in writing on April 27, 2004, and again on October 20, 2004.

E. With the knowledge of the facts set forth in A, B. and C above, Ellipso reaffirmed the December 15, 2003, agreement with TRSC by executing an amendment to that agreement on August 2, 2004.

F. With the knowledge of the facts set forth in A, B. and C above, Ellipso reaffirmed the January 30, 2004 Collateralized Loan Agreements with MannTech by executing an amendment thereto on August 2, 2004.

G. With the knowledge of the facts set forth in A, B, and C above, Ellipso continued to accept

   1) the benefits of Patterson's consulting services;

   2) the benefits of the TRSC contract; and

   3) the benefits of the MannTech contract.

H. With the knowledge of the facts set forth in A, B, and C above, Ellipso caused Paterson, MannTech, and TRSC to continue to expend time, money and resources in performance of their obligations pursuant to these respective contracts.

II. Defendant Patterson is entitled to judgment on the pleadings on Counts V, VI, and VII of the Complaint because the Complaint does not allege that Ellipso was defrauded on October 20, 2004, or April 27, 2004, when Ellipso reaffirmed the October 1, 2002, consulting contract with Patterson.

III. Defendant Patterson is entitled to judgment on the pleadings on Count XII of the Complaint because the Complaint does not allege that Ellipso was defrauded on August 2, 2004, when Ellipso reaffirmed the December 15, 2003 contract with TRSC.

IV. Defendant Patterson is entitled to judgment on the pleadings on Counts I, II, III, and IV of the Complaint because the Complaint does not allege that Ellipso was

defrauded on August 2, 2004, when Ellipso reaffirmed the January 30, 2004, Collateralized Stock Loan Agreement with MannTech, or in October 2004 when Ellipso exercised its right to forfeit the collateral and retain the loan proceeds.

V. On the undisputed fact that Ellipso had full knowledge of all material facts at the time it reaffirmed each of the contracts with Patterson, with TRSC, and with MannTech, Patterson is entitled to dismissal of all claims as a matter of law.

VI. On the undisputed fact that Ellipso reaffirmed the October 1, 2002, consulting contract with Patterson with full knowledge of all material facts, Patterson is entitled to a summary finding that the October 1, 2002, consulting contract is valid.

VII. On the undisputed fact that Ellipso reaffirmed the December 15, 2003, contract with TRSC with full knowledge of all material facts, Patterson is entitled to a summary finding that the December 15, 2003, TRSC/Ellipso contract is valid.

VIII. On the undisputed fact that Ellipso reaffirmed the January 30 2004, Collateralized Stock Loan Agreements with full knowledge of all material facts, Patterson is entitled to a summary finding that this agreement is valid.

IX. On the undisputed fact that Patterson delivered consulting services to Ellipso pursuant to the October 1, 2002 consulting contract, as amended, Patterson is entitled to a summary finding that Ellipso owes Patterson fees for those services.

Record on Motion

This motion is based on this document, the accompanying Statement of Undisputed Facts, on the accompanying Memorandum of Law, on the Affidavit of Robert B. Patterson and the exhibits attached to that affidavit, on the Certificate of Service, of all these materials that are attached to this document, on all the pleadings and papers on file

in this case, and on whatever responsive pleadings are filed hereto, and whatever evidence and argument may be allowed on a hearing on this matter.

WHEREFORE:

Defendant Patterson moves this Honorable Court to:

1. Dismiss the Complaint with prejudice insofar as it seeks relief from Patterson;

2. Find that the contract for services between Patterson and Ellipso of October 1, 2002, is valid;

3. Find that Ellipso is liable for payment to Patterson for services provided pursuant to the October 1, 2002, contract, as amended;

4. Find that the TRSC-Ellipso contract of December 15, 2003, as amended is valid; dismiss Count XII of the Complaint; and refer any disputes thereunder to arbitration;

5. Find that the MannTech-Ellipso Collateralized Stock Loan Agreements, of January 30, 2004, as amended are valid;

6. Grant such other relief as is just and proper.

Respectfully submitted,

Robert B. Patterson, *pro se*
1643 Hunting Creek Drive
Alexandria, Virginia 22314
571-278-7076

Certificate of Service

I certify that on the 21st day of November 2005, a true and correct copy of this Motion together with all attached documents was mailed first class, postage paid to – Thomas A. Mauro, Esq., 1020 Nineteenth St., N.W., Suite 400, Washington, D.C. 20036; and to – Mark S. Guberman, Esq., 1400 K St. N.W., Suite 1000, Washington, D.C. 20005.

Robert B. Patterson

# THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ELLIPSO, INC.**<br>**4410 Massachusetts Ave., Suite 385**<br>**Washington, D.C. 20016,**<br><br>    **Plaintiff,**<br><br>**v.**<br><br>**JOHN B. MANN, et al.**<br>**9330 Harts Mill Road**<br>**Warrenton, VA. 20186**<br><br>    **Defendants.** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **CASE NUMBER: 1:O5CV01186**<br><br>**JUDGE: Royce C. Lamberth** |

## MEMORANDUM OF POINTS AND AUTHORITIES

### IN SUPPORT OF

## MOTION TO DISMISS, OR FOR SUMMARY JUDGMENT, OR FOR JUDGMENT AS A MATTER OF LAW, OR FOR JUDGMENT ON THE PLEADINGS

*"May you be involved in a law suit in which you know you are right."*
*Old Gypsy curse.*

Defendant, Robert B. Patterson, ("Patterson"), appearing *pro se,* respectfully submits this Memorandum of Points and Authorities in support of his Motion to Dismiss, or for Summary Judgment, or For Judgment as a Matter of Law, or For Judgment on the Pleadings. Plaintiff has declined to acquiesce to the relief sought herein (exhibit 12, attached).

PRELIMINARY STATEMENT:

By this action Plaintiff, Ellipso, Inc. ("Ellipso") and its principle owner, David Castiel ("Castiel"), seek to avoid the obligations they accepted pursuant to three contracts. The

1

first is a consulting contract with defendant Patterson, pursuant to which Patterson provided services to Ellipso/Castiel for two years, and for which Patterson is owed in excess of two hundred fifty thousand dollars ($250,000.00) as well as substantial stock options in plaintiff's corporation(s).    The second contract is a margin stock loan transaction between Ellipso and defendant, Mann Technologies, LLC, ("MannTech"), pursuant to which MannTech loaned Ellipso ninety thousand dollars ($90,000,00), and on which debt Ellipso has never made a single payment. The third contract on which Ellipso seeks to avoid its obligations is an agreement to provide certain vanity telephone number services to defendant, The Registry Solutions Company, ("TRSC"), for which TRSC paid Ellipso another ninety thousand dollars ($90,000.00) and expended several times that amount to promote the vanity number service – a service which Ellipso has never provided. From the Complaint it appears that Ellipso seeks to rescind the MannTech loan agreement, and to be relieved of any obligation to pay Patterson, or to provide the vanity telephone services to TRSC. For the reasons set forth herein, each of Ellipso's claims should be dismissed.

Ellipso seeks to avoid its contractual obligations by asserting that it was defrauded by defendants because Patterson (and it is asserted the other defendants) concealed the fact that a) Patterson had a prior criminal conviction, and that b) when MannTech and TRSC were formed Patterson took a financial interest in each. Patterson has stipulated to both of these facts. Neither warrants the relief sought by Ellipso.

PATTERSON'S CRIMINAL PLEA HAS NO RELEVANCE HERE:

Patterson has stipulated that in 1999 he pled guilty to a single criminal count, and that he subsequently surrendered his bar licenses in Virginia and the District of Columbia.

None of these events have any relevance to the issues presented here. Both are matters of public record, and as such cannot sustain Castiel/Ellipso's claim of fraud. More directly, the Agreement for Services (Exhibit 1, hereto) specifies that Patterson was. "...to assist the Company in establishing beneficial business relationships with certain third parties, who may be interested in investing in...Ellipso...and...to assist the Company in developing its business strategy to protect Company's ...assets (the "Strategy")." The Agreement for Services is not a contract for legal services or for legal representation as asserted by Castiel/Ellipso. It is a standard finder's fee agreement which Castiel had on his laptop and utilized when appropriate with Patterson and other consultants. (Patterson afdv. @ 14, 15 )

But disposition of Castiel/Ellipso's claims of fraud does not turn on abstract principles of law, nor on parsing the nuances of the contractual language; Castiel/Ellipso had direct knowledge of Patterson's plea and Patterson's bar status. Picking their words carefully, Castiel/Ellipso state that, "At no time prior to the execution of the Agreement for Services did Patterson disclose to Ellipso that he had been incarcerated ... and disbarred...." (Complaint ¶ 9). Patterson affirmatively states that he did inform Castiel of these facts prior to October 1, 2002 (Patterson afdvt. @ 10). Curiously, Castiel/Ellipso never state when or how they learned of these events. The reason for their obfuscation is obvious. The truth destroys their case.

On April 11, 2004, Senior Probation Officer Cynthia Sutter, United States District Court for the Eastern District of Virginia, spoke to Castiel by telephone to verify Patterson's employment. On that date Castiel already knew of Patterson's status. (Patterson afdvt. @ 60). How much earlier Castiel knew is addressed *infra.* Castiel's

3

response to this telephone conversation was not that of a man who thought he had been defrauded. Instead, two weeks later on April 27, 2004, with knowledge of Patterson's status, Castiel wrote to Patterson stating, "This is to confirm the terms and status of our arrangement memorialized on 1 October, 2002 and amended on 9 February, 2003." After detailing amounts owed for past services, Castiel continues, "Ellipso agrees to maintain this current arrangement until May 31, 2004, at which time it expects to pay all deferred compensation, and pay bonuses for deferred compensation...." (Patterson afdvt. @ 65, and exhibit 5, attached). Patterson counter signed this agreement.

Relying on these contractual commitments Patterson continued to devote the majority of his professional time to Ellipso's affairs (Patterson Afdvt. @ 65, 66, 67, 68). Ellipso did not pay the amounts agreed on May 31, 2004, but Ellipso did continue to make some payments to Patterson for his services through October 2004 (Patterson afdvt. @. 66, exhibit 5, attached).

On October 20, 2004, Castiel again wrote to Patterson, by e-mail, concerning Patterson's service contract with Ellipso. After re-confirming the April 27, 2004 agreement, Castiel addresses the post May 31, 2004, services performed by Patterson for Ellipso, "...although we never defined any arrangement after May 31, 2004, Ellipso is prepared to compensate you for your efforts in the intervening period." Castiel acknowledges that "...the benefit of your activities flows to Ellipso...." The amounts owed would "...be paid as soon as funds are generated." Castiel concludes by stating, "I expect this to happen in the next several months." (Patterson afdvt. @ 73, and exhibit 9, attached). Castiel/Ellipso had full knowledge of Patterson's status on October 20, 2004, when this e-mail was sent to Patterson. Patterson relied on these representations and

commitments of Castiel/Ellipso in continuing to provide services to Ellipso (Patterson afdvt. @ 73 ).

Thus in at least two writings, Castiel/Ellipso re-affirmed the contracts for services with Patterson, with knowledge of his conviction and bar status. Having re-affirmed the agreements with this knowledge, and having accepted the benefits of Patterson's services Castiel/Ellipso cannot now claim to have been defrauded thereby. (Simon v. Rossier, 127 A.2d 394 (1956); Sanche v. Electrolibration Co., 4 App. D.C. 453, (1894); Goldman v. Bequai, 19 F.3d 666, 305 U.S.App.D.C. 227, suggestion for rehearing denied (1994); see, Clark v. Harmer, 9 App.D.C. 1 (1896)). Moreover, Patterson is entitled to enforce the agreements with Ellipso due to his detrimental reliance on Ellipso's contractual commitments. (Simon, supra; Sanche, supra.) Both of these tenets date to the very origins of the common law, and there is no good faith basis upon which to urge their reversal here. The written agreement of October 1, 2002; as amended February 9, 2003; as re-affirmed and modified on April 27, 2004; and as amended October 20, 2004; constitute a valid enforceable contract. Ellipso is contractually obligated to pay Patterson the agreed compensation. Ellipso's allegations of fraud pertaining to the consulting contracts must be dismissed.

The April 11, 2004, telephone conversation established that, at that time, Castiel/Ellipso already knew of Patterson' status. But how much prior to April 11, 2004, were Castiel/Ellipso informed? Placing this in context, between October 1, 2002, the date of the initial consulting contract, and April 30, 2003, Patterson worked virtually full time, every day, at Ellipso's corporate headquarters on the eighth floor at 1133 21st St., N.W., Washington, D.C.    At that time there were only five people in the Ellipso

corporate offices – Castiel, Lori Blakley (Corporate Secretary), James Murphy (Acting General Counsel), Ambassador Gerald Helman (VP Regulatory Affairs), and Patterson (Consultant). On most days Castiel and Patterson rode to work together. Castiel and Patterson had lunch together almost every day, and spent several additional hours each day working together. On April 30, 2003, Patterson disappeared for six months. Patterson's whereabouts were not a mystery. In May 2003, everyone in the Ellipso corporate offices learned of Patterson's incarceration (Patterson afdvt. @ 31, 32, 33). Patterson's brother, Ronald Patterson, an attorney, contacted Castiel and asked if Castiel would testify, or write a letter, supporting his brother. Castiel declined to do either (Patterson afdvt. @ 34). Castiel/Ellipso knew of Patterson's plea and bar status at least six months prior to either the TRSC or MannTech agreements. Patterson's plea and bar status is simply not relevant to any issues pertaining to any of the three contracts here; except perhaps as it reflects on Castiel/Ellipso's credibility.

Castiel/Ellipso's allegations, that Patterson misrepresented his expertise in telecommunications and finances (Complaint ¶¶ 70, 71), are equally un-credible. The Agreement for Services was drafted by Castiel from a standard consulting/finder's fee contract which Castiel had on his laptop computer. That language was drafted by Castiel and appears in all of Ellipso's standard consulting contracts (Patterson afdvt. @ 14, 15). In any event, Castiel apparently had no complaints concerning Patterson's expertise when he wrote the October 20, 2004 e-mail praising the benefits of Patterson's work. Count VI –Fraudulent Inducement Against Robert Patterson and Consulting Management, Ltd., should be dismissed in its entirety.

Likewise, Castiel/Ellipso's allegations that, "Patterson made no efforts to locate funding sources outside of ...Mann Tech..." (Complaint ¶ 65) is belied by their introduction of the financing proposal from Argyle. Count V – Breach of Contract Against Consulting Management, Ltd. and Robert Patterson, should be dismissed in its entirety.

PATTERSON INFORMED CASTIEL OF HIS INTENT TO SEEK INTERESTS IN TRSC AND MANNTECH:

When the TRSC/Ellipso agreement was executed on December 15, 2003, TRSC had not yet been incorporated.   Likewise, when the MannTech/Ellipso Agreement was executed on January 30, 2004, MannTech had not been incorporated.  Patterson had no interest in either entity to disclose.  Patterson did inform Castiel that if a) a suitable agreement were reached between Ellipso and Mann (the individual) concerning the registry functions for the 881 vanity telephone service, and b) Mann formed a company to perform those functions, and c) Mann were agreeable, then d) Patterson intended to seek a participating interest in that company (Patterson afdvt. @ 42).  Likewise Patterson informed Castiel that if a) Ellipso and Mann reached an agreement on the ICOHA stock margin loan, and b) Mann formed a company to effectuate that loan transaction, and c) Mann were agreeable, then d) Patterson intended to seek a participating interest in that company (Patterson afdvt. @ 42).

It has long been held that a promise to perform a future act will not sustain a claim of fraud absent proof that, at the time of the promise, the maker had no intention of performing the future act. (see, Baker v. Baker, 296 F. 961, 54 App.D.C. 214 (1924)) Here, Patterson had the hope of participating in Mann's companies at some future time,

but only if Mann agreed. At the same time Patterson had representations from Castiel that Patterson would have an equity participation in Ellipso's future. Patterson, of course, hoped this would be a significant participation. Claims of fraud cannot rest on the mere possibilities of realizing future hopes. Would Castiel/Ellipso still claim fraud if Mann had not been agreeable to granting Patterson an interest in TRSC or MannTech? Would it be fraud?

Of course, when these public companies were formed, Patterson's participation therein became a matter of public record. Fraud cannot rest on matters that are public record. As a matter of law, Patterson could not have committed fraud here as there was never any legally recognized interest to disclose. Count VII – Breach of Fiduciary Duties Against Consulting Management, Ltd. and Robert Patterson, should be dismissed.

This memorandum will now address the other counts in the Complaint pertaining to TRSC and MannTech as these claims are an integral part of the claims against Patterson.

THE BREACH OF CONTRACT CLAIM AGAINST TRSC SHOULD BE DISMISSED:

In Count XII – Breach of Contract Against Registry (Complaint ¶¶ 100-104), Castiel/Ellipso ask this Court to relieve Ellipso of fulfilling any of its obligations to TRSC, asserting that TRSC has breached the agreement. Two breaches by TRSC are alleged. First, that TRSC failed to make certain payments pursuant to the TRSC/Ellipso agreement(s); and second, that Patterson failed to disclose that he was an affiliate of TRSC. Neither has merit.

In the October 20, 2004, e-mail to Patterson concerning Patterson's consulting contract(s), discussed *supra.*, Castiel writes,

> "2) My understanding was that you were 'covered' as you indicated to me
> starting in June through a variety of sources, including…TRSC/Mann

8

> Tech (of which you are a substantial holder…) …In fact, in addition to
> assisting Ellipso, you have been actively involved with TRSC/Mann
> Tech for businesses unrelated to Ellipso or 881." (exhibit 9, attached).

Again, Castiel's reaction was not that of a man who thought he had been defrauded. He does not abrogate the TRSC/Ellipso agreement because Patterson is an affiliate of TRSC. Instead, he uses Patterson's interest in TRSC to attempt to renegotiate Patterson's compensation arrangements with Ellipso, pleading that, "…although…Ellipso is prepared to compensate you for your efforts…I believe it is only fair that the burden be shared with your other employers/businesses as anticipated earlier." (Exhibit 9, attached). The phrase, "as anticipated earlier" refers to the June conversation previously referenced in the e-mail (Patterson afdvt. @ 73).

After the October 20, 2004 e-mail, Castiel continued with the TRSC contact without interruption. Two of Castiel's e-mails are illustrative. On November 22, 2004, Castiel writes to John Mann, ("Mann"), an owner of TRSC and a defendant here, with copies to Patterson and Jeff Guzy, a TRSC consultant, stating, "Hello everybody. I talked to Oscar last week after our meeting." (Patterson afdvt. @ 76, and exhibit 10, attached). The "our meeting" refers to a meeting with Patterson, Mann, Guzy and other TRSC consultants, which was held at 7787 Leesburg Pike, Falls Church, Virginia, the offices of TRSC's consultants (Patterson afdvt. @ 76). In the November 22, 2004 e-mail, Castiel proceeds to make a report on the progress and problems encountered by Ellipso in attempting to initiate the 881 vanity services, including a paragraph "5. Concerning the Registry…" in which Castiel specifically addresses the role of TRSC in the service implementation. (exhibit 10, attached). Oscar is the contact at the Dutch telephone company, KPN, with whom Castiel had been dealing.

9

On December 9, 2004, in response to numerous e-mails from Mann concerning Ellipso's failure to provide the 881 vanity service required by the TRSC/Ellipso contract, Castiel writes, "Please do not make unfair comments about Ellipso's ability to provide a service. We are doing fine and will be able to start Vanity service... I will know more next week..." (Patterson afdvt. @ 76, and exhibit 11, attached). Thus with full knowledge of Patterson's interests in TRSC, Castiel/Ellipso continued the relationship with TRSC as "business as usual."

By their conduct, Castiel/Ellipso have re-affirmed the TRSC/Ellipso agreement, with full knowledge of Patterson's interests in TRSC. Having knowingly re-affirmed the agreement, Castiel/Ellipso cannot now assert fraud (Simon, supra.; Sanche, supra.; Clark, supra.; Dean v. Garland, 779 A.2d 911 (2001);). Moreover, with knowledge of Patterson's interests in TRSC, Castiel/Ellipso induced TRSC to continue to expend resources in furtherance of the agreement. One who induces detrimental reliance on a contract with knowledge of an alleged fraud, cannot thereafter plead that fraud as a defense to enforcement of the contract. (In re National Student Marketing Litigation, 445 F.Supp 157, affirmed Lipsig v. National Student Marketing Corp, 663 F.2d 178, 214 U.S.App.D.C. (1978); First Nat. Bank & Trust Co. in Macon v. American Sec. & Trust Co. 437 F.Supp. 771 (1977)).

But as the October 20, 2004, e-mail shows, Castiel/Ellipso knew of Patterson's interest in TRSC at least as early as June 2004. Thereafter, on August 2, 2004, Castiel/Ellipso executed an amendment to the December 15, 2003 TRSC/Ellipso Agreement. After detailing several amendments to the December 15, 2003 Agreement, the parties agree that, "All other terms remain in force." (exhibit 8, attached). Thus on

August 2, 2004, with knowledge of Patterson's interests in TRSC, Castiel/Ellipso re-affirmed the agreement. Castiel/Ellipso are barred from now belatedly pleading that they were thereby defrauded. (Simon, supra; Sanche, supra.). The Complaint is devoid of any assertion that Castiel/Ellipso were somehow defrauded into executing the August 2, amendment. The pleading fails to state a claim.

But Castiel's knowledge of Patterson's interest in TRSC predated June of 2004. Commencing in February 2004 and continuing through November 2004, there were a series of almost weekly meetings attended by Castiel, at which Castiel introduced Patterson as one of the owners of TRSC. These meetings were with telecom executives, investors, consultants, suppliers and others (Patterson afdvt. @ 59).

The second breach alleged by the Complaint is that TRSC "...failed to make several required payments...and never provided the additional funding...it had contractually promised." (Complaint ¶ 102). However, the August 2, 2004 Amendment to the TRSC/Ellipso Agreement of December 15, 2003, specifies,

> Now Therefore, the Parties agree as follows:
>
> 1. The March 30, 2004 Amendment is hereby abrogated and annulled by all parties.
> ..........
>     A. The royalty fee of $12,500 shall be permanently waived upon the execution of this Amendment and the payment of $15,000 at execution of the Amendment. (exhibit 8, attached).

The additional funding had been promised in the March 30, 2004 amendment which was abrogated and annulled by all parties, including Castiel/Ellipso. (see, March 30, 2004, amendment attached to the Complaint.) The required royalty payments were permanently waived upon execution of the August 2, 2004, amendment, which Castiel

11

executed.    Count XII—Breach of Contract Against Registry, should be dismissed as the

defendants are entitled to judgment on the pleadings.

But there is an even more compelling basis for dismissal of the Complaint against

TRSC. The Complaint simply fails to state a cause of action. Nowhere does Ellipso

assert that it fulfilled its contractual obligations to TRSC. Ellipso simply seeks to be

relieved of its obligations to TRSC, which is an admission that it has not met its

obligations. The truth is that Ellipso has never provided the 881 Vanity telephone service

upon which the TRSC/Ellipso agreement is based (Patterson afdvt. @ 78), Castiel admits

that no service had been provided as of December 9, 2004, (exhibit 11, attached); and

none has been provided to date. Ellipso has never submitted a single number to TRSC for

registration. TRSC has simply paid Ellipso ninety thousand dollars ($90,000.00) for

nothing (Patterson afdvt. @ 78). The only service which Ellipso has initiated is a limited

audio-text service, telephone sex talk, which is available in Holland and a few other

locations in Western Europe. The August 2, 2004, Amendment to the TRSC/Ellipso

Agreement at Paragraph 2. B, obligates Ellipso to pay to TRSC a portion of the revenues

from that audio-text service (exhibit 8, attached). To date no payments have been made

by Ellipso to TRSC pursuant to that service (Patterson afdvt. @ 79). Count XII against

TRSC should be dismissed for failure to state a claim upon which relief can be granted.

A final basis for dismissal of the Complaint against TRSC is that the parties to that

agreement specified that, "...any disputes concerning this agreement shall be submitted

to binding arbitration..." (exhibit 3, attached). The pending motion by TRSC seeking to

enforce that provision should be granted.

COUNTS I, II, III AND IV OF THE COMPLAINT SHOULD BE DISMISSED AS TO

DEFENDANT PATTERSON:

Counts I through IV of the Complaint allege claims of fraudulent inducement based,

again, on an asserted non-disclosure of Patterson's financial dealings with MannTech.

As discussed *supra.*, Patterson had no interest in MannTech prior to execution of the

stock loan agreement on January 30, 2004, as MannTech had not been formed. Patterson

did disclose to Castiel his hope of participating in the company (Patterson afdvt. @ 42).

But even if Patterson held some undisclosed interests on January 30, 2004, such interest

became public knowledge on February 24, 2004, when the company was registered in

Nevada.

But here too, resolution of the issue does not turn on abstract legalities or conflicting

assertions concerning who said what to whom. Castiel/Ellipso, by their own admissions,

had direct knowledge of Patterson's ownership interests in MannTech. The October 20,

2004, e-mail from Castiel, discussed previously, shows that Castiel knew of Patterson's

interest in MannTech at least as early as June 2004 (exhibit 9, attached). Thereafter, on

August 2, 2004, Castiel/Ellipso executed an Amendment to the Collateralized Loan

Agreement (Patterson afdvt. @ 72, and exhibit 8, attached). After agreeing to a formula

for liquidation of the ICOHA shares, the Amendment specifies,

> "7) As of October 1st, 2004 all shares not sold shall be subject to the terms of the
> Original...Loan Agreement." (exhibit 8, attached).

Castiel/Ellipso thus re-affirmed the original stock loan agreement with knowledge of

Patterson's interest in MannTech, and cannot now claim they were defrauded thereby.

(citations). Any doubt that Castiel/Ellipso knew Patterson was an owner of MannTech is

dispelled by an August 11, 2004, Joint Sale Order for the ICOHA stock signed by Castiel

for Ellipso and Patterson for MannTech (Patterson afdvt. @ 70, and exhibit 7, attached). Castiel had knowledge of Patterson's interests when he executed that Joint Sale Order. Thereafter, Castiel/Ellipso received their share of the proceeds from the sale of 25,000 shares of ICOHA stock pursuant to the August 2, 2004, Amendment to the Collateralized Stock Loan Agreement (Patterson afdvt. @ 71). Having accepted the benefits of the agreements, with knowledge of Patterson's interests in MannTech, Castiel/Ellipso cannot plead fraud as a basis for rescission of those agreements. (see, U.S. ex rel. Siewick v. Jamieson Science and Engineering, Inc. 214 F.2d 1372, 341 U.S.App.D.C. 459 (2000).

Moreover, the Complaint is devoid of any assertion that Castiel/Ellipso were defrauded in to executing the August 2, 2004 amendment to the MannTech agreement. The pleading fails to state a claim.

The relief sought by the Complaint is rescission of the Collateralized Loan Agreements. This relief cannot be granted as Castiel/Ellipso have defaulted on the agreements by failing to make even a single payment on the loan (Patterson afdvt. @ 77 ). A party who defaults on his contractual obligations is not entitled to rescission of the contract. (citations). Here Castiel/Ellipso also accepted the benefits of the contract, including keeping the $90,000.00, thus precluding recission. (See, In re International Loan Network, Inc. 160 B.R.1 (1993)). As the Complaint is devoid of any assertions that Ellipso met its contractual obligations, it fails to state a claim upon which relief can be granted. Defendant Patterson is entitled to judgment on the pleadings.

Ellipso's losses are self-inflicted. The loan payments pursuant to the Collateralized Loan Agreement were approximately five hundred dollars ($500.00) per quarter (Patterson afdvt. @ 61, 62, and exhibit 4, attached). Ellipso disregarded its obligation to

14

make payments on the loan. Moreover, in the event Ellipso chose not to repay the loan, it could simply walk away from the transaction, forfeiting the collateral as this was a non-recourse loan. (see, exhibit 4). In October 2004, the ICOHA shares became essentially worthless, falling to two cents per share on very limited volume. Entreaties from MannTech to meet with Castiel/Ellipso to discuss repayment of the loan were refused. When asked about repayment of the loan, Castiel told Patterson that he never wanted to speak to either Patterson or Mann about it again (Patterson afdvt. @ 74, 75). At that point Castiel certainly was not seeking rescission of the loan agreement. Castiel/Ellipso had essentially sold MannTech worthless stock for $90,000.00. [MannTech had been unable to protect its interests by liquidating a portion of the ICOHA shares, because, despite repeated requests, Castiel/Ellipso had failed for eight months to provide the documentation required by the loan agreements (Patterson afdvt. @ 63, 64)].

Counts I through IV of the Complaint make two other allegations. First, that notice of default was required, and second, that Ellipso merely had to pledge the stock, not transfer title. Both are specious. The Collateralized Loan Agreement provides,

   7.2  Rights. Upon occurrence of an Event of Default, the Note, together with any accrued and unpaid interest thereon, shall be immediately due and payable without notice or demand, presentment, or protest, all of which are hereby expressly waived.

   At any time after the date first above written, Lender shall thereupon have the rights, benefits, and remedies afforded to it under any of the Loan Documents with respect to the collateral and may take, use, sell or otherwise encumber or dispose of the Collateral as if it were the lenders own property....(exhibit 4, attached).

Notice is expressly waived. Moreover, since the lender was entitled to treat the collateral "...as if it were the lenders own property..." from and after the date of the agreement, what notice could be given, and when. [Margin stock loans only work if the lender can

immediately liquidate enough stock to cover its down-side risk.] Castiel fully understood this, as he had already executed stock transfer documents in January 2004, for the Argyle loan, before Argyle backed out of the transaction (Patterson afdvt. @ 49, 50).

Counts I through IV of the Complaint should be dismissed as to defendant Patterson.

THE EQUITIES:

In the business dealings between Castiel/Ellipso and the defendants, Castiel/Ellipso failed to perform any of its contractual obligations. Ellipso failed to repay the stock loan or the interest thereon. Ellipso failed to provide the 881 Vanity telephone service. Ellipso failed to pay Patterson for his services. Ellipso failed to provide the required stock transfer documentation. Ellipso failed to pay TRSC its share of the revenues from the audio-text service. The investments which the defendants have made in Castiel/Ellipso far exceed any moneys recovered from the sale of the ICOHA stock. Castiel/Ellipso have directly received almost two hundred thousand dollars ($200,000.00) from TRSC and MannTech. Castiel/Ellipso have received in excess of two hundred fifty thousand dollars ($250,000.00) in services from Patterson, for which they have not paid. TRSC has expended hundreds of thousands of dollars more in promoting Ellipso's non-existent 881 Vanity telephone service. It is Castiel/Ellipso that have benefited from the business relationships with defendants. The scales of equity do not tip in Ellipso's favor.

CONCLUSION AND REQUESTED RELIEF:

For the reasons set forth herein defendant Patterson asks this Honorable Court to:

dismiss the Complaint with prejudice insofar as it seeks any relief from Patterson;

find that the contract for services between Patterson and Ellipso is valid;

find that Ellipso is liable to Patterson for payment for services performed pursuant the contract between them;

find that the TRSC-Ellipso contract as amended is valid;

dismiss Count XII against TRSC and refer that matter to arbitration;

find that the Ellipso-MannTech stock loan agreement as amended is valid;

grant such other relief as is just and proper.

Respectfully submitted,

Robert B. Patterson, *pro se*
1643 Hunting Creek Drive
Alexandria, Virginia 22314
(571) 278-7076

17

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ELLIPSO, INC.**<br>**4410 Massachusetts Ave., Suite 385**<br>**Washington, D.C. 20016,**<br><br>      **Plaintiff,**<br><br>**v.**<br><br>**JOHN B. MANN, et al.**<br>**9330 Harts Mill Road**<br>**Warrenton, VA. 20186**<br><br>      **Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

           **CASE NUMBER: 1:O5CV01186**

           **JUDGE: Royce C. Lamberth**

## STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant Robert B. Patterson lists the following undisputed facts in support of his Motion for Summary Judgment, each of which is contained in his affidavit filed herewith:

1. Patterson has known David Castiel ("Castiel") since approximately December 2001.

2. Castiel is the principle owner of Ellipso, Inc., (Ellipso), a Delaware company that raised approximately one hundred million dollars ($100,000,000.00) in an unsuccessful attempt to launch a satellite telecommunications system.

3. Ellipso has never returned any monies to its investors.

4. Ellipso currently has only one full time employee, Castiel, and its corporate office is a post office box.

5. On October 1, 2002, Patterson executed a contract to provide consulting services to Ellipso. A true and correct copy of that contract is attached as Exhibit 1.

1

6. That consulting contract was amended on February 9, 2003, and a true and correct copy of that amendment is attached as Exhibit 2.

7. In 1999 Patterson pled guilty to a single criminal count of theft of government property for cashing his mother-in-law's pension checks following her death. As a consequence of this plea, he surrendered his bar license in Virginia and the District of Columbia.

8. Patterson's principle function for Ellipso was to raise funds for Ellipso. To this end he introduced Ellipso to a number of potential investors, lenders, stock brokers, and consultants. He also contacted scores of potential funding sources, most of whom had no interest in Ellipso due to Ellipso's litigation problems, and/or its business prospects.

9. Patterson had been involved in business finance for more than ten (10) years; mostly dealing in financing for distressed businesses or litigation finance. Patterson contacted many of his prior sources on behalf of Ellipso.

10. Patterson had experience in the aerospace industry having represented MacDonnell Douglas for almost ten years as a partner in the law firm of Bryan, Cave.

11. The October 1, 2002, consulting contract was drafted by Castiel, utilizing a standard finder's fee agreement which he had on his laptop, and which Castiel used with numerous consultants. Patterson utilized it himself later for other consultants.

2

12. The language in the consulting contract pertaining to telecommunications experience was standard language which was contained in the boiler plate of the contract on Castiel's laptop.

13. The other consulting service that Patterson was to provide pursuant to the October 1, 2002, contract was to advise Ellipso on means of controlling its litigation costs. At that time Ellipso was engaged in more than a dozen cases with investors, suppliers, former employees, and directors; and was incurring tens of thousands of dollars a month in attorney's fees and costs.

14. The language in the October 1, 2002, consulting contract was carefully drafted to define Patterson's services as developing a "Strategy" (capital "S", a term of art) for controlling Ellipso's litigation costs while protecting its assets. That language was drafted jointly by Castiel and by Patterson.

15. The October 1, 2002, consulting contract was not for legal representation of Ellipso.

16. Patterson's experience in controlling litigation costs came from two decades as a corporate and lawfirm litigator, involving both large cases and large case loads.

17. While the October 1, 2002, consulting contract specified monthly payments, the practice was that Patterson would only be paid by Ellipso when he asked for payment, with the other unpaid amounts accrued. Patterson submitted monthly invoices to Ellipso for services, showing amounts paid and amounts accrued.

3

18. All amounts accrued were to be doubled when paid. This was a standard policy which Castiel and Ellipso instituted with employees and consultants who were willing to provide service on a deferred compensation basis.

19. In approximately February 2003, Patterson was approached by a Canadian company that was interested in implementing telephone services utilizing the 881-2 and 881-3 country codes, which Ellipso had been granted by the International Telecommunications Union in Geneva. Patterson worked with Castiel and Ambassador Gerald Helman (Ellipso's VP, Regulatory Affairs) in developing this business opportunity.

20. Patterson has known John Mann ("Mann") socially for more than twenty years through their children, who are the same age. Patterson had only seen Mann sporadically over the past ten years; perhaps once a year.

21. Mann and Patterson had never been business associates prior to February 2004.

22. Mann had been involved during his career with technology companies such as MCI and Network Solutions.

23. In approximately March of 2003, Patterson introduced Mann to Castiel, as well as to Ambassador Gerald Helman, (Ellipso's VP for Regulatory Affairs). Patterson introduced Mann as a long time acquaintance. There was a luncheon meeting at the Red Tomato restaurant; and at least one follow-up meeting between Castiel and Mann.

24. Castiel approached Mann about joining Ellipso as a company officer, or as an investor, or as a consultant on a finder's fee agreement such as that with Patterson. Castiel described to Mann in great detail Ellipso's business,

4

financial, and litigation situation, including providing corporate documents to Mann. Mann declined at that time to become involved with Ellipso.

25. During the spring of 2003, Patterson identified a brokerage firm in New York that agreed to attempt to market the ICOHA stock which Ellipso held. Castiel negotiated a contract with them for this effort which involved the brokerage house receiving some ICOHA shares as compensation.

26. During the spring of 2003, Patterson introduced Castiel to his law school friend, Senator Larry Pressler, of South Dakota, former chairman of the Senate Telecommunications Sub-Committee. Castiel approached him about becoming an Ellipso board member, but he declined as Ellipso had no D&O insurance.

27. During the spring of 2003, Patterson introduced Castiel to a long time aid of Senator John Warner's, who operated a consulting and lobbying business, to assist in marketing Ellipso's satellite technology to the DOD. He declined to assist Ellipso when Castiel refused to sign a retainer agreement.

28. Between October 1, 2002, and April 30, 2003, Patterson worked at Ellipso's corporate headquarters on 21st Street in Washington, D.C. on a daily basis. On many occasions Castiel and Patterson would ride to work together. They had lunch together on most days and spent several additional hours working together almost daily.

29. At that time there were five people in the Ellipso executive office – Castiel, Laury Blakley (Corporate Secretary), James Bailey (Acting General Counsel), Ambassador Gerald Helman (VP Regulatory Affairs), and Patterson, whose office was next to Castiel's.

30. On April 30, 2003, Patterson was incarcerated for a probation violation stemming from his prior criminal plea. In May 2003, everyone in the Ellipso executive offices learned of Patterson's status.

31. In May 2003, Ronald Patterson, contacted Castiel and to ask him to come to court, or write a letter on his brother's behalf. Castiel declined to do either.

32. Mann did not know of Patterson's conviction until August 2005, when the instant suit was served on him.

33. In June 2003, Ellipso surrendered its corporate offices, placed its corporate records in storage, and has since been operating from the post office box.

34. On approximately November 1, 2003, Patterson resumed his consulting work for Ellipso; now working from home. Castiel and Patterson agreed that the consulting contract was to be on the same terms as previously agreed.

35. Castiel was working on four projects. First, he was still trying to control the Ellipso litigations which had expanded to the Southern District of New York. Second, he was trying to implement the 881 telephone services through the Canadian company and the Dutch telephone company KPN. Third, Castiel was trying to sell Ellipso, or the technology, to an off-shore investor group. Fourth, he was trying to raise capital for Ellipso.

36. On Castiel's urging, in November 2003, Patterson again approached Mann about investing in Ellipso.

37. Castiel and Patterson discussed a possible transaction to accomplish two objectives – first to raise operating capital for Ellipso, and second to further the 881 telephone business. Ellipso needed operating capital primarily to pay

Castiel's salary as the company had few expenses other than the storage and post office box rents. The legal fees were all being deferred.

38. The proposal which Castiel and Patterson jointly developed was to approach Mann about buying some of the ICOHA shares from Ellipso; and concomitantly to approach Mann about providing a "registry" service for the 881 numbers. Mann's background with Network Solutions seemed directly applicable to this registry function.

39. Sometime around Thanksgiving 2003, Patterson arranged a meeting between Castiel and Mann at Mann's home outside Warrenton, Virginia. During the ride to Warrenton, Castiel and Patterson discussed Patterson's hope to participate with Mann in the prospective new venture. Castiel said he was pleased by this as he thought their good working relationship would assist with the new venture.

40. At the meeting, which lasted several hours, Castiel and Mann discussed, and negotiated the particulars of the proposed transactions. The deal that was discussed between Castiel and Mann was that Mann would set up a new company to purchase twenty-five thousand dollars ($25,000.00) of ICOHA shares each month, for ten months, for a total of two hundred fifty thousand dollars ($250,000.00). The ICOHA shares were trading at approximately sixty cents per share ($0.60), and Castiel offered to sell them to Mann at fifty cents per share ($0.50).

41. In the discussion between Castiel and Mann concerning the 881 registry, the deal being negotiated was that Mann would again set up a new company, which

7

would then enter a contract with Ellipso. The new company would pay Ellipso a monthly royalty for the right to provide the registry service for the new 881 telephone numbers. Once the service started, the new company would charge a fee for these services, and remit a percentage of the profits back to Ellipso. The new company would pay Ellipso a specified royalty amount per month prior to start of the service.

42. It was a cordial meeting, and it was agreed to meet for further discussions once some of the documents were prepared. Castiel and Patterson jointly prepared the proposed contracts.

43. Sometime in December 2003, there was a second meeting attended by Castiel, Mann and Patterson at the Rail Stop restaurant in The Plains, Virginia. Again Mann and Castiel discussed the particulars of the proposed transactions between them.

44. Patterson continued to seek other sources of funding for Ellipso, and around mid December 2003, located an investment company, Argyle Investments, that indicated a willingness to make Ellipso a margin loan against the ICOHA stock. Patterson informed Castiel of this, who stated that he was pleased as he preferred to borrow against the stock rather than sell it.

45. Argyle sent Patterson a term sheet, which he sent on to Castiel. Castiel agreed to the terms, and Argyle sent a set of its standard margin stock loan documents, which Patterson again immediately sent on the Castiel. As these were standard documents for Argyle, it was clear that there was little or no possibility of

renegotiating their terms. Castiel never stated any objection to the terms of the Argyle loan.

46. At this point, Castiel began to deal directly with Argyle, but sent Patterson copies of all the documents.

47. One of the documents which Castiel sent to Patterson was a copy of an executed stock transfer of the ICOHA shares from Ellipso to Argyle's transfer agent. From this document, and from his statements, there is no doubt that Castiel understood that the margin stock loan from Argyle required that ownership in the ICOHA shares be transferred to Argyle.

48. The agreement between Castiel and Mann concerning the registry for the 881 service was executed on December 15, 2003. A true and correct copy of that agreement is attached as Exhibit 3. The new company, The Registry Solutions Company ("TRSC") began making royalty payments to Ellipso pursuant to that agreement.

49. On or about January 15, 2004, Argyle backed out of the stock margin loan to Ellipso.

50. On Castiel's urging, Patterson approached Mann about assuming Argyle's place as lender in the stock margin loan transaction.

51. Castiel suggested that the amount of the loan could be increased by increasing the number of shares involved from the 250,000 in the Argyle proposal, to 492,611, the number on one of the certificates which Ellipso held. Castiel also wanted to increase the margin from 35% to 40%, which would also increase the

amount received by Ellipso.  Both of these changes were incorporated in the proposal which Patterson conveyed to Mann on Castiel's behalf.

52. The final loan documents were prepared by Castiel, as Patterson was unable to down load the Argyle documents for revision on his computer.  Castiel had Jack Anderson (Ellipso rocket scientist) assist him in down loading the Argyle documents, as they were encoded somehow.

53. The Collateralized Loan Agreement documents, prepared by Castiel, were executed on January 30, 2004.  The ICOHA stock certificate for 492,611 shares, together with a letter directing that the shares be placed in the name of Mann Technologies, L.L.C., ("MannTech"), was delivered to Patterson by Castiel at that time.  A true and correct copy of the Collateralized Loan Agreement documents is attached as Exhibit 4.

54. In early February Patterson spoke to Mann about acquiring an equity interest in both MannTech and TRSC.  He agreed to granting Patterson an interest in each.

55. TRSC was incorporated on February 13, 2004.  MannTech was incorporated on February 25, 2004.

56. Commencing in February 2004, there were almost weekly meetings pertaining to development of the 881 telephone services.  These meetings were with telecommunications executives, consultants, suppliers, investors and others.  At these meetings Castiel introduced Patterson as the owner of the registry services company.  Castiel made these statements to at least twenty people over the course of the next several months.

57. On April 11, 2004, Senior Probation Officer Cynthia Sutter, United States District Court for the Eastern District of Virginia, spoke to Castiel to verify Pastterson's employment by Ellipso. Patterson had previously told Castiel that she would be calling.

58. On April 15, 2004, Castiel failed to make the payment required on the stock loan, of approximately five hundred dollars ($500.00).

59. Ellipso has never made any payments on the loan, nor has Ellipso ever offered to repay the loan.

60. On April 15, 2004, the stock loan agreements were amended to allow for the sale of 92,611 shares of the ICOHA stock, with the proceeds to be divided between Ellipso and MannTech. The stock was never sold pursuant to that amendment as Ellipso did not provide the requisite documentation to enable MannTech to sell the shares.

61. Ellipso did not provide the requisite documentation to enable MannTech to sell the ICOHA shares until September 2004.

62. On April 27, 2004, Castiel wrote to Pastterson confirming the contractual arrangements of Patterson's consulting contract. Patterson counter signed that agreement. A true and correct copy of that agreement is attached as Exhibit 5.

63. Ellipso never paid Patterson the amounts specified by the April 27, 2004, agreement, but did continue to make payments on Patterson's invoices until October 2004.

64. In June 2004, Castiel and Patterson had a conversation at the Potomak Landing restaurant in Alexandria, Virginia. Castiel told Patterson that Ellipso would not

be able to pay Patterson the fees owed, as the plans to sell the Ellipso technology to the off-shore investor had not materialized. Castiel asked Patterson to continue providing services to Ellipso. Patterson agreed do so, and to defer almost all of his compensation as Patterson's financial requirements were covered by income from other sources, including MannTech and TRSC. Castiel was not surprised by this.

65. Relying of Caastiel/Ellipso's representations that he would be paid double for any deferred compensation, Patterson continued to provide services to Ellipso.

66. On August 2, 2004, Castiel executed an amendment to the Collateralized Stock Loan Agreement, providing for the sale of all of the ICOHA shares held by MannTech, and division of the proceeds between MannTech and Ellipso. Castiel never mentioned that he thought he was being defrauded by this transaction. A true and correct copy of the amendment is attached as Exhibit 6. Any ICOHA shares not sold by October 1, 2004, pursuant to this amendment would remain subject to the original January 30, 2004, agreement.

67. On or about August 11, 2004, pursuant to the August 2, amendment, Castiel and Patterson executed a joint sale agreement for the ICOHA shares. Patterson signed for MannTech, and Castiel's signature is only inches from Patterson's on the document. A true and correct copy of this joint sale document is attached as Exhibit 7.

68. In September 2004, 25,000 shares of the ICOHA stock were sold and the proceeds divided between Ellipso and MannTech pursuant to the August 2, 2004, amendment.

12

69. Also in August 2, 2004, Castiel executed an amendment to the TRSC-Ellipso agreement of December 15, 2003. A true and correct copy of that amendment is attached as Exhibit 8. That amendment suspended additional royalty payments by TRSC; provided for a division of revenues from the contemplated audio-text service; and abrogated a prior March 30, 2004, amendment to that agreement. All other provisions were reaffirmed. Castiel never indicated that he thought he was being defrauded by this amendment.

70. On October 20, 2004, Castiel again wrote to Patterson concerning his consulting contract with Ellipso and payments due thereunder. Castiel reaffirmed the April 27, 2004, agreement, and acknowledged that Patterson was owed fees for services performed after May 31, 2004. The email also references their conversation in June 2004, concerning Patterson's financial interests in TRSC and MannTech.

71. In October 2004, the ICOHA stock sale price fell to two cents per share on almost no volume. The stock was worthless.

72. Both Mann and Patterson made entreaties to Castiel to discuss repayment of the stock margin loan. Castiel refused to even discuss it. Pursuant to the loan agreements, Castiel/Ellipso had the right to forfeit the collateral, the worthless ICOHA stock, and not repay the loan. MannTech understood from Castiel's words and his actions that Ellipso was exercising that right.

73. During November and early December 2004, Castiel continued to meet with Patterson, Mann and the consultants TRSC had hired to facilitate the 881 vanity telephone service. Castiel's actions and words induced TRSC to continue to

13

expend money and time on the project. True and correct copies of two of Castiel's emails from this period are attached as exhibits 9 and 10.

74. Ellipso has never offered to repay the margin stock loan nor any interest thereon.

75. Ellipso has never provided the 881 vanity telephone service upon which the TRSC-Ellipso contract was based.

76. Ellipso has never made any payment to TRSC from any revenues received from the audio-text services.

77. Ellipso has never offered to pay the fees owed Patterson for consulting services, which exceed two hundred fifty thousand dollars ($250,000.00).

Respectfully submitted,

Robert B. Patterson
1643 Hunting Creek Drive
Alexandria, Virginia 22314
571-278-7076

14

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELLIPSO, INC.<br>4410 Massachusetts Ave., Suite 385<br>Washington, D.C. 20016, | )<br>)<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>) |
| JOHN B. MANN, et al.<br>9330 Harts Mill Road<br>Warrenton, VA. 20186 | )     CASE NUMBER: 1:O5CV01186<br>)<br>)     JUDGE: Royce C. Lamberth |
| Defendants. | )<br>)<br>) |

---

### AFFIDAVIT OF ROBERT B. PATTERSON

1. I am over the age of eighteen and competent to testify from personal knowledge on the matters set forth herein.

2. I practiced law for thirty years and now work as a business consultant. I reside in Alexandria, Virginia.

3. I have known David Castiel ("Castiel") since approximately December 2001.

4. Castiel is the principle owner of Ellipso, Inc., (Ellipso), a Delaware company that raised approximately one hundred million dollars ($100,000,000.00) in an unsuccessful attempt to launch a satellite telecommunications system.

5. Ellipso has never returned any monies to its investors.

6. Ellipso currently has only one full time employee, Castiel, and its corporate office is a post office box.

7. On October 1, 2002, I executed a contract to provide consulting services to Ellipso. A true and correct copy of that contract is attached as Exhibit 1.

1

8. That consulting contract was amended on February 9, 2003, and a true and correct copy of that amendment is attached as Exhibit 2.

9. In 1999 I pled guilty to a single criminal count of theft of government property for cashing my mother-in-law's pension checks following her death; which I did to reimburse me for moneys I had spent on her care prior to her death. As a consequence of this plea, I surrendered my bar license in Virginia and the District of Columbia.

10. I told Castiel of my conviction and the surrender of my bar licenses prior to execution of the October 1, 2002, consulting contract. Castiel did not consider these to be an impediment to my employment as a consultant by Ellipso.

11. My principle function for Ellipso was to raise funds for Ellipso. To this end I introduced Ellipso to a number of potential investors, lenders, stock brokers, and consultants. I also contacted scores of potential funding sources that had no interest in Ellipso due to Ellipso's litigation problems, and/or its business prospects.

12. I had been involved in business finance for more than ten (10) years; mostly dealing in financing for distressed businesses or litigation finance. I contacted many of my prior sources on behalf of Ellipso.

13. I had experience in the aerospace industry having represented MacDonnell Douglas for almost ten years as a partner in the lawfirm of Bryan, Cave.

14. The October 1, 2002, consulting contract was drafted by Castiel, utilizing a standard finder's fee agreement which he had on his laptop, and which Castiel used with numerous consultants. I utilized it myself later for other consultants.

2

15. The language in the consulting contract pertaining to telecommunications experience was standard language which was contained in the boiler plate of the contract on Castiel's laptop.

16. The other consulting service that I was to provide pursuant to the October 1, 2002, contract was to advise Ellipso on means of controlling its litigation costs. At that time Ellipso was engaged in more than a dozen cases with investors, suppliers, former employees, and directors; and was incurring tens of thousands of dollars a month in attorney's fees and costs.

17. The language in the October 1, 2002, consulting contract was carefully drafted to define my services as developing a "Strategy" (capital "S", a term of art) for controlling Ellipso's litigation costs while protecting its assets. That language was drafted jointly by Castiel and by me.

18. The October 1, 2002, consulting contract was not for legal representation of Ellipso.

19. My experience in controlling litigation costs came from two decades as a corporate and lawfirm litigator, involving both large cases and large case loads.

20. While the October 1, 2002, consulting contract specified monthly payments, the practice was that I would only be paid by Ellipso when I asked for payment, with the other unpaid amounts accrued.  I submitted monthly invoices to Ellipso for my services, showing amounts paid and amounts accrued.

21. All amounts accrued were to be doubled when paid.  This was a standard policy which Castiel and Ellipso instituted with employees and consultants who were willing to provide service on a deferred compensation basis.

22. In approximately February 2003, I was approached by a Canadian company that was interested in implementing telephone services utilizing the 881-2 and 881-3 country codes, which Ellipso had been granted by the International Telecommunications Union in Geneva. I worked with Castiel and Ambassador Gerald Helman (Ellipso's VP, Regulatory Affairs) in developing this business opportunity.

23. I have known John Mann ("Mann") socially for more than twenty years through our children, who are the same age. I have only seen Mann sporadically over the past ten years; perhaps once a year.

24. Mann and I have never been business associates prior to February 2004.

25. Mann had been involved in his career with technology companies such as MCI and Network Solutions.

26. In approximately March of 2003, I introduced Mann to Castiel, as well as to Ambassador Gerald Helman, (Ellipso's VP for Regulatory Affairs), and I think to James Murphy (Ellipso's Acting General Counsel). I introduced Mann as a long time acquaintance of mine. There was a luncheon meeting at the Red Tomato restaurant; and at least one follow-up meeting between Castiel and Mann.

27. Castiel approached Mann about joining Ellipso as a company officer, or as an investor, or as a consultant on a finder's fee agreement such as mine. Castiel described to Mann in great detail Ellipso's business, financial, and litigation situation, including providing corporate documents to Mann. Mann declined at that time to become involved with Ellipso.

28. During the spring of 2003, I identified a brokerage firm in New York that agreed to attempt to market the ICOHA stock which Ellipso held. Castiel negotiated a contract with them for this effort which, I understand, involved the brokerage house receiving some ICOHA shares as compensation.

29. During the spring of 2003, I introduced Castiel to my law school friend, Senator Larry Pressler, of South Dakota, former chairman of the Senate Telecommunications Sub-Committee. Castiel approached him about becoming an Ellipso board member, but he declined as Ellipso had no D&O insurance.

30. During the spring of 2003, I introduced Castiel to a long time aid of Senator John Warner, who operated a consulting and lobbying business, to assist in marketing Ellipso's satellite technology to the DOD. He declined to assist Ellipso when Castiel refused to sign a retainer agreement.

31. Between October 1, 2002, and April 30, 2003, I worked at Ellipso's corporate headquarters on 21st Street in Washington, D.C. on a daily basis. On many occasions Castiel and I rode to work together. We had lunch together on most days and spent several additional hours working together almost daily.

32. At that time there were five people in the Ellipso executive office – Castiel, Laury Blakley (Corporate Secretary), James Bailey (Acting General Counsel), Ambassador Gerald Helman (VP Regulatory Affairs), and me. My office was next to Castiel's office.

33. On April 30, 2003, I was incarcerated for a probation violation stemming from my prior criminal plea. In May 2003, everyone in the Ellipso executive offices learned of my status.

34. I asked my brother, Ronald Patterson, to contact Castiel and ask him to come to court, or write a letter on my behalf. My brother reported to me that Castiel declined to do either.

35. Mann did not learn of my plea until August 2005, when the instant suit was served on him.

36. In June 2003, Ellipso surrendered its corporate offices, placed its corporate records in storage, and has since been operating from the post office box.

37. On approximately November 1, 2003, I resumed my consulting work for Ellipso; now working from home. Castiel and I agreed that my consulting contract was to be on the same terms as previously agreed.

38. Castiel was working on four projects. First, he was still trying to control the Ellipso litigations which had expanded to the Southern District of New York. Second, he was trying to implement the 881 telephone services through the Canadian company and the Dutch telephone company KPN. Third, Castiel was trying to sell Ellipso, or the technology, to an off-shore investor group. Fourth, he was trying to raise capital for Ellipso.

39. On Castiel's urging, I again approached Mann about investing in Ellipso.

40. Castiel and I discussed a possible transaction to accomplish two objectives – first to raise operating capital for Ellipso, and second to further the 881 telephone business. Ellipso needed operating capital primarily to pay Castiel's salary as the company had few expenses other than the storage and post office box rents. The legal fees were all being deferred.

6

41. The proposal which Castiel and I jointly developed was to approach Mann about buying some of the ICOHA shares from Ellipso; and concomitantly to approach Mann about providing a "registry" service for the 881 numbers. Mann's background with Network Solutions seemed directly applicable to this registry function.

42. Sometime around Thanksgiving 2003, I arranged a meeting between Castiel and Mann at Mann's home outside Warrenton, Virginia. During the ride to Warrenton, Castiel and I discussed numerous things, including my hope to participate with Mann in the prospective new venture. Castiel said he was pleased by this as he thought our good working relationship would continue with the new venture.

43. At the meeting, which lasted several hours, Castiel and Mann discussed, and negotiated the particulars of the proposed transactions. The deal that was discussed between Castiel and Mann was that Mann would set up a new company to purchase twenty-five thousand dollars ($25,000.00) of ICOHA shares each month, for, as I recall, ten months, for a total of two hundred fifty thousand dollars ($250,000.00). The ICOHA shares were then trading at approximately sixty cents per share ($0.60), and I believe Castiel offered to sell them to Mann at fifty cents per share ($0.50).

44. In the discussion between Castiel and Mann concerning the 881 registry, the deal being negotiated was that Mann would again set up a new company, which would then enter a contract with Ellipso. The new company would pay Ellipso a monthly royalty for the right to provide the registry service for the new 881

telephone numbers. Once the service started, the new company would charge a fee for these services, and remit a percentage of the profits back to Ellipso. The new company would pay Ellipso a specified royalty amount per month prior to start of the service.

45. It was a cordial meeting, and we all agreed to meet for further discussions once some of the documents were prepared. Castiel and I jointly prepared the proposed contracts.

46. Sometime in December 2003, there was a second meeting attended by Castiel, Mann and me at the Rail Stop restaurant in The Plains, Virginia. Again Mann and Castiel discussed the particulars of the proposed transactions between them.

47. I continued to seek other sources of funding for Ellipso, and around mid December 2003, I located an investment company, Argyle Investments, that indicated a willingness to make Ellipso a margin loan against the ICOHA stock. I informed Castiel of this, and he stated that he was pleased as he preferred to borrow against the stock rather than sell it.

48. Argyle sent me a term sheet, which I sent on to Castiel. Castiel agreed to the terms, and Argyle sent a set of its standard margin stock loan documents, which I immediately sent on the Castiel. As these were standard documents for Argyle, it was clear that there was little or no possibility of renegotiating their terms. Castiel never stated any objection to the terms to me.

49. At this point, Castiel began to deal directly with Argyle, but I think he sent me copies of all the documents.

8

50. One of the documents which Castiel sent to me was a copy of an executed stock transfer of the ICOHA shares from Ellipso to Argyle's transfer agent. From this document, and from conversations I had with Castiel, there is no doubt that Castiel understood that the margin stock loan from Argyle required that ownership in the ICOHA shares be transferred to Argyle.

51. In the meantime, the agreement between Castiel and Mann concerning the registry for the 881 service was executed on December 15, 2003. A true and correct copy of that agreement is attached as Exhibit 3. The new company, The Registry Solutions Company ("TRSC") began making royalty payments to Ellipso pursuant to that agreement.

52. On or about January 15, 2004, Argyle backed out of the stock margin loan to Ellipso.

53. On Castiel's urging, I approached Mann about assuming Argyle's place as lender in the stock margin loan transaction.

54. Castiel suggested that the amount of the loan could be increased by increasing the number of shares involved from the 250,000 in the Argyle proposal, to 492,611, the number on one of the certificates which Ellipso held. Castiel also wanted to increase the margin from 35% to 40%, which would also increase the amount received by Ellipso. Both of these changes were incorporated in the proposal which I conveyed to Mann on Castiel's behalf.

55. The final loan documents were prepared by Castiel, as I was unable to down load the Argyle documents for revision on my computer. Castiel told me that

9

he had Jack Anderson (Ellipso rocket scientist) assist him in down loading the Argyle documents, as they were encoded somehow.

56. The Collateralized Loan Agreement documents, prepared by Castiel, were executed on January 30, 2004.   The ICOHA stock certificate for 492,611 shares, together with a letter directing that the shares be placed in the name of Mann Technologies, L.L.C., ("MannTech"), was delivered to my by Castiel at that time.   A true and correct copy of the Collateralized Loan Agreement documents is attached as Exhibit 4.

57. In early February I spoke to Mann about an acquiring an equity interest in both MannTech and TRSC.  He agreed to grant me an interest in each, as he told me he thought my participation was essential to the success of the ventures, and that he had no interest in "running a company."   I also agreed to assume personal liability for one half of Mann's investment in the ventures should they fail.

58. TRSC was incorporated on February 13, 2004.  MannTech was incorporated on February 25, 2004.

59. Commencing in February 2004, there were almost weekly meetings pertaining to development of the 881 telephone services.   These meetings were with telecommunications executives, consultants, suppliers, investors and others.  At these meetings Castiel introduced me as the owner of the registry services company.   Castiel made these statements to at least twenty people over the course of the next several months.

60. On April 11, 2004, Senior Probation Officer Cynthia Sutter, United States District Court for the Eastern District of Virginia, spoke to Castiel to verify my employment by Ellipso. I had previously told Castiel that she would be calling.

61. On April 15, 2004, Castiel failed to make the payment required on the stock loan, of approximately five hundred dollars ($500.00).

62. Ellipso has never made any payments on the loan, nor has Ellipso ever offered to repay the loan.

63. On April 15, 2004, the stock loan agreements were amended to allow for the sale of 92,611 shares of the ICOHA stock, with the proceeds to be divided between Ellipso and MannTech. The stock was never sold pursuant to that amendment as Ellipso did not provide the requisite documentation to enable MannTech to sell the shares.

64. Despite repeated requests, Ellipso did not provide the requisite documentation to enable MannTech to sell the ICOHA shares until September 2004.

65. On April 27, 2004, Castiel wrote to me confirming the contractual arrangements of my consulting contract. I counter signed that agreement. A true and correct copy of that agreement is attached as Exhibit 5.

66. Ellipso never paid me the amounts specified by the April 27, 2004, agreement, but did continue to make small payments on my invoices until October 2004.

67. In June 2004, Castiel and I had a conversation at the Potomak Landing restaurant in Alexandria, Virginia. Castiel told me that he would not be able to pay me the fees owed, as the plans to sell the Ellipso technology to the off-shore investor had not materialized. Castiel asked if I would continue to

11

provide services to Ellipso. I told him that I would do so, and that I would defer almost all of my compensation as my financial requirements were covered by income from other sources, including MannTech and TRSC. Castiel did not appear surprised by this, as I had told him of my intentions in December 2003.

68. Relying on Caastiel/Ellipso's representations that I would be paid double for any deferred compensation, I continued to provide services to Ellipso.

69. On August 2, 2004, Castiel executed an amendment to the Collateralized Stock Loan Agreement, providing for the sale of all of the ICOHA shares held by MannTech, and division of the proceeds between MannTech and Ellipso. Castiel never mentioned that he thought he was being defrauded by this transaction. A true and correct copy of the amendment is attached as Exhibit 6. Any ICOHA shares not sold by October 1, 2004, pursuant to this amendment would remain subject to the original January 30, 2004, agreement.

70. On or about August 11, 2004, pursuant to the August 2, amendment, Castiel and I executed a joint sale agreement for the ICOHA shares. I signed for MannTech, and Castiel's signature is only inches from mine. A true and correct copy of this amendment is attached as Exhibit 7.

71. In September 2004, 25,000 shares of the ICOHA stock were sold and the proceeds divided between Ellipso and MannTech pursuant to the August 2, 2004, amendment.

72. Also in August 2, 2004, Castiel executed an amendment to the TRSC-Ellipso agreement of December 15, 2003. A true and correct copy of that amendment

12

is attached as Exhibit 8. That amendment suspended additional royalty payments by TRSC; provided for a division of revenues from the contemplated audio-text service; and abrogated a prior March 30, 2004, amendment to that agreement. All other provisions were reaffirmed. Castiel never indicated that he thought he was being defrauded by this amendment.

73. On October 20, 2004, Castiel again wrote to me concerning my consulting contract with Ellipso and payments due thereunder. Castiel reaffirms the April 27, 2004, agreement, and acknowledges that I am owed fees for services performed after May 31, 2004. The email also references our conversation in June when we discussed by financial interests in TRSC and MannTech. A true and correct copy of the October 20, 2004 email is attached as Exhibit 9.

74. In October 2004, the ICOHA stock sale price fell to two cents per share on almost no volume. The stock was worthless.

75. Both Mann and I made entreaties to Castiel to discuss repayment of the stock margin loan. Castiel refused to even discuss it. Pursuant to the loan agreements, Castiel/Ellipso had the right to forfeit the collateral, the worthless ICOHA stock, and not repay the loan. I understood from his words and his actions that he was exercising that right.

76. During November and early December 2004, Castiel continued to meet with me, Mann and the consultants TRSC had hired to facilitate the 881 vanity telephone service. Castiel's actions and words induced TRSC to continue to expend money and time on the project. True and correct copies of two of Castiel's emails from this period are attached as exhibits 10 and 11.

13

77. Ellipso has never offered to repay the margin stock loan nor any interest thereon.

78. Ellipso has never provided the 881 vanity telephone service upon which the TRSC-Ellipso contract was based.

79. Ellipso has never made any payment to TRSC from any revenues received from the audio-text services.

80. Ellipso has never offered to pay the fees owed me for to my consulting services to them, which exceed two hundred fifty thousand dollars ($250,000.00).


I declare under penalty of perjury that the foregoing is true and correct.


Date: _Nov 21, 2005_                          Robert B. Patterson

14

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ELLIPSO, INC.                                )
4410 Massachusetts Ave., Suite 385          )
Washington, D.C. 20016,                     )
                                            )
     Plaintiff,                          )
                                            )
v.                                          )
                                            )
JOHN B. MANN, et al.                        )     CASE NUMBER: 1:O5CV01186
9330 Harts Mill Road                        )
Warrenton, VA. 20186                        )     JUDGE: Royce C. Lamberth
                                            )
     Defendants.                         )
                                            )
_____ )

### ORDER

    This matter came on for hearing on the ___ day of _____, 2005, on Defendant

Robert B. Patterson's Dispositive Motions.  Upon consideration of Patterson's Motions,

the responses thereto, the arguments of counsel, and the entire record herein, it is, for the

reasons set forth in the accompanying Memorandum Opinion, adjudged and

ORDERED:

    The motion to dismiss Counts V, VI and VII of the Complaint with prejudice is

granted;

    The motion to dismiss Count XII of the Complaint with prejudice is granted;

    The motion to dismiss Counts I, II, III, and IV of the Complaint as to defendant

Patterson with prejudice is granted;

    The Court makes the following summary findings of fact:

      The October 1, 2002, Agreement for Services between Robert Patterson and
Ellipso, Inc. as amended on April 27, 2004, and October 20, 2004, is a valid legal
contract.

Ellipso, Inc. is indebted to Robert Patterson for the fees for the services he provided pursuant to the October 1, 2002, agreement as amended.

Ellipso, Inc. reaffirmed the January 30, 2004, Collateralized Stock Loan Agreements with Mann Technologies, LLC, on August 2, 2004, and this agreement, as amended, is a valid legal contract.

Ellipso, Inc. reaffirmed the December 15, 2003, agreement with The Registry Solutions Company on August 2, 2004, and this agreement, as amended, is a valid legal contract.

SO ORDERED THIS ____ DAY OF _____, 2005.


_____
Royce C. Lamberth
United States District Judge


Copies:

Robert B. Patterson
1643 Hunting Creek Dr.
Alexandria, Virginia 22314

Mark S. Guberman, Esq.
1400 K St., N.W.
Suite 1000
Washington, D.C. 20005

Thomas A. Mauro, Esq.
1020 Niniteenth St., N.W.
Suite 400
Washington, D.C. 20036