IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELLIPSO, INC., | |
| Plaintiff, | |
| v. | Case No. 05cv001186   (RCL) |
| JOHN B. MANN, ET AL., | **DEMAND FOR JURY TRIAL** |
| Defendants. | |
| and | |
| JOHN B. MANN AND MANN TECHNOLOGIES, L.L.C., | |
| Counterclaim Plaintiffs, | |
| v. | |
| ELLIPSO, INC., | |
| Counterclaim Defendant. | |

## COUNTERCLAIM OF JOHN B. MANN
### AND
## MANN TECHNOLOGIES, L.L.C.

Counterclaim Plaintiffs John B. Mann and Mann Technologies, L.L.C., by and
through their undersigned counsel and pursuant to the Rules of this Honorable Court, hereby
state as their Counterclaim against Plaintiff, Ellipso, Inc., as follows:

### JURISDICTION AND VENUE

1.      This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 1331
and 1332(a). The matter in controversy exceeds $75,000.00.

1

2.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a).

**THE PARTIES**

3.      Counterclaim Plaintiff John B. Mann ("Mann") is a resident of the Commonwealth of Virginia, residing at 9330 Harts Mill Road, Warrenton, Virginia 20186.

4.      Counterclaim Plaintiff Mann Technologies, L.L.C. ("Mann Tech") is a limited liability corporation organized under the laws of the State of Nevada with its principal place of business at 9330 Harts Mill Road, Warrenton, Virginia 20186.

5.      Counterclaim Defendant Ellipso, Inc. ("Ellipso") is allegedly a corporation organized under the laws of the State of Delaware with its principal place of business at 4110 Massachusetts Avenue, N.W., Unit 385, Washington, D.C. 20016.

**STATEMENT OF FACTS**

A.      **Castiel and Ellipso Persuade Mann to Invest in Ellipso**.

6.      Mann and Defendant, Robert Patterson ("Patterson"), have known each other socially since 1985, and communicated on a yearly basis afterwards.  Mann and Patterson did not associate in business until February 2004 when Mann, with Ellipso's full knowledge and advance approval, provided Patterson with an equity interest in Counterclaim Plaintiff Mann Tech and in The Registry Solutions Company ("TRSC").

7.      Dr. David Castiel ("Castiel") established Ellipso allegedly to develop and implement a communications satellite technology utilizing medium height elliptical orbits. According to Ellipso, this configuration allows satellite-based communication systems to more efficiently use available frequency spectrum.  Ellipso claims to have been granted a series of patents pertaining to this technology.

2

8.     Mann met two times with Castiel and Patterson in 2002, but the meetings produced no business relationship between Mann and Ellipso or between Mann and Patterson and resulted in no further social contacts between Mann and Patterson.

9.     During the 2003 Thanksgiving-Christmas Holiday season, Castiel and Patterson again contacted Mann and the three met at Mann's home in Warrenton, Virginia and in other locations to discuss what Castiel described as significant, new business opportunities involving Ellipso's satellite and communications business.  At this time, Mann had no business or professional relationship whatsoever with Patterson, and no new social contacts. Castiel represented to Mann that Ellipso had the exclusive authority from the International Telephony Union ("ITU") to use so-called "881" country codes to create a "precursor service", which would provide telephone subscribers with custom vanity telephone numbers. Such vanity telephone service would be exclusive to Ellipso by virtue of the grant of 881 country code authority Ellipso had received from the ITU and would be enormously profitable, according to Castiel. Using its satellite and communications technology, Castiel represented that Ellipso could quickly and easily arrange for the provisioning of Ellipso's vanity subscription service.

10.     On information and belief at that time in late 2003 Ellipso held approximately 2,200,000 shares of a company called ICO.  These shares were "penny stocks", trading on the "Pink Sheets", with a very thin trading volume.  Any shares that could be sold would surely not sell in any volume for their listed value.  More importantly, all of the shares held by Ellipso except for a block of 492,611 shares were restricted shares which Ellipso, at times pertinent to this case, could not easily sell on the open market.  Ellipso's other assets, according to Castiel, included its unimplemented but potentially very valuable patent

technology and the business potential of its 881 country code authority.

11.     The meeting in Mann's home noted above lasted several hours. Castiel wanted Mann to invest in Ellipso's vanity service by paying for the opportunity for Mann to set up a "registry" or clearing house structure for the vanity telephone number service which Castiel represented would be highly profitable.  Castiel also wanted Mann to buy some of the unrestricted ICO shares Ellipso owned. Castiel proposed that Mann, with Patterson's assistance, set up a new company to establish and own the registry service he was proposing and a new investment company to purchase a total of $250,000.00 worth of shares of the unrestricted ICO shares at twenty-five thousand dollars ($25,000.00) worth of shares each month.  The ICO shares had a nominal market value of approximately sixty cents per share ($0.60) but Mann could buy them at fifty cents ($.50) per share.  Given the great difficulty of selling this type of stock, and the volatility of its price, Mann ultimately rejected this proposal.

12.     Castiel presented himself to Mann in 2003 and 2004 as a sophisticated and experienced entrepreneur.  He represented, falsely as was later discovered, that he and his company were actively engaged in promising business ventures.  Castiel (and by reference, the Ellipso website) represented to Mann that the Ellipso Board and its advisors consisted of captains of industry, high government officials and major national law firms.

13.     As noted, at this time Mann and Patterson were casual social acquaintances; they had no business or professional relationship whatsoever. At this time and until February 2004 Patterson's role in the discussions between Castiel and Mann was primarily that of a facilitator and advisor to Ellipso and Castiel.  Castiel openly talked about Patterson having an ownership interest in the new companies to be formed by Mann. Castiel expressed to Mann

4

Castiel's great confidence in Patterson and in Patterson's expertise and his support for Patterson's involvement in the new Mann corporations and in the registry business in particular, given Patterson's close working relationship with Castiel and Ellipso. Patterson and Mann had no business of professional relationship whatsoever and no new social relationship at this time.

14.    Mann and Castiel agreed to meet for further discussions of the registry proposal after Ellipso prepared the initial documents. Ellipso prepared a proposed contract for the registry service. Castiel and Mann, with Patterson's assistance, again met to discuss the particulars of the proposal between Mann and Ellipso.

15.    Castiel persuaded Mann that the potential for the registry business was enormous and that arrangements for service with local telephone companies were simply a matter of being "switched on". Ellipso's part of the bargain was to implement the telephone service necessary for Ellipso to provide a "vanity number" to customers who wished to secure a telephone number which identified the customer in a unique or special manner. Further, Castiel represented to Mann that the 881 codes had already been "loaded" in 23 separate countries. These representations proved to be materially false. Without the telephone service to be provided by Ellipso, there would be no registry business for the new Mann company.

**B.    Mann Pays Ellipso for the Registry and Forms The Registry Solutions Company**.

16.    Castiel and Mann signed a written agreement concerning the registry in the first part of January, 2004, that was made effective December 15, 2003. Immediately upon execution of the registry agreement, Mann began making royalty payments required by the

5

agreement to Ellipso in return for Mann's right to establish and own the service Mann, again with Patterson's assistance in accordance with his prior discussions with Castiel, incorporated The Registry Solutions Company ("TRSC") on February 13, 2004. At all times prior to execution of the registry agreement, Castiel represented that Ellipso could and would quickly implement the vanity telephone service on which the registry service and TRSC's business entirely relied.

17.    At no time prior to executing the agreements pertinent to the instant case did Castiel reveal the full extent of Ellipso's corporate and financial difficulties. On information and belief, Ellipso surrendered its corporate offices in June 2003, placed its corporate records in storage, and began operating from a post office box. On information and belief, and unknown to Mann when he signed the agreements pertinent to this case, Castiel was financially desperate. Castiel and Ellipso were heavily involved in financially draining litigation with investors and Castiel was trying to raise money for himself through Ellipso. Also unknown to Mann, Castiel was trying to sell Ellipso, or the technology related to Ellipso or owned by Ellipso, to an off-shore investor group, a fact withheld from Mann until after Mann had invested a substantial amount of time and money in the Ellipso and Castiel ventures. Again, when Mann signed the contracts pertinent to this case in January 2004, Mann had no business or professional relationship and no new social relationship with Patterson. Mann did not give Patterson an equity interest in what became TRSC or Mann Tech until February 2004, after Mann had already spent well over $100,000.00 in connection with the proposals made by Castiel and accepted by Mann. Additionally, because they had specifically discussed Patterson's involvement, Castiel knew and approved of the equity interest Mann gave

6

Patterson in Mann's new corporations.

18.     Prior to Mann's substantial investments of time and money, Castiel failed to

reveal that Ellipso's satellite business was no longer a viable business or opportunity.  He also

failed to disclose that Ellipso could not launch the vanity telephone number service because it

depended on Ellipso's non-existent satellite service.

19.     It was Mann's understanding from Castiel that Ellipso would use capital

provided by Mann to help advance the vanity 881 service.  In reality, Castiel used what money

he did obtain from Mann primarily to pay his own salary. Castiel lives extravagantly, with an

expensive home, private school tuition for his children, and all the other trappings of a lavish

life style. Although Ellipso's debts were significant, its day-to-day operating expenses were

few, mainly storage and post office box rents.  The legal fees it incurred for the above-

mentioned litigation were all being deferred or in default.

20.     Although Castiel represented to Mann that Castiel had the ability and intention

to fulfill Ellipso's part of this vanity arrangement by providing the 881 telephone service

needed, in fact, Ellipso could not provide the service the Registry needed. Ellipso knew and

had ample reason to expect that Ellipso lacked the ability or capacity to uphold Ellipso's part

of the bargain.  Castiel knew that Ellipso could not provide the services that the Registry

business relied upon and, as became evident later, never intended to provide such services.

C.     **Mann and Ellipso Execute a Non-Recourse Loan Agreement and Mann Forms
       Mann Tech**.

21.     Having persuaded Mann of the potential and value of the registry service and

having received Mann's initial payments for the registry service, in January 2004 Castiel and

Patterson again approached Mann, this time to see whether Mann was also willing to make a loan to Ellipso in the principal amount of $90,000.00. On information and belief, Ellipso needed the loan because a loan offer from Argyll Equities (to be secured by the available ICO stock) had been withdrawn by Argyll in January 2004.  Balancing Ellipso's interest against his own Mann indicated that he would make the loan only if it was secured by Ellipso's assets and only if it conformed with ordinary and prudent business practices and customs.  Castiel stated that the terms of the loan he was proposing Mann make to Ellipso were identical to the terms offered by Argyll, that the purportedly lucrative exclusive registry business would serve as a hedge on the risk of making a loan to Ellipso, and that the proposed loan to Ellipso would facilitate Ellipso's meeting its obligation to provide the vanity 881 telephone service.  These last two representations were false. Mann relied on these false representations and agreed to the loan secured by the unrestricted ICO stock.  On January 30, 2004, Mann signed the Loan Agreement on behalf of Mann Technologies, L.L.C., a company to be formed with Patterson's assistance.  Ellipso was to repay the loan through quarterly interest-only payments of approximately $500 and repayment of the $90,000.00 principal by 2007. Despite the nominal burden they would put on Ellipso, Ellipso made none of the required interest-only payments.

22.     The Loan documents were prepared solely by Ellipso.  On information and belief, the terms of The Loan were identical to the loan terms which Argyll offered to Ellipso.

23.     Immediately after The Loan documents were signed Castiel provided to Mann a copy of an instruction to Ellipso's transfer agent, signed by Castiel and dated January 30, 2004, directing the re-issuance of  the 492,611 shares of ICO stock to the benefit of Mann Technologies. This was in accordance with the provisions of The Loan Agreement.

8

24.    Mann formed Mann Tech on February 24, 2004, to service The Loan and to engage in other ventures.  Mann was not aware on January 30 or February 24 (as noted above) that Castiel personally and Ellipso generally were involved in numerous, ongoing, extensive and financially draining litigation, in this Court, in Delaware and in the District of Columbia Superior Court.  Mann was unaware of the status of any litigation, and unaware that pending litigation was threatening the business and financial viability of Ellipso.  Additionally, Mann was unaware that neither Castiel nor Ellipso, as noted above, could nor would provide the telephone service required by the new registry.

**D.    Ellipso/Castiel Induce Mann to Support Ellipso's Purported 881 Vanity Service**.

25.    Commencing in February 2004, there were almost weekly meetings pertaining to development of the 881 telephone service.  These meetings were with telecommunications executives, consultants, suppliers, investors and others.  At these meetings Castiel introduced Patterson and Mann as the owners of Mann Tech and TRSC.  Castiel made these statements to several people over the course of the next several months.  Mann continued to pay, and Ellipso and Castiel continued to accept, moneys on these agreements after these public meetings.

26.    Mann faithfully made the required monthly payments to Ellipso.  He and Patterson carried out all of TRSC's and Mann Tech's obligations to Ellipso in accordance with all of the written agreements.  John Mann alone was the source of these payments.

**E.**    **Ellipso's Fraudulent Inducements Concerning the Allegedly Imminent Registry Service Caused Mann to Enter into Several Amendments to his Agreements with Ellipso**

27.    Notwithstanding Ellipso's defaults on The Loan Agreement and its failure to provide the necessary carrier service for the registry business, Mann agreed to three amendments to the TRSC/Ellipso agreement and two to The Loan Agreement.  In these instances, Castiel negotiated the amendments with Mann and Patterson as principals of TRSC and Mann Tech.  Mann entered into these amendments to his detriment in reliance on Castiel's false representations about the imminent start of the 881 vanity service and Castiel's representations that all that was needed to start the service was a little more capital.  It was Mann's intention and his understanding with Castiel that the amendments would free up and provide the further marginal capital that Ellipso said it needed to start the service.

28.    Specifically with respect to The Loan Agreement and based on Castiel's repeated assurances about the 881 service, Ellipso and Mann Tech executed two amendments to The Loan Agreement, on March 30, 2004, and on August 2, 2004.  The March 30, 2004, Amendment provided for Mann Tech to sell some portion of the ICO shares in its possession, and share the proceeds with Ellipso.  However, Mann Tech could not sell these shares as agreed because Castiel would not provide the necessary Board Resolution, making up one false reason after another for its absence.

29.    With the ICO stock market price beginning to rise modestly in July 2004, Ellipso and Mann Tech executed the second amendment to The Loan Agreement on August 2, 2004. This amendment provided for Mann Tech to sell the ICO stock that Ellipso had transferred to it and share the proceeds with Ellipso if the share selling price was $0.55 or

higher. In addition, under the August 2 amendment Mann advanced Ellipso another $10,000.00 which Ellipso was to repay at a future time. Ellipso also agreed that Mann Tech would retain 50,000 shares of the ICO stock.

30.     Pursuant to the August 2 Amendment, Ellipso found a way to transfer all of the pledged shares to Mann Tech through a Sale Order directed to the financial institution, UBS. In August 2004 Patterson signed the Sale Order for Mann Tech and Castiel signed it for Ellipso. In September 2004, 25,000 shares of the ICO stock were sold by Mann Tech as agreed and the proceeds of approximately $13,000 were shared equally with Ellipso. At that point the stock began a precipitous decline in value and no further shares were sold under the terms of the Amendment.

31.     Ellipso nonetheless defaulted on the next quarterly interest payment due. Thus, Ellipso never made any of the interest payments, kept the $10,000.00 advance it received in August 2004 and the proceeds of the September 2004 sale, and never offered to return the $90,000.00 loan principal to Mann Tech. The agreement to sell the ICO stock was not open-ended. Under the terms of the August 2, 2004, Amendment the loan reverted to its original terms and status on October 1, 2004.

32.     By the end of October 2004, it was clear that Castiel/Ellipso was not going to honor the repayment terms of The Loan Agreement. Ellipso had not made a single payment on The Loan Agreement, and the total collateral, the 492,611 shares of ICO, at that time had a nominal market value (at two cents a share) of less than $10,000.00. This itself constituted an event of default.

33.     With the ICO shares virtually worthless Castiel abandoned all pretext of

repaying The Loan or asserting an ownership interest in the ICO stock. He reaffirmed the

Pledge Agreement that was part of The Loan, and refused to provide Mann Tech with any

further collateral, advising John Mann that "a deal is a deal." Thus, Ellipso expressly relied

upon the terms of The Loan Agreement under which Mann Tech would and could take

complete and absolute ownership of the collateral as Mann Tech's only recourse for Ellipso's

non-payment.

> **F.** **Mann Continues to Fund the 881 Service that Ellipso Failed to Provide**.

34.    Even though, in retrospect, it is obvious that Ellipso had willfully failed to

provide the 881 service and simply used it as a lure to obtain Mann Tech and Mann's money,

Counterclaim Plaintiffs Mann and Mann Tech expended approximately $350,000.00 in cash

payments to Ellipso and performed thousands of man-hours of work.

35.    Ellipso withheld material information from Mann regarding the past difficulties

that Ellipso had experienced in trying to provide that service. This included an undisclosed

contract Ellipso had entered into with Sunburst Communications. That contract interfered

with Ellipso's promised implementation of a service called "Audiotext" that was also to

provide capital for Ellipso to implement the 881 service for the Registry.

36.    During November 2004 and early December 2004, Castiel continued to meet

with Patterson, Mann and the consultants Mann had hired to facilitate the 881 vanity telephone

service. Castiel's actions and and continuing misrepresentations induced Mann to continue to

expend money and time on the project.

37.    Mann Tech was, and continues to be, involved in other business activities,

including implementation of the 881 service that Ellipso intentionally failed to provide under

12

its agreements.

38.     To the best of Mann and Mann Tech's knowledge and belief, Ellipso has still not provided the 881 service contemplated by the agreements.  Consequently, TRSC has no registry business.  If Ellipso is providing 881 services, Ellipso has neither disclosed this fact to Mann, nor has it made any payments to Mann or TRSC for this service, or any other service, as required under its Agreement with TRSC.  Ellipso has failed to perform any of its obligations, including its promise to establish the communication service promised as "imminent" or pay a portion of revenues for use of 881 numbers as promised in the Ellipso/TRSC Agreement.

39.     The Counterclaim Plaintiffs were fraudulently induced by Castiel, Ellipso and other Castiel alter egos to enter into the various obligations described above, which were written, oral, implied, and implied-at-law, to set up TRSC and Mann Tech, to pay Ellipso substantial amounts of money, and to retain Patterson as a part owner of the businesses Mann established.

40.     The Counterclaim Plaintiffs were fraudulently induced by Castiel, Ellipso and other Castiel alter egos to spend $350,000.00 on various Ellipso ventures and Ellipso-related matters.

41.     In violation of their duty of good faith and fair dealings under each contract, Castiel and Ellipso failed to disclose or misrepresented the legal problems of Ellipso, lied about the state of their businesses and about the state of Ellipso in particular, and failed to deliver on a single contractual obligation.

42.     In particular, Castiel and Ellipso withheld material negative information about

13

the 881 business, in that, among other things, they:

    a.  failed to disclose that Ellipso was bankrupt, and in imminent danger of closing its

business, losing its intellectual property, and losing the 881 numbers with the ITU;

    b.  failed to provide the promised 881 vanity service;

    c  improperly and fraudulently withheld the basis for the 881 service from the ITU; and

    d.  failed to disclose that Ellipso had tried and failed to market the 881 vanity numbers

before.

    43.     Castiel and Ellipso induced Mann to set up Mann Tech, share it with Patterson,

and transfer an additional $110,000 to Ellipso, and induced Mann to spend another $250,000

on Ellipso's ventures, but withheld material, adverse information.  Castiel and Ellipso, among

other things:

    a.  misrepresented the use of funds obtained from Mann, using funds to support

Castiel's lavish personal lifestyle, and fund then undisclosed legal problems;

    b.  misrepresented Ellipso's significant legal problems, namely that Ellipso had ongoing

litigation with several individuals and entities, this despite Castiel and Ellipso

representing in The Loan Agreement that there were no lawsuits;

    c.  misrepresented the state of Ellipso's respective businesses, namely that it was

bankrupt or verged on bankruptcy, owed very large amounts in legal fees, and had

serious financial problems;

    d.  failed to disclose that Ellipso had tried and failed in the 881 business prior to

inducing Mann to invest his time and money;

    e.  did not provide the 881 vanity service which Ellipso represented to Mann was

14

"imminent";

f.  repeatedly promised imminent success in starting service despite knowing that they

could not do it;

g.  concealed prior conflicting business relationships; and

h.   failed to deliver on any of Ellipso's contractual obligations for the ventures it and

Castiel induced Mann to fund, including failure to pay interest on the Mann Tech

Loan.

44.    Mann has spent approximately twenty months of his time, generally two to three

days per week, on Ellipso related activities.  This represents a loss, at a rate of $125/hour, of

over $200,000 of opportunity costs.

## CAUSES OF ACTION

### COUNT ONE
### Breach of Contract
### (Mann Tech Against Ellipso)

45.    Counterclaim Plaintiffs hereby incorporate the foregoing paragraphs 1 - 44 of

this Counterclaim as if fully set forth herein.

46.    Ellipso has breached its contract with Mann Tech and is liable to Mann Tech

for all compensatory damages and consequential damages suffered by Mann Tech due to the

breach.

47.    As a proximate result of the breaches alleged herein, Mann Tech has sustained

substantial compensatory damages estimated at over $350,000.00, the exact amounts of which

will be proved at trial.

15

48.    In addition, The Loan Agreement provided that Mann Tech was to receive one half of any appreciation of the value of the collateral stock at the conclusion of the Loan Term (January 2007).  Since the stock was sold for an average of about $1.00 per share, Mann Tech is entitled to at least $.30 per share, namely $150,000 plus approximately $120,000 in return of principal and earned interest.

49.    As described above, in breaching its contract with Mann Tech, Ellipso acted fraudulently, willfully, maliciously, oppressively, and with callous and intentional disregard of Counterclaim Plaintiffs' interests and subjected Counterclaim Plaintiffs to undue hardship, knowing that the actions and inactions of Ellipso were substantially likely to vex, annoy, and injure Counterclaim Plaintiffs.  Accordingly, Counterclaim Plaintiff Mann Tech is entitled to punitive damages.

## COUNT TWO
### Fraudulent Inducement
### (Mann Tech Against Ellipso)

50.    Counterclaim Plaintiffs hereby incorporate the foregoing paragraphs 1 - 49 of this Counterclaim as if fully set forth herein.

51.    The August 2, 2004 Amendment to The Loan Agreement provided that Mann Tech would receive, in addition to one half of the proceeds of the sale of the stock, 50,000 shares of ICO.  Therefore, in the expected and reasonably anticipated outcome of The Loan Agreement, as amended, Mann Tech would have invested $90,000, and received back $320,000 plus 50,000 shares, or about $200,000 net as a return on Mann's considerable risk. Mann has expended $350,000, and received about $325,000 in return, plus 37,000 shares that are improperly frozen based on Castiel's and Ellipso's fraudulent representations to Mann and

16

to the Court.

52.    Accordingly, Ellipso is liable to Counterclaim Plaintiff Mann Tech in excess of $320,000, plus the value of the 37,000 shares that are frozen, the exact amounts of which will be proven at trial.

53.    As described above, by fraudulently inducing Mann Tech to enter into the August 2, 2004, Amendment, Ellipso also acted willfully, maliciously, oppressively, and with callous and intentional disregard of Counterclaim Plaintiffs' interests and subjected Counterclaim Plaintiffs to undue hardship, knowing that the actions and inactions of Ellipso were substantially likely to vex, annoy, and injure Counterclaim Plaintiffs.  Accordingly, Counterclaim Plaintiff Mann is entitled to punitive damages.

## COUNT THREE
### Quantum Meruit
### (Mann and Mann Tech Against Ellipso)

54.    Counterclaim Plaintiffs hereby incorporate the foregoing paragraphs 1 - 53 of this Counterclaim as if fully set forth herein.

55.    Ellipso received the benefit of time and money from Counterclaim Plaintiffs Mann and Mann Tech, and Counterclaim Plaintiffs are entitled as compensation for the fair value of the money and time expended.  Specifically, Mann was induced to expend money for the benefit of Castiel and Ellipso in the amount of Mann's expenditures of cash ($350,000) and time (over $200,000), the exact amounts of which to be proven at trial.  Moreover, Counterclaim Plaintiffs Mann and Mann Tech have changed their positions to their detriment in reliance on the promises made by Ellipso and Castiel.  Mann is entitled to recovery of his time and money, as benefits received by Castiel and Ellipso, the precise amount to be

17

determined at trial.

56.     As described above, Ellipso acted fraudulently, willfully, maliciously, oppressively, and with callous and intentional disregard of Counterclaim Plaintiffs' interests and subjected Counterclaim Plaintiffs to undue hardship, knowing that the actions and inactions of Ellipso were substantially likely to vex, annoy, and injure Counterclaim Plaintiffs. Accordingly, Counterclaim Plaintiffs Mann and Mann Tech are entitled to punitive damages.

## COUNT FOUR
### Unjust Enrichment
### (Mann and Mann Tech Against Ellipso)

57.     Counterclaim Plaintiffs hereby incorporate the foregoing paragraphs 1 - 56 of this Counterclaim as if fully set forth herein.

58.     Ellipso has been unjustly enriched by moneys and time received in the form of checks paid by Mann and Mann Tech and services provided by Mann, in the amount of at least $350,000 and $200,000 respectively, the exact amount to be determined at trial.

59.     As described above, Ellipso acted fraudulently, willfully, maliciously, oppressively, and with callous and intentional disregard of Counterclaim Plaintiffs' interests and subjected Counterclaim Plaintiffs to undue hardship, knowing that the actions and inactions of Ellipso were substantially likely to vex, annoy, and injure Counterclaim Plaintiffs. Accordingly, Counterclaim Plaintiffs Mann Tech and Mann are entitled to punitive damages.

## COUNT FIVE
### Fraud
### (Mann Against Ellipso)

60.     Counterclaim Plaintiffs hereby incorporate the foregoing paragraphs 1 - 59 of this Counterclaim as if fully set forth herein.

61.     In view of the above Ellipso has defrauded Mann and is liable to Mann for damages in excess of $350,000.00 for monies fraudulently received by Ellipso.  Ellipso is additionally liable to Mann for over $200,000.00 for services provided to Ellipso, the exact amounts of which will be proven at trial.

62.     Mann accordingly claims damages as a proximate result of the fraud on the part of Ellipso, in the amount of Mann's expenditures of cash ($350,000.00) and time (over $200,000.00).

63.     As described above, in fraudulently obtaining money and services from Counterclaim Plaintiff Mann, Ellipso acted fraudulently, willfully, maliciously, oppressively, and with callous and intentional disregard of Counterclaim Plaintiff's interests and subjected Counterclaim Plaintiff to undue hardship, knowing that the actions and inactions of Ellipso were substantially likely to vex, annoy, and injure Counterclaim Plaintiff.  Accordingly, Counterclaim Plaintiff Mann is entitled to punitive damages.

## COUNT SIX
### Fraudulent Inducement
### (Mann Against Ellipso)

64.     Counterclaim Plaintiffs hereby incorporate the foregoing paragraphs 1 - 63 of this Counterclaim as if fully set forth herein.

65.     Counterclaim Plaintiff Mann claims damages as a proximate result of fraudulent inducement on the part of Ellipso and Castiel, for fraudulently inducing Mann to expend money to the benefit of Ellipso in the amount of Mann's expenditures of cash ($350,000.00) and time (over $200,000.00).  Specifically, Mann was induced, to his great detriment, by the deliberately and false statements, omissions, and deceptions on the part of Castiel and Ellipso,

which thereby fraudulently induced the aforesaid monetary expenditures as well as Mann's expenditures of time and effort in behalf of Castiel and Ellipso.

66.    Therefore, Ellipso is liable to Mann for damages in excess of $350,000.00 for monies fraudulently induced from Mann by Ellipso, and Ellipso is additionally liable to Mann for over $200,000.00 for services fraudulently induced from Mann by Ellipso, the exact amounts of which will be proven at trial.

67.    As described above, in fraudulently inducing expenditures of money and services from Counterclaim Plaintiff Mann, Ellipso acted fraudulently, willfully, maliciously, oppressively, and with callous and intentional disregard of Counterclaim Plaintiffs' interests and subjected Counterclaim Plaintiff to undue hardship, knowing that the actions and inactions of Ellipso were substantially likely to vex, annoy, and injure Counterclaim Plaintiff. Accordingly, Counterclaim Plaintiff Mann is entitled to punitive damages.

## PRAYER FOR RELIEF

68.    WHEREFORE, Counterclaim Plaintiffs, John B. Mann and Mann Technologies, L.L.C., pray that the Court grant judgment in their favor for the damages to be proven at trial, both compensatory and punitive, suffered by each and both of the Counterclaim Plaintiffs against the Counterclaim Defendant, Ellipso, Inc.

69.    Plaintiffs further pray that the Court award: (1) all appropriate injunctive relief against Ellipso, Inc.; (2) the Counterclaim Plaintiffs their costs and reasonable attorneys fees in having to bring this Counterclaim and as provided for on The Loan Agreement; and (3) such other and further relief, including temporary and/or preliminary injunctive relief as the

facts may warrant; or (4) any one or all of the requests for relief made in this Prayer, as well as all other relief as deemed lawful and appropriate by the Court.

**THE COUNTERCLAIM PLAINTIFFS DEMAND TRIAL BY JURY ON ALL ISSUES IN THIS CONTERCLAIM AND IN THIS CASE.**

_____/s/_____
Thomas A. Mauro, Bar No. 184515
1020 Nineteenth Street, N.W.
Suite 400
Washington, D.C. 20036
Tel.: (202) 452-9865
Fax: (202) 452-0092
Attorney for the Counterclaim Plaintiffs, John B. Mann and Mann Technologies, L.L.C.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the foregoing Counterclaim of John B. Mann and Mann Technologies, L.L.C. has been mailed first class, postage prepaid, this 4th day of April, 2006 to :

Robert B. Patterson, *pro se*
1643 Hunting Creek Drive
Alexandria, Virginia 22314

_____
Thomas A Mauro

21