THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RECEIVED
OCT 3 0 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| ELLIPSO, INC. ) | |
| ) | |
| Plaintiff, Counterclaim ) | |
| Defendant ) | |
| ) | |
| v. ) | |
| ) | |
| JOHN B. MANN, et al. ) | CASE NUMBER: 1:05CV01186 |
| ) | JUDGE: ROYCE C. LAMBERTH |
| Defendants, Counterclaim ) | |
| Plaintiff ) | |
| ) | |

### MOTION TO QUASH THE PRELIMINARY INJUNCTION
### ENTERED NOVEMBER 2, 2005, AS TO
### DEFENDANT ROBERT PATTERSON

Defendant, Robert Patterson, respectfully moves this Court to quash the Preliminary Injunction entered in this matter on November 2, 2005, against him, as the Plaintiff, Ellipso, Inc., has admitted through discovery herein that the factual representations made to this Court to obtain that Preliminary Injunction, are false; resulting in the issuance of an improvidently granted Preliminary Injunction, and a gross miscarriage of justice.

WHEREFORE, Defendant Patterson respectfully requests that this Motion to Quash the Preliminary Injunction Entered November 2, 2005, as to Defendant Patterson be granted.

Respectfully submitted,

/s/ Robert Patterson

Robert Patterson, *pro se*
P.O. Box 3106
Reston, Virginia 20190
(571) 278-7076

## LOCAL RULE 7(m) CERTIFICATE

Plaintiff does not consent to the relief requested.

## REQUEST FOR HEARING

Defendant Patterson respectfully requests an evidentiary hearing on this motion and states that he would anticipate calling only one witness, David Castiel, and that his portion of the matter should be concluded in one hour.

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ELLIPSO, INC.                               )
                                            )
    Plaintiff, Counterclaim              )
    Defendant                            )
                                            )
                                            )
v.                                          )
                                            )
JOHN B. MANN, et al.                        )   CASE NUMBER: 1:O5CV01186
                                            )   JUDGE: ROYCE C. LAMBERTH
    Defendants, Counterclaim             )
    Plaintiff                            )
_____)

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF
DEFENDANT ROBERT PATTERSON'S
MOTION TO QUASH PRELIMINARY INJUNCTION**

**COMES NOW DEFENDANT ROBERT PATTERSON,** *pro se,* who submits this Memorandum of Points and Authorities, in Support of his Motion to Quash the Preliminary Injunction entered herein on November 2, and affirmed November 14, 2005, as Plaintiff, Ellipso, Inc., (Ellipso), has admitted in discovery that the factual representations it made to this Court to obtain the Preliminary Injunction are false. Ellipso sought the Preliminary Injunction to prevent Defendants, MannTechnologies, LLC, (MannTech), John Mann (Mann), and Robert Patterson (Patterson), from transferring certain shares of stock in ICOHA (now ICOG), which Ellipso had transferred to MannTech as security for a loan. Although Ellipso acknowledges that it never made any payments to MannTech on the loan; Ellipso here seeks to rescind the loan agreement alleging that Ellipso was defrauded into entering the loan transaction by its consultant, Defendant Patterson, who concealed from Ellipso his ownership interest in MannTech.

1

The Court issued the Preliminary Injunction based upon the sworn affidavit of David Castiel (Castiel), the majority owner and Chief Executive of Ellipso, in which Castiel swears, "At no time, prior to, during, or after the negotiations did [defendants] …disclose to Ellipso … that Patterson was a member of MannTech…" [Castiel affdvt. attached to Motion for Preliminary Injunction, p. 2, l. 2-3]. Defendants disputed this assertion, but argued primarily that even if Ellipso initially did not know of the ownership interest, Ellipso certainly learned of it during the course of the loan and affirmed the initial loan agreement by executing an amendment to the loan agreement on August 2, 2004, with knowledge of Patterson's interest in MannTech. Defendants introduced an email from Castiel in which Castiel acknowledges learning of Patterson's interest in June 2004. The Court implicitly rejected this evidence due to its ambiguity. The Court of Appeals affirmed, finding that it could not say that the Court's factual finding was clearly erroneous.

THE FACTS:

During discovery Castiel, CEO of Ellipso, admitted that he learned that Patterson was a "…double agent…"vis-à-vis Ellipso and MannTech in June of 2004 [Deposition of Castiel, p. 106-107, and Exhibit 13, thereto, May 2, 2007; Exhibit I attached]; prior to his execution of the August 2, 2004, amendment. Plaintiffs appear to have deliberately misled this Court by concealing the true date upon which Ellipso learned of Patterson's asserted fraud. Castiel made this admission in his deposition only after being confronted with another of his emails sent to Patterson on November 16, 2004, [Castiel Deposition Exhibit 13], in which he again states that "…I never knew until May/June 2004 that you [Patterson} were a 50% owner of MannTech…" [Castiel Deposition, p.170]   [n.b.

2

Castiel has never produced either of these incriminating emails; despite Defendant's document requests, and Castiel's testimony that he never deleted any emails from his computer; and the fact that he did produce emails both before and after the dates of both of these emails and their dispositive admissions.]

The Court is invited to compare this deposition testimony with Castiel's sworn Answers to Interrogatories, served March 27, 2007, [Exhibit II attached] before Castiel was aware that Patterson had a copy of the incriminating November 16, 2004, email. In that sworn response, Castiel states that the first time he had any knowledge of Patterson's asserted dual role, was on August 12, 2004, after execution of the August 2, amended agreement reaffirming the Loan Agreement between Ellipso and MannTech. Castiel even goes in great detail to describe how Patterson "confessed" at Starbucks on August 12, 2004.

The Court of Appeals affirmed the Preliminary Injunction, based on the same factual misrepresentations that Ellipso made to this Court. The Appellate Opinion states the applicable law,

> "Mann Tech argues next that Ellipso did not show a likelihood of success on its fraud claim because it had, in fact, affirmed the loan agreement with full knowledge of Patterson's dual roles with Ellipso and Mann Technologies. Mann Tech is correct that if Ellipso continued to perform under the contract after learning of Patterson's conflict, Ellipso cannot then seek rescission of the contract. ... If the fraud victim 'affirms the contract through continued performance, that party is precluded from seeking rescission.'" (citations omitted) Opinion p. 6-7 [attached]

The seminal issue in this case is, when did Ellipso learn of Patterson's interest in MannTech. Ellipso (Castiel) has now admitted that it knew of Patterson's asserted dual role at least as early as June 2004, prior to execution of the amended agreement on August 2, 2004. Even accepting the representation that June, 2004, was the first date

3

upon which Ellipso learned of the asserted fraud, which Defendant hotly disputes, issuance of the Preliminary Injunction was not warranted. As the Court of Appeals states, the applicable legal standard here is "continued performance" after learning of the alleged fraud.

> "Where a party to an executed contract discovers a material misrepresentation made in the execution of the contract, that party may elect one of two mutually exclusive remedies. He may either affirm the contract and sue for damages, or repudiate the contract and recover that with which he or she has parted. [Court of Appeals Opinion, p. 7. citations omitted].

The appropriate inquire is, what actions did Ellipso take upon learning of the asserted fraud in June, 2004, or on August 12, 2004, [depending on which of Castiel's versions one wishes to credit.] As set forth herein, Ellipso took absolutely no actions to repudiate the January 1, 2004, Collateralized Loan Agreement, but to the contrary did everything in Ellipso's power to enforce and perform that Loan Agreement and the August 2, 2004 Amendment, including facilitating the sale of 25,000 ICOG shares pursuant to that August 2, 2004, Agreement, and accepting it share of the proceeds from said sale. By its actions Ellipso waived any claims for rescission of the Loan Agreement. Moreover, Ellipso acknowledges that it breached the Loan Agreement by failing to make even a single payment thereon of either interest or principle. Having failed to perform its obligation pursuant to the Loan Agreement, Ellipso is also precluded from maintaining an action for damages. The following excerpts from Castiel's Deposition on May 2, 2007, are dispositive of the factual issues here:

BY MR. PATTERSON:

   Q   Did you at any time communicate with John Mann your belief that you had been duped on the stock margin loan transaction?

A    No, I didn't communicate with John Mann.

Q    Now, you alluded to some discussions with Mr. Patterson. When did those discussions take place concerning your concerns that Mr. Patterson was an owner of Mann Tech?

A    I thought I had already answered that question.

Q    Well, you said you had discussions. The question was: When?

A    Well, the first indication that Mr. Patterson was a double agent was in June 2004 –

MR. GOODMAN: You like that? You're laughing at that.

THE WITNESS: -- when Mr. Patterson acknowledged he was getting a kickback from Mr. Mann, a commission or some upside or some – some kickback, which I thought very unethical on the part of Mr. Mann to bribe my own guy.

BY MR. PATTERSON:    And that discussion took place in June of 2004?

A    That's right; but it was a kickback, a commission, or some freebie. And –

Q    So to use your own words, when you executed the August 2nd amendment to the loan agreement, you knew that Mr. Patterson was a double agent?

A    No. Mr. – I knew Mr. – no, no, no. I thought Mr. Patterson was totally committed to Ellipso. But he was getting another kickback from Mr. Mann. Mr. Mann was also, I think, trying to bribe Mr. Tomassoni. I think his way of doing business is to bribe people on the other side.
    But I was assured by Mr. Patterson that his loyalty was to Ellipso. And it made sense, since Ellipso has much bigger assets. So, even as a selfish interest, it made sense for him to – okay, if Mann wants to give him a kickback, he'll take it. But long term, there was more interest in Ellipso.
    So, I – I trusted that relationship. And you knew it. And you continued working diligently on several things; for example, the Sahagen settlement proposal that you drafted as an expert Harvard-trained lawyer. It was a good document. So, okay, he might pay you something one day, but he's – your allegiance, I believed, was still with us, not to him.

Q    How much money did Ellipso receive during 2004 as a consequence of Mr. Patterson's efforts?

A    Net of our losses, probably negative, but in terms of receipts, you can count what Mr. Mann reimbursed. It's probably $200,000, if you add Mann Tech and TRS[C] ...[Castiel Deposition, p. 106-109, May 2, 2007]

5

.........

Q  Okay. And during this time frame, which is July 13 of 2004, you, at that time, were aware that Mr. Patterson was, I believe in your words, acting as a double agent?

A  No. I believed he was receiving a commission or a kickback from Mr. Mann. I still believed he was on my side.

Q  Because you could offer him more compensation in the long run?

A  No, because Ellipso had more assets on the long term that could be beneficial to anybody than a commission on the sale of stock that we couldn't predict – for which we couldn't predict the value. And also, I believed that you had some – still some ethical commitments of honesty. [Castiel Deposition, p. 189-190, May 2, 2007]

..........

Q  Okay. Now, let's return to August 12, 2004. And you had a meeting scheduled that day?

A  I think we all had a meeting at UBS.

Q  And my you, you mean whom?

.........

A  Yourself, Mr. Mann, and myself and John Piper at UBS. There may have been another UBS person that came in and out.

Q  What was the purpose of this meeting?

A  The purpose of this to – was to implement the amendment of – to the loan agreement and facilitate the sale of shares and split the proceeds of the sale of those shares.

.......

Q  And what transpired at the meeting?

A  That we agreed to liquidate the sale – the shares that were held in the name of Ellipso, but held physically by Mann Tech in New Jersey, I think, with Georgetown Securities or something like that. And we needed to sign the documents so Georgetown Securities could send the stock certificate to UBS to process.

.......

Q  Okay. Now, at the conclusion of the meeting, Mr. Piper says, Okay. I'll go do what I'm going to do, And then what happened with you and Mr. Mann and Mr. Patterson?

A    We went to Starbucks. Mr. Mann wrote a check and left. And I stayed with Mr. Patterson and asked him, So, he lets you sign on behalf of Mann Tech?

So, that's when Mr. Patterson said, Well, I am the owner – an owner of Mann Tech.

And I said, But I thought he was just giving you a kickback, which I didn't like, by the way.

But he said, No, I am 50 percent owner. And that was quite a revelation.

..........

Q    What did you do with the check that Mr. Mann gave you?

A    I deposited it. And I think I wrote a check to you either the same day or right after, because you were hurting as well, so, I gave you a check.

Q    And there were some stocks sold pursuant to the arrangements that were made at that meeting at UBS?

A    Yeah. It took several weeks for that to happen. Yes.

Q    And after the stock was sold, did Ellipso receive a portion of the proceeds?

A    Yes.

Q    And did your take any actions between the time that Mr. Patterson told you he was a part owner of Mann Technologies and the time that Ellipso received the proceeds from the sale of the stock to void that transaction?

A    No.

Q    After Ellipso received the proceeds from the sale of that stock, did you continue to meet with Mr. Mann and Mr. Patterson?

A    I don't' think we met in September, or early September, but we continued meeting a while after. Mr. Mann was out on vacation somewhere or had to do something.

Q    And when was the first time that you raised the issue of fraud on the Mann stock loan transaction with anyone?

A    Well, we raised it when we filed the complaint.

Q    That was the first time?

A    Raised – what do you mean by "raised the issue"? Maybe if you're specific –

7

Q    Did you discuss the fact that you thought you had been defrauded with anyone?

A    Well, I didn't think. I knew I was defrauded. It was not a thought. It was knowledge. I discussed it with you. And I told you it wasn't the right way to do things. But at that time I had —

Q    I'm going to hand you your answers to interrogatories and ask you to look at Number 2. I guess the question was: Did you discuss the fact that you thought you had been defrauded with anyone?

A    Oh, yes, yes. I – I thought you meant you or Mann or – not attorneys. I did discuss that with an attorney in late November in New York. [Castiel Deposition, p. 94, 100-102, May 2, 2004]

ARGUMENT:

I.  Ellipso waived any claims for rescission by continuing to perform the Loan Agreement, including execution of the August 2, 2004, Amendment reaffirming the January 31, 2004, Collateralized Loan Agreement, retaining the loan corpus, and accepting additional payments there under, all with knowledge of Patterson's interest in MannTech.

Ellipso now admits that it knew of Patterson's dual role and interest in MannTech and his stake in the ICOG stock prior to execution of the August 2, 2004, Amendment. Examination of the record herein shows the total absence of any actions by Ellipso engendered by the discovery of the alleged "fraud." When Ellipso admits it learned of Patterson's interest either in June 2004, or on August 12, 2004, no ICOG stock had been sold pursuant to the August 2, 2004 Amended Agreement, and coincidently no payments had been made by Ellipso to MannTech on the loan. At that point rescission may have been available to Ellipso; yet Ellipso took no action to rescind the Loan Agreements with ManTech. To the contrary,

1. Ellipso executed the Amended Agreement on August 2, 2004.

2. Ellipso accepted a ten thousand dollar ($10,000) payment from MannTech pursuant to the August 2, 2004, Amended Agreement.

8

3. On August 12, 2004, Ellipso met defendants at UBS to conclude the necessary arrangements to sell the ICO shares pursuant to the August 2, 2004 Amended Agreement.

4. In his deposition, Castiel admits that the only action he took as a consequence of learning of this "fraud," was to consult an attorney several months later in November 2004. [Castiel deposition p.101-102, see also Plaintiff's Answer to Interrogatory No. 2 and 4].

5. By Ellipso's own admission, it never gave any notice that it thought Ellipso had been defrauded to anyone, including
   i. MannTech,
   ii. UBS,
   iii. Patterson, or
   iv. John Mann.

6. Ellipso never attempted to rescind the authority for UBS to sell the ICOG shares, even though the shares were not ready for sale until several weeks later..

7. With Ellipso's knowledge, twenty-five thousand (25,000) shares of ICOG stock were sold in late August 2004, by the authority of the August 2, 2004 Amended Agreement (the January 31, 2004 Loan Agreement did not provide for such sale.)

8. Thereafter Ellipso accepted its share of the proceeds of this sale of ICOG shares.

9. The first, and only notice of the claimed "fraud", that Ellipso has ever given Defendants was more than one year later, in August 2005, when Ellipso served MannTech with the instant law suit.

10. Throughout the fall of 2004 Castiel continued to meet with defendants on almost a weekly basis, conducting business as usual.

11. Throughout the fall of 2004, Ellipso continued to pursue enforcement and revision of its loan agreements with MannTech.

12. Similarly, throughout the fall of 2004, Ellipso continued, as before, to solicit Patterson's assistance and to pay Patterson for his services.

13. Ellipso did not communicate with Defendants between mid December, 2004, and the service of the instant suit on MannTech in August 2005. It was during this period that MannTech sold 90% of the ICOG shares it held.

There is not a single action that Ellipso took after it claims it discovered the asserted "fraud" in June 2004, or on August 12, 2004, that can in any way be interpreted as evidencing either a belief that Ellipso was being defrauded, or any action to avoid the consequences of the "fraud". By its actions, and inaction, Ellipso affirmed the August 2, 2004, Amended Agreement, and the January 31, 2004, Collateralized Loan Agreement. [While Ellipso has suggested that at that time it was subject to some economic distress, such a claim is not only legally insufficient to excuse its failure to act to protect itself from the asserted "fraud"; but factually deficient since on August 12, 2004, the ICOG stock had a value several times the loan amount. Ellipso could have simply sold enough shares to repay the loan and retrieved its remaining ICOG shares.]

After August 2004, the value of the ICOG shares continued to fall, settling at four cents ($0.04) on October 25, 2004. Ellipso had an interest payment due to MannTech on the loan on October 30, 2004. Ellipso opted not to make the payment, and thus forfeit the remaining ICOG shares, which at that point were worthless. Ellipso could have repaid the ninety thousand dollar ($90,000) non-recourse loan and retrieved the than worthless ICOG stock. Ellipso exercised its option pursuant to the loan agreements to walk away from the non-recourse loan and forfeit its collateral. Ellipso never told MannTech at that point that Ellipso wanted to rescind the loan agreements. Obviously, such an offer would have been gladly received.

II. As a practical matter, rescission of the loan agreements is not available as MannTech had disposed of ninety percent (90%) of the shares at the time of the filing of the instant action.

As noted, Ellipso never raised its claims of "fraud" until August 2005, when the instant action was served on MannTech. Ellipso had opted to exercise its option to forfeit

10

the ICOG shares by refusing to make the interest payment on the loan in October 2004. Thereafter, MannTech exercised its rights to sell the shares for whatever price it could get. By August 2005, MannTech held less than ten percent (10%) of the ICOG shares. MannTech cannot return that which it no longer possesses. Ellipso waived any claims to rescission by sitting on its rights.

Although Ellipso does not specifically seek "reform" of the loan agreements to permit it to repay part of the loan and recover the remaining ICOG shares in MannTech's possession, such relief could conceivably be encompassed by Ellipso's creative pleadings. However, such a result would require the finding of some authority for a theory of "partial waiver of rights with knowledge of fraud." It is suggested that no such authority exists. Once a fraud is discovered it is incumbent on the aggrieved party to act to protect its interests, or suffer the loss of all of its fraud claims. Wyatt v Madden, 32 F.2d 838, 59 App. D.C. 38 (1929); Dresser v Sunderland Apartment Tenants Ass'n, Inc., 465 A. 2d 835 (1983); Millard v. Lorain Inv. Corp., 184 A. 2d 630 (1962); Kent Homes, Inc. v Frankel, 128 A. 2d 444 (1957). As the Court of Appeals states, one who discovers a fraud has two mutually exclusive remedies, return that which he has received and seek rescission, or keep that which he has received and sue for damages. Here Ellipso has retained all the benefits of the Loan Agreements.

Allowing Ellipso to seek partial rescission of the Loan Agreements would be particularly inequitable here. Having discovered the fraud in June or on August 12, 2004, Ellipso opted to exercise its rights pursuant to the non-recourse Loan Agreements to forfeit the than worthless ICOG stock to MannTech and avoid the obligation to repay the loan. Ellipso has retained the benefits of the loan transaction - the ninety thousand dollars

($90,000), the ten thousand dollars ($10,000), and the proceeds from the sale of the 25,000 ICOG shares - and thereby waived any rights to rescission. Now that the ICOG shares have increased in value, Ellipso seeks to revisit its prior exercise of its contractual rights. Ellipso's decision to forgo repayment of the loan in October 2004; retain the more than one hundred thousand dollars ($100,000) it held; avoid the obligation to repay the loan; and to forfeit the than worthless ICOG stock was – knowing, deliberate, conscious, and reasonable – and constituted the unequivocal affirmation of the Loan Agreements with MannTech.

    III.    Ellipso's assertions of fraud are unbelievable on their fact, as the only way Ellipso could forfeit the ICOG shares was by its own failure to repay the loan.

Ellipso's entire case rests on the assertion that some conspiracy existed between Patterson and Mann to illicitly obtain the ICOG shares from Ellipso. The assertion is absurd on its face. The January 31, 2004 Loan Agreement provides for a loan to Ellipso secured by the ICOG shares. The only way Ellipso would forfeit the shares would be if Ellipso defaulted on the Loan Agreement. What was the conspiracy? How was it to be accomplished? Only Ellipso itself could be the instrument of its loss of the ICOG stock.

The August 2, 2004, Amendment to the Collateralized Loan Agreement provides that the ICOG shares shall be sold and proceeds divided between Ellipso and MannTech; unwinding the January 1, 2004 Loan Agreement. How is this fraud? How could this be fraud? What is the purpose and how is it to be accomplished? Ellipso's cleverly crafted pleadings never address this fundamental issue.

    IV.    Elliso waived any claims for damages for breach of contract by failing to perform its obligations pursuant to the Loan Agreements.

Ellipso never made a single payment of interest or principal on the loan from MannTech. The August 2, 2004, Amended Agreement recites, "Whereas Ellipso has failed to timely make the interest payments to MannTech as required under the Collateralized Loan Transaction." [Amendment of Aug. 2. 2004, p. 1]. Ellipso acknowledges that it did not make the requisite interest payment due on October 30, 2004; nor any other payments to MannTech whatsoever. Having breached its obligations pursuant to the Loan Agreement, Ellipso is precluded as a matter of law from seeking damages there under. As Ellipso's pleadings never assert performance of Ellipso's obligations pursuant to the Loan Agreement, Ellipso is precluded from seeking to enforce any contract claims against MannTech. See, Bank of Columbia v Hagner, 26 U.S. 455, 1 Pet. 455, 7 L.Ed. 219 (1828); In Re: Belmar, 319 B.R. 748 (Bkrtcy. D. Dist. Col. 2004), citing Park v Arnott, 1992 WL 184521 (D.D.C. 1992).

CONCLUSION and REQUESTED RELIEF:

It is respectfully submitted that Ellipso has materially misled this Court concerning the facts at hand, resulting in an improvidently granted Preliminary Injunction. It is respectfully requested that the Preliminary Injunction be quashed as to Defendant Patterson, and that Ellipso be required to pay all the costs and damages occasioned thereby, and that the Court grant such other relief as is just and proper.

Respectfully submitted,

*[signature]*

Robert Patterson, *pro se*
P.O. Box 3106
Reston, VA  20195
(571) 278-7076

CERTIFICATE OF SERVICE:

I certify that on this 30th day of October 2007, the foregoing was served by hand on:

Natalie Ludaway, Esq.
Leftwich & Ludaway, LLC
1400 K St., NW
Suite 1000
Washington, D.C. 20005

Christopher Hoge, Esq.
1710 Rhode Island Ave., N.W.
Suite 700
Washington, D.C. 20036

Robert Patterson