**EXHIBIT I**

1

```
 1            IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
 2   - - - - - - - - - - - - - - - -x
                                    :
 3   ELLIPSO, INC.,                 :
                                    :
 4      Plaintiff/Counterclaim      :
        Defendant                   :
 5                                  :
        v.                          :  Case No. 05-cv01186(RCL)
 6                                  :
     JOHN B. MANN, et al.,          :
 7                                  :
        Defendants/Counterclaim     :
 8      Plaintiffs.                 :
                                    :
 9   - - - - - - - - - - - - - - - -x

10                       Reston, Virginia

11                       Wednesday, May 2, 2007

12        Deposition of DAVID CASTIEL, Witness, called for

13   examination by counsel for the Defendant/Counterclaim

14   Plaintiff, at the Metro Offices, 11710 Plaza America,

15   Reston, Virginia, before Diana L. Cox, CCR, a stenographic

16   reporter and notary public in and for the District of

17   Columbia, commencing at 10:20 a.m., when were present on

18   behalf of the respective parties:

19

20

21

22
```

```
1          THE WITNESS:  Yeah, the -- the strike
2     price and -- that's correct, on terms of term sheet.
3     There is no equivalent term sheet from John Mann or
4     Mann Tech.
5          MR. GOODMAN:  Just answer his question.
6          THE WITNESS:  Well, there is no equivalent
7     term sheet from Mann Tech, so, I -- we're comparing
8     two different things.
9     BY MR. PATTERSON:
10        Q    Okay.  Now, let's return to August 12, 2004.
11    And you had a meeting scheduled that day?
12        A    I think we all had a meeting at UBS.
13        Q    And by you, you mean whom?
14        A    I didn't say "you."  I said "we."
15        Q    "We."  I'm sorry.
16        A    Yourself, Mr. Mann, and myself and John Piper at
17    UBS.  There may have been another UBS person that came in
18    and out.
19        Q    What was the purpose of this meeting?
20        A    The purpose of this to -- was to implement the
21    amendment of -- to the loan agreement and facilitate the
22    sale of shares and split the proceeds of the sale of those
```

1   ownership at the meeting. I said no already: I don't
2   think that was an issue. That was an issue between
3   Patterson and me either before or after the meeting or
4   around the meeting. I don't remember exactly.
5       Q   Okay. Now, at the conclusion of the meeting,
6   Mr. Piper says, Okay. I'll go do what I'm going to do.
7   And then what happened with you and Mr. Mann and
8   Mr. Patterson?
9       A   We went to Starbucks. Mr. Mann wrote a check
10  and left. And I stayed with Mr. Patterson and asked him,
11  So, he lets you sign on behalf of Mann Tech?
12          So, that's when Mr. Patterson said, Well, I am
13  the owner -- an owner of Mann Tech.
14          And I said, But I thought he was just giving you
15  a kickback, which I didn't like, by the way.
16          But he said, No, I am 50 percent owner. And
17  that was quite a revelation.
18      Q   And how long was Mr. Mann at Starbucks?
19      A   Not long; 20 minutes, 15 minutes. He had to go.
20      Q   What did you do with the check that Mr. Mann
21  gave you?
22      A   I deposited it. And I think I wrote a check to

1   you either the same day or right after, because you were

2   hurting as well, so, I gave you a check.

3       Q    And there were some stocks sold pursuant to the
4   arrangements that were made at that meeting at UBS?

5       A    Yeah.  It took several weeks for that to happen.
6   Yes.

7       Q    And after the stock was sold, did Ellipso
8   receive a portion of the proceeds?

9       A    Yes.

10      Q    And did you take any actions between the time
11  that Mr. Patterson told you he was a part owner of Mann
12  Technologies and the time that Ellipso received the
13  proceeds from the sale of the stock to void that
14  transaction?

15      A    No.

16      Q    After Ellipso received the proceeds from the
17  sale of that stock, did you continue to meet with Mr. Mann
18  and Mr. Patterson?

19      A    I don't think we met in September, or early
20  September, but we continued meeting a while after.  Mr.
21  Mann was out on vacation somewhere or had to do something.

22      Q    And when was the first time that you raised the

1    issue of fraud on the Mann stock loan transaction with
2    anyone?
3         A    Well, we raised it when we filed the complaint.
4         Q    That was the first time?
5         A    Raised -- what do you mean by "raised the
6    issue"?  Maybe if you're specific --
7         Q    Did you discuss the fact that you thought you
8    had been defrauded with anyone?
9         A    Well, I didn't think.  I knew I was defrauded.
10   It was not a thought.  It was a knowledge.  I discussed it
11   with you.  And I told you it wasn't the right way to do
12   things.  But at that time I had --
13        Q    I'm going to hand you your answers to
14   interrogatories and ask you to look at Number 2.  I guess
15   the question was:  Did you discuss the fact that you
16   thought you had been defrauded with anyone?
17        A    Oh, yes, yes.  I -- I thought you meant you or
18   Mann or   not attorneys.  I did discuss that with an
19   attorney in late November in New York.
20        Q    And were you considering legal action based upon
21   the fraud at that time?
22        A    Well, I knew I was duped, in the -- in the

1   layman's term. Fraud is a legal term, I understand, so, I
2   don't think I was using that as -- in a legal sense,
3   because I'm not a lawyer.
4          And I didn't know to what extent I had been
5   duped and I was had, and I had no recourse, because you
6   did it so intelligently and you bamboozled me so well that
7   I couldn't know. And I had to accept reality.
8          It's when I talked to an attorney that we --
9          MR. GOODMAN: Objection. Don't discuss
10  anything you've discussed with your attorney.
11         THE WITNESS: That's correct.
12  BY MR. PATTERSON:
13  Q    But you were exploring potential options,
14  including legal options?
15  A    Before talking to an attorney, I didn't explore
16  any action, except abiding by the agreements I had signed,
17  because I had signed agreements, so, I believed I was
18  bound to them. Whether there was fraud or not, that's not
19  for me to decide.
20  Q    When did you first consider the possibility of
21  bringing legal action based upon the fact that you thought
22  you had been duped?

1          MR. GOODMAN:  Objection.  Calls for
2   attorney-client privilege.
3          MR. PATTERSON:  No, I asked when he first
4   considered it.
5          MR. GOODMAN:  That would require him to
6   reveal his discussions with counsel, unless you're
7   adding if Ellipso was going to --
8          MR. PATTERSON:  Maybe, maybe not.
9          MR. GOODMAN:  Well, to the extent that it
10  involves a communication between you and any
11  attorney, you're not to answer.  If there was any
12  other instances outside of that relationship, you
13  can answer.
14         THE WITNESS:  Well, I didn't discuss this
15  case outside counsel.  I mean, I knew -- I thought
16  about it myself, but I didn't discuss it.
17  BY MR. PATTERSON:
18     Q    And you discussed it with counsel in November,
19  December of 2000 and --
20         MR. GOODMAN:  Objection, objection to what
21  he discussed with counsel.  That's privileged.
22         MR. PATTERSON:  Okay.  It's in the

1     interrogatory answers?
2              MR. GOODMAN:  It says he sought the advice
3     of counsel, and that's the extent of the
4     information
5     BY MR. PATTERSON:
6        Q    Approximately how long did the discussion with
7     Mr. Patterson take at Starbucks?
8        A    Well, if you add the time when Mr. Mann was
9     there, probably an hour, 45 minutes to an hour.  And I
10    think we drove or walked somewhere after that, so, it was
11    relatively long; an hour, I would say.
12       Q    So, what time of day?
13       A    Morning -- well, it must have been lunch time by
14    then.
15       Q    And when did you deposit the check that you had
16    received from John Mann?
17             MR. GOODMAN:  I'm sorry what check?
18             MR. PATTERSON:  The check that he
19    testified to.
20             MR. GOODMAN:  At the collateral loan
21    agreement or at the office meeting?
22             MR. PATTERSON:  We're talking about the

```
 1   office meeting.
 2             THE WITNESS:  Probably the same day or the
 3   next morning.
 4   BY MR. PATTERSON:
 5      Q    And you have a deposit slip for that?
 6      A    I don't know.  I may have.
 7      Q    In any event, the bank records would reflect
 8   when it was deposited?
 9      A    That's correct.
10      Q    Did you at any time communicate to John Mann
11   your belief that you had been duped on the stock margin
12   loan transaction?
13      A    No, I didn't communicate with John Mann.
14      Q    Now, you alluded to some discussions with
15   Mr. Patterson.  When did those discussions take place
16   concerning your concerns that Mr. Patterson was an owner
17   of Mann Tech?
18      A    I thought I had already answered that question.
19      Q    Well, you said you had discussions.  The
20   question was:  When?
21      A    Well, the first indication that Mr. Patterson
22   was a double agent was in June 2004 --
```

107

                MR. GOODMAN:  You like that?  You're
laughing at that.
                THE WITNESS:  -- when Mr. Patterson
acknowledged he was getting a kickback from Mr
Mann, a commission or some upside or some -- some
kickback, which I thought very unethical on the part
of Mr. Mann to bribe my own guy.
BY MR. PATTERSON:
    Q    And that discussion took place in June of 2004?
    A    That's right; but it was a kickback, a
commission, or some freebie.  And --
    Q    So, to use your own words, when you executed the
August 2nd amendment to the loan agreement, you knew that
Mr. Patterson was a double agent?
    A    No.  Mr. -- I knew Mr. -- no, no, no.  I thought
Mr. Patterson was totally committed to Ellipso.  But he
was getting another kickback from Mr. Mann.  Mr. Mann was
also, I think, trying to bribe Mr. Tomassoni.  I think his
way of doing business is to bribe people on the other
side.
         But I was assured by Mr. Patterson that his
loyalty was to Ellipso.  And it made sense, since Ellipso

108

had much bigger assets.  So, even as a selfish interest,

```
 2   it made sense for him to -- okay, if Mann wants to give
 3   him a kickback, he'll take it.  But long term, there was
 4   more interest in Ellipso.
 5           So, I -- I trusted that relationship.  And you
 6   knew it.  And you continued working diligently on several
 7   things; for example, the Sahagen settlement proposal that
 8   you drafted as an expert Harvard-trained lawyer.  It was a
 9   good document.  So, okay, he might pay you something one
10   day, but he's -- your allegiance, I believed, was still
11   with us, not to him.
12      Q    How much money did Ellipso receive during 2004
13   as a consequence of Mr. Patterson's efforts?
14      A    Net of our losses, probably negative, but in
15   terms of receipts, you can count what Mr. Mann reimbursed.
16   It's probably $200,000, if you add Mann Tech and TRS.  We
17   never received payment for Mr. Patterson's efforts in the
18   acquisition of -- whatever that company -- Locknet, since
19   they never paid us.
20      Q    How did Mr. Patterson's interests in Mann
21   Technologies cause you to be duped by entering into the
22   August 2nd amendment agreement?
```

```
 1      Q     Okay.  That's all part of the same e-mail
 2  string?
 3      A     Yep.
 4            (Castiel Deposition Exhibit No 13 was
 5  marked for identification.)
 6  BY MR. PATTERSON:
 7      Q     We're up to Exhibit 13, which is a 1-page e-mail
 8  dated November 16, 2004?
 9      A     Yes.
10      Q     Did you send this document?
11      A     Yes.
12            MR. PATTERSON:  The next document, we'll
13  mark as Exhibit 14.
14            Are you with us, Tom?
15            MR. MAURO:  I think I lost track here.
16            MR. PATTERSON:  If you want to catch up,
17  this is 14.  It's dated October 20.  And they should
18  go pretty much in order.
19            MR. MAURO:  Okay.
20            (Castiel Deposition Exhibit No. 14 was
21  marked for identification.)
22  BY MR. PATTERSON:
```

1      Q    Okay.  Exhibit 14, 1-page e-mail dated
2 October 20, 2004, do you recognize that document?
3      A    Yes.
4      Q    Did you send that e-mail?
5      A    Yes.
6           (Castiel Deposition Exhibit No. 15 was
7 marked for identification.)
8 BY MR. PATTERSON:
9      Q    The next document is Number 15, a 1-page e-mail
10 dated September 27, 2004.  Did you receive this e-mail?
11     A    Yeah, it appears -- yes, the top.  I haven't
12 read the rest, so, I don't know.
13          Yeah.  Yes.
14     Q    And did you -- the bottom portion of this is an
15 e-mail from you?
16     A    It appears to be, yes.
17     Q    And did you send this e-mail?
18     A    I don't recall every single e-mail I sent.  It
19 appears that I may have sent that e-mail.  If it's -- if
20 it's reproduced in its integrity, then I sent it.
21     Q    Is there any language in here that you think may
22 not be yours?

189

```
 1              MR. GOODMAN:  Did you prepare that
 2    document?
 3              THE WITNESS:  Yes.
 4    BY MR. PATTERSON:
 5       Q    And was that an analysis of what was being
 6    proposed in the amendments that were being discussed?
 7       A    That's an analysis of the returns depending on
 8    various scenarios, if we implemented one of these
 9    amendments or not, I guess.  I have to study them.
10       Q    It was your analysis of what the financial
11    effects would be of the proposed amendments?
12       A    That's correct.
13       Q    Okay.  And during this time frame, which is
14    July 13 of 2004, you, at that time, were aware that Mr.
15    Patterson was, I believe in your words, acting as a double
16    agent?
17       A    No.  I believed he was receiving a commission or
18    a kickback from Mr. Mann.  I still believed he was on my
19    side.
20       Q    Because you could offer him more compensation in
21    the long run?
22       A    No, because Ellipso had more assets on the
```

1  longer term that could be beneficial to anybody than a
2  commission on the sale of stock that we couldn't predict
3  -- for which we couldn't predict the value.  And also, I
4  believed that you had some -- still some ethical
5  commitments of honesty.

```
 1    shares.
 2       Q    And what time was the meeting scheduled?
 3       A    In the morning.  I don't know what -- 10
 4    o'clock, 11.  I don't know.
 5       Q    Do you recall what time you arrived at UBS?
 6       A    No.
 7       Q    And UBS's office is essentially 15th and --
 8       A    And K.
 9       Q    When you arrived at UBS, was anyone else there?
10       A    I think we all waited for Mr. Mann.  I think you
11    came with me or you came before Mr. Mann.  I think he came
12    by himself later, because he came from far away.  So, I
13    think you were there and Mr. Piper and myself, initially.
14       Q    And what transpired at the meeting?
15       A    That we agreed to liquidate the sale -- the
16    shares that were held in the name of Ellipso, but held
17    physically by Mann Tech in New Jersey, I think, with
18    Georgetown Securities or something like that.  And we
19    needed to sign the documents so Georgetown Securities
20    could send the stock certificate to UBS to process.
21       Q    Was the stock certificate present at the
22    meeting?
```

Case 1:05-cv-01186-RCL   Document 134-2   Filed 10/30/2007   Page 18 of 18

Yahoo! Mail - legalmanagement@yahoo.com                                      Page 1 of 1

# YAHOO! MAIL

Print - Close Window

**From:** "David Castiel" <dcastiel@ellipso.com>
**To:** "'rb patterson'" <legalmanagement@yahoo.com>
**Subject:** RE: payment arrangements
**Date:** Tue, 16 Nov 2004 09:55:54 -0500

Hi Bob

Since you have bombarded me with e-mails re. your compensation, I feel compelled to answer in writing the topics we discussed last week in person. Although many elements of your presentation are correct, not all are. In particular I never knew until May/June 2004 that you were 50% owner of MannTech and you had a stake in the upside of the ICO stock. Neither you nor John alerted me to that. The effect is that while I believed in January that you were negotiating with MannTech on behalf of Ellipso, an activity you were accruing $10,000/month and $10,000 in deferment bonus, in fact you were on both sides of the transaction. I blame this position in part for the confusion of the actual agreement and the ensuing argument over the summer regarding the forced disposition of the stock.

In fact several issues are unresolved regarding the stock, and the effort, fees and other arrangements relating to the Registry as well and of course the LookNet deal, where a similar two-sided position exists.

I propose that we attempt to resolve everything, including what Ellipso owes you for past services, how it will be paid and what role you play at TRSC, MannTech and/or Ellipso going forward and of course at what rate. I think it will be to everyone's benefit to resolve all this as a whole rather than piecemeal. We could do this in the intervening time prior to actual receipt of early 881 revenues. I have also asked Jack Anderson to give me a precise analysis of the accounting submitted to us by LookNet in order to come to a fair resolution.

We can meet later in the week (Thursday, or the dreadful Friday). Let me know.

David

-----Original Message-----
**From:** rb patterson [mailto:legalmanagement@yahoo.com]
**Sent:** Friday, November 12, 2004 11:43 AM
**To:** david castiel
**Subject:** payment arrangements

David,
    Attached is a letter memorializing our discussions for payment arrangements for the May 31, 2004 invoices
    We also need to address the question of payment arrangements for post May 31, services.
                                        Bob

Do you Yahoo!?
Check out the new Yahoo! Front Page. www.yahoo.com


EXHIBIT 13

PATT 000012

http://us.f541.mail.yahoo.com/ym/ShowLetter?box=Inbox&MsgId=9685_0_3899189_150...  3/23/2007