UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ELLIPSO, INC., | ) | |
| | ) | |
| Plaintiff and | ) | |
| Counter-Defendant | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-1186 (RCL) |
| | ) | |
| JOHN B. MANN, *et al.*, | ) | |
| | ) | |
| Defendants and | ) | |
| Counter-Plaintiffs | ) | |

**MOTION FOR SUMMARY JUDGMENT**
**OF DEFENDANTS JOHN D. MANN AND MANN TECHNOLOGIES, LLC**

COME NOW Defendants/Counter-Plaintiffs, John B. Mann and Mann

Technologies,

LLC (hereinafter collectively referred to as the "Mann Defendants" or "Mann"), by their

undersigned counsel, and respectfully move this Court, pursuant to Fed. R. Civ. P. 56

and L. Cv. R. 56.1, for summary judgment on all nine counts of the Complaint directed

against the Mann Defendants, specifically Counts I (Rescission), II (Lender Liability /

Breach of Fiduciary Duty), III (Lender Liability / Implied Covenant of Good Faith and Fair

Dealing), IV (Lender Liability / Fraudulent Nondisclosure), VIII (Fraud), IX (Conversion),

X (Trover / Replevin), XI (Civil Conspiracy), and XIII (RICO).

In support of their Motion, the Mann Defendants rely upon the attached Statement

of Points and Authorities, Statement of Material Facts as to Which No Genuine Issue

Exists, and exhibits.

Respectfully submitted,

/s/ Christopher G. Hoge
      Christopher G. Hoge #203257
Counsel for Defendants/Counter-Plaintiffs
John B. Mann and Mann Technologies, LLC

CROWLEY, HOGE & FEIN, P.C.
1710 Rhode Island Avenue, N.W.
7th Floor
Washington, D.C.  20036
(202) 483-2900

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that true copies of the foregoing Motion were, this

30th day of November, 2007, served electronically upon:

VANESSA CARPENTER LOURIE, ESQ.
4400 MacArthur Blvd., N.W.
Suite #205
Washington, D.C.  20007-2521
Co-Counsel for Plaintiff/Counter-Defendant

and

LINDA AWKARD, ESQ.
4201 Cathedral Ave., N.W.
Suite #1416W
Washington, D.C. 20016
Co-Counsel for Plaintiff/Counter-Defendant

and via first class mail, postage prepaid, upon:

> ROBERT B. PATTERSON
> 11775 Stratford House Place
> #407
> Reston, VA 20190
> Defendant/Counter-Plaintiff *Pro Se*


/s/ Christopher G. Hoge
    Christopher G. Hoge

cgh/z/wpdirs/civ
mannmsj.wpd

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ELLIPSO, INC.,                           )
                                         )
        Plaintiff and                    )
        Counter-Defendant                )
                                         )
        v.                               )      Civil Action No. 05-1186 (RCL)
                                         )
JOHN B. MANN, *et al.*,                  )
                                         )
        Defendants and                   )
        Counter-Plaintiffs               )


## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT <u>OF DEFENDANTS JOHN D. MANN AND MANN TECHNOLOGIES, LLC</u>


## I. <u>INTRODUCTION</u>

Despite the large number of counts and the amount of verbiage contained in Plaintiff's unwieldy complaint, the essence of its case against the Mann Defendants comes down to two propositions: 1) that the Mann Defendants, along with Co-Defendant Patterson, failed to inform Plaintiff of Patterson's relationship with the Mann Defendants at the time Mann made a loan to Plaintiff; and 2) that the terms of the loan by the Mann Defendants to Plaintiff were so unfair as to be unconscionable.

However, information developed during the discovery and investigation phase of this litigation, including documents, responses to requests for admissions and interrogatories, and deposition testimony, makes it clear beyond peradventure that:  1) Plaintiff ratified the terms of the loan agreement *after* being fully informed of the exact relationship between Defendants Patterson, Mann and Mann Tech; and 2) the loan

terms were not only fair and commercially reasonable under the circumstances, but substantially identical to terms that Ellipso had offered another potential lender just prior to its negotiations with Mann.

The admissions made by Ellipso and documents discovered over the past two years of this litigation make it clear as a matter of law that Plaintiff cannot prevail on any of its claims.

## II.  STATEMENT OF RELEVANT FACTS

This case involves a collateralized loan transaction between Ellipso, Inc., "a telecommunications company that, among other endeavors, markets satellite telecomm [sic] products to third-parties for their use in routing telephone calls" (Complaint, par. 1), and Mann Technologies, LLC ("Mann Tech"), a company formed by Defendants Mann and Patterson, at the suggestion of David Castiel, to make the loan.  Ex. 1 (affidavit of John Mann), par. 12-13.

### A.  History of the Loan Transaction

Castiel is and has always been the CEO of Ellipso.  Ex. 2 (deposition of D. Castiel), at p.    9.  Dr. Castiel has degrees in physics and economics, a Ph.D in physics and has done post-doctoral work.  *Id.*, pp. 8-9.  Before forming Ellipso in 1990, he held executive positions with General Electric, Booz Allen Hamilton and other major companies.  *Id.*  At all times relevant to this case, the only person who executed contracts and could bind Ellipso was Castiel.  Ex. 1, par. 4.  Castiel was Ellipso's only

full-time employee, and in 2004 he operated it from his home.  *Id.*

The loan agreement in question was entered into in January of 2004.  Ex. 3.   In late 2003 Ellipso was experiencing great financial difficulty and, according to its financial statement for 2003 and 2004 was in fact insolvent.  Ex. 4.   In June of 2003 it had moved from its headquarters at 1133 21st Street, N.W., Washington, D.C.  Ex. 1, par. 50.  As of January 30, 2004, Ellipso had currently due debts in excess of $2,000,000.  Ex. 4.

However, one asset which Ellipso did own at the time, both directly and through its subsidiaries, was 2.2 million shares of stock in a publicly traded company known as ICO Global Communications (Holdings) Ltd. ("ICO").  Ex. 2, p. 78.  Ellipso had acquired its ICO stock as the result of several agreements that Ellipso and its wholly-owned subsidiary, MCHI, had negotiated with ICO .  Ex. 1, par. 47.

At all times relevant hereto, ICO was a thinly traded stock with a very volatile price.  It was traded over-the-counter, on a "pink sheet" system, and was not listed on any of the major stock exchanges.  As of January 30, 2004, the date of the Mann loan, its price was $0.46 per share.  Ex. 5.  In the year preceding the loan its price had fluctuated from a low of $ 0.36 per share to a high of $1.91.   *Id.*   Due to the low volume of trading, even these prices were more theoretical than real.  Three years prior to issuance of the stock, ICO had declared bankruptcy, effectively wiping out all shareholder value in the company.   Ex. 1, par. 46.

In late 2003 and early 2004 Ellipso had tried unsuccessfully to sell or borrow against its ICO shares.  Ex. 6 (Plaintiff's Responses to Requests for Admissions), Nos.18 and 30.  One potential lender it negotiated with was a company called Argyll Equities ("Argyll").  A number of draft term sheets were exchanged by Ellipso and Argyll in early

4

2004.  On January 12, 2004, Dr. Castiel responded to a proposed Argyll term sheet by hand-writing notes indicating the terms he was willing to agree to.  Ex. 2, pp. 79-80; Ex. 7(a).  Those terms included a loan amount of $89,250 and the use of 492,611 shares of ICO stock as collateral.  *Id.*   A final loan agreement was tendered by Argyll, but was never executed.  Ex. 2, pp. 79-81; Ex. 7(b).

The essential terms of the Argyll loan to which Castiel was willing to agree, as demonstrated by Ex. 7(a), were substantially identical to those of the loan agreement entered into by the parties hereto.  Those terms included, *inter alia*, a three-year, *non-recourse* loan secured by ICO stock, with the lender and the borrower equally sharing any appreciation in the value of the collateralized stock subsequent to the loan date.  *Id.*  The Mann Defendants had nothing to do with the negotiation of the Argyll loan.  Ex. 1, par. 11.

In late 2002 John Mann was introduced to Castiel by Robert Patterson, a social acquaintance since 1986.  Ex. 1, par. 3.  At the time Patterson, through his company Consulting Management, Ltd., was acting as a consultant to Ellipso, pursuant to a Consulting Agreement dated October 1, 2002.  Complaint, par. 12.  One of Patterson's functions was to "introduce Ellipso to individuals and entities that could invest and/or loan cash to Ellipso".  *Id.*  At the time of the introduction, and indeed at all times relevant to this litigation, Mann did not know that Patterson had been disbarred and convicted of a felony offense.  Ex. 1, par. 5.   However, Castiel has admitted that he knew of Patterson's conviction and incarceration as early as November, 2002.  Ex. 2, pp. 83-84.

In late 2003 Patterson contacted Mann at Castiel's request to discuss Mann's potential investment in several Ellipso "opportunities", such as a Registry function for

5

Ellipso's imminent 881-service offerings. Ex. 1, par. 6. A meeting was held among

Mann, Castiel and Patterson in late November, 2003, at which time Castiel proposed that

Mann and Patterson set up a new company to purchase from Ellipso the right to provide

the Registry function for the 881 service Ellipso was about to introduce. Castiel also

suggested setting up a separate company, Mann Tech, to purchase some of Ellipso's

ICO shares. He and Patterson showed Mann drafts of two agreements, one for the sale

of the ICO securities to Mann Tech, and the other for a new company, to be called The

Registry Solutions Company ("TRSC"), to hold the exclusive rights to provide the 881-

service Registry function. Mann agreed to consider these opportunities. *Id.*, par. 7; Ex.

8 (Affidavit of Robert Patterson dated November 21, 2005), par. 41, 43, 44 and 46.

In December of 2003 Patterson emailed Mann a draft "Contract for Sale of

Securities" under which Mann would purchase up to 500,000 ICO shares from Ellipso at

a price of $0.50 per share. Ex. 9. In late December, 2003 and early January, 2004,

Castiel was also negotiating with Argyll for a loan collateralized by Ellipso's ICO stock.

Ex. 2, pp. 79-81. As part of the negotiation, on January 13, 2004 Castiel sent Patterson

an email with a draft attachment authorizing the transfer of 250,000 shares of ICO stock

to Argyll. Ex. 10.

After the Argyll deal fell through, Castiel emailed Patterson a draft loan agreement

with Mann Tech which included terms almost identical to those he had proposed to

Argyll, including the amount of the loan ($90,000), and that it was a three year, non-

recourse loan, was collateralized with ICO stock, and provided that the lender and

borrower would equally share any increase in the value of the collateral over the term of

the loan. Ex. 2, pp. 119-20; Ex. 27. The final Collateralized Loan Agreement, dated

6

January 30, 2004 and executed by Ellipso and Mann Tech, contained those same terms. Ex. 3.  Pursuant to the Agreement, on January 30, 2004 Castiel wrote to ICO's counsel authorizing the reissuance of 492,611 shares of ICO stock to Mann Tech.  Ex. 11.   On February 25, 2004, Mann Tech was incorporated in Nevada.   Ex. 12.

## B.  Terms of the Agreement

The financial terms of the Mann Tech / Ellipso loan agreement are actually more favorable to Ellipso than those of the proposed loan agreement with Argyll.  Argyll originally proposed to lend Ellipso an amount equal to 35% of the trading value of the pledged ICO stock.  Castiel counter-proposed a 40% loan, which was rejected by Argyll. Ex. 2, pp. 91-93; Ex. 7(a).  The Mann Tech / Ellipso loan agreement calls for a 40% loan to value ratio.  Ex. 3.  The proposed Argyll agreement and the Mann Tech agreement are substantially identical.  *Id.*; Ex. 7.

The Mann Tech / Ellipso loan agreement on its face waives any formal Notice of Default, providing as follows in par 7.2:

> At any time after the date first above written, Lender shall thereupon have the rights, benefits, and remedies afforded to it under any of the Loan Documents with respect to the Collateral *and may take, use, sell or otherwise, encumber or dispose of the Collateral as if it were the Lender's own property.*  Borrower agrees that Lender may or may not proceed, *as it determines in its sole discretion*, with any or all other rights, benefits, and remedies that it may be entitled against the Borrower.  (Emphasis supplied).

This language is identical to that of the contract which Castiel had negotiated with Argyll. Ex. 7, par. 7.2.  Castiel understood at the time that the agreement allowed Mann Tech to retain a portion of any increase in value of the ICO stock to compensate it for the risk

inherent in a non-recourse loan, particularly where there was a danger that the ICO stock value could dramatically decrease.[1]  Ex. 2, pp. 130-32.  He also understood that Mann Tech was allowed to sell any of the ICO stock at any time during the term of the loan.  *Id.*

### C.  Amendments to the Agreement

In April of 2004 the value of the ICO stock unexpectedly increased to $1.50 per share.  Ex. 1, par. 18;  Ex. 5.   On April 21, 2004, Ellipso and Mann Tech executed an amendment to the loan agreement which provided that "MannTech shall liquidate ... 92,611 shares of the ICO [stock] ...".  Ex. 13.  It was estimated that Ellipso would receive $85,000 and Mann Tech $50,000 from this sale.  Ex. 2, p. 64.  However, Mann Tech was unable to sell stock pursuant to the amendment because Mann Tech's broker, First Georgetown Securities, required an authorization for the sale from Ellipso.  Ex. 1, par. 20.  From late April through early August of 2004, Ellipso failed to provide the necessary corporate resolution to enable the sale.  Ex. 1, par. 21; Ex. 8, par. 63.  Castiel was aware that Mann Tech required these documents for the ICO shares to be transferred, as a result of repeated communications with Mann.  *See, e.g.,* Ex. 14.  Moreover, the issue of the stock sale became less urgent when the value of the ICO stock fell on very low volume.  Ex. 1, par. 21; Ex. 5.

During the summer of 2004, Castiel proposed that Mann Tech return the

---

[1]In fact, that danger came to pass.  *See* Ex. 5 for the trading history of ICO during 2003 and 2004.  In October, 2004 the value dropped as low as $0.04 per share.

collateralized 492,611 shares of ICO stock so that Ellipso could sell them.  In return, he promised to replace the shares as collateral sometime after October, 2004.  Ex. 1, par. 22.  Mann rejected this proposal as an unsound business practice and a violation of the letter and spirit of the loan agreement.  *Id.*

There ensued a series of discussions among Mann, Patterson and Castiel about amending the loan agreement, and in fact the parties executed an amendment on August 2, 2004.  Ex. 15.  Pursuant to the amendment, Mann Tech and Ellipso executed a Joint Sale Order regarding the ICO stock.  Ex. 16.  Shortly thereafter, on August 8, 2004, Mann received an original stock certificate, #A-2008, for 492,611 shares of ICO stock, still in Ellipso's name.  Ex. 1, par. 25.  The next day, August 9, 2004, Mann emailed to Castiel and Patterson informing them of his receipt of the certificate and again requesting the Ellipso corporate resolution which would allow Mann to implement the August 2 amendment and sell ICO stock.  Ex. 17.  Castiel responded the next day with an email requesting Mann to provide him with the certificate and stating that "all necessary documentation" for the sale was at Ellipso's broker, UBS.  Ex. 18.   In a subsequent email dated August 11, 2004, Castiel advised Mann that the corporate resolution which UBS had on file for Ellipso was sufficient to allow the certificate to be deposited into Mann Tech's UBS account and sold, pursuant to the amendment.  Ex. 19.

On August 12, 2004, Castiel, Patterson and Mann met at UBS' Washington, DC office for purposes of issuing a sale order pursuant to the August 2 amendment.  It was agreed that Mann would actually be the issuer of the sale order.  Ex. 1, par. 31-2.   That same day Castiel deposited a $10,000 check he received from Mann pursuant to the

9

August 2 amendment.  *Id.*, par. 33.

On August 24, 2004, Ellipso transferred the 492,611 ICO shares from Ellipso's UBS account to Mann Tech's UBS account.  On August 27, 2004, Mann Tech sold 25,000 shares of ICO stock and received $11,869 in proceeds in its UBS account.  That same day half of those proceeds, $5,934, were transferred to Ellipso's UBS account, in compliance with the August 2 amendment.  Ex. 1, par. 34-36; Ex. 2, p. 101.

### D.  Ellipso Default on Loan Agreement

Ellipso has never made any of the required payments under the loan agreement.  Ex. 1, par. 17.  *See also,* "Opposition of Plaintiff/Counter-Defendant Ellipso, Inc. to Motion to Quash the Preliminary Injunction Entered November 2, 2005, as to Defendant Robert Patterson" (hereinafter referred to as "Opposition to Motion to Quash"), filed 11/26/07, at p. 6.  Section 2.2( c) of the Loan Agreement requires quarterly payments of interest, commencing on April 15, 2004.

From August 24 through September, 2004, the volume of ICO trading declined and the price dropped steadily, remaining well below the minimum sale price of $0.55 per share specified in the August 2 amendment.  Ex. 2, p. 128;  Ex. 5.  As a result, in late September, when the price of ICO had slipped to $0.16 per share and below, Mann and Castiel exchanged several emails about possible additional security for the Mann Tech loan, which by then was over five months in default.  Ex. 20.

During several meetings in October of 2004, with the ICO stock continuing to fall

and Ellipso in continued default, Mann again asked Castiel for additional security. Castiel declined, stating that "a deal is a deal".  Castiel went on to remind Mann that the loan was "non-recourse" and that Mann could look only to the collateralized ICO stock for repayment (thus implicitly agreeing to forfeiture of the collateral).  Ex. 1, par. 40. Castiel also suggested that Mann look to future gains from the 881-Registry service to compensate it for its losses.  *Id.*

By the end of October, 2004, the value of the ICO stock declined to $0.04 per share.  Ex. 5.  Ellipso did not communicate at all with the Mann Defendants from December of 2004 until it filed the instant lawsuit in June of 2005.  Ex. 2, pp. 101-105. During this period, Ellipso was selling some of its ICO stock.  Ex. 2, pp. 136-8.

### E.  Ellipso's Knowledge of Patterson Role with Mann Tech

Castiel was fully aware of Patterson's felony conviction and incarceration in November of 2002.  Ex. 2, pp. 83-4.  He also knew that Patterson was again incarcerated from May to October of 2003.  *Id.*

Castiel has testified at his deposition that by May or June of 2004 he was aware that Patterson was receiving some sort of "commission or a kickback" from Mann Tech. Ex. 2, p. 189.  He further attests that, immediately following the meeting of Castiel, Patterson and Mann at the UBS offices on August 12, 2004, he first became fully aware of the nature of Patterson's involvement in Mann Tech.  *Id.*, pp. 94-101.

11

However, *after* Castiel, by his own admission, was fully on notice of Patterson's one-half ownership of Mann Tech, he deposited the $10,000 check that Mann had delivered to him pursuant to the August 2, 2004 amendment to the loan agreement.  *Id.*, pp. 105-06.  *See also*, Ex. 25 (the $10,000 check) showing date of deposit in Ellipso's account as August *13*, 2004.

Furthermore, in October of 2004, *after* being fully advised of Patterson's role, Castiel told Mann that "a deal is a deal" in response to Mann's request for additional security.  Ex. 1, par. 40.   After August 12, 2004, and throughout the fall of that year, Castiel met with Mann and Patterson regularly and conducted business just as before.  Ex. 23 includes some representative emails from that period.  Furthermore, during that period Ellipso continued to pursue enforcement and revision of its agreements with Mann Tech.  *Id.*

Of great significance is an email sent by Castiel to Patterson on November 16, 2004, in which he stated that "[I]n particular I never knew until May/June 2004 that you were 50% owner of Mann Tech and you had a stake in the upside of the ICO stock".  Ex. 21.  Even though that email was not produced by Ellipso in discovery and was found by Patterson on his computer, at his deposition Castiel acknowledged the validity of the email and the accuracy of the quoted statement.  Ex. 2, pp. 170-1.   This directly contradicts Ellipso's allegation, at par. 58 of its Complaint, that "Plaintiffs were *at all times ignorant of the facts* the Lender failed to disclose...."  (Emphasis supplied).  *See also*, Ex. 26 (10/20/04 email from Castiel to Patterson.

Other than filing the instant lawsuit, Ellipso has taken no steps to repudiate the loan agreement or the amendment since August 12, 2004.  No letter, email or other

correspondence seeking to rescind the agreement has ever been received by the Mann Defendants or, upon information and belief, by Patterson.  Ex. 1, par. 43-44.   While Ellipso has very recently claimed that its failure to make any of the interest payments under the agreement evidences its intent to rescind the agreement (Opposition to Motion to Quash Preliminary Injunction, at p. 6), in fact such failure is nothing more than an act of default.

Ellipso's third quarterly interest payment was due on October 30, 2004.  At that time, or at any other time, Ellipso could have paid off the $90,000 loan and received back the collateral.  Ex. 1, par. 48.   However, it did not do so, and after the third missed quarterly payment (at a time when ICO was selling for approximately $0.04 per share), Mann took possession of the collateral and commenced selling it.  Ex. 1, par. 41, 48.  On October 2 of 2004, Ellipso, through its subsidiary, MCHI, owned 1,571,547 shares of ICO stock which was freely traded and valued at $0.16 per share that day.  Ex. 24.

### III.  ARGUMENT

#### A.  The Standard for Summary Judgment

The criteria for the grant of a motion for summary judgment are well-known and the Mann Defendants will not here provide a lengthy dissertation on the subject.  Suffice it to say that summary judgment "shall be rendered forthwith if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The purpose of summary judgment "is to dispose of cases where there is no genuine issue of fact, even though an issue may be raised formally by the pleadings." *Fletcher v. Krise*, 73 App. D.C. 266, 269, 120 F.2d 809, 812 (D.C. 1941).

The mere assertion of a "scintilla of evidence" is not enough to frustrate a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). A court must discredit such an assertion if it appears "that there is no substantial evidence on it." *Miller v. Miller*, 74 App. D.C. 216, 219, 122 F.2d 209, 212 (D.C. 1941) (citing *Whitaker v. Coleman*, 115 F.2d 305, 306 (5th Cir. 1940); *see also Agosto v. I.N.S.*, 436 U.S. 748, 772 (1978) (Powell, J., dissenting) ("[T]here must be a degree of substantiality to the evidence proffered in opposition to a summary judgment motion if the motion is to be defeated."). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

## B. Count By Count Analysis

### 1. <u>Count I - Rescission</u>

Ellipso has based its claim for rescission on three alternative grounds - fraud,

unconscionability and economic duress.  None of these grounds passes muster when examined in light of the record developed herein.

### a. <u>Fraud</u>

It is well established in this jurisdiction that fraud consists of six elements at common law:  "(1) a false representation (2) made in reference to a material fact, (3) with knowledge of its falsity, (4) with the intent to deceive, and (5) an action that is taken in reliance upon the representation . . . .  At least in cases involving commercial contracts negotiated at arm's length, there is the further requirement (6) that the defrauded party's reliance be reasonable."  *Park v. Sandwich Chef, Inc.*, 651 A.2d 798, 801 (D.C. 1994) (citing *Hercules & Co. v. Shama Restaurant, Inc.*, 613 A.2d 916, 923 (D.C. 1992)).  Fraud must be plead with particularity.  *Park*, 651 A.2d at 802 n.3 (citing *Hercules*, 613 A.2d at 923).

In this case, the alleged fraud is the failure of the defendants to advise Ellipso of Patterson's involvement with Mann Tech.  "[M]ere silence does not constitute fraud unless there is a duty to speak".  *Kapiloff v. Abington Plaza Corp.*, 59 A.2d 516, 517 (D.C. 1948).  A series of arm's length transactions generally will not impose a duty to speak.  *See, e.g.*, *One-O-One Enterprises, Inc. v. Caruso*, 270 U.S.App.D.C. 251, 254-5, 848 F.2d 1283, 1286-7 (1988) (upholding final, fully integrated contract over "defendants' prior representations (and defendants' nondisclosure of negotiations inconsistent with those representations)").

The Collateralized Loan Agreement between Ellipso and Mann Tech is a fully integrated contract.  Ex. 3, par. 8.7.  The test for a completely integrated agreement is,

according to the *Hercules* opinion, *supra,* as follows:

> If [the parties to a contract] intended the writing to be a final expression of the terms it contains, but not a complete expression of the terms agreed upon – some terms remain unwritten – the agreement is *partially integrated*. If the parties intended the writing to be a complete expression of all the terms agreed upon, as well as a final expression of the terms it contains, the agreement is *completely integrated.*

*Hercules & Co. v. Shama*, *supra*, 613 A.2d at 927 n.14 (emphasis supplied) (citing E. Allen Farnsworth, Contracts, Sec. 7.3 at 198 (1990)). If the Court finds from the language of par. 8.7 of the Loan Agreement that the contract was "a complete expression of all the terms agreed upon, as well as a final expression of the terms it contains", then extrinsic evidence of negotiations leading up to the agreement is deemed irrelevant. *Id.*

Even if Ellipso could get past the "mere silence" and "integrated contract" barriers, its claim of fraud must fail because no false representation (or omission) was made by the Mann defendants; because Ellipso's claimed reliance on Patterson's statements (or non-statements) could not have been reasonable; and because Ellipso affirmed the contract through continued performance. Moreover, Ellipso retained the benefits of the contract, thereby waiving any right it might have to rescission.

First, at the time of the initial Loan Agreement, January 30, 2004, there was no "dual role" of Patterson to disclose. As attested by Robert Patterson in his attached affidavit, Ex. 8, at the time of the agreement Patterson advised Castiel that if a) Ellipso and Mann reached an agreement on the collateralized loan, and b) if Mann formed a company to effectuate that loan transaction, and c) if Mann were agreeable, then Patterson intended to seek a participating interest in that company. Ex. 8, par. 42. In

fact, Mann Tech was incorporated in Nevada in February, 2004, after the loan
agreement had been signed.  Ex. 12.  Thus, it is uncontroverted that there was no
omission of a material fact in the discussions between Mann and Castiel leading up to
the January 30, 2004 agreement.

Secondly, Castiel has admitted that he knew of Patterson's felony conviction and
disbarment as early as November of 2002, well before any of the events herein.  Ex. 2,
pp. 83-4.  "A misrepresentation, even if relied upon, has no legal effect unless the
recipient's reliance on it is justifed".  *Weaver v. Bratt*, 421 F. Supp. 2d 25, 32 (DDC 2006)
(Lamberth, J.) (citing Restatement (Second) of Contracts, Sec. 164, cmt. d (1981)), *aff'd*
No. 06-5140, 2006 U.S.App.LEXIS 28691 (D.C. Nov. 17, 2006).  Reliance by
sophisticated and educated individuals usually vitiates a party's claim of fraud or
misrepresentation in the inducement.  Id., citing *Schlaifer Nance & Co. v. Estate of
Warhol*, 119 F.3d 91, 98 (2nd Cir. 1997).  Clearly Dr. Castiel, with his high level of
erudition, knew exactly whom he was dealing with in Mr. Patterson.

Third, and perhaps most significantly, after Castiel learned unequivocally of
Patterson's involvement with Mann Tech, Ellipso affirmed the Collateralized Loan
Agreement in a number of respects.    At his deposition, Castiel admitted that:

> The first indication Mr. Patterson was a double agent was in June 2004 when Mr.
> Patterson acknowledged he was getting a kickback from Mr. Mann, a commission
> or some upside or some - some kickback, which I thought was very unethical of
> Mr. Mann to bribe my own guy.

Ex. 2, pp. 106-7.  This is consistent with an email Castiel sent Patterson on November
16, 2004, stating that:

> In particular, I never knew until May/June 2004 that you were 50% owner of
> MannTech and you had a stake in the upside of the ICO stock.  Neither you nor

John alerted me to that.

Ex. 21.

Having learned of this fact in May/June, 2004, Ellipso proceeded to perform the

following acts in affirmance of the January 30, 2004 Collateralized Loan Agreement:

- It negotiated and executed the August 2, 2004 amendment to the
  agreement.  Ex. 15.

- On August 12, 2004 it accepted a $10,000 check from Mann pursuant to
  the August 2 amendment, and on August 13 deposited such funds in its
  account at UBS.    Ex. 1, par. 33; Ex. 25.

- On August 24, 2004, Ellipso transferred the 492,611 ICO shares from its
  UBS   account to Mann Tech's UBS account.  Ex. 1, par. 35.

- On August 27, 2004, Ellipso accepted $5,934 from Mann Tech,
  representing one-  half the proceeds from Mann Tech's sale, that same
  day, of 25,000 shares of the   collateralized ICO stock.  Ex. 1, par. 36-7;
  Ex. 2, p. 101.

- In October of 2004, while discussing Mann's request for additional security
  due to   the ICO stock's falling price, Castiel responded that "a deal is a
  deal".  Ex. 1, par. 40.

Even if Castiel had not admitted in his November 16, 2004 email, Ex. 21, that he

was fully aware of the relationship between Patterson and Mann as of May/June 2004,

his deposition testimony establishes beyond doubt that he knew of it after his meeting

with Mann and Patterson on August 12, 2004.  Ex. 2, pp. 94-101.  Most of the acts of

affirmation noted above occurred after the August 12 "confession", including the deposit

of the $10,000 check on August 13..

In its decision affirming this Court's imposition of a preliminary injunction, the

District of Columbia Court of Appeals stated as follows:

Where a party to an executed contract discovers a material misrepresentation
made in the execution of the contract, that party may elect one of two mutually

exclusive remedies.  He may either affirm the contract and sue for damages, or repudiate the contract and recover that with which he or she has parted. ... If the fraud victim "affirms the contract through continued performance, that party is precluded from seeking rescission."

*Ellipso, Inc. v. Mann, et al.*, 375 U.S.App.D.C. 270, 275, 480 F.3d 1153, 1158 (2007)

(citations omitted).  As to the specifics of this case, the appellate court stated:

> Mann Tech argues next that Ellipso did not show a likelihood of success on its fraud claim because it had, in fact, affirmed the loan agreement with full knowledge of Patterson's dual roles with Ellipso and Mann Technologies.  *Mann Tech is correct that if Ellipso continued to perform under the contract after learning of Patterson's conflict, Ellipso cannot then seek rescission of the contract.*

*Id.*  (Emphasis supplied; citations omitted).

In its opposition to Defendant Patterson's Motion to Quash the Injunction, Ellipso has raised the novel argument that its default on the loan agreement constitutes a repudiation, thus entitling it to a rescission.  With nary a citation to support this imaginative gambit, Ellipso relies on basic common law principles that "whether a party has ratified a contract is inherently a question of fact".    Opposition to Motion to Quash, at p. 8 (citing *Kuwait Airways Corp. v. Am. Sec. Bank*, 890 F.2d 456, 465 (D.C. Cir. 1989).  However, for purposes of a motion for summary judgment, when faced with irrefutable evidence of ratification as specified above, it is incumbent on Ellipso to offer some evidence (and not just a scintilla) of non-ratification.  *Anderson v. Liberty Lobby, Inc.*, *supra*, 477 U.S. at 252

Once Patterson's role had been made crystal clear to Ellipso, at the latest on August 12, 2004, it did nothing whatsoever to repudiate the January 30, 2004 loan agreement, as amended.  Castiel never gave notice to the Mann Defendants, to Patterson, to UBS or to anyone else that he believed Ellipso had been defrauded.  Ex. 2, pp. 101-03; Ex. 23 (Ellipso Answers to Interrogatories), at Answer #1.  It never attempted

19

to rescind its authority to UBS to transfer ICO shares to Mann Tech or to sell some

shares in late August, 2004.  Ex. 2, p. 101.  Throughout the fall of 2004 Castiel met

regularly with Mann and never claimed Ellipso had been defrauded.  Ex. 1, par. 37-42.  A

number of emails sent by Castiel to Mann during that period evidence Ellipso's intent to

continue abiding by the agreement.   E.g., Ex. 24.   At his deposition, Castiel admitted

that the only action he took as a consequence of learning of this "fraud" was to consult

an attorney three or four months later, in November or December of 2004.  Ex. 2, p. 101-

103.

Most significantly, Ellipso retained the benefit it had received under the

agreement, namely, the $90,000, and never offered to pay it back to the Mann

Defendants.  The equitable remedy of rescission requires that the party seeking it restore

the other party to its position at the time the contract was made. *Dean v. Garland*, 779

A.2d 911, 915 (D.C. 2001).   Ellipso's rescission claim must fail for that reason alone.


### b.  Unconscionability

"A contract may be unconscionable either because of the manner in which it was

made or

because of the substantive terms of the contract or, more frequently, because of a

combination of both" - procedural unconscionability or substantive unconscionability.

*Urban Investments, Inc. v. Branham*, 464 A.2d 93, 99 (D.C. 1983) (quoting *Bennett v.*

*Fun & Fitness*, 434 A.2d 476, 480 (D.C. 1981)) These elements of unconscionability

amount to (1) "an absence of meaningful choice on the part of one of the parties", and

(2) "contract terms which are unreasonably favorable to the other party.  *Branham*, 464

A.2d at 99 (quoting *Williams v. Walker-Thomas Furniture Co.*, 121 U.S.App.D.C. 315, 319, 350 F.2d 445, 449 (1965)).

The seminal *Walker-Thomas* decision elaborated on the factors to be considered in evaluating a claim of unconscionability:

> Whether a meaningful choice is present in a particular case can only be determined by consideration of all the circumstances surrounding the transaction. In many cases the meaningfulness of the choice is negated by a gross inequality of bargaining power. The manner in which the contract was entered is also relevant to this consideration. Did each party to the contract, considering his obvious education or lack of it, have a reasonable opportunity to understand the terms of the contract, or were the important terms hidden in a maze of fine print and minimized by deceptive sales practices? Ordinarily, one who signs an agreement without full knowledge of its terms might be held to assume the risk that he has entered a one-sided bargain. But when a party of little bargaining power, and hence little real choice, signs a commercially unreasonable contract with little or no knowledge of its terms, it is hardly likely that his consent, or even an objective manifestation of his consent, was ever given to all the terms.

121 U.S.App.D.C. at 319, 350 F.2d at 449.  Of course, Mrs. Williams was a minimally-educated consumer asked to sign a contract of adhesion written by a large, sophisticated business.  *See, Williams v. Walker-Thomas Furniture Co.*, 198 A.2d 914, 915 (D.C. 1964).  Dr. Castiel, on the other hand, is a Ph.D physicist with extensive business experience who wrote the agreement in question himself, based on a nearly identical contract he had been negotiating with another potential lender.

In the Complaint, Ellipso cites the following provisions of the Collateralized Loan Agreement as being "unconscionable and one-sided":

-    ... in the event Ellipso defaulted under the terms of the loan agreement Mann Tech had the right to accelerate the loan and exercise its onerous and one-sided rights and remedies with respect to the Collateral. (Complaint, par. 21).

-    ... the Pledge Agreement required that the ICOHA shares be retitled and transferred to and in the name of Mann Tech and that all ICOHA shares be

21

transferred into an account with USB Financial services of Washington, DC, owned and controlled by Mann Tech. (*Id.*, par. 22).

-       The terms of the Loan Documents also unconscionably permitted, among other things, that upon default by Ellipso and after the cure period, Mann tech was not obligated to forward to Ellipso any proceeds from its sale of the ICOHA Shares which exceeded Ellipso's indebtedness.  Rather, Patterson inserted language allowing Mann Tech to utilize all cash proceeds from the sale of ICOHA Shares in its sole discretion. (*Id.*, par. 23.)

Even assuming, *arguendo*, that Ellipso could clear the hurdle of procedural unconscionability, given Dr. Castiel's sophistication and the manner in which the agreement was negotiated, the cited examples come nowhere close to establishing substantive unconscionability under the circumstances.   This was a high risk, non-recourse loan to a debt-ridden, out-of-work and out-of-money small business.  The collateral was highly volatile in price, thinly traded, and at many points during the relevant time period was worth substantially less than the amount of the loan.  For example, on October 25, 2004 the value of the collateral was less than $10,000, with volume of trading so low that even that valuation was, at best, a high-end estimate.  Ex. 5.

        The right to accelerate a loan repayment based upon the debtor's default is so standard as to be familiar to any homeowner who has applied for a mortgage.  As for application of the proceeds of sale of the collateral, the loan documents provide that the lender must credit to the borrower 50% of any appreciation of the collateral after the date of closing.  Ex. 3, par. 2.3.  It is only in the event of default that Mann Tech could exercise full control over the collateral.  *Id.*, par. 7.2.   This very provision was included in the draft contract with Argyll, which the Mann Defendants had nothing to do with and which was used by Castiel as the model for the loan agreement herein.  Ex. 7, par. 7.2.

22

### c. **Economic Duress**

Economic duress serves as a defense to the enforcement of a contract when a party can establish "(1) an improper threat and (2) the lack of a reasonable alternative." *Osborne v. Howard Univ. Physicians, Inc.*, 904 A.2d 335, 339 (D.C. 2006). A threat is improper when:

> (a) what is threatened is a crime or a tort, or the threat itself would be a crime or a tort if it resulted in obtaining property,
>
> (b) what is threatened is a criminal prosecution,
>
> (c) what is threatened is the use of civil process and the threat is made in bad faith, or
>
> (d) the threat is a breach of the duty of good faith and fair dealing under a contract with a recipient.

*Id.* (adopting Restatement (Second) of Contracts Sec. 176(1) (1981)).

The defense of duress renders a contract voidable rather than void. *Ozerol v. Howard University*, 545 A.2d 638, 643 (D.C. 1988) (adopting Restatement (Second) of Contracts, Sec. 175, which distinguishes physical compulsion from the deprivation of a reasonable alternative, and renders a contract void for the former but voidable for the latter). Even when a party succeeds in proving duress, "the contract at issue is not voidable if the victim has accepted benefits under that contract, thereby ratifying it." *Osborne*, 904 A.2d at 340 n. 4 (citing *Goldstein v. S & A Rest. Corp.*, 622 F. Supp. 139, 145 (D.D.C. 1985)).

Ellipso's claim of economic duress cannot, as a matter of law, hold up on the record of this case.  No physical coercion or threat has even been alleged.   Nor has there been an allegation of lack of a reasonable alternative under the circumstances of this loan.

### d.  Retention of Benefits of the Contract

Most significantly, Ellipso retained the benefit it had received under the agreement, namely, the $90,000, and never offered to pay it back to the Mann Defendants.  The equitable remedy of rescission requires that the party seeking it restore the other party to its position at the time the contract was made.  *Dean v. Garland, supra*, 779 A.2d at 915.   Ellipso's rescission claim must fail for that reason alone.

Just as reaffirmation of a contract and acceptance of benefits thereunder precludes a claim for fraud, so do they constitute a defense to the claim of rescission. Affirmation of a contract through continued performance precludes rescission later on. *Id.* (referring to exclusionary choice between affirmation and rescission as "the doctrine of election of remedies") (citations omitted).

### 2.  Count II - Lender Liability / Breach of Fiduciary Duty

"The relationship between a debtor and a creditor in a loan transaction is 'ordinarily a contractual relationship . . . and is not fiduciary in nature.'"  *Overseas Private Inv. Corp. v. Industria de Pesca, Inc.*, 920 F. Supp. 207, 210 (D.D.C. 1996) (quoting *Yousef v. Trusts Bank Savings*, 568 A.2d 1134, 1138 (Md. App. 1990)); *see also,*

24

*Williams v. Federal Land Bank*, 293 U.S. App. D.C. 343, 346, 954 F.2d 774, 777 (1992) (discussing relevant case law and noting that the general failure to find a fiduciary duty in lenders arises from its potential to chill the loan market); *Continental Bank, N.A. v. Everett*, 964 F.2d 701, 704 (7th Cir. 1992) ("Banks' self-interest leads them to nose out the value of collateral; if they do not, they are apt to suffer loss. Borrowers and guarantors have their own reasons to know the value of the assets. None acts as fiduciary of another."). Parties owe fiduciary duties only under "facts suggestive of a special relationship." *Williams*, 293 U.S. App. D.C. at 346, 954 F.2d at 777.

"Special relationships" include such relationships as custodian of another's money (*Government of Rwanda v. Johnson*, 366 U.S.App.D.C. 98, 409 F.3d 368, 370 (2005)), or realtor in a home sale (*Goodman v. Tighe Woods*, 259 A.2d 594 (D.C. 1969); *Harten v. Loffler*, 31 App.D.C. 362 (1908). However, the District of Columbia Court of Appeals has been conservative in finding such a "special relationship" even in a case where there was a signed agreement for representation. *E.g., Urban Investments v. Branham*, 464 A.2d 93 (D.C. 1983).

Here, the Complaint alleges in paragraph 45 ten factors which it claims evidence such a "special relationship" between Ellipso and the Defendants. However, no case which the Mann Defendants have been able to find imposes such a relationship based on the types of factors specified in the Complaint. Rather, the only conclusion which can be drawn from the evidence in this case is that this was an arm's length loan transaction between the Mann Defendants and Ellipso. Mann never purported to represent Ellipso in any manner, and the two contracts discussed in the pleadings (one for the loan and one for the Registry) constitute irrefutable evidence of that.

25

3. **Count III - Lender Liability / Implied Covenant of Good Faith & Fair Dealing**

The D.C. Court of Appeals has recently adopted the definition of "good faith" in

the

context of contractual negotiations set forth in the <u>Restatement (Second) of Contracts</u>:

> The phrase "good faith" is used in a variety of contexts, and its meaning
> varies somewhat with the context. Good faith performance or enforcement
> of a contract emphasizes faithfulness to an agreed common purpose and
> consistency with the justified expectations of the other party; it excludes a
> variety of types of conduct characterized as involving "bad faith" because
> they violate standards of decency, fairness or reasonableness.

*Allworth v. Howard Univ.*, 890 A.2d 194 (D.C. 2006) (citing <u>Rest</u>. Section 205 cmt. a, and

elaborating that bad faith involves "subterfuges and evasions . . . . of the spirit of the

bargain, lack of diligence and slacking off, willful rendering of imperfect performance,

abuse of a power to specify terms, and interference with or failure to cooperate in the

other party's performance" (citing, *inter alia*, <u>Restatement</u>)); *see also Tymshare, Inc. v.

Covell*, 234 U.S.App.D.C. 46, 727 F.2d 1145, 1152 (1984) (describing the requirement of

good faith as an "excluder" of bad faith).

But when the concept of good faith enters to fill in the gaps of a contract, it does

not affect the negotiated terms, since it is just an estimate of what the parties would have

done had they thought to discuss the subject. *See Continental Bank, N.A. v. Everett*,

964 F.2d 701**,** 705 (7th Cir. 1992), *cited in Overseas Private Investment Corp. v.

Industria de Pesca*, 920 F. Supp. 207, 211 (DDC. 1996); *see also Adler v. Abramson*,

728 A.2d 86 (D.C. 1999) ("[T]he written language of a contract governs the parties' rights

unless it is not susceptible of clear meaning (or is the result of fraud, duress, or mutual

26

mistake)" (citing *Sagalyn v. Foundation for Preservation of Historic Georgetown*, 691 A.2d 107, 111 (D.C. 1997)).  Nor can a party's exercise of business discretion be the basis for a breach of the covenant of good faith.  *See Williams v. Federal Land Bank*, 729 F. Supp. 1387, 1390 (DDC 1990) (declining to find bad faith in defendants' refusal of plaintiffs' request to release loan collateral).

"Fair dealing" implies conduct that is reasonable, and not arbitrary or capricious. *Allworth*, 890 A.2d at 202 (citing *Adler v. Abramson*, 728 A.2d 86, 90 (D.C. 1999); *Alden v. Georgetown Univ.*, 734 A.2d 1103, 1112 n.11 (D.C. 1999)).  For example, rejection of a tenure application was not a violation of "fair dealing" principles because the university's actions were consistent with provisions in its Faculty Handbook.  *Id.* Moreover, Ellipso has failed to assert what an objectively fair loan agreement under the circumstances presented in January 2004 would have been, and how the terms actually negotiated by the parties were violative of those standards.  That alone is fatal to Count III. *Adler*, 728 A.2d at 90.  The undisputed facts establish that Ellipso offered, and Mann accepted, a loan agreement whose terms Ellipso had been willing to accept from another third party lender, Argyll.

### 4. <u>Count IV - Lender Liability / Fraudulent Non-Disclosure</u>

The Mann Defendants incorporate by reference their arguments with regard to the fraud allegations set forth in their discussion of Count I - Rescission.  Whether the claim of fraud is cloaked in the mantle of a rescission claim or a claim for lender liability, if there is no misrepresentation, and if reliance is not justified, and if the plaintiff affirms the agreement after

learning of the alleged fraud, the claim cannot stand.

### 5.  Count VIII - Common Law Fraud

The Mann Defendants incorporate by reference their arguments with regard to the fraud allegations set forth in their discussion of Count I - Rescission.

### 6.  Count IX - Conversion

Conversion is "any unlawful exercise of ownership, dominion or control over the personal property of another in denial or repudiation of his rights thereto." *Bucheit v. PLO*, 363 U.S. App. D.C. 342, 349 (2004) (citations omitted).

Here, Mann's possession and sale of the collateral was precisely in accordance with the Collateralized Loan Agreement between the parties.  Ex. 3.  Hence it is presumptively valid unless the contract is found to be invalid.  The only reasons suggested for invalidating the contract, i.e. fraud and unconscionability, have been discussed above and have no validity.  Therefore, there has been no conversion.

### 7.  Count X - Trover/Replevin

The first problem here is that trover and replevin are mutually inconsistent causes of action.  Trover is a claim for damages for wrongful conversion; replevin seeks return of the wrongfully converted goods.

The substance of Count X sounds in replevin, since it seeks return of the collateralized ICO shares.  However, Ellipso is only entitled to replevin if it can show the stock was wrongfully converted, which it cannot.   The stock was converted pursuant to a

valid and binding contract between the parties.

### 8.  <u>Count XI - Civil Conspiracy</u>

Civil conspiracy consists of four elements: "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." *Second Amendment Found. v. U.S. Conf. of Mayors*, 348 U.S.App.D.C. 238, 274 F.3d 521, 524 (2001) (citing *Halberstam v. Welsch*, 227 U.S.App.D.C. 167, 705 F.2d 472, 477 (1983)).   There is no independent tort of civil conspiracy in the District of Columbia.  *Halberstam*, 705 F.2d at 479.

Plaintiff's civil conspiracy claim fails because no "unlawful act" or "lawful act in an unlawful manner" can be shown from the evidence in this case.  The Mann Defendants incorporate by reference their prior arguments regarding fraud and unconscionability.

### 9.  <u>Count XIII - RICO</u>

To succeed in a civil RICO claim, a plaintiff must prove (1) a violation of 18 USCS §1962, and (2) resulting injury to the plaintiff's business or property.  Am. Jur. 2d Extortion § 208; *see also Western Associates Ltd. Partnership v. Market Square Associates*, 344    U.S.App.D.C. 257, 235 F.3d 629, 633 (2001) (elements of RICO include "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering

activity") (citations omitted); *Barlow v. McLeod*, 666 F. Supp. 222, 225 (DDC 1986) (directing plaintiffs to "specify what subsection of the Act has been violated", and to assert the essential elements of "existence of an enterprise, how it affects interstate commerce, and a pattern of racketeering activity").  Additionally, the "allegation requires pleading the existence of at least one overt act by a defendant in furtherance of the conspiracy and the assent of each defendant to the conspiracy."  *Barlow*, 666 F. Supp. at 225 (citing *Van Dorn Co. v. Howington*, 623 F. Supp. 1548, 1559 (N.D. Ohio 1985)).

For the same reasons Ellipso's civil conspiracy claim must fail, so must its RICO action.  Simply put, the allegation of racketeering in the Complaint is premised upon the alleged fraud, and if the fraud claim fails, so must the RICO claim.  Once again, the Mann Defendants incorporate by reference their previous arguments as to the fraud allegations.

## **CONCLUSION**

Because there is no genuine dispute as to any of the material facts relating to Plaintiffs' claims of fraud or unconscionability, and because the Mann Defendants are

entitled to judgment on those claims as a matter of law, and because all of Plaintiffs'

other claims in the Complaint are dependent on those two claims, the Mann Defendants

are entitled to summary judgment as to all counts in which they are named as

defendants.

/s/ Christopher G. Hoge

Christopher G. Hoge
Attorney for the Mann Defendants.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ELLIPSO, INC.,                          )
                                        )
     Plaintiff and                    )
     Counter-Defendant                )
                                        )
     v.                               )     Civil Action No. 05-1186 (RCL)
                                        )
JOHN B. MANN, *et al.*,                 )
                                        )
     Defendants and                   )
     Counter-Plaintiffs               )

## **ORDER**

UPON CONSIDERATION of the Motion for Summary Judgment filed by

Defendants/Counter-Plaintiffs, John B. Mann and Mann Technologies, LLC, and of the

memorandum in opposition thereto filed by Plaintiff, and for good cause shown, it is by the Court,

this _____ day of _____, 2007, hereby

     ORDERED, that the Motion be, and it is hereby, GRANTED; and it is further

     ORDERED, that summary judgment be, and it hereby is, granted in favor of Defendants

John B. Mann and Mann Technologies, LLC on Counts I, II, III, IV, VIII, IX, X, XI and XII of

the Complaint herein.


                              _____
                              UNITED STATES DISTRICT JUDGE




Copies:

VANESSA CARPENTER LOURIE, ESQ.
4400 MacArthur Blvd., N.W.

Suite #205
Washington, D.C.  20007-2521
vlourie@carpenterlourie.com

LINDA AWKARD, ESQ.
4201 Cathedral Ave., N.W.
Suite #1416W
Washington, D.C.  20016
lawkard@earthlink.net

CHRISTOPHER G. HOGE, ESQ.
CROWLEY, HOGE & FEIN, P.C.
1710 Rhode Island Avenue, N.W.
7th Floor
Washington, D.C.  20036
chfcgh@aol.com

ROBERT B. PATTERSON
11775 Stratford House Place
#407
Reston, VA 20190

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ELLIPSO, INC.,                              )
                                            )

<table>
<tr><td>Plaintiff and</td><td>)</td></tr>
<tr><td>Counter-Defendant</td><td>)</td></tr>
</table>

|                              |   |                                  |
|------------------------------|---|----------------------------------|
| Plaintiff and                | ) |                                  |
| Counter-Defendant            | ) |                                  |
|                              | ) |                                  |
| v.                           | ) | Civil Action No. 05-1186 (RCL)   |
|                              | ) |                                  |
| JOHN B. MANN, *et al.*,      | ) |                                  |
|                              | ) |                                  |
| Defendants and               | ) |                                  |
| Counter-Plaintiffs           | ) |                                  |

## STATEMENT OF MATERIAL FACTS AS TO WHICH <u>THERE IS NO GENUINE DISPUTE</u>

### CHRONOLOGY OF THE LOAN TRANSACTION

1. Ellipso attempted, unsuccessfully, to sell or borrow against its ICO shares during 2003.  Ex. 6 (#17,18,30), Ex. 2, Ex. 1 para. 6-9.

2. Ellipso was insolvent in Dec. 2003. Ex. 4.

3. At all times relevant to this action, Ellipso had only one full-time employee, Castiel, and its corporate office has been a post office box.  Ex.1 para 4.

4. Castiel has degrees in physics and economics. (Ex. 2 pgs_8-9_)

5. Castiel knew of Patterson's conviction for theft and incarceration in Nov. 2002. Ex. 2 pgs 83-84.

6. Patterson was again incarcerated from May 2003 to October 2003.  Ex. 2 pgs. 83-84.

7. Patterson's conviction for theft, and his subsequent incarceration(s) and disbarment was unknown to Mann until the serving of the instant lawsuit. Ex. 1 para. 5, Ex. 8  para. 35

8. In late October or early November 2003, Patterson contacted Mann to suggest that Castiel wanted to discuss Mann's potential investment in several Ellipso opportunities.  These were characterized as a Registry function for Ellipso's imminent 881-service offering, as well as the purchase of ICO shares that Ellipso possessed.  Patterson represented to Mann that Castiel and Patterson had discussed the possibility that Patterson could participate in any ventures that would be established to effect these investments. Ex. 1 para. 6

9. Castiel and Patterson met with Mann at his home a few days after Thanksgiving 2003.  Castiel proposed that Mann and Patterson set up a Company to purchase from Ellipso the rights to provide the registry function for  the 881-service that Ellipso was about to introduce.  Castiel also suggested that Mann set up a separate Company to be named Mann Technologies Limited to purchase some of Ellipso's ICO shares.  Castiel and Patterson showed Mann drafts of two agreements: 1) CONTRACT FOR SALE OF SECURITIES providing for the sale of the ICO shares to an entity to be called Mann Technologies; and 2) an agreement providing for a company to be called The Registry Solutions Company (TRSC) to contract with Ellipso for the exclusive rights to provide the registry function for Ellipso's 881-service.  Mann said that he would consider these opportunities. Ex. 1 para. 7, Ex. 8 para. 43,46.

10. On December 5 and Dec. 8, 2003, Mann received emails from Patterson containing an attachment entitled CONTRACT FOR SALE OF SECURITIES

2

proposing terms to sell to Mann Technologies Limited of up to 500,000 of Ellipso's ICO shares for $0.50 per share. (See e-mails in MANN 26-31,32-38) Ellipso has also provided in discovery a draft document entitled CONTRACT FOR SALE OF SECURITIES dated in December 2003. Ex. 2 (pgs. 69-70 and Exhibit #5).

11. On Dec. 2, 2003, Castiel sent Juan Tomassoni, an Ellipso consultant, an email in which Castiel references Ellipso's ongoing negotiations with Mann to purchase Ellipso's ICO stock. (See Tomassoni Deposition pgs. 159-160 and Exhibit #13)

12. On December 23, 2003, March Kimmel of the ARGYLL Group sent an e-mail to Patterson regarding a possible loan to Ellipso secured by its ICO stock. (PATT 00386-00392)

13. On Jan. 7, 2004 Kimmel/ARGYLL sent Patterson and Castiel an e-mail containing a proposed Term Sheet for the stock loan, requesting that it be signed and faxed to Kimmel to begin the loan process. Ex. 2 (Exhibit #42

14. On Jan. 12, 2004, Castiel admits faxing to Argyll Equity Group a previously received Term Sheet, annotated with modifications proposed by Castiel and signed by Castiel, describing a 3-year, non-recourse loan secured by ICO stock and providing the Lender a 50% fee on the appreciation of the value of the stock. Ex. 2 (Exhibit #6 and pgs. 79-81)

15. On Jan. 13, 2004, Castiel sent Patterson an e-mail with an attached draft Letter of Authority (LOA) from Castiel authorizing Ellipso to transfer 250,000 shares of ICO stock to Argyll Equity. Ex. 2 (Exhibit #41)

16. Ellipso has also provided in discovery a non-recourse, collateralized Loan Agreement between Ellipso and Argyll Equities LLC dated Jan. 13, 2004. Ex. 7(b)

17. On Jan. 29, 2004, Castiel sent to Patterson an email with an attached document "Mann-Loan.doc" which is a draft agreement of a non-recourse loan of $90,000 from MannTech to Ellipso secured by ICO stock. Ex.27, Ex.2 pg. 119-120  This "Mann-Loan.doc" attachment is a virtual duplicate of the Argyll-Ellipso loan document dated Jan. 13, 2004 described previously.

18. On or about Jan. 30, 2004, Ellipso and MannTech executed the Collateralized Loan Agreement, and Mann, on behalf of MannTech, provided a $90,000 check to Ellipso as called for in the Collateralized Loan Agreement. Ex. 3.  On Jan. 30, 2004, Castiel wrote a letter to ICO's counsel authoring the reissuance of the Stock Certificate A-2008 for 492,611 shares from the name of Ellipso to MannTech.  Ex. 2 (Exhibit #7).

19. Mann and Patterson agreed that Patterson would forthwith incorporate Mann Technologies as an LLC incorporated in Nevada. Ex. 1 para. 13.

20. Mann Technologies, LLC was incorporated in Nevada on Feb. 25, 2004. Ex. 12.

21. Each of the terms of the MannTech-Ellipso Collateralized Loan Agreement is the same as, or more favorable to Ellipso, than Argyll Equities' proposed loan that Ellipso negotiated and accepted. Ex. 3, Ex. 7(b).

22. The financial terms of the MannTech-Ellipso Loan dated Jan. 30, 2004 are more favorable than either the contract submitted to Ellipso by Argyll, or

Ellipso/Castiel's proposed counter-offer to Argyll. Ex. 2 pgs. 91-93. As these documents show, Argyll offered to lend Ellipso an amount equal to 35% of the trading value of the pledged ICO stock. Castiel countered with a request for 40%. The Ellipso-MannTech Loan specifies 40%. In all other respects (financial and otherwise) the two Loan documents are identical.

23. The Loan Agreement: 1) waived any required Notice of Default, and 2) did not require that MannTech merely hold onto the stock certificate. Complaint ¶¶ 9, 22, Complaint Exhibit #2 ¶ 7.2, Castiel 8/25/05 Affidavit ¶ 9, Ex. 2 pgs. 131-132, 91-92

24. Castiel understood and accepted that the Loan provided for MannTech to retain a portion of any increase in the value of the ICO stock to compensate them for the risk inherent in a non-recourse loan in which the stock value may dramatically decrease. Ex.2 pgs 130-131.

25. Castiel understood and accepted that the Collateralized Loan Agreement transferred 492,611 shares of ICO stock to MannTech. Ex.1 para. 13-16

26. Castiel understood that the Collateralized Loan Agreement allowed MannTech to sell any of the ICO stock at any time during the term of the Loan. Complaint Exhibit #2 ¶ 7.2, Ex. 2 pgs. 131

27. In April, 2004, the ICO stock volume and price increased substantially to approximately $1.50. Ex. 1 para. 18.

28. Ellipso and MannTech executed an Amendment to the Collateralized Loan Agreement dated April 21, 2004. The Amendment provided that "MannTech shall liquidate ... 92, 611 shares of the ICO (stock)..." and estimated that

Ellipso would receive $85,000 and MannTech $50,000.   Ex. 2 (Pgs 64 and Exhibit #1).

29. On April 27, 2004 Castiel wrote a letter to Kelly Meadows of ICO instructing the reissuance of an enclosed stock certificate A-2008 in Ellipso's name into two certificates, both in the name of MannTech: one for 400,000 shares, the other for 92,611 shares.  Ex. 2  (Exhibit #4)

30. MannTech was unable to sell the stock pursuant to the April 21 Amendment because MannTech's broker, First Georgetown Securities, required additional documentation from Ellipso that authorized MannTech to sell the ICO shares. (See Patterson 11/25/05 Motion to Dismiss ¶¶ 60, 61, Ex. 2 pgs 131-132, Ex.1 para. 20.

31. From late April through early August 2004, despite repeated requests by Patterson and Mann, Castiel/Ellipso failed to provide the Corporate Resolution that was required for MannTech to sell the ICO shares. Ex. 2 (Exhibits #66,20,25,26,27,28) Ex. 1 para. 21.

32. The issue of an immediate stock sale by MannTech resolved itself shortly when the stock again fell on very low volume.  Ex.1 para. 21.

33. Castiel has admitted in emails to Patterson dated Nov. 16, 2004 and Oct. 20, 2004, that he knew in May/June 2004 that Patterson was a 50% owner of MannTech. Ex. 21.

34. Castiel has also admitted that the first indication that Patterson was a double agent was in June 2004, and that Patterson informed him that Mann was

6

providing Patterson a "kickback", "bribe", "commission or some upside…". Ex. 2 pg. 106-107.

35. During the summer of 2004, Castiel made a series of proposals to the effect that MannTech return the 492,611 shares of ICO stock so that Ellipso could sell them.  In return, Ellipso offered to promise to replace the ICO shares to MannTech at a time after October, 2004.  Ex. 2 (pgs. 207-208 and Exhibits #39, #50, #31, #32, #34).

36. MannTech rejected these proposals as unsound business practice and a violation of the letter and the spirit of the loan agreement.  Ex. 1 para. 22.

37. MannTech never received the required additional documentation from Ellipso in order to transfer the ICO shares to MannTech. Ex. 2(Exhibit #66, and pg 132).

38. After numerous discussions and correspondence (including the exchange of several agreement drafts) among Mann, Castiel and Patterson during June and July 2004, MannTech and Ellipso executed the Amendment to Collateralized Loan Agreement dated Aug. 2, 2004. Ex. 2  (Exhibits #39, 63, 38, 50, 38, 37, 32, 31, 30, 29, 23, 66, 22, 21, 65, 51).

39. On or about Aug. 2, 2004, MannTech and Ellipso executed a Joint Sale Order signed by Castiel for Ellipso and Patterson for MannTech. Ex. 16. Mann did not see this document until Castiel faxed it to him on Aug. 11, 2004. Ex. 1 para. 30.

40. On or about August 8, 2004, Mann received the original ICO Stock Certificate A-2008, still in Ellipso's name, for 492,611 shares.  It was from a company in

7

New Jersey.   Mann assumes it was from the transfer agent for First Georgetown Securities, but he was surprised by its arrival at his home, unannounced. Ex. 1 para. 25.

41. Castiel knew that the Certificate had been in New Jersey since he references its location in a July 20, 2004 e-mail instructing Patterson to "Make sure the stock certificate is shot back from NJ so at least you have it handy."  Ex. 2 (Pgs 95 and Exhibit #30)).

42. In an Aug. 9th 2004 e-mail Mann informed Patterson and Castiel of his receipt of the ICO stock certificate and asked Patterson and Castiel to make sure MannTech got the Corporate Resolution from Ellipso so that MannTech could implement the Aug. 2 Amendment. Ex. 17.

43. In an August 10, 2004 e-mail Castiel requested Mann (and ccPatterson) to provide the ICO Share Certificate so that the parties could implement the Aug 2 Amendment.  Castiel stated that "all necessary documentation" was at the broker, UBS, and that Patterson had copies of these documents.  Ex. 18. Castiel did not explicitly address the issue of the required Corporate Resolution, which had remained an impediment to selling the stock at least since April 2004.

44. Finally, in an Aug. 11, 2004 e-mail, Castiel informed Mann that the Corporate Resolution UBS had on file for Ellipso was sufficient to allow UBS to deposit the Certificate's shares into MannTech's account to be sold. Castiel promised to fax the documents to Mann for review. Ex. 19.

45. Mann received a fax from Ellipso/Castiel on the afternoon of Aug. 11.  The fax

contained a four-year-old Corporate Resolution and a note from John Piper of UBS stating that it was sufficient to enable the transfer of the ICO shares into the MannTech account.  Ex. 2 (Exhibit 43).

46. Based on Castiel's and Piper's representations, Mann agreed to bring the Stock Certificate to UBS, to be deposited in the MannTech brokerage account and sold pursuant to the Aug. 2 Amendment. Castiel, Patterson and Mann arrived at UBS the morning of Aug. 12. The parties agreed that Mann would issue the sale orders to UBS.  At the request of John Piper/UBS, Mann issued the sale order, and all subsequent sale orders, strictly in accordance with the Aug. 2 Amendment. Ex. 2 (Exhibits 17,18,19), Ex. 1 para. 31-32.

47. Castiel admits that he first learned of Patterson's interest in MannTech on Aug.12, 2004 when Patterson "confessed" it to him, privately, at Starbucks following a meeting of Patterson, Castiel, and Mann at UBS with John Piper. Ex.22 (Interrogatory #1), Ex. 2 pgs. 94-101.

48. Castiel admits he deposited a $10,000 check he received from Mann pursuant to the Aug. 2, 2004 Loan Amendment on August 12, 2004 after Patterson "confessed" his interest in MannTech. Ex. 2 pgs. 100-101,104-106, Ex. 1 para.33 and Ex. 25.

49. On August 24, 2004, Piper/UBS notified Mann, Patterson and Castiel that the ICO shares were ready to be transferred from Ellipso to MannTech.  Ex. 2 (Exhibit #17).

50. On August 24, 2004, Ellipso transferred the 492,611 ICO shares from Ellipso's UBS account to Mann Tech's UBS brokerage. Ex. 1 para. 34-35.

51. On Aug 27, 2004, MannTech sold 25,000 shares of ICO stock, and received $11,869 into its brokerage account. Ex. 1 para. 36.

52. On August 27, 2004, half of those proceeds of the ICO stock sale, $5,934, were transferred to Ellipso's UBS account, in compliance with the August 2 amendment. Ex. 2 pg. 101, Ex. 1 para.37.

53. From Aug. 24th through September, the volume of ICO stock trading declined and the price dropped steadily, remaining well below the minimum sale price of $0.55 per share specified in the Aug. 2nd Amendment.  Ex. 2 pgs. 128, Ex. 1 para. 38.

54. In late Sept. 2004, as the sale period specified in the Aug 2 Amendment drew to a close, Mann and Castiel had several conversations and e-mails discussing ways in which Ellipso could provide additional security for MannTech's loan.  At this time, the ICO was trading at or below $0.16 per share, and had very low volume. Ex. 1 para. 39, Ex. 23.

55. During several meetings in October 2004, with the ICO stock continuing to fall, Mann again reminded Castiel that Ellipso was in default and again suggested to Castiel that Ellipso provide additional security on the defaulted loan.  Castiel declined to provide additional security, responding that "a deal is a deal" and pointed out that the Loan Agreement was non-recourse, and that MannTech could look only to the ICO stock for repayment of the loan. Ex. 1 para. 19) Castiel told Mann and Patterson that MannTech should look to the future gains from 881-registry service to compensate it for its losses. Ex. 1 para 38.

10

56.  The ICO stock continued to decline, both in volume and in price, to $0.04 per share by the end of October 2004. Ex. 1 para. 39.

57. Ellipso did not communicate with Defendants between mid December 2004, and the filing of the instant suit on MannTech in June 2005. Ex. 2 pgs 101-105. It was during this period that MannTech sold 90% of the ICOG shares it held.

58. Castiel has admitted taking no action to repudiate the Loan transaction from the time it admits it first learned of Patterson's role or interest in MannTech in May, or June, or August 2004 and the filing of the instant lawsuit in June 2005. Ex. 2.

59. Castiel admits it first discussed any concerns of the "fraud" predicated by Patterson's "dual role" with an attorney in Nov/Dec. 2004. Ex. 2.


**OTHER RELEVANT FACTS:**

60. Ellipso possessed approximately 2.2 million shares of ICO stock on Jan 30, 2004, when it executed the Collateralized Loan Agreement with MannTech. Castiel states that he believed such stock was worth over $20 million at that time.  Ex. 2.

61. The ICO stock was issued by ICO Global Holdings Ltd., a Corporation that had in the three years preceding this issuance, declared bankruptcy, effectively wiping out the shareholders value. Ex. 1 para. 46.

62. On Jan. 30, 2004, ICO stock closed at $0.46 per share.

63. In the Jan. 30, 2004 Collateralized Loan Agreement., Ellipso represented that

1) the Collateral is free of any restrictions, including restrictive legends;  2) that "there is no action or proceeding pending, contemplated or threatened against Borrower before any court...which might result in a material adverse change in the financial condition of Borrower.", and, 3) that "Borrower is not in default in the payment or performance of any of his obligations or in the performance of any contract, agreement ..."  Ex. 3.

64. On Jan. 30, 2004, Ellipso tendered to Patterson a Certificate A-2008 for 492,611 ICO shares that contained a restrictive legend.  Ex. 28.  The restrictive legend wasn't removed until after the Aug.2 Loan Amendment. Ex. 2 pg. 196) As of Jan 30, 2004, Ellipso was involved in numerous lawsuits. Ex. 2.

65. As of Jan 30, 2004, Ellipso had currently due debts in excess of $2,000,000. Ex. 4.

66. On April 28, 2004, when Ellipso executed the Amendment to the Collateralized Loan Agreement with MannTech, the ICO stock closed at $1.55.

67. On or about April 30, 2004, Ellipso failed to make its quarterly interest payment under the terms of the Collateralized Loan Agreement.  Ex. 1 para. 17.

68. On or about July 30, 2004, Ellipso failed to make its quarterly interest payment to MannTech under the terms of the Collateralized Loan Agreement. .  Ex. 1 para. 17.

69. On August 2, 2004, ICO stock closed at $0.65 per share.  Ex. 5.

12

70. On Oct. 1, 2004, ICO stock closed at $0.16 per share.  Ex. 5.

71. On Oct. 2, 2004, Ellipso had, in its possession, 1,571,547 shares of ICO stock that could be freely traded. On Oct. 2, 2004 ICO stock closed at $0.16 per share.  Ex. 24.

72. On Oct. 25, 2004, ICO closed at $0.04 per share.  Ex. 5.

73. On or about October 30, 2004, Ellipso failed to make its quarterly interest payment to MannTech under the terms of the Collateralized Loan Agreement. . Ex. 1 para. 17, Ex. 2

74. Ellipso did not meet any of its contractual obligations under the Loan Agreement and its amendments.  Ex. 1