## DECLARATION OF JOHN B. MANN UNDER PENALTY OF PERJURY

1. I am over the age of eighteen and competent to testify from personal knowledge on the matters set forth herein.

2. I am an engineer and business consultant. I reside in Warrenton, Virginia.

3. I have known Robert Patterson socially since 1986. Prior to 2002, when Mr. Patterson first introduced me to Ellipso and Dr. David Castiel, I talked to Mr. Patterson an average of once every one or two years.

4. I have known of Ellipso and Dr. Castiel since late 2002, when Mr. Patterson introduced me to Dr. Castiel. Dr. Castiel has advised me that he was the only person who could execute contracts or bind Ellipso. He also told me that he was the only full-time employee and in 2004 that he operated the business from his home.

5. I did not know of Mr. Patterson's conviction for theft, and his subsequent incarceration(s) and disbarment until the serving of the instant lawsuit in August 2005.

6. In late October or early November 2003, Mr. Patterson contacted me to suggest that Dr. Castiel wanted to discuss my potential investment in several Ellipso opportunities, including a Registry function for Ellipso's imminent 881-service offerings, as well as the purchase of ICO shares that Ellipso possessed. Mr. Patterson represented that Dr. Castiel and Mr. Patterson had discussed the possibility that Mr. Patterson could participate in any ventures that would be established to effect these investments.

EXHIBIT 1

7. I met with Dr. Castiel and Mr. Patterson at my home in Warrenton a few days after Thanksgiving 2003. Dr. Castiel proposed that I set up a Company to purchase from Ellipso the rights to provide the registry function for the 881-service that Ellipso was about to introduce. Dr. Castiel also suggested that I might set up a separate Company to be named Mann Technologies Limited to purchase some of Ellipso's ICO shares. Dr. Castiel and Mr. Patterson showed me drafts of two agreements: 1) CONTRACT FOR SALE OF SECURITIES providing for the sale of 500,000 ICO shares to an entity to be called Mann Technologies; and 2) an agreement providing for a company to be called The Registry Solutions Company (TRSC) to contract with Ellipso for the exclusive rights to provide the registry function for Ellipso's 881-service. During the meeting Dr. Castiel mentioned that I might want to consider Mr. Patterson as a partner in at least the Registry, since he was knowledgeable and could help manage the business. I said that I would consider these opportunities and would welcome Mr. Patterson's involvement, if it made business sense.

8. On December 5 and Dec. 8, 2003, I received emails from Mr. Patterson containing an attachment entitled CONTRACT FOR SALE OF SECURITIES proposing terms to sell to Mann Technologies Limited of up to 500,000 of Ellipso's ICO shares for $0.50 per share.

9. In December 2003, I had several discussions with Mr. Patterson and Dr. Castiel about the two business investments.

2

10. In early January, Dr. Castiel and I executed The Registry Solutions Company (TRSC) agreement for registry services. I signed for TRSC. Dr. Castiel, Mr. Patterson and I agreed that Mr. Patterson, as a partner in TRSC, would begin the formal incorporation process immediately.

11. In early or mid January 2004, Mr. Patterson informed me that Ellipso had decided to obtain a loan against the ICO stock that had been proposed by a company called Argyll, and that Castiel preferred to obtain a loan instead of a sale. At no time was I involved in any way with the negotiations of terms between Ellipso and Argyll, nor did I offer to anyone any advice on such negotiations or its terms.

12. In late January 2004 Mr. Patterson called me to say that Argyll and Ellipso were no longer negotiating and that Dr. Castiel wanted to know if I was interested in the same deal as Argyll. Mr. Patterson outlined the terms to me, and I said that I would be happy to discuss it with Ellipso. Shortly thereafter, Dr. Castiel, Mr. Patterson and I met to discuss the terms. Dr. Castiel and Mr. Patterson showed me the Argyll Loan documents and we discussed the terms. Dr. Castiel and Mr. Patterson suggested to me that the loan be made by the company they had previously proposed to buy the shares, Mann Technologies, LLC and that Dr. Castiel would feel comfortable with Mr. Patterson having the same kind of interest that he had in TRSC.

13. Dr. Castiel, Mr. Patterson and I met again, in late January or early February 2004, to review and execute the final loan documents. I tendered

to Mr. Patterson a check payable to Ellipso for $90,000, with the understanding 1) that an additional option would be added offering an option for MannTech to convert the ICO shares to Ellipso shares, 2) that Mr. Patterson would form the new company with he and I as owners, and that Mr. Patterson would deposit the ICO shares into a MannTech brokerage account.

14. At the time I executed the Collateralized Loan Agreement with Ellipso, I understood from Dr. Castiel and Mr. Patterson that the terms in that agreement were identical to those in the Argyll documents that I had previously been given.

15. At the time I executed the Loan, Dr. Castiel showed me the stock transfer instructions he had given to ICO, and assured me that all was in conformity with the terms of the Loan documents.

16. During our discussions in late January and early February 2004, Dr. Castiel and I discussed, in detail, the terms of the Loan Agreement, in particular 1) that it was non-recourse, 2) that Mann Tech would immediately try to sell some portion of the ICO shares to minimize its risk, 3) that quarterly interest payments were required, and 4) that Mann Tech and Ellipso would share in the appreciation of the value of stock, if any, over the three year term of the loan.

17. The first interest payment on the Mann Tech loan to Ellipso was due on or about April 30, 2004. Ellipso failed to make that payment or any quarterly interest payments on the loan. During the course of this loan, I met with

Dr. Castiel often, sometimes two or three times a week, and never failed to discuss Ellipso's defaulted status on the Loan.

18. In April, 2004, the ICO stock price increased substantially to approximately $1.50. Dr. Castiel and I discussed the feasibility and wisdom of MannTech selling some of the shares to both reduce MannTech's exposure, and to provide some working capital to Ellipso, since Ellipso had been unable to implement the 881 service to date.

19. On or about April 27, 2004 Dr. Castiel provided Mr. Patterson and me with a letter he had written to Kelly Meadows of ICO instructing the reissuance of an enclosed stock certificate A-2008 in Ellipso's name into two certificates, both in the name of MannTech: one for 400,000 shares, the other for 92,611 shares.

20. In late April or early May Mr. Patterson told me that MannTech had been unable to sell the stock pursuant to the April 21 Amendment because MannTech's broker, First Georgetown Securities, required additional documentation from Ellipso that authorized MannTech to sell the ICO shares.

21. From late April through early August 2004, Mr. Patterson and I repeatedly asked Dr. Castiel to provide the Corporate Resolution that was required for MannTech to sell the ICO shares. Dr. Castiel generally told me that he would work with Mr. Patterson to jointly resolve the matter. Mr. Patterson told me that Dr. Castiel would either evade the matter or ask why First Georgetown needed the Corporate Resolution. The issue of an

immediate stock sale by MannTech lost its immediacy when the stock soon fell on very low volume.

22. During the summer of 2004, Dr. Castiel made a series of proposals to Mr. Patterson and me to the effect that MannTech return the 492,611 shares of ICO stock so that Ellipso could sell them. In return, Ellipso offered to promise to replace the ICO shares to MannTech at a time after October, 2004, when Dr. Castiel said that Ellipso's additional shares would become available. I rejected these proposals as unsound business practice and a violation of the letter and the spirit of the loan agreement.

23. After numerous discussions and correspondence (including the exchange of several agreement drafts) among me, Dr. Castiel and Mr. Patterson during June and July 2004, I (for MannTech) and Dr. Castiel (for Ellipso) executed the Amendment to Collateralized Loan Agreement dated Aug. 2, 2004. This agreement made explicit the need for Ellipso to provide the long asked for Corporate Resolution.

24. Dr. Castiel and Mr. Patterson told me that they would work together to implement the agreement as soon as possible. We all agreed that the important thing was for Ellipso to provide the Corporate Resolution to First Securities so that MannTech could begin to sell the ICO stock.

25. On or about August 9, 2004, I received, via DHL, the original ICO Stock Certificate A-2008, still in Ellipso's name, for 492,611 shares. It was from a company in New Jersey. Although I assumed it was from the

6

transfer agent for First Georgetown Securities, I was surprised, and pleased, by its arrival at my home, unannounced.

26. On Aug. 9th 2004 I sent an e-mail to Mr. Patterson and Dr. Castiel telling them of my receipt of the ICO stock certificate and asking them to make sure MannTech got the Corporate Resolution from Ellipso so that MannTech could implement the Aug. 2 Amendment.

27. Mr. Patterson then called me to say that Dr. Castiel had told him that Ellipso could not readily provide the Corporate Resolution either to First Georgetown or to MannTech. Mr. Patterson also said that Dr. Castiel had proposed that the shares be delivered to UBS.

28. In an August 10, 2004 e-mail Dr. Castiel requested Mann (and ccMr. Patterson) to provide the ICO Share Certificate so that the parties could implement the Aug 2 Amendment. Dr. Castiel stated that "all necessary documentation" was at the broker, UBS, and that Mr. Patterson had copies of these documents. Dr. Castiel did not explicitly address the issue of the required Corporate Resolution, which had remained an impediment to selling the stock at least since April 2004.

29. On Aug. 11, 2004 Dr. Castiel sent me an e-mail saying that a Corporate Resolution UBS had on file for Ellipso was sufficient to allow UBS to deposit the Certificate's shares into MannTech's UBS account to be sold. Dr. Castiel promised to fax the documents to me for review.

30. I received a fax from Ellipso/Dr. Castiel on the afternoon of Aug. 11. The fax contained a four-year-old Corporate Resolution and a note from John

Piper of UBS stating that it was sufficient to enable the transfer of the ICO shares into the MannTech account. (It also contained a Joint Sale Order that I had not seen before)

31. Based on Dr. Castiel's and Piper's representations, I agreed to bring the Stock Certificate to UBS, to be deposited in the MannTech brokerage account and sold pursuant to the Aug. 2 Amendment.

32. Dr. Castiel, Mr. Patterson and I arrived at UBS the morning of Aug. 12. After some discussion, we agreed that I would issue the sale orders to UBS. I turned the stock certificate over to John Piper of UBS and received a receipt. Piper told us that the restrictive legend would be removed as soon as practicable and the stock deposited in MannTech's brokerage account. At the request of John Piper/UBS, I issued the sale order, and all subsequent sale orders, strictly in accordance with the Aug. 2 Amendment.

33. After meeting at UBS, Dr. Castiel, Mr. Patterson and I spoke briefly and I gave Dr. Castiel the $10,000 payment to Ellipso called for under the Aug. 2, 2004 Amendment. We had a pleasant chat for a few minutes and I left for another meeting.

34. Via e-mail on August 24, 2004, John Piper of UBS notified me, (as well as Mr. Patterson and Dr. Castiel) that the ICO shares were ready to be transferred from Ellipso to MannTech.

35. On August 24, 2004, Ellipso transferred the 492,611 ICO shares from Ellipso's UBS account to Mann Tech's UBS brokerage.

8

36. On Aug 27, 2004, MannTech sold 25,000 shares of ICO stock, and received $11,869 into its brokerage account. At Piper's request, I sent instructions to Piper/UBS to transfer half of those proceeds ($5,934) to the account of Ellipso per the Aug. 2, Amendment.

37. That same day half of those proceeds, $5,934, were transferred to Ellipso's UBS account, in compliance with the August 2 amendment.

38. From Aug. 24th through September, the volume of ICO stock trading declined and the price dropped steadily, remaining well below the minimum sale price of $0.55 per share specified in the Aug. 2nd Amendment.

39. In late Sept. 2004, as the sale period specified in the Aug 2 Amendment drew to a close, I had several conversations with Dr. Castiel and exchanged e-mails discussing ways in which Ellipso could provide additional security for MannTech's loan. At this time, the ICO was trading at or below $0.16 per share, and had very low volume.

40. During several meetings in October 2004, with the ICO stock continuing to fall, Mann again reminded Dr. Castiel that Ellipso was in default and again suggested to Dr. Castiel that Ellipso provide additional security on the defaulted loan. Dr. Castiel declined to provide additional security, responding that "a deal is a deal" and pointed out that the Loan Agreement was non-recourse, and that MannTech could look only to the ICO stock for repayment of the loan. I asked him if Ellipso was walking away from

9

the loan obligation, and Dr. Castiel responded that MannTech should look to the future gains from 881-registry service to compensate it for its losses.

41. The ICO stock continued to decline, both in volume and in price, to $0.04 per share by the end of October 2004.

42. I continued to meet and correspond with Dr. Castiel concerning Ellipso's lack of performance on its agreements with TRSC and our attempts to work with Ellipso to get the 881 services operational and the registry producing revenue.

43. At no time prior to the service of this lawsuit at my home on August 2005, did Dr. Castiel write or say to me anything that in any way could be construed as repudiating the Loan agreements with MannTech.

44. At no time prior to the service of this lawsuit at my home on August 2005, did Dr. Castiel express to me any surprise or concern that Mr. Patterson had a role or interest in MannTech.

45. At no time prior to the service of this lawsuit at my home on August 2005, was I aware of any written contractual relationship between Mr. Patterson and Ellipso. I was told by Mr. Patterson in June 2004 that Ellipso owed him some back fees, and that that he, Mr. Patterson, had an agreement with Ellipso to raise money and provide business advice about potential suitors for Ellipso.

46. The ICO stock was issued by ICO Global Holdings Ltd., a Corporation that had in the three years preceding this issuance, declared bankruptcy, effectively wiping out the shareholders value.

47. On Oct. 2, 2004, Ellipso had, in its possession, 1,571,547 shares of ICO stock that could be freely traded. On Oct. 2, 2004 ICO stock traded at a very low volume and closed at $0.16 per share. This stock had been acquired by Ellipso's subsidiary Mobile Communications Holdings Inc. (MCHI) pursuant to contracts with ICO Global Holdings Inc.

48. As of October 30, 2004, MannTech held 467,611 shares of ICO stock in its UBS brokerage account.

49. Between August 27, 2004 and the filing of the instant lawsuit, MannTech sold all but 37,611 shares of its ICO stock.

50. In June 2003, Ellipso moved from its offices at 1133 21st Street, N.W., Washington, D.C. and began operations from Castiel's home.

I declare, pursuant to 28 U.S.C. Sec. 1746 and under the penalty of perjury, that the foregoing is true and correct to the best of my personal knowledge and belief.

Date: November 30, 2007

_____
John B. Mann