FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELLIPSO, INC.<br>4410 Massachusetts Ave., Suite 385<br>Washington, D.C. 20016,<br><br>Plaintiff,<br><br>v.<br><br>JOHN B. MANN, et al.<br>9330 Harts Mill Road<br>Warrenton, VA. 20186<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  CASE NUMBER: 1:O5CV01186<br>)<br>)  JUDGE: Royce C. Lamberth<br>)<br>)<br>)<br>) |

## AFFIDAVIT OF ROBERT B. PATTERSON

1. I am over the age of eighteen and competent to testify from personal knowledge on the matters set forth herein.

2. I practiced law for thirty years and now work as a business consultant. I reside in Alexandria, Virginia.

3. I have known David Castiel ("Castiel") since approximately December 2001.

4. Castiel is the principle owner of Ellipso, Inc., (Ellipso), a Delaware company that raised approximately one hundred million dollars ($100,000,000.00) in an unsuccessful attempt to launch a satellite telecommunications system.

5. Ellipso has never returned any monies to its investors.

6. Ellipso currently has only one full time employee, Castiel, and its corporate office is a post office box.

7. On October 1, 2002, I executed a contract to provide consulting services to Ellipso. A true and correct copy of that contract is attached as Exhibit 1.

1

**EXHIBIT 8**

8. That consulting contract was amended on February 9, 2003, and a true and correct copy of that amendment is attached as Exhibit 2.

9. In 1999 I pled guilty to a single criminal count of theft of government property for cashing my mother-in-law's pension checks following her death, which I did to reimburse me for moneys I had spent on her care prior to her death. As a consequence of this plea, I surrendered my bar license in Virginia and the District of Columbia.

10. I told Castiel of my conviction and the surrender of my bar licenses prior to execution of the October 1, 2002, consulting contract. Castiel did not consider these to be an impediment to my employment as a consultant by Ellipso.

11. My principle function for Ellipso was to raise funds for Ellipso. To this end I introduced Ellipso to a number of potential investors, lenders, stock brokers, and consultants. I also contacted scores of potential funding sources that had no interest in Ellipso due to Ellipso's litigation problems, and/or its business prospects.

12. I had been involved in business finance for more than ten (10) years, mostly dealing in financing for distressed businesses or litigation finance. I contacted many of my prior sources on behalf of Ellipso.

13. I had experience in the aerospace industry having represented MacDonnell Douglas for almost ten years as a partner in the lawfirm of Bryan, Cave.

14. The October 1, 2002, consulting contract was drafted by Castiel, utilizing a standard finder's fee agreement which he had on his laptop, and which Castiel used with numerous consultants. I utilized it myself later for other consultants.

15. The language in the consulting contract pertaining to telecommunications experience was standard language which was contained in the boiler plate of the contract on Castiel's laptop.

16. The other consulting service that I was to provide pursuant to the October 1, 2002, contract was to advise Ellipso on means of controlling its litigation costs. At that time Ellipso was engaged in more than a dozen cases with investors, suppliers, former employees, and directors; and was incurring tens of thousands of dollars a month in attorney's fees and costs.

17. The language in the October 1, 2002, consulting contract was carefully drafted to define my services as developing a "Strategy" (capital "S", a term of art) for controlling Ellipso's litigation costs while protecting its assets. That language was drafted jointly by Castiel and by me.

18. The October 1, 2002, consulting contract was not for legal representation of Ellipso.

19. My experience in controlling litigation costs came from two decades as a corporate and lawfirm litigator, involving both large cases and large case loads.

20. While the October 1, 2002, consulting contract specified monthly payments, the practice was that I would only be paid by Ellipso when I asked for payment, with the other unpaid amounts accrued. I submitted monthly invoices to Ellipso for my services, showing amounts paid and amounts accrued.

21. All amounts accrued were to be doubled when paid. This was a standard policy which Castiel and Ellipso instituted with employees and consultants who were willing to provide service on a deferred compensation basis.

22. In approximately February 2003, I was approached by a Canadian company that was interested in implementing telephone services utilizing the 881-2 and 881-3 country codes, which Ellipso had been granted by the International Telecommunications Union in Geneva. I worked with Castiel and Ambassador Gerald Helman (Ellipso's VP, Regulatory Affairs) in developing this business opportunity.

23. I have known John Mann ("Mann") socially for more than twenty years through our children, who are the same age. I have only seen Mann sporadically over the past ten years; perhaps once a year.

24. Mann and I have never been business associates prior to February 2004.

25. Mann had been involved in his career with technology companies such as MCI and Network Solutions.

26. In approximately March of 2003, I introduced Mann to Castiel, as well as to Ambassador Gerald Helman, (Ellipso's VP for Regulatory Affairs), and I think to James Murphy (Ellipso's Acting General Counsel). I introduced Mann as a long time acquaintance of mine. There was a luncheon meeting at the Red Tomato restaurant; and at least one follow-up meeting between Castiel and Mann.

27. Castiel approached Mann about joining Ellipso as a company officer, or as an investor, or as a consultant on a finder's fee agreement such as mine. Castiel described to Mann in great detail Ellipso's business, financial, and litigation situation, including providing corporate documents to Mann. Mann declined at that time to become involved with Ellipso.

4

28. During the spring of 2003, I identified a brokerage firm in New York that agreed to attempt to market the ICOHA stock which Ellipso held. Castiel negotiated a contract with them for this effort which, I understand, involved the brokerage house receiving some ICOHA shares as compensation.

29. During the spring of 2003, I introduced Castiel to my law school friend, Senator Larry Pressler, of South Dakota, former chairman of the Senate Telecommunications Sub-Committee. Castiel approached him about becoming an Ellipso board member, but he declined as Ellipso had no D&O insurance.

30. During the spring of 2003, I introduced Castiel to a long time aid of Senator John Warner, who operated a consulting and lobbying business, to assist in marketing Ellipso's satellite technology to the DOD. He declined to assist Ellipso when Castiel refused to sign a retainer agreement.

31. Between October 1, 2002, and April 30, 2003, I worked at Ellipso's corporate headquarters on 21st Street in Washington, D.C. on a daily basis. On many occasions Castiel and I rode to work together. We had lunch together on most days and spent several additional hours working together almost daily.

32. At that time there were five people in the Ellipso executive office – Castiel, Laury Blakley (Corporate Secretary), James Bailey (Acting General Counsel), Ambassador Gerald Helman (VP Regulatory Affairs), and me. My office was next to Castiel's office.

33. On April 30, 2003, I was incarcerated for a probation violation stemming from my prior criminal plea. In May 2003, everyone in the Ellipso executive offices learned of my status.

5

34. I asked my brother, Ronald Patterson, to contact Castiel and ask him to come to court, or write a letter on my behalf. My brother reported to me that Castiel declined to do either.

35. Mann did not learn of my plea until August 2005, when the instant suit was served on him.

36. In June 2003, Ellipso surrendered its corporate offices, placed its corporate records in storage, and has since been operating from the post office box.

37. On approximately November 1, 2003, I resumed my consulting work for Ellipso, now working from home. Castiel and I agreed that my consulting contract was to be on the same terms as previously agreed.

38. Castiel was working on four projects. First, he was still trying to control the Ellipso litigations which had expanded to the Southern District of New York. Second, he was trying to implement the 881 telephone services through the Canadian company and the Dutch telephone company KPN. Third, Castiel was trying to sell Ellipso, or the technology, to an off-shore investor group. Fourth, he was trying to raise capital for Ellipso.

39. On Castiel's urging, I again approached Mann about investing in Ellipso.

40. Castiel and I discussed a possible transaction to accomplish two objectives – first to raise operating capital for Ellipso, and second to further the 881 telephone business. Ellipso needed operating capital primarily to pay Castiel's salary as the company had few expenses other than the storage and post office box rents. The legal fees were all being deferred.

41. The proposal which Castiel and I jointly developed was to approach Mann about buying some of the ICOHA shares from Ellipso; and concomitantly to approach Mann about providing a "registry" service for the 881 numbers. Mann's background with Network Solutions seemed directly applicable to this registry function.

42. Sometime around Thanksgiving 2003, I arranged a meeting between Castiel and Mann at Mann's home outside Warrenton, Virginia. During the ride to Warrenton, Castiel and I discussed numerous things, including my hope to participate with Mann in the prospective new venture. Castiel said he was pleased by this as he thought our good working relationship would continue with the new venture.

43. At the meeting, which lasted several hours, Castiel and Mann discussed, and negotiated the particulars of the proposed transactions. The deal that was discussed between Castiel and Mann was that Mann would set up a new company to purchase twenty-five thousand dollars ($25,000.00) of ICOHA shares each month, for, as I recall, ten months, for a total of two hundred fifty thousand dollars ($250,000.00). The ICOHA shares were then trading at approximately sixty cents per share ($0.60), and I believe Castiel offered to sell them to Mann at fifty cents per share ($0.50).

44. In the discussion between Castiel and Mann concerning the 881 registry, the deal being negotiated was that Mann would again set up a new company, which would then enter a contract with Ellipso. The new company would pay Ellipso a monthly royalty for the right to provide the registry service for the new 881

telephone numbers. Once the service started, the new company would charge a fee for these services, and remit a percentage of the profits back to Ellipso. The new company would pay Ellipso a specified royalty amount per month prior to start of the service.

45. It was a cordial meeting, and we all agreed to meet for further discussions once some of the documents were prepared. Castiel and I jointly prepared the proposed contracts.

46. Sometime in December 2003, there was a second meeting attended by Castiel, Mann and me at the Rail Stop restaurant in The Plains, Virginia. Again Mann and Castiel discussed the particulars of the proposed transactions between them.

47. I continued to seek other sources of funding for Ellipso, and around mid December 2003, I located an investment company, Argyle Investments, that indicated a willingness to make Ellipso a margin loan against the ICOHA stock. I informed Castiel of this, and he stated that he was pleased as he preferred to borrow against the stock rather than sell it.

48. Argyle sent me a term sheet, which I sent on to Castiel. Castiel agreed to the terms, and Argyle sent a set of its standard margin stock loan documents, which I immediately sent on the Castiel. As these were standard documents for Argyle, it was clear that there was little or no possibility of renegotiating their terms. Castiel never stated any objection to the terms to me.

49. At this point, Castiel began to deal directly with Argyle, but I think he sent me copies of all the documents.

8

50. One of the documents which Castiel sent to me was a copy of an executed stock transfer of the ICOHA shares from Ellipso to Argyle's transfer agent. From this document, and from conversations I had with Castiel, there is no doubt that Castiel understood that the margin stock loan from Argyle required that ownership in the ICOHA shares be transferred to Argyle.

51. In the meantime, the agreement between Castiel and Mann concerning the registry for the 881 service was executed on December 15, 2003. A true and correct copy of that agreement is attached as Exhibit 3. The new company, The Registry Solutions Company ("TRSC") began making royalty payments to Ellipso pursuant to that agreement.

52. On or about January 15, 2004, Argyle backed out of the stock margin loan to Ellipso.

53. On Castiel's urging, I approached Mann about assuming Argyle's place as lender in the stock margin loan transaction.

54. Castiel suggested that the amount of the loan could be increased by increasing the number of shares involved from the 250,000 in the Argyle proposal, to 492,611, the number on one of the certificates which Ellipso held. Castiel also wanted to increase the margin from 35% to 40%, which would also increase the amount received by Ellipso. Both of these changes were incorporated in the proposal which I conveyed to Mann on Castiel's behalf.

55. The final loan documents were prepared by Castiel, as I was unable to down load the Argyle documents for revision on my computer. Castiel told me that

9

he had Jack Anderson (Ellipso rocket scientist) assist him in down loading the Argyle documents, as they were encoded somehow.

56. The Collateralized Loan Agreement documents, prepared by Castiel, were executed on January 30, 2004. The ICOHA stock certificate for 492,611 shares, together with a letter directing that the shares be placed in the name of Mann Technologies, L.L.C., ("MannTech"), was delivered to my by Castiel at that time. A true and correct copy of the Collateralized Loan Agreement documents is attached as Exhibit 4.

57. In early February I spoke to Mann about an acquiring an equity interest in both MannTech and TRSC. He agreed to grant me an interest in each, as he told me he thought my participation was essential to the success of the ventures, and that he had no interest in "running a company." I also agreed to assume personal liability for one half of Mann's investment in the ventures should they fail.

58. TRSC was incorporated on February 13, 2004. MannTech was incorporated on February 25, 2004.

59. Commencing in February 2004, there were almost weekly meetings pertaining to development of the 881 telephone services. These meetings were with telecommunications executives, consultants, suppliers, investors and others. At these meetings Castiel introduced me as the owner of the registry services company. Castiel made these statements to at least twenty people over the course of the next several months.

60. On April 11, 2004, Senior Probation Officer Cynthia Sutter, United States District Court for the Eastern District of Virginia, spoke to Castiel to verify my employment by Ellipso. I had previously told Castiel that she would be calling.

61. On April 15, 2004, Castiel failed to make the payment required on the stock loan, of approximately five hundred dollars ($500.00).

62. Ellipso has never made any payments on the loan, nor has Ellipso ever offered to repay the loan.

63. On April 15, 2004, the stock loan agreements were amended to allow for the sale of 92,611 shares of the ICOHA stock, with the proceeds to be divided between Ellipso and MannTech. The stock was never sold pursuant to that amendment as Ellipso did not provide the requisite documentation to enable MannTech to sell the shares.

64. Despite repeated requests, Ellipso did not provide the requisite documentation to enable MannTech to sell the ICOHA shares until September 2004.

65. On April 27, 2004, Castiel wrote to me confirming the contractual arrangements of my consulting contract. I counter signed that agreement. A true and correct copy of that agreement is attached as Exhibit 5.

66. Ellipso never paid me the amounts specified by the April 27, 2004, agreement, but did continue to make small payments on my invoices until October 2004.

67. In June 2004, Castiel and I had a conversation at the Potomak Landing restaurant in Alexandria, Virginia. Castiel told me that he would not be able to pay me the fees owed, as the plans to sell the Ellipso technology to the off-shore investor had not materialized. Castiel asked if I would continue to

provide services to Ellipso. I told him that I would do so, and that I would defer almost all of my compensation as my financial requirements were covered by income from other sources, including MannTech and TRSC. Castiel did not appear surprised by this, as I had told him of my intentions in December 2003.

68. Relying on Caastiel/Ellipso's representations that I would be paid double for any deferred compensation, I continued to provide services to Ellipso.

69. On August 2, 2004, Castiel executed an amendment to the Collateralized Stock Loan Agreement, providing for the sale of all of the ICOHA shares held by MannTech, and division of the proceeds between MannTech and Ellipso. Castiel never mentioned that he thought he was being defrauded by this transaction. A true and correct copy of the amendment is attached as Exhibit 6. Any ICOHA shares not sold by October 1, 2004, pursuant to this amendment would remain subject to the original January 30, 2004, agreement.

70. On or about August 11, 2004, pursuant to the August 2, amendment, Castiel and I executed a joint sale agreement for the ICOHA shares. I signed for MannTech, and Castiel's signature is only inches from mine. A true and correct copy of this amendment is attached as Exhibit 7.

71. In September 2004, 25,000 shares of the ICOHA stock were sold and the proceeds divided between Ellipso and MannTech pursuant to the August 2, 2004, amendment.

72. Also in August 2, 2004, Castiel executed an amendment to the TRSC-Ellipso agreement of December 15, 2003. A true and correct copy of that amendment

12

is attached as Exhibit 8. That amendment suspended additional royalty payments by TRSC; provided for a division of revenues from the contemplated audio-text service; and abrogated a prior March 30, 2004, amendment to that agreement. All other provisions were reaffirmed. Castiel never indicated that he thought he was being defrauded by this amendment.

73. On October 20, 2004, Castiel again wrote to me concerning my consulting contract with Ellipso and payments due thereunder. Castiel reaffirms the April 27, 2004, agreement, and acknowledges that I am owed fees for services performed after May 31, 2004. The email also references our conversation in June when we discussed by financial interests in TRSC and MannTech. A true and correct copy of the October 20, 2004 email is attached as Exhibit 9.

74. In October 2004, the ICOHA stock sale price fell to two cents per share on almost no volume. The stock was worthless.

75. Both Mann and I made entreaties to Castiel to discuss repayment of the stock margin loan. Castiel refused to even discuss it. Pursuant to the loan agreements, Castiel/Ellipso had the right to forfeit the collateral, the worthless ICOHA stock, and not repay the loan. I understood from his words and his actions that he was exercising that right.

76. During November and early December 2004, Castiel continued to meet with me, Mann and the consultants TRSC had hired to facilitate the 881 vanity telephone service. Castiel's actions and words induced TRSC to continue to expend money and time on the project. True and correct copies of two of Castiel's emails from this period are attached as exhibits 10 and 11.

13

77. Ellipso has never offered to repay the margin stock loan nor any interest thereon.

78. Ellipso has never provided the 881 vanity telephone service upon which the TRSC-Ellipso contract was based.

79. Ellipso has never made any payment to TRSC from any revenues received from the audio-text services.

80. Ellipso has never offered to pay the fees owed me for to my consulting services to them, which exceed two hundred fifty thousand dollars ($250,000.00).

I declare under penalty of perjury that the foregoing is true and correct.

Date: Nov 21, 2005

Robert B. Patterson