1

```
 1            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA
 2   - - - - - - - - - - - - - -x
                                 :
 3   ELLIPSO, INC.,              :
                                 :
 4      Plaintiff/Counterclaim   :
        Defendant,               :
 5                               :
        v.                       :  Case No. 05-cv01186(RCL)
 6                               :
     JOHN B. MANN, et al.,       :
 7                               :
        Defendants/Counterclaim  :
 8       Plaintiffs.             :
                                 :
 9   - - - - - - - - - - - - - -x
```

10                                Reston, Virginia

11                                Wednesday, May 2, 2007

12           Deposition of DAVID CASTIEL, Witness, called for

13   examination by counsel for the Defendant/Counterclaim

14   Plaintiff, at the Metro Offices, 11710 Plaza America,

15   Reston, Virginia, before Diana L. Cox, CCR, a stenographic

16   reporter and notary public in and for the District of

17   Columbia, commencing at 10:20 a.m., when were present on

18   behalf of the respective parties:

19

20

21

22

EXHIBIT

2

2

```
 1   APPEARANCE:

 2      On Behalf of the Plaintiff/Counterclaim Defendant:
             MATTHEW H. GOODMAN, ESQ.
 3           Leftwich & Ludaway
             1400 K Street, Northwest
 4           Suite 1000
             Washington, DC 20036
 5           202-434-9100

 6      On Behalf of the Defendants/Counterclaim Plaintiffs:
             THOMAS A. MAURO, ESQ.
 7           Mauro Law Offices, PC &
             1020 Nineteenth Street, Northwest
 8           Suite 400
             Washington, DC 20036
 9           202-452-9865

10           ROBERT PATTERSON, PRO SE
             11775 Stratford House Place, #407
11           Reston, Virginia 20190

12

13

14

15

16

17

18

19

20

21

22
```

3

```
1                      I-N-D-E-X

2   WITNESS:                                      PAGE:

3     DAVID CASTIEL

4   Examination by Mr. Patterson                    7

5   Examination by Mr. Goodman                    284

6   CASTIEL DEPOSITION EXHIBIT:                   PAGE:
```

```
7   No. 1   Amendment to Collateralized Loan agreement    63

8   No. 2   Check to Robert Patterson                      64

9   No. 3   Letter from Castiel to Piper                   65

10  No. 4   Letter from Castiel to Meadows                 67

11  No. 5   Contract for Sale of Securities                69

12  No. 6   Facsimile from Castiel to Kimmel               79

13  No. 7   Letter from Castiel to Wolff                   81

14  No. 8   Collateralized Loan Agreement                 118

15  No. 9   E-mail from Kimmel, Dated 01/07/04            167

16  No. 10  E-mail from Castiel, Dated 12/11/04           167

17  No. 11  E-mail from Mann to Castiel, Dated 12/10/04   169

18  No. 12  E-mail from Castiel to Mann, Dated 12/10/04   169

19  No. 13  E-mail from Castiel to Patterson, Dated 11/16/04 170

20  No. 14  E-mail from Castiel to Patterson, Dated 10/20/04 170

21  No. 15  E-mail from Mann to Castiel, Dated 09/27/04   171

22  No. 16  E-mail from Castiel to Mann, Dated 09/23/04   172
```

4

```
 1   CASTIEL DEPOSITION EXHIBIT:                        PAGE:

 2   No. 17  E-mail from Piper to Mann, Dated 08/24/04      172

 3   No. 18  E-mail from Piper to Mann, Dated 08/13/04      172

 4   No. 19  E-mail from Piper to Mann, Dated 08/13/04      173

 5   No. 20  E-mail from Castiel to Mann, Dated 08/11/04    173

 6   No. 21  E-mail from Castiel to Patterson, Dated 07/29/04 175

 7   No. 22  E-mail from Castiel to Patterson, Dated 07/27/04 177

 8   No. 23  E-mail from Castiel, Dated 07/22/04            178

 9   No. 24  E-mail from Castiel, Dated 08/02/04            181

10   No. 25  E-mail from Mann to Patterson, Dated 08/11/04  183

11   No. 26  E-mail from Castiel to Mann, Dated 08/10/04    184

12   No. 27  E-mail from Castiel, Dated 08/09/04            184

13   No. 28  E-mail from Mann to Patterson, Dated 08/09/04  185

14   No. 29  E-mail from Castiel to Patterson, Dated 07/21/04 185

15   No. 30  E-mail from Castiel to Patterson, Dated 07/20/04 186

16   No. 31  E-mail from Castiel to Patterson, Dated 07/15/04 187

17   No. 32  E-mail from Castiel to Patterson, Dated 07/13/04 187

18   No. 33  E-mail from Castiel to Patterson, Dated 07/09/04 190

19   No. 34  E-mail from Castiel to Patterson, Dated 07/09/04 191

20   No. 35  E-mail from Castiel to Patterson, Dated 02/06/04 198

21   No. 36  E-mail from Castiel to Patterson, Dated 02/03/04 199

22   No. 37  E-mail from Castiel to Patterson, Dated 06/16/04 201
```

1    CASTIEL DEPOSITION EXHIBIT:                              PAGE:

2    No. 38  E-mail from Castiel to Patterson, Dated 06/15/04 205

3    No. 39  E-mail from Castiel, Dated 06/09/04              207

4    No. 40  E-mail from Castiel to Patterson, Dated 04/19/04 211

5    No. 41  E-mail from Castiel to Patterson, Dated 01/13/04 212

6    No. 42  E-mail from Kimmel, Dated 01/07/04              213

7    No. 43  Handwritten Letter from Castiel to Mann        214

8    No. 44  E-mail from Patterson, Dated 12/23/03          219

9    No. 45  E-mail from Patterson, Dated 12/24/03          221

10   No. 46  E-mail from Patterson, Dated 01/02/04          224

11   No. 47  E-mail from Mann, Dated 03/04/04               225

12   No. 48  E-mail from Castiel, Dated 03/11/04            231

13   No. 49  E-mail from Mann, Dated 04/20/04               232

14   No. 50  E-mail from Castiel, Dated 06/14/04            234

15   No. 51  E-mail from Patterson, Dated 07/31/04          236

16   No. 52  E-mail from Castiel, Dated 09/08/04            236

17   No. 53  E-mail from Mann, Dated 09/09/04               237

18   No. 54  E-mail from Castiel to Mann, Dated 11/09/04    238

19   No. 55  E-mail from Mann to Castiel, Dated 11/09/04    253

20   No. 56  E-mail from Castiel to Mann, Dated 11/09/04    253

21   No. 57  E-mail from Mann to Castiel, Dated 11/12/04    253

22   No. 58  E-mail from Castiel to Mann, Dated 11/22/04    254

1   CASTIEL DEPOSITION EXHIBIT:                              PAGE:

2   No. 59  E-mail from Mann to Castiel, Dated 11/22/04        257

3   No. 60  E-mail from Mann to Castiel, Dated 12/09/04        259

4   No. 61  E-mail from Castiel to Mann, Dated 12/09/04        259

5   No. 62  E-mail from Mann to Castiel, Dated 12/11/04        263

6   No. 63  E-mail from Patterson to Castiel, Dated 06/09/04  266

7   No. 64  E-mail from Mann to Patterson, Dated 08/10/04      267

8   No. 65  E-mail from Mann to Patterson, Dated 07/30/04      268

9   No. 66  E-mail from Mann to Patterson, Dated 07/27/04      269

10  No. 67  E-mail from Castiel, Dated 08/11/04               270

11  No. 68  E-mail from Patterson to Castiel, Dated 08/10/04  270

12  No. 69  Subpoena                                          298

13

14

15

16

17

18

19

20

21

22

8

1       A    No.

2       Q    You have no medical conditions or medications

3   that prohibit that, interfere --

4       A    No.

5       Q    -- with that?

6       A    No.

7       Q    Would you briefly give us your educational

8   background?

9       A    I got a Bachelors in Science and Physics at the

10  University of Montreal.  I pursued a Masters program at

11  Miguel University.  And I got the Ph.D. at the University

12  of Paris, France.  And I did a postdoctoral fellowship,

13  the University of California.

14      Q    And what are your degrees in?

15      A    Well, in physics, Ph.D. in physics.  I also have

16  an economics degree.

17      Q    And would you briefly give us your employment

18  history?

19      A    When I left academia, I worked for General

20  Electric in systems engineering.  I left General Electric

21  and worked at Booze Allen for a short period and then I

22  moved to a company that became Hughes Network System, that

9

```
 1   was acquired by Hughes.  That was 1990 -- I'm sorry --
 2   '88.
 3            And then I joined American Mobile Satellite
 4   Consortium in 1988.  And then I formed Ellipso -- a
 5   company called Mobile Communications Holdings that became
 6   Ellipso in 1990, late 1990.  I've been with that company
 7   since then.
 8       Q   I'm sorry.  When was Mobile Communications
 9   Holdings, Inc. formed?
10       A   1990.  There was -- there were two MCHIs:  1990
11   in DC, but we were reincorporated in Delaware in 1991.
12       Q   And you said that became Ellipso?
13       A   Yes.
14       Q   It was merged into Ellipso?
15       A   Yeah.  It was a reverse merger in 1998.
16       Q   So, MCHI ceased as a corporate entity in 1998?
17       A   No.  It became a subsidiary of Ellipso.
18       Q   A wholly owned subsidiary of Ellipso; is that
19   correct?
20       A   Yes.
21       Q   Now, do you recall receiving and responding to a
22   request for answers to interrogatories from Defendant John
```

1    Q    What stock?  How much stock was owned?

2    A    I think it was about 2 million shares of ICO

3    stock.

4    Q    And that was held in Ellipso's name?

5    A    Both.  And I'd check the records to be precise.

6    I think one and a half million shares were in the name of

7    MCHI and the other half million were in name of Ellipso.

8    I think they were all MCHI first, but I don't know why

9    they are separate.

10    Q    And --

11    A    And we also held a dozen shares of Orion

12    Technologies.

13    Q    Did Orion Technologies shares have any value?

14    A    At the time, they had some value.  Today, they

15    don't.

16         MR. GOODMAN:  Just at the time.

17         THE WITNESS:  Oh, at the time, maybe 5

18    cents a share or something.  It was pretty minimal

19    value.

20    BY MR. PATTERSON:

21    Q    And the --

22    A    And they were not tradeable.  They were

46

1    restricted.

2        Q    And would it be fair to say that Ellipso had

3    control of the MCHI ICO shares -- the ICO Corporation

4    shares held by MCHI by virtue of the fact that MCHI was a

5    wholly owned subsidiary of Ellipso?

6        A    Yes.

7        Q    Was Ellipso owed any money by MCHI in January of

8    2004?

9        A    I don't -- I don't think so, but I -- I don't

10   know.  I never thought about that question; maybe so.  I

11   don't -- it would be in accounting.

12       Q    Who are the owners and directors of MCHI?

13       A    The same as Ellipso.

14       Q    The same board of directors?

15       A    That's correct.

16       Q    How about Ellipso Private Holdings, LLC?  Who

17   are the officers and directors?

18       A    There's only one director.  It's an LLC.  I am

19   the managing partner -- or no, the managing director.  I

20   think that's the title.

21       Q    There's only one director?

22       A    That's correct.

1       Q     And one officer, and that's you?

2       A     That's correct.

3       Q     Would it be accurate to say that as the sole

4    director of Ellipso Private Holdings, LLC, or the sole

5    managing member, and the fact that Ellipso Private

6    Holdings, LLC, is the majority shareholder of Ellipso that

7    you personally have absolute control of Ellipso?

8              MR. GOODMAN:  Objection to the form of the

9    question.  I don't understand what you mean, "you

10   personally."  I'm going to instruct him not to

11   answer unless you qualify the question.

12             MR. MAURO:  I'm going to comment for the

13   record that speaking objections in this district are

14   improper.

15             MR. GOODMAN:  That wasn't a speaking

16   objection.  That was a request for clarification of

17   the question.

18             MR. PATTERSON:  The witness hasn't

19   indicated he didn't understand it.

20             Can you answer the question, Dr. Castiel?

21             MR. GOODMAN:  I'm sorry.  For the record,

22   let's be clear.  As the attorney for Ellipso, my

56

1   BY MR. PATTERSON:

2       Q    On January 30, 2004, was Ellipso involved in any

3   litigation?

4       A    Yes.

5       Q    What litigation was Ellipso involved in on that

6   date?

7       A    Well, the -- there was the tail end of the

8   Sahagen suits that you helped manage.  I think we had --

9   they had -- in December 2003, there was an appeal hearing

10  in Delaware that they -- they appealed their loss, so, we

11  were awaiting the result of the appeal, which we -- was

12  determined in our favor.

13          There was also the New York litigation by

14  Sahagen that was basically the same thing as they tried in

15  Delaware, they tried in New York.  And I don't know the

16  status of that.

17          MR. GOODMAN:  Just what lawsuits pending.

18          THE WITNESS:  There was a Drame (ph.)

19  litigation.  We sued a former employee for stealing

20  our -- or breaching his fiduciary duty to the

21  company and taking proprietary information.

22          He sued us, also, for other -- there's

1    another lawsuit part of that for his own claims.

2    There was an Inciardi (ph.) lawsuit, another

3    employee we sued.  He didn't sue us.  There was no

4    counterclaim.  I don't believe there was another

5    lawsuit.  I think that's it.

6    BY MR. PATTERSON:

7        Q    Was the ownership of the Ellipso technology at

8    issue in the Drame litigation?

9        A    The owner -- I'm sorry.  Could you repeat,

10   because I didn't understand?

11       Q    Was the ownership of the patents, Ellipso

12   patents, at issue in the Drame case?

13            MR. GOODMAN:  Objection.  You can answer.

14            THE WITNESS:  There were two Drame cases:

15   One, Drame -- Drame against us, that we sued Drame

16   for taking -- stealing our property; him against us,

17   claimed that we hadn't given him --

18            MR. GOODMAN:  Just answer the question.

19            THE WITNESS:  I'm trying to understand.

20            MR. GOODMAN:  Okay.

21            THE WITNESS:  I can't say yes or no,

22   because I don't know exactly if it is yes or no.

1          As a relief for us not honoring, in his

2     view, an oral agreement seven years before, he

3     wanted a rescission of the patent assignment.  So, I

4     don't know if that answers your question whether it

5     was in question or not.

6          One of the relief he sought, he -- I don't

7     think there was a lawsuit saying we didn't own our

8     technology.  He was asking the Court to rescind his

9     assignment.  It's an allegation or -- or a wish.

10    BY MR. PATTERSON

11        Q    That's the question.

12             Now, the Sahagen litigation, Sahagen was an

13    investor in Ellipso and its affiliated companies, was he

14    not?

15        A    Yes.

16        Q    And approximately how much did Mr. Sahagen

17    invest?

18        A    He invested in two -- in the two companies.  He

19    put -- invested $4.2 million in Ellipso, just piggybacking

20    on the Boeing deal --

21             MR. GOODMAN:  Just answer the question.

22             THE WITNESS:  -- And $5 million in Virtual

59

1    Geo, for 25 percent.

2            MR. PATTERSON:  Mr. Goodman, I would

3    appreciate your not coaching your witness in the

4    middle of his answer.

5            MR. GOODMAN:  Mr. Patterson, I've got a --

6            MR. PATTERSON:  That is really improper.

7            MR. GOODMAN:  Mr. Patterson --

8            MR. PATTERSON:  And I would ask that you

9    refrain from doing so.

10           MR. GOODMAN:  You can ask whatever you'd

11   like, Mr. Patterson.  My obligation is to make sure

12   that --

13           MR. PATTERSON:  No, your obligation is to

14   follow the rules, not to walk all over my

15   deposition.  And I would kindly thank you to stop

16   doing it.

17           MR. GOODMAN:  Mr. Patterson, you may ask

18   your questions and I will instruct my client to

19   answer the questions and keep his questions to the

20   answer.

21           MR. PATTERSON:  If you have an objection,

22   you may make it before he starts his answer.

64

```
 1        Q     I'm going to hand you what I've marked as

 2    Exhibit Number 1.  Dr. Castiel, do you recognize this

 3    document?

 4        A     It looks like a document I've seen.  I thought

 5    it was May, but it says April.

 6        Q     Is that your signature on this document?

 7        A     Yes.

 8        Q     And directing your attention to the end of the

 9    first line where it says, It's agreed that Mann shall

10    liquidate 92,611 shares --

11        A     Uh-huh.

12        Q     -- what did you understand that to mean?

13        A     Sell.

14        Q     That Mann would sell it?

15        A     Yes, but you had possession of the shares.

16              MR. PATTERSON:  I'll mark this next as

17    Exhibit Number 2.

18              (Castiel Deposition Exhibit No. 2 was

19    marked for identification.)

20    BY MR. PATTERSON:

21        Q     Do you recognize this document?

22        A     Yes.
```

69

```
 1        Q    And that was the stock certificate that was the

 2   subject of the January 30, 2004, loan agreement between

 3   Mann Technologies and Ellipso?

 4        A    Yes.

 5             MR. PATTERSON:  This next one will be

 6   marked as Exhibit Number 5.  And it's titled

 7   "Contract for Sale of Securities," a 2-page

 8   document.

 9             (Castiel Deposition Exhibit No. 5 was

10   marked for identification.)

11   BY MR. PATTERSON:

12        Q    Dr. Castiel, do you recognize this document?

13        A    No.  I'll have to read it to see if I remember

14   what it is.

15        Q    This is a document produced by you; is it not?

16        A    I don't know if I produced it.  It may have been

17   produced by -- produced or created by you, not by me.  I

18   don't think I created this document.

19        Q    Okay.  By "produced," I meant you supplied it in

20   response to the discovery request for documents in this

21   proceeding?

22        A    I don't know.
```

1     Q     Have you ever seen this document before?

2     A     I don't recall it, but it's not impossible.

3    I'll have to refresh my memory somehow.

4     Q     You don't recall ever discussing this document

5    with John Mann?

6     A     No.  I don't think I ever discussed with John

7    Mann the sale of securities.  I don't recall, at least.

8     Q     Did you ever visit John Mann's home?

9     A     Yes.

10     Q     And when was that?

11     A     I think it was early in January 2004 following

12    our meeting at the restaurant.

13     Q     And what was the purpose of going to John Mann's

14    home?

15     A     To follow up on the meeting.

16     Q     Meeting about what?

17     A     How Mr. Mann would help us raise money for the

18    company or be involved in achieving our objectives.

19     Q     And did you meet with John Mann at his home on

20    that occasion?

21     A     Yes.

22     Q     Did you discuss raising money for Ellipso so it

1    Communications Holdings, Limited.  So, you see, it's IGCL

2    instead of IGL.

3          There might have been a confusion.  But I

4    believe MCHI had the same thing.  So, these other shares,

5    you, Mr. Patterson, advocated selling in the private

6    market with Waller Capital in the summer of 2003.

7      Q    So, on January 30, 2004, Ellipso and MCHI

8    collectively held approximately 2.2 million shares of IGL

9    stock, which would have a value of $22 million?

10     A    That's -- that's correct, privately held stock

11   that had a nominal value of over $20 million.

12     Q    Why didn't you just sell some of the stock?

13     A    Well, as I said, under your leadership, we

14   contracted with Waller Capital and tried to sell them --

15   even some of them, at least -- at a discount.  Instead of

16   $10, we'd sell them at $8.  And they failed to find a

17   customer.

18     Q    How was Waller Capital compensated for their

19   efforts?

20     A    They wanted $200,000 in cash to do their work.

21   And we didn't have it, so, we didn't pay them $200,000.

22   In lieu of that, we gave them 20,000 shares of ITGL,

1    which, in their view, was equivalent.  And they accepted

2    that.

3        Q    Who did you deal with at Waller Capital?

4        A    I'm sorry.  I didn't hear.

5        Q    Who did you deal with at Waller Capital?

6        A    Somebody called Garrett, I think, Garrett

7    something.  I don't know if it's first or last name.

8    Garrett -- Garrett Baker, I think, I think.

9        Q    Your memory's better than mine.  Yes, that's

10   correct.

11            Who is March Kimmel?

12       A    I think you -- it's -- it's somebody that you

13   told me worked for Argyle.

14       Q    And what is Argyle?

15       A    I don't know.  Maybe I should ask the question.

16       Q    Did you ever have any dealings with Argyle?

17       A    No.  I think I talked to Mr. Kimmel once, but I

18   don't know who Argyle is and whether he's really Argyle or

19   whether Argyle exists.

20            (Castiel Deposition Exhibit No. 6 was

21   marked for identification.)

22   BY MR. PATTERSON:

80

1    Q    I'm showing you a document that's been marked as

2    Exhibit 6.  Do you recognize this document?

3    A    Yes.

4    Q    It appears to be a fax transmission from you,

5    David Castiel, to Argyle Equities.

6    A    That's correct.

7    Q    And on the second page, that's your signature?

8    A    Yes.

9    Q    And those changes that are written in, that's

10   your writing?

11   A    Yes.

12   Q    Is it still your testimony you don't know who

13   Argyle Equities is?

14   A    If you let me clarify:  You sent me that

15   document and asked me to make any changes I wanted and fax

16   it to this guy.  I did not contact Argyle or check them

17   out or anything.

18        I assumed they are legitimately in existence, or

19   I did assume at the time, since you told me and I trusted

20   what you said.  So, you asked me to make the changes I

21   would deem acceptable.  I made them and faxed it back to

22   him.  It's a fax, it shows here.

81

```
 1        Q     And you testified you did speak at least on one

 2   occasion with March Kimmel?

 3        A     Yeah.  I don't know if I called him or he called

 4   me.

 5              MR. PATTERSON:  I'll mark this the next

 6   exhibit, Number 7, which is a 1-page letter to

 7   Benjamin Wolf.

 8              (Castiel Deposition Exhibit No. 7 was

 9   marked for identification.)

10   BY MR. PATTERSON:

11        Q     Do you recognize that document?

12        A     Yes.

13        Q     That's your signature on it?

14        A     Yes.

15        Q     What do you mean by the language in the first

16   sentence that says, Reissuance of attached original Stock

17   Certificate A-2008 for 492,611 shares of ICO Class A

18   common stock to the benefit of Mann Technologies, LLC?

19        A     Uh-huh, yes.  You told me -- Mr. Patterson told

20   me that this was a requirement of the loan agreement with

21   Mann Tech, that I had to transfer the shares to be held as

22   collateral in Mann Tech's name, not in an escrow account,
```

1    as most collateral things are held.

2         Q    Okay.

3         A    I trusted your advice.

4         Q    So, on or before January 30, Mr. Patterson

5    advised you that you had to transfer the stock, ICO stock,

6    to Mann Technologies?

7         A    In compliance with the loan agreement.

8         Q    So, you knew, based upon Mr. Patterson's

9    representations, that the stock was to be transferred to

10   Mann Technologies pursuant to the loan agreement?

11        A    I knew that the loan agreement required or

12   specified that the stock would be held as collateral and

13   when sold, there was a formula for splitting the upside.

14             And Mr. Patterson indicated that the collateral

15   had to be held in the name of -- of Mann Tech and not the

16   name of ICO -- I'm sorry -- of Ellipso.  And that's why I

17   surrendered the stock and gave authorization to transfer,

18   in good faith to implement the agreement that we had just

19   signed.

20        Q    Now, there came a time when the stock

21   certificate that is attached to -- a copy of which is

22   attached to Exhibit 4, was transferred out of Ellipso's

1    name?

2        A    Yes.

3        Q    And when was that?

4        A    I think it was in August.

5        Q    Of 2004?

6        A    2004.

7        Q    And you've talked about the shares that were

8    held by MCHI.  Did there come a time when those shares

9    were transferred out of MCHI's name?

10       A    Yes, much later, maybe in October 2004.

11       Q    When did you first learn of Mr. Patterson's

12   criminal conviction?

13       A    Either the same day or a few days later, around

14   the time frame after we had signed the first consulting

15   agreement.

16       Q    Do you want to put a time frame on that?

17       A    November 2002, but it was after we executed the

18   consulting agreement.

19       Q    Did you at any time thereafter seek to void that

20   consulting agreement with Mr. Patterson?

21       A    No.  Based on what Mr. Patterson told me, I

22   thought every man deserves a second chance.  And based on

84

1    the explanations he gave me, it was -- I guess to quote

2    you, I was generous about it.  But I did reconsider when

3    you left for your second conviction, your second jail

4    term, that it was perhaps more -- more trouble than I

5    needed.

6        Q    And you continued to make payments to

7    Mr. Patterson for services during 2003 and 2004?

8        A    Well, in 2003, Mr. Patterson left for what he

9    calls a sabbatical, which means another six months of jail

10   term, which apparently was blamed on contempt of court

11   because he insulted a judge or something.  And so, I

12   didn't pay him for that.  He wasn't there.  He came back

13   in October and sought reinstatement into the affairs of

14   the company.

15       Q    And the second jail term you referred to was May

16   through October of 2003?

17       A    That's probably correct.

18       Q    Did there come a time, referring you back to the

19   IGL shares, that you received some information that

20   changed your opinion as to the value of those shares?

21       A    Yes.  It was a progressive revelation.  The

22   first shock was through the Argyle interchange.  Since we

1    bailed out of it.  I never talked to them.  I think you

2    told me that Kimmel had resigned or was fired.  I never

3    attempted to call.  You told me it was gone and we should

4    deal with John Mann.  So, I said, Fine.

5         Q    Now, turning your attention back to Exhibit

6    Number 6, the second page, which is the fax that you

7    modified and sent to Argyle, what is the difference

8    between the terms on this sheet and the terms that Ellipso

9    ultimately signed a contract with Mann Tech for?

10             MR. GOODMAN:  Let me just object, as the

11   documents will speak for themselves.  To the extent

12   that you know the difference, you can testify.

13             THE WITNESS:  Well, the difference, we

14   were adjusting the numbers to be accurate in

15   representing the exact shares that we would transfer

16   as to a wrong number.

17             And I think the estimated strike price, or

18   the bid price, they had put 51.  I think the day I

19   talked to them, it was 55.  It could have been

20   different.  That's -- that's a number that would

21   be -- the actual number would be the number -- the

22   value of the stock on that day.

1           So, nobody -- that was not a negotiation,

2    really.  And I think the loan to value percent, they

3    wanted 35.  And when I talked to Kimmel on the

4    phone, he said 40; that was okay.  And that's why I

5    changed that.  So, there was not much difference,

6    really.

7    BY MR. PATTERSON:

8         Q    Isn't it true, Dr. Castiel, that there is no

9    difference between the term sheet that you filled out that

10   you said what you wanted from Argyle and the terms that

11   you ultimately got from Mann Tech?

12        A    I don't know that there is any difference.  I

13   didn't read the Argyle document in its entirety.  So, from

14   the terms, it appears that it is a collateralized loan

15   agreement in which we would share the upside in roughly

16   similar business terms.

17        Q    Which terms on this sheet that you filled out

18   are different from the terms that you ultimately accepted

19   from Mann Tech?

20        A    I think the bid price of 55 cents is different.

21   I think he had 45 cents, didn't he?  I don't know.  You

22   have the document.  I think the bid price was less than 55

1    cents with Mr. Mann.

2        Q    But the bid price was determined by the market,

3    was it not?

4        A    That's correct.  That's what it was supposed to

5    be.  But the day we signed the agreement with Mr. Mann, I

6    don't know what the price of the market was.

7        Q    So, aside from the market price of the shares,

8    are there any differences in the terms that you filled out

9    on this sheet and the terms that Ellipso ultimately

10   accepted from Mann Tech?

11       A    Yes, because this sheet does not specify the

12   default conditions and lack of notice and other things

13   that you were supposed to have read and advised me on.

14   And those are not contained here.  This is more of a term

15   sheet, not an agreement.

16       Q    But the question is just in terms of the terms

17   on this sheet.

18       A    Well, I already answered that question.

19       Q    Okay.  So, it's the same other than the strike

20   price?

21            MR. GOODMAN:  A continuing objection.  You can

22   answer.

1          THE WITNESS:  Yeah, the -- the strike

2    price and -- that's correct, on terms of term sheet.

3    There is no equivalent term sheet from John Mann or

4    Mann Tech.

5          MR. GOODMAN:  Just answer his question.

6          THE WITNESS:  Well, there is no equivalent

7    term sheet from Mann Tech, so, I -- we're comparing

8    two different things.

9    BY MR. PATTERSON:

10     Q     Okay.  Now, let's return to August 12, 2004.

11   And you had a meeting scheduled that day?

12     A     I think we all had a meeting at UBS.

13     Q     And by you, you mean whom?

14     A     I didn't say "you."  I said "we."

15     Q     "We."  I'm sorry.

16     A     Yourself, Mr. Mann, and myself and John Piper at

17   UBS.  There may have been another UBS person that came in

18   and out.

19     Q     What was the purpose of this meeting?

20     A     The purpose of this to -- was to implement the

21   amendment of -- to the loan agreement and facilitate the

22   sale of shares and split the proceeds of the sale of those

1    shares.

2        Q    And what time was the meeting scheduled?

3        A    In the morning.  I don't know what -- 10

4    o'clock, 11.  I don't know.

5        Q    Do you recall what time you arrived at UBS?

6        A    No.

7        Q    And UBS's office is essentially 15th and --

8        A    And K.

9        Q    When you arrived at UBS, was anyone else there?

10        A    I think we all waited for Mr. Mann.  I think you

11    came with me or you came before Mr. Mann.  I think he came

12    by himself later, because he came from far away.  So, I

13    think you were there and Mr. Piper and myself, initially.

14        Q    And what transpired at the meeting?

15        A    That we agreed to liquidate the sale -- the

16    shares that were held in the name of Ellipso, but held

17    physically by Mann Tech in New Jersey, I think, with

18    Georgetown Securities or something like that.  And we

19    needed to sign the documents so Georgetown Securities

20    could send the stock certificate to UBS to process.

21        Q    Was the stock certificate present at the

22    meeting?

96

1        A    I don't think so.  I think it took a long time

2    for Mr. Mann after that meeting to authorize the actual

3    transfer or to order Georgetown to transfer.

4        Q    Were any documents signed at that meeting?

5        A    Yes.

6        Q    What documents?

7        A    The joint sale order you showed us, I think, or

8    something like that.  I think they -- they had to redo a

9    lot of documents.  They had to -- they had a draft and

10   then they -- they scratched it and they did another draft

11   -- I don't know why -- to comply with bank regulations.

12   So, there were a few with no letterhead documents prepared

13   by UBS.

14       Q    Okay.  And so returning you to document number

15   three, the second page, which you've said you think is a

16   separate document, you say that was executed at the

17   meeting on August the 12th?

18       A    Well, I don't know, because it says -- the fax

19   indicates August the 11th, but I don't know who signed it

20   on when.

21       Q    And the letter in front of it indicates August

22   the 2nd?

97

1      A      That's correct.  But it was faxed on the 11th.

2      Q      Do you recall which documents were signed at

3  this?

4      A      And the answer is no.  I know we signed

5  documents and we read documents, so, I -- I don't know

6  what --

7      Q      Did you receive copies of the documents that

8  were signed at that meeting?

9      A      I am sure UBS copied and gave us a copy each.

10     Q      And if you had those documents, you would have

11  produced them in this litigation, wouldn't you?

12     A      If I had them, they were produced.  Whatever I

13  had was produced.

14     Q      Okay.  Now, approximately how long did the

15  meeting last?

16     A      I don't -- an hour, hour and a half.  I don't

17  know.

18     Q      And did everybody -- all four people were at the

19  meeting, no one else:  Piper, Castiel, Patterson, and

20  Mann?

21         MR. GOODMAN:  Objection.  Asked and

22  answered.  You can answer again.

```
 1            THE WITNESS:  That's my recollection.
 2    There may have been another UBS guy coming back and
 3    forth.
 4    BY MR. PATTERSON:
 5        Q    What happened at the conclusion of the meeting?
 6        A    Mr. Piper declared, Okay, guys.  I'll do that.
 7    I'm not an attorney.  We're a bank.  We don't get
 8    involved.  But this is great.  Let's move forward.  We can
 9    sell these shares.
10            And I remember him telling us, Everything is
11    above board.  Whatever he tells me, I tell you and what --
12    whatever you tell me, I tell me.  We all work as a team.
13    I don't want to get involved in any fights or anything
14    like that.  And we all agreed, Sure.
15            So, he reiterated that any transaction,
16    sale order that any party request, he would get the
17    agreement from the other one before moving forward
18    and everybody would know everything.
19        Q    Okay.  And that's -- and looking again at
20    Exhibit 3, the second page, which is the joint sale order
21    signed by you and Mr. Patterson, that provides that any
22    pre-sale terms would have to be reviewed by you and by
```

99

1    Mr. Patterson, you on behalf of Ellipso and Mr. Patterson

2    on behalf of Mann Technologies?

3        A    That's correct.  That's what it says.

4        Q    Was there any discussion at that meeting of

5    Mr. Patterson's interest in, ownership interest in, Mann

6    Technologies?

7        A    No.

8        Q    What was your understanding of Mr. Patterson's

9    authority to execute the joint sale agreement on behalf of

10   Mann Technologies?

11       A    The -- there was a possibility that Mr. Mann

12   would not show up, because he had other obligations and he

13   had absented him from town.  He was taking a selling

14   course in Annapolis or something.  And he lives very far.

15            So, Mr. Patterson explained to me that he could

16   sign on behalf of -- he had authority from Mann to sign.

17   So, there was no big deal at the meeting.  But Mr. Mann

18   did show up anyway.  So --

19       Q    And this discussion took place in front of

20   Mr. Piper?

21       A    Not necessarily, because I know he -- no, you

22   asked if we discussed Mr. Mann -- Mr. Patterson's

100

1    ownership at the meeting.  I said no already:  I don't

2    think that was an issue.  That was an issue between

3    Patterson and me either before or after the meeting or

4    around the meeting.  I don't remember exactly.

5        Q    Okay.  Now, at the conclusion of the meeting,

6    Mr. Piper says, Okay.  I'll go do what I'm going to do.

7    And then what happened with you and Mr. Mann and

8    Mr. Patterson?

9        A    We went to Starbucks.  Mr. Mann wrote a check

10   and left.  And I stayed with Mr. Patterson and asked him,

11   So, he lets you sign on behalf of Mann Tech?

12            So, that's when Mr. Patterson said, Well, I am

13   the owner -- an owner of Mann Tech.

14            And I said, But I thought he was just giving you

15   a kickback, which I didn't like, by the way.

16            But he said, No, I am 50 percent owner.  And

17   that was quite a revelation.

18       Q    And how long was Mr. Mann at Starbucks?

19       A    Not long; 20 minutes, 15 minutes.  He had to go.

20       Q    What did you do with the check that Mr. Mann

21   gave you?

22       A    I deposited it.  And I think I wrote a check to

101

1    you either the same day or right after, because you were

2    hurting as well, so, I gave you a check.

3        Q    And there were some stocks sold pursuant to the

4    arrangements that were made at that meeting at UBS?

5        A    Yeah.  It took several weeks for that to happen.

6    Yes.

7        Q    And after the stock was sold, did Ellipso

8    receive a portion of the proceeds?

9        A    Yes.

10       Q    And did you take any actions between the time

11   that Mr. Patterson told you he was a part owner of Mann

12   Technologies and the time that Ellipso received the

13   proceeds from the sale of the stock to void that

14   transaction?

15       A    No.

16       Q    After Ellipso received the proceeds from the

17   sale of that stock, did you continue to meet with Mr. Mann

18   and Mr. Patterson?

19       A    I don't think we met in September, or early

20   September, but we continued meeting a while after.  Mr.

21   Mann was out on vacation somewhere or had to do something.

22       Q    And when was the first time that you raised the

1    issue of fraud on the Mann stock loan transaction with

2    anyone?

3         A    Well, we raised it when we filed the complaint.

4         Q    That was the first time?

5         A    Raised -- what do you mean by "raised the

6    issue"?  Maybe if you're specific --

7         Q    Did you discuss the fact that you thought you

8    had been defrauded with anyone?

9         A    Well, I didn't think.  I knew I was defrauded.

10   It was not a thought.  It was a knowledge.  I discussed it

11   with you.  And I told you it wasn't the right way to do

12   things.  But at that time I had --

13        Q    I'm going to hand you your answers to

14   interrogatories and ask you to look at Number 2.  I guess

15   the question was:  Did you discuss the fact that you

16   thought you had been defrauded with anyone?

17        A    Oh, yes, yes.  I -- I thought you meant you or

18   Mann or -- not attorneys.  I did discuss that with an

19   attorney in late November in New York.

20        Q    And were you considering legal action based upon

21   the fraud at that time?

22        A    Well, I knew I was duped, in the -- in the

1    layman's term.  Fraud is a legal term, I understand, so, I

2    don't think I was using that as -- in a legal sense,

3    because I'm not a lawyer.

4         And I didn't know to what extent I had been

5    duped and I was had, and I had no recourse, because you

6    did it so intelligently and you bamboozled me so well that

7    I couldn't know.  And I had to accept reality.

8         It's when I talked to an attorney that we --

9         MR. GOODMAN:  Objection.  Don't discuss

10   anything you've discussed with your attorney.

11        THE WITNESS:  That's correct.

12   BY MR. PATTERSON:

13     Q    But you were exploring potential options,

14   including legal options?

15     A    Before talking to an attorney, I didn't explore

16   any action, except abiding by the agreements I had signed,

17   because I had signed agreements, so, I believed I was

18   bound to them.  Whether there was fraud or not, that's not

19   for me to decide.

20     Q    When did you first consider the possibility of

21   bringing legal action based upon the fact that you thought

22   you had been duped?

1           MR. GOODMAN:  Objection.  Calls for

2    attorney-client privilege.

3           MR. PATTERSON:  No, I asked when he first

4    considered it.

5           MR. GOODMAN:  That would require him to

6    reveal his discussions with counsel, unless you're

7    adding if Ellipso was going to --

8           MR. PATTERSON:  Maybe, maybe not.

9           MR. GOODMAN:  Well, to the extent that it

10   involves a communication between you and any

11   attorney, you're not to answer.  If there was any

12   other instances outside of that relationship, you

13   can answer.

14          THE WITNESS:  Well, I didn't discuss this

15   case outside counsel.  I mean, I knew -- I thought

16   about it myself, but I didn't discuss it.

17   BY MR. PATTERSON:

18      Q    And you discussed it with counsel in November,

19   December of 2000 and --

20          MR. GOODMAN:  Objection, objection to what

21   he discussed with counsel.  That's privileged.

22          MR. PATTERSON:  Okay.  It's in the

1    interrogatory answers?

2            MR. GOODMAN:  It says he sought the advice

3    of counsel, and that's the extent of the

4    information.

5    BY MR. PATTERSON:

6        Q    Approximately how long did the discussion with

7    Mr. Patterson take at Starbucks?

8        A    Well, if you add the time when Mr. Mann was

9    there, probably an hour, 45 minutes to an hour.  And I

10   think we drove or walked somewhere after that, so, it was

11   relatively long; an hour, I would say.

12       Q    So, what time of day?

13       A    Morning -- well, it must have been lunch time by

14   then.

15       Q    And when did you deposit the check that you had

16   received from John Mann?

17           MR. GOODMAN:  I'm sorry what check?

18           MR. PATTERSON:  The check that he

19   testified to.

20           MR. GOODMAN:  At the collateral loan

21   agreement or at the office meeting?

22           MR. PATTERSON:  We're talking about the

1    office meeting.

2             THE WITNESS:  Probably the same day or the

3    next morning.

4    BY MR. PATTERSON:

5        Q    And you have a deposit slip for that?

6        A    I don't know.  I may have.

7        Q    In any event, the bank records would reflect

8    when it was deposited?

9        A    That's correct.

10       Q    Did you at any time communicate to John Mann

11   your belief that you had been duped on the stock margin

12   loan transaction?

13       A    No, I didn't communicate with John Mann.

14       Q    Now, you alluded to some discussions with

15   Mr. Patterson.  When did those discussions take place

16   concerning your concerns that Mr. Patterson was an owner

17   of Mann Tech?

18       A    I thought I had already answered that question.

19       Q    Well, you said you had discussions.  The

20   question was:  When?

21       A    Well, the first indication that Mr. Patterson

22   was a double agent was in June 2004 --

1          MR. GOODMAN:  You like that?  You're

2     laughing at that.

3          THE WITNESS:  -- when Mr. Patterson

4     acknowledged he was getting a kickback from Mr.

5     Mann, a commission or some upside or some -- some

6     kickback, which I thought very unethical on the part

7     of Mr. Mann to bribe my own guy.

8     BY MR. PATTERSON:

9          Q    And that discussion took place in June of 2004?

10         A    That's right; but it was a kickback, a

11    commission, or some freebie.  And --

12         Q    So, to use your own words, when you executed the

13    August 2nd amendment to the loan agreement, you knew that

14    Mr. Patterson was a double agent?

15         A    No.  Mr. -- I knew Mr. -- no, no, no.  I thought

16    Mr. Patterson was totally committed to Ellipso.  But he

17    was getting another kickback from Mr. Mann.  Mr. Mann was

18    also, I think, trying to bribe Mr. Tomassoni.  I think his

19    way of doing business is to bribe people on the other

20    side.

21              But I was assured by Mr. Patterson that his

22    loyalty was to Ellipso.  And it made sense, since Ellipso

```
 1   document?
 2       A    No.
 3       Q    The document has an Ellipso logo on the front
 4   page at the top?
 5       A    Yes.
 6       Q    Do you know how that Ellipso logo came to be on
 7   that document?
 8       A    I appended it to the document.
 9       Q    You did?
10       A    Yes.
11       Q    Did you make any other changes to that document
12   or entries on that document?
13       A    You e-mailed me the Argyle document that you had
14   problems with because it was encrypted or protected.
15   Nobody -- you couldn't make changes.  So, you sent it to
16   me to see if I can make it editable and asked me to put --
17   to remove the Argyle logo, because we were going to put
18   Ellipso.
19            So, I made it a Word document that you could
20   edit.  I think -- I don't know who made the changes to the
21   names and the numbers that are slightly different.  It's
22   probably you, or maybe me -- I don't know -- or both.
```

1       Q    What are the differences between this particular

2   agreement and the Argyle agreement?

3       A    I don't know, but the names are different.

4       Q    And you're saying you transmitted this back to

5   Mr. Patterson after you had put it in Word format?

6       A    Yes.

7       Q    Do you recall the date when that might have

8   occurred?

9       A    Well, it says 30th of January, so, probably a

10  few days earlier than that.

11      Q    Now, in your complaint, you assert that there

12  was a conspiracy between Mr. Mann and Mr. Patterson to

13  defraud Ellipso on the stock loan transaction, of which

14  that is the agreement.  Would you describe what that

15  conspiracy was and how that fraud was to be carried out?

16      A    Well, I'm not the architect of the conspiracy,

17  so, I can't tell you how the conspirators conspired.  I

18  wasn't invited to the meetings, so, I can't tell.

19      Q    Well, you assert in your complaint that there

20  was a conspiracy to defraud Ellipso out of the ICO stock.

21  How was that to be done?

22      A    Based on what we know now, it appears evident

128

```
 1        Q    The August 2nd amendment basically says that

 2   Ellipso and Mann Tech agree to sell all of the shares at

 3   55 cents or better and divide the proceeds.  Is that

 4   actually what that agreement says?

 5        A    That is correct.

 6        Q    How does that effectuate the alleged conspiracy

 7   to defraud Ellipso out of the stock?

 8        A    Well, there was still an out.  That agreement,

 9   that covenant to sell expired on October 1st.  If things

10   didn't happen by October 1st, then -- which they didn't --

11   Mann Tech had access to the entire stock available.  And

12   that's what they did.  They took it and they sold it.  I

13   think that speaks for -- the events speak for themselves.

14        Q    And why wasn't all of the stock sold before

15   October the 1st?

16        A    Because the stock fell below 50 cents.

17        Q    And that wasn't something that Mr. Mann or Mr.

18   Patterson or Ellipso or anybody could have controlled?

19        A    That is correct.

20        Q    So, how is that defrauding Ellipso?

21        A    I don't think we alleged that one single line of

22   an agreement is a fraud or a conspiracy.  Conspiracy is
```

130

1   to have something than nothing.  So, it depends on

2   which point of view.  The market price can be

3   considered as a good thing or bad thing.

4   BY MR. PATTERSON:

5       Q    So, at this point --

6       A    It was a good thing for him, after all.

7       Q    So, at that point in time, it was your view that

8   the ICO stock was virtually worthless?

9       A    No.  If we -- if everybody had thought it was

10  worthless, we would have sold it at 10 cents.  But what

11  happened is, Mr. Mann absorbed it, all of it, when it fell

12  at a certain value.  But he didn't sell it at that value.

13  He just acquired it, and paid himself and made a

14  1,200 percent profit on an annualized basis.  So --

15      Q    On October 30, 2004, what was the ICO stock

16  selling for?

17      A    I don't know; maybe 10, 12 cents, 13.  I don't

18  know.  It was at that value, that level.

19      Q    So, the value of the 492,000 shares -- actually,

20  it had been 25,000 sold at that point, so, the value of

21  the remaining shares was less than the $90,000 loan

22  amount?

```
 1      A    Yeah, it was less than the loan amount.  But the

 2  collateralized loan agreement doesn't say that the loan

 3  amount has -- the value has to always be over -- above the

 4  loan amount.  That's the risk the lender took.  That's why

 5  we share the upside and downside.

 6      Q    And this particular stock margin loan was

 7  nonrecourse; was it not?

 8      A    That's correct.

 9      Q    And what does that mean?

10      A    That if the stock goes below a certain value, if

11  the stock goes below the value of the loan, the lender

12  loses that difference.  And that's why I advised Mr. Mann

13  to sell a sufficient amount of stock when it was a bit

14  higher to recover his $90,000, so everything would be

15  upside.  But you guys blocked that in April, for some

16  reason.  I don't know why.

17      Q    So nonrecourse means that Ellipso did not have

18  to repay the loan?

19      A    Yeah, that is correct, that the collateral would

20  cover the loan.

21      Q    You made reference to the attempted sale of

22  92,000-some shares in April of 2004.  At that point in
```

132

 1    time, had Ellipso provided all of the requisite

 2    documentation to enable Mann Technologies to sell the

 3    Ellipso -- the ICO shares?

 4         A    Yes.

 5         Q    And Ellipso didn't need to provide any other

 6    documentation whatsoever to enable Mann Technologies to

 7    sell those ICO shares?

 8         A    We provided the stock certificate and a letter

 9    addressed to the exchange agent, and ICO or Kelly Meadows

10    -- I believe you showed me that letter -- instructing them

11    to transfer those shares to Mann Tech.

12              I don't know what else they wanted.  And if Mann

13    Tech wanted something else, they could have asked.  But

14    they had all the power to change the stock certificate to

15    their name.

16         Q    Directing your attention back to Exhibit 3, and

17    the second page of that, the joint sale order, the second

18    sentence, which says, Please review, if necessary, any

19    pre-sale terms with Messrs. Castiel (Ellipso), Patterson,

20    (Mann Technologies) --

21         A    Uh-huh.

22         Q    -- what were "any pre-sale terms" that this

136

1    $1.30 in April.  That's when we decided to sell the 92,000

2    shares.  It might have gone up.  I think it was $1.20,

3    $1.30.

4         Then it started going down to $1.00, 80, 70

5    cents through the summer, stayed at 50 cents from July to

6    mid-September.  And then it started going down from

7    September through early November to 8 cents progressively,

8    and then went back up to $1.60, I think.

9         Around Christmas, it went back a little bit.  I

10   don't know what range, 80 cents or so at the end of the

11   year.  That's my recollection, but it's not 100 percent

12   accurate.

13        But it was up and down.  So, from January 2004

14   to January 2003, it had actually increased in value by

15   maybe 30 percent, but it had gone down in the meantime,

16   too.

17   Q    Did Ellipso and/or MCHI sell any ICO stock

18   during 2004?

19        MR. GOODMAN:  Objection.  I'll object.

20   I'll allow him to answer, but I'll ask for a proffer

21   in a minute.

22        THE WITNESS:  It's not relevant.  We did

137

1    sell some.

2    BY MR. PATTERSON:

3        Q    And what price did you sell it -- was the stock

4    sold for?

5        A    A variety of prices.

6        Q    A range?

7            MR. GOODMAN:  Objection.

8            MR. PATTERSON:  What is the objection?

9            MR. GOODMAN:  On the relevance of what

10   Ellipso sold its ICO shares for.

11           MR. PATTERSON:  Well, relevancy objections

12   are reserved, but he's testified as to what he's

13   thought the value of the stock was.  And I think

14   what he sold it for is the most telling evidence,

15   probative evidence, of what it was really worth and

16   what he ultimately thought it was worth.

17   BY MR. PATTERSON:

18       Q    So, the question is:  What was the range at

19   which either Ellipso or MCHI sold ICO stock in 2004?

20           MR. GOODMAN:  Continuing objection.  You

21   can answer.

22           THE WITNESS:  Well, your statement is

138

1    incorrect.  What we thought the value was has

2    nothing to do with what we agreed to sell.  You may

3    think your jewelry is extremely valuable, but if you

4    need the cash, you sell it at a discount.

5            So, your statement is too generalized.  We

6    sold it at market price at October, November, and

7    December.  So you can guess what the prices were.

8    We followed the trend.

9    BY MR. PATTERSON:

10    Q    Would it be fair to say that Ellipso sold --

11    when MCHI sold the stock in October 2004, for less than a

12    dollar a share?

13    A    We sold some stock that was for less than a

14    dollar, yes.

15    Q    Just to clarify your prior testimony concerning

16    Waller Capital, what was Waller Capital's fee for

17    attempting to sell the ICO shares?

18            MR. GOODMAN:  Objection, asked and

19    answered.  You can answer.

20            THE WITNESS:  I think they wanted $200,000

21    plus a commission, a percentage of the proceeds.  I

22    don't recall what it was.

170

1     Q    Okay.  That's all part of the same e-mail

2  string?

3     A    Yep.

4        (Castiel Deposition Exhibit No. 13 was

5  marked for identification.)

6  BY MR. PATTERSON:

7     Q    We're up to Exhibit 13, which is a 1-page e-mail

8  dated November 16, 2004?

9     A    Yes.

10     Q    Did you send this document?

11     A    Yes.

12        MR. PATTERSON:  The next document, we'll

13  mark as Exhibit 14.

14        Are you with us, Tom?

15        MR. MAURO:  I think I lost track here.

16        MR. PATTERSON:  If you want to catch up,

17  this is 14.  It's dated October 20.  And they should

18  go pretty much in order.

19        MR. MAURO:  Okay.

20        (Castiel Deposition Exhibit No. 14 was

21  marked for identification.)

22  BY MR. PATTERSON:

1    Q    Okay.  Exhibit 14, 1-page e-mail dated

2  October 20, 2004, do you recognize that document?

3    A    Yes.

4    Q    Did you send that e-mail?

5    A    Yes.

6         (Castiel Deposition Exhibit No. 15 was

7  marked for identification.)

8  BY MR. PATTERSON:

9    Q    The next document is Number 15, a 1-page e-mail

10  dated September 27, 2004.  Did you receive this e-mail?

11    A    Yeah, it appears -- yes, the top.  I haven't

12  read the rest, so, I don't know.

13         Yeah.  Yes.

14    Q    And did you -- the bottom portion of this is an

15  e-mail from you?

16    A    It appears to be, yes.

17    Q    And did you send this e-mail?

18    A    I don't recall every single e-mail I sent.  It

19  appears that I may have sent that e-mail.  If it's -- if

20  it's reproduced in its integrity, then I sent it.

21    Q    Is there any language in here that you think may

22  not be yours?

189

```
 1          MR. GOODMAN:  Did you prepare that

 2  document?

 3          THE WITNESS:  Yes.

 4  BY MR. PATTERSON:

 5      Q    And was that an analysis of what was being

 6  proposed in the amendments that were being discussed?

 7      A    That's an analysis of the returns depending on

 8  various scenarios, if we implemented one of these

 9  amendments or not, I guess.  I have to study them.

10      Q    It was your analysis of what the financial

11  effects would be of the proposed amendments?

12      A    That's correct.

13      Q    Okay.  And during this time frame, which is

14  July 13 of 2004, you, at that time, were aware that Mr.

15  Patterson was, I believe in your words, acting as a double

16  agent?

17      A    No.  I believed he was receiving a commission or

18  a kickback from Mr. Mann.  I still believed he was on my

19  side.

20      Q    Because you could offer him more compensation in

21  the long run?

22      A    No, because Ellipso had more assets on the
```

196

1    Q    And when was this inquiry made?

2    A    May 2004 or June, May, probably May.

3    Q    So, when you entered into the loan agreement

4    with -- when Ellipso entered into the loan agreement with

5    Mann Technologies on January 30, 2004, Stock Certificate

6    A-2008 was restricted and could not be sold?

7    A    Well, actually, that's not true.  We didn't

8    focus -- or I didn't know, and I don't think anybody knew,

9    at the time what the restriction meant, or at least I

10   didn't know.

11        The 2-year period had already expired, anyway,

12   in November 2003.  So, there -- the 2-year period had

13   expired, so, there -- the legend was removable just for

14   asking.  But I don't think that was a material element in

15   the loan transaction.  I don't think anybody --

16        MR. GOODMAN:  Just answer his question.

17   BY MR. PATTERSON:

18   Q    When was the restrictive legend on Share

19   Certificate A-2008 actually removed?

20   A    I think it was after it was submitted to UBS in

21   August, August 2004, maybe September.  It takes a few

22   weeks for them to process that.

207

1    of commercial service?

2        A    Yeah.  I think I mean distribution of revenues

3    of commercial service.  I mean, I'm guessing right now,

4    because I don't have the document.

5        Q    And commercial service would have been in

6    connection with the 881 service?

7        A    I -- I suppose so, yes.  That's the only

8    commercial service we anticipated at the time.

9            (Castiel Deposition Exhibit No. 39 was marked

10   for identification.)

11   BY MR. PATTERSON:

12       Q    Document 39, again, an e-mail from David Castiel

13   to John Mann, dated June 9, 2004.  Do you recognize this

14   document?

15       A    No.  I -- I just take it that it's -- I read the

16   heading -- headers and -- I don't remember this.

17       Q    What is the attachment?

18       A    Well, the attachment is -- is something with no

19   title, but it's called swap of shares doc.  And I guess we

20   were proposing to swap the shares.

21       Q    By "we," you mean Ellipso?

22       A    Ellipso and -- and Mann Tech were discussing the

208

```
 1    possibility of swapping shares.

 2        Q    And you were going to swap the Certificate

 3    A-2008 of the 492,611 shares of ICO stock for a pledge to

 4    replace it with stock from Certificate A-2221?

 5        A    That's correct, in part.

 6        Q    This is a proposal that you were making to John

 7    Mann?

 8        A    Yes.

 9        Q    And you also sent this to me, to Robert

10    Patterson?

11        A    I think that follows a meeting in which --

12             MR. GOODMAN:  Did you send it to Robert

13    Patterson?

14             THE WITNESS:  It says it's sent to

15    Patterson -- Mann, Patterson.

16             MR. GOODMAN:  Is that a yes or no?

17             THE WITNESS:  Yes.

18    BY MR. PATTERSON:

19        Q    And the e-mail itself says, With the last update

20    from Occhuiti -- and that's spelled O-C-C-H-U-I-T-I -- who

21    was Occhuiti?

22        A    He was the man in charge at KPN of implementing
```