### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ELLIPSO, INC.** | ) |
| | ) |
| **Plaintiff/Counter-Defendant** | ) |
| | ) |
| **v.** | ) **Civil Action No.: 05-01186(RCL)** |
| | ) |
| **JOHN B. MANN, et al.** | ) |
| | ) |
| **Defendants/Counter-Plaintiffs** | ) |
| ———————————————————— | ) |

### PLAINTIFF/COUNTER-DEFENDANT'S OPPOSITION TO DEFENDANTS/COUNTER-PLAINTIFFS JOHN MANN AND MANN TECHNOLOGIES, LLC'S MOTION FOR SUMMARY JUDGMENT

Plaintiff/Counter-Defendant Ellipso, Inc. ("Plaintiff" or "Ellipso") hereby respectfully submits its Opposition to Defendants/Counter-Plaintiffs John Mann and Mann Technologies, LLC's ("Mann Defendants") motion for summary judgment.

### Preliminary Statement

Although Defendants accuse Plaintiff of "verbiage" in its Complaint, they submit all of 43 pages (and 29 Exhibits) of contradictory arguments, incorrect statements and self-serving allegations presented as facts where "there is no genuine dispute" to attempt to prove what cannot be proved: that John Mann and Robert Patterson did not conspire to defraud Ellipso and enrich themselves in violation of the same fraudulent agreement they hoodwinked Ellipso into signing. Contrary to Defendants' assertions, there are several material facts and statements where there exists genuine dispute. These disputed facts serve to defeat this motion for summary judgment as discussed below. This is not a case of a simple arm's length transaction where all parties <u>know</u> and accept the terms of the

deal as the motion would have this Court to believe. It is a history of deception, concealment and duplicity.

At the heart of this case is the fact, not disputed by the Mann Defendants, that in December 2003, Defendants Robert Patterson and John Mann, in their individual capacities and prior to having any specific discussion of any specific deal with Ellipso, decided to team up and offer a deal to Ellipso through a company to be formed, and yet unnamed. These meetings and conversations were secret. Defendants have provided no evidence that anyone other than themselves knew of their plan. Two emails produced by Defendants illustrate this scheme: Exhibit 1, dated December 24, 2003 in which Patterson privately informs John Mann of "David [Castiel, Ellipso's CEO]'s response to <u>our</u> offer. I would suggest that <u>we</u> accept the terms"; and Exhibit 2, dated one day earlier, December 23, 2004, in which Patterson informs both Castiel and Mann of his revisions to the agreement, and Mann of Castiel's travel plans, presumably as an Ellipso representative. Patterson did not disclose the December 24th email until discovery in the instant case. Mann knew of Patterson's association with Ellipso as early as 2002 but did not hesitate to enlist Patterson as his partner in a potential deal with Ellipso, offering him fifty percent (50%) of a company in which Mann was putting up <u>all</u> the up-front money. Mann never claimed he disclosed to Ellipso he was enlisting Patterson as his partner, he just did it. Patterson on his part never disclosed to Ellipso the tenor of his discussions with Mann, nor that he would not only be on both sides of a contemplated transaction, but he <u>was</u> the other side. It is important to note that following the consummation of the loan transaction, Patterson claimed and received five percent (5%) in cash from Ellipso in accordance with his agreement (Exhibit 3) as an agent of Ellipso. The e-mail at Exhibit 1 cited above is

not a random expression of the intent and actions of Mann and Patterson at the time they took those actions. Contemporaneous e-mails reproduced in subsequent Exhibits refer to "the company you and I are forming" (Exhibit 3), that Patterson "was satisfied that we are protected" (Exhibit 4[1]), that "we need to get the [ICO] shares in our company's name" (Exhibit 5) and as late as June 9, 2004 (Exhibit 6) when Patterson asks Mann whether "we want share for share replacement" and that he, Patterson is "game to play the market if you want" with Ellipso's ICO shares placed as collateral (emphases added). One cannot find any evidence of any consideration that Patterson gave to the soon to be formed joint company to end up with a fifty percent (50%) ownership interest. Orchestrating a deal behind the back of Ellipso is and can be the only explanation. John Mann colluded with Patterson in Patterson's betrayal of his duty to Ellipso. Given Patterson's history, his corruption in this transaction is not necessarily surprising. . These undisputed facts, based on discovery materials obtained after the instant lawsuit was filed, show that Mann and Patterson in their individual capacities conspired to defraud Ellipso.

Patterson, in his engagement contract with Ellipso, had a duty of "protect(ing) and preserv[e](ing) the Company's [Ellipso] assets" (Exhibit 7, p.1, sec 1). Despite this contractual obligation he sought, with Mann's connivance, to insert himself as principal when his role was understood by contract as that of a broker on commission (Exhibit 7, p 2, § 2.2). Patterson also acted as legal advisor, on the basis of his qualifications as a Harvard-trained lawyer, and having practiced at the Department of Justice and Brian

---

[1] Note that Exhibit 4 refers to the check for the actual $90,000 as having bounced, itself an act against the law, especially on the part of a "lender". Other checks from John Mann bounced afterwards exposing Ellipso to liabilities, causing unnecessary expenses and embarrassment to Ellipso. The funds were ultimately made available.

Cave. Until August 2004 Ellipso relied on his advice and counsel in accordance with Patterson's agreement with plaintiff that specifically provided: "Consultant will establish a Strategy to defend and protect the Company in all business matters including litigation of pending and future actions" and "consultant will have primary responsibility to effectuate the initiation of actions against former employees who have breached their contracts" (Exhibit 7, p. 3, §2.4).

Furthermore, Patterson's agreement with Ellipso contains a clause (Exhibit 7, §2.2) prohibiting dual compensation from Ellipso and a potential financier at the same time. Hence the fifty percent (50%) obtained fraudulently by Patterson from John Mann legitimately belong to Ellipso, since Ellipso compensated Patterson according to §2.2 and paid him five percent (5%) of the loan transaction in cash. At least as a result of the very same agreement Patterson breached, and Mann incited him to breach, Ellipso is entitled to recovery of one-half (1/2) of the proceeds of MannTech's illicit sale of Ellipso's ICO stock or one-half (1/2) of $519,000.00 ($259,500.00), the amount Patterson presumably received or is entitled to pursuant to his fifty percent (50%) ownership of MannTech.

As a result of these events, it is undisputed that Patterson and Mann sought to benefit from a transaction whereby Ellipso was purposely kept in the dark as to who it was dealing with. Ellipso at all times leading to that transaction acted in good faith, sharing all its information with Patterson, who would then use it to benefit himself and Mann. In this context not one person or company can enter into a fair deal. Commercial transactions are valid when entered in good faith and at arm's length, not when one party pretends to be on one side but in fact is the other side itself. It would have been bad enough to have Patterson be a double agent, but he was more than that, he was the lender.

Much is made in Defendants' motion of a purported ratification, presumably obtained implicitly, according to Defendants, through the amendment to the loan agreement in August 2004. At the time of the amendment to the loan agreement Ellipso was still acting pursuant to the advice and counsel of Patterson pursuant to the specific terms of his engagement. As counsel to Ellipso, Patterson never advised Ellipso, especially in August 2004, that an amendment would signify ratification of a fraud Ellipso was not even aware of yet. Defendants would have this Court to have Mann and Patterson, having hoodwinked Ellipso commercially, to do the same legally. This behavior cannot and should not be condoned.

Defendants make much of an e-mail, written in November 2004, after all the damage was done, referring with hindsight knowledge that Patterson's ownership was acknowledged as of June 2004, and use that post-mortem document to "prove" their theory of ratification. No document, testimony or evidence exists that contemporaneously to June 2004 establishes knowledge of Patterson's duplicity. Defendants' own witness on cross-examination testified that to this day he believes MannTech to be "a company owned by John Mann" (Exhibit 8, p. 117)[2]. In fact, the November 2004 e-mail, when compared with an earlier e-mail dated October 20, 2004 branded at the injunction hearing as proof of a purported ratification and in which Patterson's interest in MannTech is referred to but in a less explicit fashion, clearly shows that with the passage of time, events learned of progressively and separately, are assimilated and consolidated. Plaintiff did learn of Patterson's ownership interest in MannTech in August 2004.

---

[2] It is worthwhile to note that that same witness, Mr. Tomassoni testified that he was invited to lunch by John Mann in April 2006, two years after their last contact for the purpose of eliciting a deposition from Mr. Tomassoni (Exhibit 8, pp. 123-126)

It is also undisputed that Defendants, after having crafted an agreement under the conditions described above, provided to Ellipso a collateralized loan whereby the collateral was converted and cashed at multiples of the value of the loan, over a period of less than ten (10) months. This close to eight hundred percent (800%) annualized return was kept entirely by Defendants for their own use, in breach of the loan agreement itself that required the application of a formula for profit sharing under these circumstances.

Finally, even if Defendants' assertions are taken at face value, which they cannot be in a motion for summary judgment, Defendants fail to address how a company who by their own account was "insolvent" could enter without duress into an amendment to a contract it sought to provide liquidity through its own assets placed as collateral. The amendment of August 2004 was not aimed at ratifying anything, it had for a goal the disposition of the collateral that would pay MannTech the loan, with a handsome profit, and Ellipso much needed liquidity.  Contrary to a false statement made in their brief at page 7, the shares certificates were held by John Mann personally at all times since January 2004 and there was no way Ellipso could have access to its assets and pay the loan without Mann agreeing to physically deliver the stock, something he consented to do only after he and Patterson secured the amendment, which he and Patterson knew, and Ellipso did not, that they would use to claim ratification of illicit acts of which Ellipso was not even aware.

Mann had Patterson's help in this scheme, as Patterson advised Ellipso in the drafting of the amendment. And now Mann and Patterson claim that the amendment ratifies the concealed knowledge of Patterson's and Mann's deceptions.

Finally, in the Spring of 2004, it is now undisputed that Ellipso's only liquid asset was physically held by John Mann personally. Under these circumstances, even if it had known of the Mann-Patterson's scheme sometime after January 2004, which it did not, how could Ellipso have refused all further dealings with the Mann Defendants, and immediately sought rescission of the fraudulently obtained loan agreement? It could not; it did not have the means to, or even the knowledge that it should, seek redress. Ellipso was subject to the whim of Mann-Patterson. Even if the amendment were valid, the amendment rests as a contract of adhesion, and drafted by the hands of someone, Patterson, who was supposed to "protect the assets of Ellipso" (Exhibit 6 above).

For these reasons, the motion should fail.

## STATEMENT OF FACTS

Upon re-introducing David Castiel, CEO of Ellipso, to John Mann in the winter of 2003 Patterson, purportedly on behalf of Ellipso, negotiated with Mann a collateralized loan agreement by which Mann, through Mann Technologies, LLC, would loan Ellipso $90,000. The collateral tendered by Ellipso was 492,611 shares of stock in a company then known as ICO Global Communications Holding, Ltd. ("ICO"). Among ICO's primary shareholders were Bill Gates and Craig McCaw (Exhibit 9, p.76).

Ellipso received "privately held" stock in ICO (Exhibit 9, p.76). This stock was not traded and was given a value of $10.45/share at the execution of the contract between Ellipso and ICO. McCaw had acquired "old ICO" out of bankruptcy in 2000, and some of its stock was trading in the pink sheet, irrespective of "new ICO's" plans and value. As a result there was great discrepancy between ICO's restricted stock value and ICO's pink sheet value. As acknowledged by Defendants, Ellipso believed at the time its ICO stock

was worth about $20 million (about 2 million shares at $10.45/share) (Relevant Facts #52 in the Motion at page 9 of the Statement of Material Facts). However this stock was not liquid.

In early 2004 Patterson came with a proposition he had presumably discussed with Argyle, a potential lender that he had identified. His proposition consisted of borrowing a small amount of cash to support operations while placing some of ICO's restricted stock as collateral. Upon this stock becoming liquid, or up to three (3) years thereafter, the lender and Ellipso would equally share the upside. In that fashion, Ellipso would receive cash but still would preserve a large portion of its assets (Exhibit 9, p. 86-87). Patterson was the person dealing with Argyle and announced in mid-January 2004 that Argyle was no longer interested in the deal and that he would seek to enlist John Mann in a similar transaction. Of course, Patterson (Exhibits 1 through 5 cited above) had already discussed the matter with Mann in December 2003 and decided, with Mann's consent, that they would form a company, jointly owned by them, to effect the transaction. It is unknown whether Argyle withdrew, or was torpedoed by Patterson for his own gain. The "upside" was not lost on Patterson who had become intimately knowledgeable of Ellipso's finances and business dealings, and of ICO's potential value.

In Mann, Patterson found a business partner capable of putting up enough cash to allow Patterson and Mann to obtain a significant amount of ICO stock. Even better, knowing Ellipso's finances, Patterson knew all too well that Ellipso would be incapable of meeting its repayment obligations without obtaining liquidity from that same stock placed as collateral. Indeed, Patterson advised Ellipso not to make interest payments on the loan (Exhibit 9, p.122). The final and fatal blow struck by Patterson, with Mann's

cooperation at all times, was ensuring that the loan agreement contained a no presentation clause, meaning that the Mann Defendants, upon Ellipso's default, would have immediate rights to the ICO stock and would not need to provide Ellipso notice of default or allow time to cure.

All of the above came to fruition.

## ARGUMENT

Defendants state that this case rests on two elements; 1) that Defendants *failed to inform* Ellipso of Patterson's relationship and 2) that the terms of the loan were *unfair*. Although these two statements are true, they are not the basis of this dispute. Rather, this case is: 1) about Patterson and Mann conspiring individually nearly three months before they even incorporated and one month before they entered into agreement with Ellipso to conceal Patterson's true role and identity in this transaction; and 2) whether an amendment entered without full knowledge of the Mann-Patterson conspiracy and under adhesion constitutes valid "ratification", albeit implicit or unintentional. The facts outlined here from the record show that on these two elements Ellipso would prevail in the fraud and the ensuing counts.

### I.    Standard of Review

Citing Fed. R. Civ. P. 56(c) Defendants state that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Contrary to Defendants' belief there is much more than "mere scintilla of evidence"

in Plaintiff's favor to deny this motion.  As shown below, Defendants make a few statements that are false or absurd, or both, in particular:

>  a) at page 7 of their motion, when they claim that John Mann created MannTech at the request of Dr. Castiel, when Patterson's e-mail to Mann of December 23, 2004 suggests otherwise) and,

>  b)  that MannTech received on August 9, 2004 the original stock certificate #A-2008 when in the same page they acknowledge that that same stock certificate was held by John Mann's broker Georgetown Securities as early as April 2004.[3]

Since a material fact is one that "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248, as Defendants contend, the body of evidence established here does not warrant a summary judgment based on undisputed material facts. Indeed, as shown herein, there is ample evidence that Ellipso is entitled to recovery even if ratification had occurred, which it did not, pursuant to the terms of that same amendment Defendants contend resulted in ratification.

## II.    The Facts Establish a Claim of Fraud

Although the Mann Defendants correctly set forth the elements necessary to establish a claim of fraud, they incorrectly suggest that an omission of material fact cannot form the basis of a fraud claim.  See  Cadet v. Draper & Goldberg, 2007 U.S. Dist. LEXIS 72504 *20 (D.D.C. 2007) (recognizing that an omission of material fact can constitute fraud when there is a duty to speak as found in a fiduciary relationship).  Here, Patterson, as a trusted agent of Ellipso, owed Ellipso a fiduciary duty.  High v. McLean

---

[3] Defendants also take many liberties with their "Statement of Material Facts as to Which there is No Genuine Dispute", as will be discussed further. This is misleading and improper.

Financial Corp., 659 F. Supp. 1561, 1568 (D.D.C. 1987).  Accordingly, Patterson's omission that he was working in concert with Mann with respect to the collateralized loan deal – hence, simultaneously serving two masters, one of which was himself as fifty percent (50%) owner to be of MannTech – constitutes a material misrepresentation for purposes of proving Ellipso's fraud claim.

The Mann Defendants' argument that there could be no omission because MannTech was not formed until February 2004 is without merit.  First, it is an undisputed fact that Ellipso did not know, as of January 2004, that Mann and Patterson were in business together, regardless of the date MannTech actually was formed.  Second, the facts demonstrate that Mann and Patterson were individually, acting in concert together even before they formed MannTech.  Patterson's e-mail of December 23, 2007 quoted above (Exhibit 1) and subsequent ones are reinforced by the January 31, 2004 e-mail from Mann to Patterson  (Exhibit 5) as already explained earlier: "On reading the agreement, I think we need to add the conversion option to Ellipso shares, and we need to get the shares in our company's name") (emphases added).

The Mann Defendants, without much support, also suggest that it was not reasonable for Ellipso to trust Patterson because it knew of his incarceration and disbarment prior to the January 2004 loan deal[4].  These facts however do nothing to demonstrate that Ellipso's reliance on Patterson's business and legal advice was misplaced.  The Mann Defendants make much of Dr. Castiel's purported sophistication in business deals – with no facts, incidentally, to support this supposition – yet

---

[4] When Patterson disclosed his past, after he had begun working for Ellipso and performed well, Dr. Castiel, at the request of Patterson agreed to give him another chance in life (Exhibit 9, pp. 83-84) for which Patterson credits Dr. Castiel for his generosity (Exhibit 10, p. 52). Whether generous or stupid, a deed deemed good at the time, has gone severely punished by Mann-Patterson.

simultaneously contend that, despite this sophistication, Dr. Castiel was foolishly led down a primrose path by Patterson. Dr. Castiel's presumed sophistication stems from his educational background and experience in science, engineering and business management, not law. For that, he relied on Patterson. And this reliance turned out to be a very costly mistake.

### III.     Defendants have not established that there was ratification

The Mann Defendants contend that Ellipso, upon learning of Patterson's duplicity and deception in August 2004, nonetheless ratified the loan deal.  The facts supporting this ratification all center around Ellipso's consummation of the August 2004 amendment to the loan agreement.  See Mann Defendants' Motion at 15-16.  It is beyond the pale for the Mann Defendants to demand that Ellipso, even if it had known of Patterson's ownership of MannTech at the time of the amendment – which it did not - could just walk away from an agreement that allowed it to recover its asset, pay its loan and move away from association with John Mann, and Patterson. Had it done so, it would have been embroiled in litigation, freezing its asset further. In fact, Ellipso had barely had time to digest the meaning of Patterson's duplicity and treachery, and John Mann's connivance with it. When the amendment was consummated, Patterson was now clearly on the other side, or rather <u>was</u> the other side. Ellipso did not acknowledge explicitly that it condoned any of Patterson's and Mann's actions. It was not until a couple of months later, when it consulted competent, and impartial counsel that it decided to give notice to Mann (Exhibit 11), to which Mann failed to ever acknowledge or respond. This action ensued a few months later.

Ratification is not an implicit act concluded as a result of omission or ignorance. There can be no ratification since Ellipso finalized a binding amendment to the loan agreement just hours before it learned the true nature of Patterson's relationship with Mann and Mann Technologies.  See Avianca, Inc. v. Corriea, 1992 U.S. Dist. Lexis 4709 *28 (D.D.C. 1992) (holding that a contract is ratified only by a showing that the "intent to ratify [was] **crystal clear**") (emphasis added); see also Kuwait Airways Corp. v. Am. Sec. Bank, 890 F.2d 456, 465 (D.C. Cir. 1989) (holding that whether a party has ratified a contract is inherently a question of fact). Moreover, as stated earlier, at the time of negotiation and crafting of that same amendment, Patterson was still acting as legal counsel and was providing a variety of legal services to Ellipso, under his very agreement and under which he continued to seek compensation including in his now dismissed counterclaims in this action. In particular he crafted a proposed settlement agreement with a third party on behalf of Ellipso and provided numerous drafts for the August amendment, all crafted presumably on behalf of Ellipso. No correspondence or exchange at the time indicates that Patterson was no longer representing Ellipso, but rather his own company MannTech. All drafts until the UBS sale order show as signatory for MannTech "John Mann, Managing Director". Not one mentions Patterson as connected to MannTech. In fact, an e-mail dated June 16, 2004 (Exhibit 12) has Patterson informing Mann that "he [Castiel] is about 75% to reality" indicating the ruse was taking effect and certainly not knowledge by Ellipso of the Mann-Patterson collusion.

Since Patterson deceived Ellipso as to his role when he crafted an amendment to a transaction he now claims is a ratification of that same transaction, the basis for ratification, if any, is flawed. Patterson and Mann cannot have Patterson craft on behalf

of Ellipso an amendment to an agreement from which they now claim ratification of that same agreement. Since Patterson acting as legal advisor to Ellipso crafted the amendment that purportedly results in ratification, the basis for ratification is itself flawed and fraudulently obtained. Defendants' circular argument cannot be logically supported.

Moreover, the conditions under which the amendment was entered call into question the validity of ratification, even if all of Defendants' assertions were true, which they are not. Having placed its only liquid assets <u>literally</u> in the hands of John Mann, Ellipso had no other alternative than to enter into an amendment in an attempt to recover those assets. Since Mann and Patterson, through their acts – they sold practically all of the collateral in November/December 2004 and early 2005 (Exhibit 13) - and their own assertion here that they were entitled to do so, were intent on keeping the collateral as their own, Ellipso had two choices: a) go into litigation and freeze its assets for a long period – as eventually did happen – or b) negotiate a surrender of its ICO shares, which it tried, which unfortunately resulted in Ellipso being defrauded once again by Mann-Patterson. The ensuing contract, especially when viewed in light of Patterson's duplicity, is a contract of adhesion which cannot stand.

Finally, the Mann Defendants contend that by not tendering back to the Mann Defendants the $90,000 loaned to it, Ellipso is barred from proceeding on its rescission claim.  This is simply not the case. As the Mann Defendants well know – indeed, they counted on it – Ellipso was in no position to return the $90,000 loaned to it without first liquidating the very asset Mann-Patterson held tight to and ultimately took away from Ellipso.  Restoration is not a mandatory element of a rescission claim.  <u>First Nat'l Bank & Trust Co. v. American Sec. & Trust Co.</u>, 437 F. Supp. 771, 774 (1977) (holding that

restoration of benefits received is necessary on a rescission claim only if equity so requires).  Here, equity dictates that Ellipso's inability to tender payment back to the Mann Defendants, which could then only be done through the restitution to Ellipso of its collateral, does not require dismissal of its claim for rescission.

Finally, Ellipso had three (3) years pursuant to the terms of the loan agreement to repay the principal (Exhibit 14, par.2.1 p. 2) and was barred from pre-paying the loan before eighteen (18) months (Exhibit 14, par. 2.5 (a) p. 2). Mann-Patterson had already sold most of the collateral without Ellipso's knowledge in the fall of 2004. The facts are that Ellipso was precluded from repaying the loan in 2004 because of the prohibition on prepayment before July 2005, the maturity date. Further, Ellipso was never notified of the status of the loan - whether it was still in place, foreclosed, in default or otherwise. The terms crafted by Patterson were indeed absurd.  A borrower can repay his loan, and interest only if he: a) knows that he owes something, and 2) is informed of how much he owes. Therefore restitution, made impossible by the very terms crafted by Patterson, cannot negate a solid basis for rescission - that of Patterson and Mann's deception.

**IV.    <u>Ellipso was not in default when Mann sold the Ellipso's ICO stock</u>**

Defendants contradict themselves when they state that ratification occurred in August 2004, but that Ellipso was in default of interest payments under the loan agreement. They cannot have it both ways. The amendment expressly recognizes that interest had not been paid and waives that obligation pursuant to the terms of the disbursement of proceeds from the sale of the ICO stock to occur through October 1, 2004 (Exhibit 15, p. 1-2).

The amendment also states that the unsold stock was to be treated in accordance with the original agreement after October 1, 2004. Therefore, interest on the remaining note (less than the $90,000 since MannTech had already recovered some of its loan) was not due until December 31, 2004 as the loan agreement called for quarterly payments (Exhibit 14 par. 2.2(c) p. 2). However, MannTech never sent an invoice to Ellipso for payment of any interest, never claimed any interest, and never calculated and submitted the new interest amount to be paid by December 31, 2004. It simply disposed of most of the stock, without notice in November/December 2004, before the interest was due, and kept all the proceeds without adhering to the loan agreement which calls for a split of the "appreciation in the value of the Collateral" after the principal is paid. (Exhibit 14 par. 2.3(a), p2). This interpretation of the terms is supported by Mann-Patterson themselves in an e-mail dated July 15, 2004 (Exhibit 16) which states: "MannTech gets repaid the $90,000 + interest + <u>one half of any appreciation in the share price</u> above the strike price of $0.45" (emphasis added).

MannTech claims that after a default is determined by MannTech at its sole discretion and of which notice need not be given to Ellipso, MannTech simply takes possession and disposes of the proceeds as it sees fit. In that context, since it would not even know if it were in default, why and how could Ellipso possibly pay the interest on a loan that may have been fully paid through the disposition of the collateral? If these are the terms, negotiated by Patterson on behalf of Ellipso, they are indeed unconscionable. They are more than unconscionable, they are illogical. A borrower cannot pay interest on a loan of which it knows not if default has occurred and its collateral disposed of by the lender.  In that case, it owes no interest. With the knowledge acquired now, in fact Ellipso

owed no interest at all as of December 31, 2004 (the first date interest would have been due pursuant to the amendment of August 2004) since MannTech had unilaterally and illegally taken ownership of the collateral. There was no loan then. MannTech cannot have it both ways again.  Either the loan was active, in which case interest was due on December 31, 2004 and Mann Tech had no right to dispose of the shares unilaterally and for its own exclusive benefit; or the collateral was foreclosed and therefore Ellipso owed no interest.   In this latter case, MannTech owes Ellipso its portion of the proceeds through the profit sharing formula of the loan agreement at par. 2.3 (a). The fact is that Patterson and Mann were the only ones to know of the status of the loan or the stock. They forbade UBS from even talking about the ICO shares with Ellipso (Exhibit 17: "I instructed John Piper of UBS to maintain the standard professional practices regarding confidentiality for the Mann Tech account") and pocketed an annualized return of close to eight hundred percent (800%) on a $90,000 in ten (10) months.

Finally, even if MannTech were justified in every one of these illicit and sometimes unpardonable acts, it still breached its obligations under the loan agreement. A default allows the lender to take possession and dispose of the collateral to recover its principal, without the borrower being able to object to its liquidation. It does not entitle the lender to keep all the proceeds as Mann-Patterson contend and unilaterally awarded to themselves.  A bizarre explanation of that lending practice was given by Patterson in his deposition (Exhibit 10, p. 172-173). Patterson was asked to compare this loan to a mortgage loan on a house, when the loan is in default. When asked "if the house is worth $10 million more that the mortgage, does the bank keep the $10 million?" Patterson responded: "They get paid…Whoever buys the house gets the $10 million".

Patterson even claims that in his past practice concerning commercial loans (before he was disbarred and imprisoned), that was a common characteristic of such loans (Exhibit 10, p. 73). This goes against UCC rules and regulations of commercial loans. It bears to emphasize that MannTech was created solely for the purpose of making a loan to Ellipso (and not at the request of Dr. Castiel as Defendants falsely and absurdly state), hence it is a lender subject to act in good faith in both the performance of the contract and in enforcement of the contract. 28 D.C. Code §28:1-203.

**V.    Ellipso Is Entitled To Recovery.**

Patterson states that the strange terms of "lender keeps all" are justified under the "non recourse" aspect of that loan. However, that provision was already foreseen by the flawed loan agreement itself, through the provision (2.3 (a)) under which the loan agreement provides the lender with an upside in excess of the principal in the form of the profit sharing described in the document (50% of the appreciation of the Collateral, that a regular mortgage bank would not get in a foreclosure). As a result, Ellipso is entitled to at least one-half (1/2) of the proceeds, or $519,000.00/2 ($259,500.00).

If, however, Mann Tech disposed of the collateral prior to a default as was demonstrated above, MannTech should return a minimum one-half (1/2) of the shares it sold, or about 215,000 shares worth today approximately $750,000. In addition, Ellipso is entitled to interest and punitive and consequential damages that resulted from the misconduct of Patterson and Mann.

Finally, as discussed above, Patterson violated the compensation terms of his agreement with Ellipso, prohibiting him from accepting dual compensation. Since he was paid five percent (5%) commission for bringing the $90,000 loan to Ellipso, in

accordance with that same agreement the consideration that Patterson illegally received from John Mann, fifty percent (50%) of MannTech, belongs to Ellipso. This includes fifty percent (50%) of the stock of MannTech, fifty percent (50%) of all the proceeds from the sale of ICO stock, and fifty percent (50%) of the remaining assets.

## VI.    Analysis of the Counts

### 1.  Count I.  Rescission

Defendants contend that the grounds for rescission: fraud, unconscionability and duress are not present here.  Setting aside the accuracy of these requirements, by Defendants' own account, the grounds for rescission have been met:

**a. Fraud**

The six (6) elements of fraud are clearly present here:

a)  a <u>false representation</u> was made by Mann that he was dealing with Ellipso while his secret co-shareholder was the key negotiating party and legal advisor on behalf of Ellipso;

b)  Patterson's <u>duplicity was material</u> in establishing the fairness of any deal.

c)  The intent to deceive is clearly proven by the December 23, 2003 e-mail (Exhibit 1) contemporaneous with the negotiations.

d)  All actions taken by Ellipso were taken in <u>reliance that Patterson was protecting its interests</u>, not his own and those of John Mann; and,

e)  It was <u>reasonable</u> for Ellipso to rely on Patterson since he had discharged his duties to Ellipso honorably for over a year and was expecting a commission for closing the deal.

In the cases they rely upon, Defendants acknowledge the need for a commercial contract to be negotiated at "arm's length" and the defrauded party's reliance to "be reasonable." *Park v. Sandwich Chef, Inc.*, 651 A.2d 798, 801 (D.C. 1994) (citing *Hercules & Co. v. Shama Restaurant, Inc.*, 613 A.2d 916, 923 (D.C. 1992). Contrary to Defendants' contention, there was nothing close to an arm's length situation with Patterson who, under contract with Ellipso and performing a variety of legal tasks, including the drafting of contracts, secretly owned fifty percent (50%) of a company with which he negotiated a contract of behalf of Ellipso. It was further reasonable for Ellipso, for whom Patterson had discharged his duties properly for over a year and enjoyed the complete trust and confidence of its CEO, to rely on Patterson.

Defendants argue that "mere silence" is not fraud unless there is a "duty to speak". *Kapiloff v. Abington Plaza Corp.*, 59 A.2d 516, 517 (D.C. 1948). A series of arm's length transactions generally will not impose a duty to speak. *See, e.g.*, *One-O-One Enterprises, Inc. v. Caruso*, 270 U.S.App.D.C. 251, 254-5, 848 F.2d 1283, 1286-7 (1988) (upholding final, fully integrated contract over "defendants' prior representations (and defendants' nondisclosure of negotiations inconsistent with those representations)") (emphasis added). In the instant case, this court should find, as it already did during the preliminary injunction phase, that there was a duty to inform. Moreover, the cases cited concern "arm's length transactions". Patterson was engaged in self-dealing, and was not engaged in an arm's length transaction with Ellipso. Further he had the complete cooperation and duplicity of John Mann months before they incorporated MannTech. As such, the elements of fraud are present, combined with conspiracy.

Defendants contend that the Collateralized Loan Agreement between Ellipso and MannTech is a fully integrated contract (Defendants Ex. 3, par. 8.7) pursuant to *Hercules.* However, Defendants cannot hide behind an integration clause when the drafter of the entire agreement was duplicitous. Had he disclosed his role, as *Hercules* requires since there was no hidden identity there, the case would take another meaning altogether. Patterson's duplicity, proven to have existed prior to the execution of the loan agreement, cannot be covered and excused through an integration clause. Defendants failed to provide any case law where an agent secretly acting on behalf of the other party, in fact being part of the other party, can claim protection under the integration clause.

The later incorporation of MannTech does not absolve Mann-Patterson of their duplicity that began before the execution, or even the negotiation of the loan agreement, a deceit that nullifies any protection under integration. Moreover Patterson's incarceration has never been presented by Ellipso as a basis for rescission or any other relief. Hence it is useless to argue its impact here.

Ellipso relied on Patterson who had a contract with Ellipso to perform services, and Patterson teamed up with Mann to defraud Ellipso. Patterson's misconduct toward Ellipso does not stem from his incarceration, but from Mann's offering Patterson fifty percent (50%) of his company for the purpose of defrauding Ellipso. The cases cited by Defendants are thus not relevant to the issue at hand.

Defendants make the assertion that Ellipso's actions following the revelation that Patterson was fifty percent (50%) owner of MannTech in August 2004 (Defendant contends an earlier date) result in affirmance of the contract and hence ratification. This is simply not the case. Deprived of its legal advisor, Patterson, and of liquidity through

the freezing of its only liquid asset at the time by Mann-Patterson, Ellipso could not but take the most conservative path to avoid litigation from MannTech. It was not until it could and did consult with competent counsel in December 2004 and when it discovered that MannTech may have sold the ICO stock, that Ellipso took action by notifying Mann by letter to protect its collateral (Exhibit 11).

Moreover Ellipso, although it could then, did not pay the interest on the loan in December 2004. Whether it owed any no one knows since MannTech had already sold most of the ICO stock, and refused then to recognize the legitimacy of the agreement. Having by then consulted legal counsel other than Patterson and learned of its rights, Ellipso immediately notified MannTech and refused performance of any agreements with MannTech, John Mann and Patterson. To affirm an illicit contract through continuation of its performance, a party must know that the contract is indeed illicit, and that it has a right to discontinue performance without itself being in breach of the contract. In that context, requiring Ellipso to immediately terminate all contacts with Mann-Patterson when it discovered that there was something irregular in Patterson's conduct would be unreasonable. Although Ellipso reasonably believed it was being ably represented by Patterson, in fact, the record reflects that Patterson had a greater benefit in protecting the interests of MannTech. At the time, however, Ellipso relied upon and accepted the advice of Patterson as skilled at contract drafting, and knowledgeable regarding the intricacies of contract law. Requiring from Ellipso under such circumstances to take the risk of being sued by MannTech for breaching a contract when it did not know its rights is unreasonable.

### b. Unconscionability

The unconscionability of the contract does not reside in the commercial terms: profit sharing, interest, repayment periods etc. It resides on terms crafted by Patterson that are obscure and sometimes absurd. A particular example is the no-notice provision for default which could be declared unilaterally by MannTech while at the same time requiring Ellipso to pay interest on a loan that may already be forfeited. These unusual terms do not permit the borrower to meets its obligations and allow MannTech to confiscate at will the collateral, if it deems that the collateral has more value than the expected payment of principal. And since there is a no-prepayment clause of eighteen (18) months, Ellipso at any time within the eighteen (18) months may lose its collateral while making interest payments.

Despite Defendants' attribution of sophistication to Dr. Castiel., this does not diminish or obviate Patterson's responsibilities to fairly and faithfully carry out his contractual duties to serve as consultant and legal advisor to Ellipso. Dr. Castiel is not and was not a lawyer. The deal negotiated by Patterson, purportedly on behalf of Ellipso, was unconscionable and indeed impossible to effect. The deal contained a formula for confiscation of the collateral if MannTech ever desired so.

The interpretation by Mann-Patterson of an agreement crafted by Patterson, even assuming the contract were valid, is itself unconscionable. Upon foreclosure, a mortgage lender recovers his principal and costs, but does not keep the excess value. Here, even in its flawed form, this agreement only gave Mann-Patterson half the "upside". They kept all of the proceeds from the sale of the collateral.

### c. Retention of Benefits of the Contract

As discussed, in accordance with the loan terms, Ellipso did not have to pay the principal until three (3) years from the loan, and was prohibited from doing so before eighteen (18) months. Defendants have therefore not established an undisputed basis that Ellipso retained the benefits of the contract. If indeed ratification is the outcome, the $90,000 will be factored in the restitution, damages, and any other remedy the Court deems proper. Having established the basis for fraud, the agreement is subject to rescission. As a result, none of the arguments to refute the claim for fraud have merit and Defendants are not entitled to summary judgment as to Count I.

### 2. Count II - Lender Liability / Breach of Fiduciary Duty

Although Defendants claim that "the relationship between a debtor and a creditor in a loan transaction is 'ordinarily a contractual relationship . . . and is not fiduciary in nature'" and amply cite cases not relevant, (*Overseas Private Inv. Corp. v.* 22 *Industria de Pesca, Inc.*, 920 F. Supp. 207, 210 (D.D.C. 1996) (quoting *Yousef v. Trusts Bank Savings*, 568 A.2d 1134, 1138 (Md. App. 1990)); *see also, Williams v. Federal Land Bank*, 293 U.S. App. D.C. 343, 346, 954 F.2d 774, 777 (1992) ), the fact is that Patterson, as a paid agent of Ellipso and secretly the lender, owed a fiduciary duty to Ellipso. Defendants cannot dissociate Patterson, who is a MannTech owner and officer, from MannTech and John Mann, the other owner and officer. Contending that Mann-Patterson can therefore act as independent lenders when they were not is sufficient to defeat the request for summary judgment as to Count II. Defendants implicitly admit that Patterson at the time of the loan transaction <u>was</u> the lender and owed no fiduciary duty as such. If

he was the lender, as admitted, Defendants must concede the fraud and rescission alleged in Count I. They simply cannot have it both ways.

### 3. Count III - Lender Liability / Implied Covenant of Good Faith & Fair Dealing

Defendants assume that Patterson is dissociated from MannTech, the lender. Patterson was and is MannTech as much as John Mann was and is MannTech. There is nothing done in good faith that Defendants have indisputably presented concerning Patterson's actions. The cases in support of their motion do not reflect the situation here where the lender placed himself inside the borrower's entity, acting as infiltrator. Therefore, Defendants' request for summary judgment as to Count III should be denied.

### 4. Count IV - Lender Liability / Fraudulent Non-Disclosure

Ellipso incorporates by reference the arguments with regard to the fraud allegations set forth in the discussion of Count I – Rescission, since the fraud claim is well supported Count IV must not be summarily disposed of by motion.

### 5. Count VIII - Common Law Fraud

Ellipso incorporates by reference the arguments with regard to the fraud allegations set forth in the discussion of Count I – Rescission, since the fraud claim is well supported Count VIII must not be summarily disposed of by motion.

### 6. Count IX – Conversion

Ellipso incorporates by reference the arguments with regard to the fraud allegations set forth in the discussion of Count I – Rescission, since the fraud claim is well supported and the arguments supporting Ellipso's entitlement to recovery set forth above, Count IX Conversion  not be summarily disposed of by motion.

### 7.  Count X - Trover/Replevin

Since Ellipso can show that MannTech's unilateral and secret decision to sell Ellipso's ICO shares placed as collateral, and to keep all the proceeds for itself, in violation of the very agreement MannTech contends was "ratified", Count X must not be summarily disposed of by motion.

### 8.  Count XI - Civil Conspiracy

The disclosure of the e-mails preceding the negotiation and execution of the loan agreement establish that Mann and Patterson secretly conspired to form a company without the knowledge of Ellipso, and decided to use Paterson, who had infiltrated Ellipso and was acting as legal advisor to Ellipso, to achieve their scheme.  The ensuing events show that Mann and Patterson did meet Defendants' four requirements for civil conspiracy: "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme. This scheme was unlawful and in violation of Patterson's agreement with Ellipso.  Since Patterson and Mann knew of the scheme, MannTech is charged with the knowledge of the scheme. Therefore, this Court should deny the request for summary judgment as to Count XI.

### 9.  Count XIII – RICO

Mann and Patterson's actions (1) are in violation of 18 USCS §1962 as evidenced by the preceding arguments, and the statement of facts, and (2) they resulted in injury to Ellipso's business or property. The December 2003 and January 2004 e-mails between Mann and Patterson are ample evidence of consent to the conspiracy by Mann and Patterson. They conspired through the overt act of executing a loan agreement that kept their true identities and interests secret. As a result, the Defendants' request for summary judgment as to Count XIII should be denied.

### **CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment should be denied *in toto*, and Ellipso should be entitled to recover against the Defendants as claimed.

Respectfully submitted,


            /s/
_____
Vanessa Carpenter Lourie, #250068
4400 MacArthur Blvd., N.W.
Suite #205
Washington, D.C. 20007-2521
(202) 342-8000 (Telephone)
(202) 342-9000 (Facsimile)
vlourie@carpenterlourie.com (e-mail)



            /s/
_____
Linda Awkard, #38748
4201 Cathedral Avenue, N.W.
Suite 1416 W
Washington, D.C. 20016
(202) 237-1535 (Telephone)
(202) 237-1204 (Facsimile)
lawkard@earthlink.net (e-mail)

Counsel for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ELLIPSO, INC.** | ) | |
| | ) | |
| **Plaintiff/Counter-Defendant** | ) | |
| | ) | |
| v. | ) | **Civil Action No.: 05-01186** |
| | ) | |
| **JOHN B. MANN, et al.** | ) | |
| | ) | |
| **Defendants/Counter-Plaintiffs** | ) | |
| _____ | ) | |

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS
GENUINE DISPUTE OR WHICH ARE MATERIAL TO ITS CLAIM**

Defendants' Statement as to undisputed facts is misleading, false and improper. It

contains sixty-five (65) allegedly undisputed facts, of which thirty-one (31) are simply

taken out of a new "Declaration of John B. Mann under Penalty of Perjury": facts 1, 3, 7

to 10, 12, 16, 24, 26 to 28, 31, 33 to 36, 40, 42 to 50, 53, 59, 60 and 65. They are

therefore not "Facts as to which there is NO Genuine Dispute"[5].  Nevertheless, plaintiff

can rebut several of those allegedly "undisputed facts", hence discrediting the entire

statement of "undisputed facts":

1)      The statement that MannTech did not receive the ICO stock certificate #A2008

        until August 9, 2004 is false. In fact, Mann himself declares under oath, in the

        same declaration, that he was unable to sell the ICO shares held in his brokerage

---

[5] Undisputed facts for the purpose of a motion for summary judgment must be submitted in good faith
when the submitting party can convince itself that the other party also believes in the accuracy and truth of
those facts. This is simply not the case here and the sheer volume of the entire motion, with its 28
attachments and confusing references (exhibit numbers are offset from their filed document numbers and
bear no title), even after correcting the motion almost two weeks after filing it, brings into question the
Mann Defendants' motives in submitting clearly disputed facts as undisputed, and including some
statements that are patently false. This court should take note of this.

account at Georgetown Securities in April 20004 because Ellipso allegedly refused to provide an unspecified "corporate resolution". So he had physical possession of the shares in April 2004 (they were delivered in January 2004 at the closing of the loan transaction).

2)  MannTech's incorporation date supplied by Mann in his declaration contradicts Defendants' own exhibit 13.

3)  The absurd claim that in January 2004, Mann and Patterson agreed to incorporate a company as MannTech at the request of Dr. Castiel is preposterous. Mann-Patterson have not shown they took orders from Dr. Castiel. In fact although the Statement says that they incorporated "Mann Tech" at Castiel's request, Mann's declaration does not even go that far. It only says Castiel requested that Mann-Patterson incorporate "a company" (Defendants' exhibit 1, par. 13).

In addition to the aforestated factual disputes, Plaintiff states as follows:

1.  In the spring of 2002 Dr. David Castiel ("Dr. Castiel") was introduced to Robert B. Patterson who was working as an attorney with the Washington, DC law firm Barkats and Associates. Ellipso was then a client of Barkats and Associates.

2.  In November 2002, Robert Patterson was engaged by Ellipso to provide a variety of legal and business advisory services.

3.  Shortly after his engagement was executed, Mr. Patterson disclosed to Dr. Castiel that he had had some difficulties arising from his family situation and that those difficulties had put his legal standing in jeopardy.

4.  Mr. Patterson represented to Dr. Castiel that he could still provide legal services since he was admitted to the bar in Missouri.

5.  Mr. Patterson became a solid and dedicated legal and business advisor to Ellipso in the months afterwards and provided a variety of legal services, including the drafting and editing of contracts

(in particular the 8813 services with Sunburst), and several litigation related activities (motions, preparation for depositions, discovery material, pre-trial motions and settlement negotiations)

6. In November 2001, Ellipso and ICO Communications Holdings, Ltd (ICOHA) executed a stock swap by which Ellipso received 492,611 shares from ICOHA in 2001. ICO was rescued out of bankruptcy in May 2000 by a group of investors that included Craig McCaw and Bill Gates.

7. The ICO shares were valued at $10.15 each.

8. In November 2002, Patterson introduced Ellipso to John Mann as an individual whose association could bring value to Ellipso since according to Patterson John Mann had been a key executive at Network Solutions, a highly successful company that managed a registry for the Internet ("the '.com' people").

9. On or around December 2003 Mr. Patterson contacted Mr. Mann to explore the possibility of his association with the 881 project. A lunch meeting was held in or near Warrenton, Virginia on or about December 10, 2003.

10. At that meeting Mr. Mann's interest in other aspects of Ellipso's activities was discussed in particular Virtual Geo and its ICOHA assets.

11. In early January 2004, Mr. Patterson contacted a company called Argyle who presumably proposed, or was willing to consider, a novel loan structure by which the lender and borrower shared the risks and rewards of assets that were not liquid at the time of the loan.

12. Dr. Castiel did not request that Mann and Patterson form a company to make a loan to Ellipso.

13. A Collateralized Loan Agreement was entered on January 30, 2004 and the last Amendment to the Loan Agreement was executed on or about August 2, 2004.

14. At execution of the loan agreement in January 2004, Dr. Castiel handed out the stock certificate #A2008 for 492,611 shares to Patterson for delivery to John Mann together with all the executed loan documents.

15. The stock certificate has since then been at all times in the possession of John Mann and/or his brokers.

16. Concurrently with the above Patterson handed Dr. Castiel a check for $90,000 from John Mann.

17. Ellipso then wrote a company check for $4,500 to Patterson for his commission in the deal.

18. The check for the loan in the amount of $90,000 was not initially honored by the bank when deposited at UBS.

19. It was replaced with a payment that turned successful a few days later.

20. Other payments to Ellipso by John Mann's companies also bounced in the months ahead.

21. The agreement contained legal "fine print" which was primarily reviewed and approved by Patterson.

22. Dr. Castiel reviewed the loan agreement for the business terms, not the legal implications.

23. Dr. Castiel relied on Patterson, as legal advisor to Ellipso and recipient of 5% commission per the loan agreement, for its compliance with lending laws, fairness and ability of Ellipso to protect its interests.

24. Neither John Mann nor Robert Patterson disclosed that they were in business together since December 2003 and that they intended to incorporate a company in which they would share equally the proceeds of the loan transaction.

25. The August amendment was entered into to permit the parties to liquidate the ICOHA stock, repay the loan, waive any default on the interest payment and share the upside.

26. The formula for sharing was explicitly enunciated. It contained however a contingency on the sale price and a time limit, October 1, 2004.

27. Dr. Castiel discussed with Patterson the insertion of the interest in default in order to cure said default and, on behalf of Ellipso Patterson discussed it with Mann according to emails received in discovery.

28. Mr. Patterson prepared all of the amendments since June/July 2004 leading up to the August Amendment in his capacity of legal advisor to Ellipso.

29. Mr. Patterson never advised Ellipso that an amendment would constitute a ratification of facts known and unknown to me at the time and prior to said amendment.

30. In June 2004 Mr. Patterson told Dr. Castiel that if the loan turned out to have a lot of upside Mr. Mann would give him a bonus.

31. Dr. Castiel did not view that potential reward as Patterson being against the interests of Ellipso since it was a one time bonus. In that same conversation Patterson spoke derogatorily of John

Mann if the loan turned out to be a bad bet, lending more confidence to Dr. Castiel's belief that Patterson was as he had always been on Ellipso's side.

32. Mr. Patterson continued afterwards to serve Ellipso's interest in other matters as before.

33. All the drafts of the amendment crafted by Patterson in June, July and August bore the name of John Mann as the signatory for MannTech.

34. At the execution of the amendment which occurred on or about August 2, 2004 at the offices of UBS, Patterson's name appeared as the signatory for MannTech for the first time.

35. Patterson explained to Dr. Castiel later that he had been a 50% owner with Mann of MannTech all along.

36. The UBS representative, Mr. Piper agreed to act as seller of the stock and distributor of the proceeds to both parties provided all elements were "above board".

37. After October 1, 2004 John Mann prohibited UBS, where Ellipso's ICOHA shares used as collateral were held, from giving any information to Ellipso as to the status of these shares. Ellipso did not know whether MannTech had sold any or all its shares in ICOHA until discovery in the present action.

38. From October 1, 2004 until sometime in mid December 2004 MannTech did not give any notice or any information concerning the loan. All the few contacts between Ellipso and John Mann and Patterson then concerned the 881 business.

39. In October and November Patterson insisted in reaffirming the consulting agreement with Ellipso.

40. Dr. Castiel sent Mr. Patterson two e-mails, one on October 20, 2004 and one on November 16, 2004 and in both he explained that he was reluctant to pay Patterson for services for a period during which he knew then, in the Fall of 2004, that he Patterson had been on the side of John Mann rather than Ellipso.

41. The first e-mail (October) is much less explicit than the November one leading Dr. Castiel to conclude that he amalgamated the information as time went by and in anger at Patterson. Since Patterson had revealed some form of bonus as early as June and then 50% ownership in August, Dr. Castiel considered the ownership as of June as a *fait accompli* and hence was reluctant to conceded to owing Patterson any monies for his services for that period.

42. Both e-mails reflect the knowledge Dr. Castiel had in October and November 2004.

43. In any event, Mr. Patterson never explicitly asked Dr. Castiel, when advising Ellipso on the amendment, that his signature would ratify something Patterson had not told him of yet explicitly.

44. In early December 2004, John Mann informed Dr. Castiel that Ellipso had been in default "at least five times" without being specific or told him that he had already sold the bulk of the collateral, or asking Ellipso to cure such alleged defaults.

45. By December 2004, the business relationship between Ellipso and Mann Tech had practically ceased to exist.

46. Ellipso's last communication with Robert Patterson, John Mann and Mann Technologies relating to the Collateralized Loan Agreement occurred in December 2004 in a letter advising MannTech to preserve Ellipso's assets placed as collateral.

47. No response was received to that letter and MannTech disposed of most of the remaining collateral thereafter, despite that notice.

48. At all times, MannTech's address has been that of Mr. Mann's residence, which Dr. Castiel visited in or about January 2004 and April 2004.

49. Prior to filing this lawsuit Dr. Castiel contacted Mr. Mann requesting a meeting, involving attorneys to discuss legal issues in the relationship between Ellipso and MannTech.

50. Mr. Mann declined to meet if it involved attorneys.


```
              /s/
Vanessa Carpenter Lourie, Esquire



              /s/
Linda Awkard, Esquire
```