```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA

ELLIPSO, INC.                           )
                                        )
     Plaintiff/Counter-Defendant,       )
                                        )
                    v.                  ) Case #05cv01186 (RCL)
                                        )
JOHN B. MANN, et al.                    ) Royce C. Lamberth,
                                        ) Judge
     Defendants/Counter-Plaintiffs.     )
```

## DECLARATION OF DAVID CASTIEL

1. I am over the age of eighteen and otherwise competent to testify on all matters contained herein.

2. At all relevant times I have been the Chief Executive Officer of Ellipso, Inc. and, as such, have personal knowledge of all facts contained herein.

3. In the spring of 2002 I was introduced to Robert B. Patterson who was working as an attorney with the Washington, DC law firm Barkats and Associates. Ellipso was then a client of Barkats and Associates.

4. In November 2002, Robert Patterson was engaged by Ellipso to provide a variety of legal and business advisory services. Shortly after his engagement was executed, Mr. Patterson disclosed that he had had some difficulties arising from his family situation and that those difficulties had put his legal standing in jeopardy.

5. Mr. Patterson represented that he could still provide legal services since he was admitted to the bar in Missouri.

6. Mr. Patterson became a solid and dedicated legal and business advisor to Ellipso in the months afterwards and provided a variety of legal services including the

1

drafting and editing of contracts (in particular the 8813 services with Sunburst), and several litigation related activities (motions, preparation for depositions, discovery material, pre-trial motions and settlement negotiations)

7. In November 2001, Ellipso and ICO Communications Holdings, Ltd (ICOHA) executed a stock swap by which Ellipso received 492,611 shares from ICOHA in 2001. ICO was rescued out of bankruptcy in May 2000 by a group of investors that included Craig McCaw and Bill Gates. The shares were valued at $10.15 each.

8. In November 2002, Patterson introduced Ellipso to John Mann as an individual whose association could bring value to Ellipso since according to Patterson John Mann had been a key executive at Network Solutions, a highly successful company that managed a registry for the Internet ("the '.com' people").

9. On or around December 2003 Mr. Patterson contacted Mr. Mann to explore the possibility of his association with the 881 project. A lunch meeting was held in or near Warrenton, Virginia on or about December 10, 2003.

10. At that meeting Mr. Mann's interest in other aspects of Ellipso's activities was discussed in particular Virtual Geo and its ICOHA assets.

11. In early January 2004, Mr. Patterson contacted a company called Argyle who presumably proposed, or was willing to consider, a novel loan structure by which the lender and borrower shared the risks and rewards of assets that were not liquid at the time of the loan.

12. I did not request that Mann and Patterson form a company to make a loan to Ellipso and I did not create the name MannTech.

13. A Collateralized Loan Agreement was entered on January 30, 2004 and the last Amendment to the Loan Agreement was executed on or about August 2, 2004.

14. At execution of the loan agreement in January 2004, I handed out the stock certificate #A2008 for 492,611 shares to Patterson for delivery to John Mann together with all the executed loan documents. The stock certificate has since then been at all times in the possession of John Mann and/or his brokers.

15. Concurrently with the above Patterson handed me a check for $90,000 from John Mann and I wrote a company check for $4,500 to Patterson for his commission in the deal. The check for the loan in the amount of $90,000 bounced when deposited at UBS. It was replaced with a payment that turned successful a few days later. Other payments to Ellipso by John Mann's companies also bounced in the months ahead.

16. The agreement contained legal "fine print" which was primarily reviewed and approved by Patterson. I concentrated on the business terms. Although I read the entire agreement I relied on Patterson, as legal advisor to Ellipso and recipient of 5% commission per the loan agreement, for its compliance with lending laws, fairness and ability of Ellipso to protect its interests.

17. Neither John Mann nor Robert Patterson disclosed to me that they were in business together since December 2003 and that they intended to incorporate a company in which they would share equally the proceeds of the loan transaction. I did not suggest that Patterson be given an equity interest in MannTech.

18. The August amendment was entered into to permit the parties to liquidate the ICOHA stock, repay the loan, waive any default on the interest payment and share the upside. The formula for sharing was explicitly enunciated. It contained however a contingency on the sale price and a time limit, October 1, 2004. I discussed with Patterson the insertion of the interest in default in order to cure said default and, on behalf of Ellipso Patterson discussed it with Mann according to emails received in discovery.

19. Mr. Patterson prepared all of the amendments since June/July 2004 leading up to the August Amendment in his capacity of legal advisor to Ellipso. Mr. Patterson never advised me that an amendment would constitute a ratification of facts known and unknown to me at the time and prior to said amendment.

20. In June 2004 Mr. Patterson told me that if the loan turned out to have a lot of upside Mr. Mann would give him a bonus. I did not view that potential reward as Patterson being against the interests of Ellipso since it was a one time bonus. In that same conversation Patterson spoke derogatorily of John Mann if the loan turned out to be a bad bet, lending more confidence to my belief that Patterson was as he had always been on Ellipso's side.

21. Mr. Patterson continued afterwards to serve Ellipso's interest in other matters as before.

22. All the drafts of the amendment crafted by Patterson in June, July and August bore the name of John Mann as the signatory for MannTech.

23. At the execution of the amendment which occurred on or about August 2, 2004 at the offices of UBS, Patterson's name appeared as the signatory for MannTech.

24. Patterson explained to me later than he had been a 50% owner with Mann of MannTech all along.

25. The UBS representative, Mr. Piper agreed to act as seller of the stock and distributor of the proceeds to both parties provided all elements were "above board".

26. After October 1, 2004 John Mann prohibited UBS, where Ellipso's ICOHA shares used as collateral were held, from giving any information to Ellipso as to the status of these shares. Ellipso did not know whether MannTech had sold any or all its shares in ICOHA until discovery in the present action.

27. From October 1, 2004 until sometime in mid December 2004 MannTech did not give any notice or any information concerning the loan. All the few contacts between Ellipso and John Mann and Patterson then concerned the 881 business.

28. In October and November Patterson insisted in reaffirming the consulting agreement with Ellipso, and I told him I did not understand why he wanted to reaffirm that contract. I now know he was attempting to obtain ratification.

29. Patterson and I had a few acrimonious telephone conversations during that period because after I had digested the events of August 2004 I felt betrayed by him.

30. I sent Mr. Patterson two emails, one on October 20, 2004 and one on November 16, 2004 and in both I explained that I was reluctant to pay Patterson for services for a period during which I knew then, in the Fall of 2004, that he Patterson had been on the side of John Mann rather than Ellipso.

31. The first email (October) is much less explicit than the November one leading me to conclude that I amalgamated the information as time went by and in anger at

Patterson. Since he had revealed some form of bonus as early as June and then 50% ownership in August, I considered the ownership as of June as a *fait accompli* and hence was reluctant to owing Patterson any dues for his services for that period. Both emails reflect the knowledge I had in October and November 2004.

32. In any event, Mr. Patterson never explicitly asked me, when advising me on the amendment, that my signature would ratify something he had not told me of yet explicitly.

33. In early December 2004, John Mann informed me that Ellipso had been in default "at least five times" without being specific or telling me he had already sold the bulk of the collateral, or asking me to cure such alleged defaults.

34. By December 2004, the business relationship between Ellipso and Mann Tech had practically ceased to exist. My last communication with Robert Patterson, John Mann and Mann Technologies relating to the Collateralized Loan Agreement occurred in December 2004 in a letter advising MannTech to preserve Ellipso's assets placed as collateral. No response was received to that letter and MannTech disposed of most of the remaining collateral thereafter, despite that notice.

35. At all times, MannTech's address has been that of Mr. Mann's residence, which I visited in or about January 2004 and April 2004.

36. Prior to filing this lawsuit I contacted Mr. Mann requesting a meeting, involving attorneys to discuss legal issues in the relationship between our companies. Mr. Mann declined to meet if it involved attorneys.

I declare, pursuant to 28 U.S.C. § 1746 and under the penalty of perjury, that the foregoing is true and correct to the best of my knowledge and belief.

December 26, 2007   _____
David Castiel
CEO
Ellipso, Inc.