76

1  know now; I didn't even know then -- they were trading at

2  about 70 cents, 80 cents, a dollar.  It depends.

3      They had been -- I know now that they had been

4  $2 and $3 in the past.  The shares we held were privately

5  held shares in a company called ITGL, which then became

6  IGL.  And those were the ones that were $10 a share.

7    Q   When you talked about Ellipso's assets earlier,

8  you talked about the shares that Ellipso held and the

9  shares that MCHI held.  Who held these ITGL shares?

10   A   Nobody.  ITGL was converted to IGL.

11   Q   IGL.  And when did that happen?

12   A   I don't know.  ICO had many reorganizations.

13  They had ITGL, which stood for ICO-Teledesic Global,

14  Limited.  And that's when key Teledesic -- that was Bill

15  Gates' company and I think they remerged it or did

16  something and it became IGL, ICO Global, Limited.

17      And then they called it ICO North America and

18  then ICO World Communications and ICO all kinds.  I don't

19  know.  There were so many ICOs, I don't know which one was

20  which.

21   Q   All right.  Referring you back to Exhibit 4 and

22  the attached --

77

1   A   Uh-huh.

2   Q   -- copy of the stock certificate, which type of

3   ICO stock was this?

4   A   This, in our review, was ICO Global, Limited,

5   IGL, which was a successor to ITGL. And that was $10.45

6   per share. It had -- had a very restrictive list of

7   shareholders.

8   Q   So, on January 30, 2004, this certificate for

9   492,611 shares -- they were trading at $10 a share --

10  would be worth $4,926,000?

11  A   No. They were not trading. It was a private --

12  private stock. It was not -- it was not traded.

13  Q   But that was the value of this certificate on

14  January 30, 2004?

15  A   In our view, that's correct.

16  Q   Who's "our view"?

17  A   This, our, ICO and ourselves. That's what they

18  gave us. That's what the agreement with ICO was.

19  Q   Now, the stock certificate that MCHI held, was

20  that the same IGL?

21  A   Yeah. But now that I read it, it has the word

22  "holdings" in parentheses, so, it's ICO Global

78

1  Communications Holdings, Limited.  So, you see, it's IGCL

2  instead of IGL.

3       There might have been a confusion.  But I

4  believe MCHI had the same thing.  So, these other shares,

5  you, Mr. Patterson, advocated selling in the private

6  market with Waller Capital in the summer of 2003.

7    Q   So, on January 30, 2004, Ellipso and MCHI

8  collectively held approximately 2.2 million shares of IGL

9  stock, which would have a value of $22 million?

10   A   That's -- that's correct, privately held stock

11  that had a nominal value of over $20 million.

12   Q   Why didn't you just sell some of the stock?

13   A   Well, as I said, under your leadership, we

14  contracted with Waller Capital and tried to sell them --

15  even some of them, at least -- at a discount.  Instead of

16  $10, we'd sell them at $8.  And they failed to find a

17  customer.

18   Q   How was Waller Capital compensated for their

19  efforts?

20   A   They wanted $200,000 in cash to do their work.

21  And we didn't have it, so, we didn't pay them $200,000.

22  In lieu of that, we gave them 20,000 shares of ITGL,

79

1  which, in their view, was equivalent. And they accepted

2  that.

3   Q   Who did you deal with at Waller Capital?

4   A   I'm sorry. I didn't hear.

5   Q   Who did you deal with at Waller Capital?

6   A   Somebody called Garrett, I think, Garrett

7  something. I don't know if it's first or last name.

8  Garrett -- Garrett Baker, I think, I think.

9   Q   Your memory's better than mine. Yes, that's

10  correct.

11      Who is March Kimmel?

12   A   I think you -- it's -- it's somebody that you

13  told me worked for Argyle.

14   Q   And what is Argyle?

15   A   I don't know. Maybe I should ask the question.

16   Q   Did you ever have any dealings with Argyle?

17   A   No. I think I talked to Mr. Kimmel once, but I

18  don't know who Argyle is and whether he's really Argyle or

19  whether Argyle exists.

20      (Castiel Deposition Exhibit No. 6 was

21  marked for identification.)

22  BY MR. PATTERSON:

80

1   Q   I'm showing you a document that's been marked as
2   Exhibit 6.  Do you recognize this document?
3   A   Yes.
4   Q   It appears to be a fax transmission from you,
5   David Castiel, to Argyle Equities.
6   A   That's correct.
7   Q   And on the second page, that's your signature?
8   A   Yes.
9   Q   And those changes that are written in, that's
10  your writing?
11  A   Yes.
12  Q   Is it still your testimony you don't know who
13  Argyle Equities is?
14  A   If you let me clarify:  You sent me that
15  document and asked me to make any changes I wanted and fax
16  it to this guy.  I did not contact Argyle or check them
17  out or anything.
18      I assumed they are legitimately in existence, or
19  I did assume at the time, since you told me and I trusted
20  what you said.  So, you asked me to make the changes I
21  would deem acceptable.  I made them and faxed it back to
22  him.  It's a fax, it shows here.

1   Q   And you testified you did speak at least on one

2  occasion with March Kimmel?

3   A   Yeah. I don't know if I called him or he called

4  me.

5      MR. PATTERSON: I'll mark this the next

6  exhibit, Number 7, which is a 1-page letter to

7  Benjamin Wolf.

8      (Castiel Deposition Exhibit No. 7 was

9  marked for identification.)

10  BY MR. PATTERSON:

11   Q   Do you recognize that document?

12   A   Yes.

13   Q   That's your signature on it?

14   A   Yes.

15   Q   What do you mean by the language in the first

16  sentence that says, Reissuance of attached original Stock

17  Certificate A-2008 for 492,611 shares of ICO Class A

18  common stock to the benefit of Mann Technologies, LLC?

19   A   Uh-huh, yes. You told me -- Mr. Patterson told

20  me that this was a requirement of the loan agreement with

21  Mann Tech, that I had to transfer the shares to be held as

22  collateral in Mann Tech's name, not in an escrow account,

82

1  as most collateral things are held.

2    Q  Okay.

3    A  I trusted your advice.

4    Q  So, on or before January 30, Mr. Patterson

5  advised you that you had to transfer the stock, ICO stock,

6  to Mann Technologies?

7    A  In compliance with the loan agreement.

8    Q  So, you knew, based upon Mr. Patterson's

9  representations, that the stock was to be transferred to

10  Mann Technologies pursuant to the loan agreement?

11    A  I knew that the loan agreement required or

12  specified that the stock would be held as collateral and

13  when sold, there was a formula for splitting the upside.

14    And Mr. Patterson indicated that the collateral

15  had to be held in the name of -- of Mann Tech and not the

16  name of ICO -- I'm sorry -- of Ellipso. And that's why I

17  surrendered the stock and gave authorization to transfer,

18  in good faith to implement the agreement that we had just

19  signed.

20    Q  Now, there came a time when the stock

21  certificate that is attached to -- a copy of which is

22  attached to Exhibit 4, was transferred out of Ellipso's

83

1  name?

2   A  Yes.

3   Q  And when was that?

4   A  I think it was in August.

5   Q  Of 2004?

6   A  2004.

7   Q  And you've talked about the shares that were

8  held by MCHI.  Did there come a time when those shares

9  were transferred out of MCHI's name?

10   A  Yes, much later, maybe in October 2004.

11   Q  When did you first learn of Mr. Patterson's

12  criminal conviction?

13   A  Either the same day or a few days later, around

14  the time frame after we had signed the first consulting

15  agreement.

16   Q  Do you want to put a time frame on that?

17   A  November 2002, but it was after we executed the

18  consulting agreement.

19   Q  Did you at any time thereafter seek to void that

20  consulting agreement with Mr. Patterson?

21   A  No.  Based on what Mr. Patterson told me, I

22  thought every man deserves a second chance.  And based on

84

1  the explanations he gave me, it was -- I guess to quote
2  you, I was generous about it.  But I did reconsider when
3  you left for your second conviction, your second jail
4  term, that it was perhaps more -- more trouble than I
5  needed.
6    Q   And you continued to make payments to
7  Mr. Patterson for services during 2003 and 2004?
8    A   Well, in 2003, Mr. Patterson left for what he
9  calls a sabbatical, which means another six months of jail
10 term, which apparently was blamed on contempt of court
11 because he insulted a judge or something.  And so, I
12 didn't pay him for that.  He wasn't there.  He came back
13 in October and sought reinstatement into the affairs of
14 the company.
15    Q   And the second jail term you referred to was May
16 through October of 2003?
17    A   That's probably correct.
18    Q   Did there come a time, referring you back to the
19 IGL shares, that you received some information that
20 changed your opinion as to the value of those shares?
21    A   Yes.  It was a progressive revelation.  The
22 first shock was through the Argyle interchange.  Since we

85

1  were seeking a loan, collateralized loan -- margin loan, I

2  think it's called -- they said that they would not give

3  value to it.

4       Although we determined it was privately held and

5  more valuable -- valuable than $10, $8 a share; that's

6  what we thought it was worth -- they would not assign any

7  other value than the value to the equivalent or same

8  company name stock in the pink sheet.  In other words, you

9  have privately held stock; that's fine, but we will not

10 give you any other value than the lower value in the pink

11 sheet.

12      And I remember, I told Mr. Patterson, It's not

13 fair.  He said, Well, that's why it's a collateralized

14 loan agreement, where you share the upside; doesn't matter

15 if it's $20, you'll get -- you'll get $10 out of it.

16      In the meantime, you get money to continue the

17 operation.  And if you're right and it's $10, then you

18 don't get the full $10, because you share it with them,

19 but that's a fair deal.  And that's my understanding.

20      So, I didn't know if it had less value, but I

21 thought that's the only value I could get out of the

22 liquidation of it, in a liquid term.  If I wanted cash out

86

1  of that, I could only get the pink sheet value, even if

2  there were different shares had directly more value.

3    Q  You couldn't sell the shares for $10 a share?

4    A  No. We tried and Waller Capital could not.

5    Q  Would it be fair to say that the stock loan

6  transaction was attractive because it enabled Ellipso to

7  participate in the potential upside value of these shares?

8       MR. GOODMAN: What stock loan transaction?

9       MR. PATTERSON: The only one we're talking

10  about here, the one with Mann Technologies.

11      MR. GOODMAN: Just repeat the question,

12  because I missed the beginning.

13  BY MR. PATTERSON:

14   Q  Would it be fair to say that the stock loan

15  transaction, whether it be with Argyle or with Mann

16  Technologies, was attractive to Ellipso because it

17  permitted Ellipso to participate in the upside of the ICO

18  value in the stock?

19   A  Well, that was the purpose of the proposal.

20  Since you cannot sell the stock at a high value, you can

21  obviously sell it at a lower value. But it -- as an

22  alternative, in between, you borrow at the lower value,

1  but you participate in the upside.

2      That made sense at the time. That's why the

3  outright sale of stock you showed me earlier makes no

4  sense in this context. It makes no sense to have two at

5  the same time.

6   Q   And Ellipso received how much money as a

7  consequence of entering into the loan transaction on

8  January 30, 2004?

9   A   $90,000 minus 5 percent commission paid to you

10 for arranging the loan as a consultant to Ellipso.

11  Q   And did Ellipso ever make any payments to Mann

12 Tech on the loan?

13  A   No. Well, indirectly, the sale of shares in

14 August or September, whatever, following the August sale

15 order was used to repay part of the loan. So, in that

16 sense, it was a repayment.

17  Q   Was the loan transaction, stock loan

18 transaction, between Mann Tech and Ellipso actually

19 executed on January 30, 2004?

20  A   I don't recall. I think the dates were

21 flexible. You adjusted the dates for some reason, maybe

22 for tax reasons for Mr. Mann or something. I don't know

122

1  collateral; isn't that correct?

2      MR. GOODMAN: Objection. Calls for

3  speculation. You can answer.

4      THE WITNESS: Oh, I didn't understand.

5      MR. GOODMAN: I'm sorry. You can answer.

6      THE WITNESS: There were many other ways

7  to create a default, even if we had paid the

8  interest. As a matter of fact, you advised me not

9  pay the interest in April when I said, Don't we owe

10  John Mann $1200 or something like that?

11      And Mr. Patterson said, Nah, don't worry

12  about it. He owes us money on the TRSC. And he's

13  an easygoing guy. Don't worry about it. So, I took

14  it as an invitation of -- to just worry about it

15  later.

16      So, that's one of the elements of

17  conspiracy. You could put me in default, because

18  you were on the other side, if I listened to your

19  advice, which I did.

20  BY MR. PATTERSON:

21   Q   What other ways would Ellipso lose the stock,

22  other than failure to pay the interest, under the loan