1

```
 1            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA
 2     - - - - - - - - - - - - - -x
                                  :
 3     ELLIPSO, INC.,             :
                                  :
 4        Plaintiff/Counterclaim  :
          Defendant,              :
 5                                :
          v.                      :  Case No. 05-cv01186(RCL)
 6                                :
       JOHN B. MANN, et al.,      :
 7                                :
         Defendants/Counterclaim  :
 8        Plaintiffs.             :
                                  :
 9     - - - - - - - - - - - - - -x

10                          Reston, Virginia

11                          Wednesday, May 2, 2007

12          Deposition of DAVID CASTIEL, Witness, called for

13     examination by counsel for the Defendant/Counterclaim

14     Plaintiff, at the Metro Offices, 11710 Plaza America,

15     Reston, Virginia, before Diana L. Cox, CCR, a stenographic

16     reporter and notary public in and for the District of

17     Columbia, commencing at 10:20 a.m., when were present on

18     behalf of the respective parties:

19

20

21

22
```

**EXHIBIT**

**1**

2

```
 1    APPEARANCE:

 2       On Behalf of the Plaintiff/Counterclaim Defendant:
              MATTHEW H. GOODMAN, ESQ.
 3            Leftwich & Ludaway
              1400 K Street, Northwest
 4            Suite 1000
              Washington, DC 20036
 5            202-434-9100

 6       On Behalf of the Defendants/Counterclaim Plaintiffs:
              THOMAS A. MAURO, ESQ.
 7            Mauro Law Offices, PC &
              1020 Nineteenth Street, Northwest
 8            Suite 400
              Washington, DC 20036
 9            202-452-9865

10            ROBERT PATTERSON, PRO SE
              11775 Stratford House Place, #407
11            Reston, Virginia 20190

12

13

14

15

16

17

18

19

20

21

22
```

3

```
 1                          I-N-D-E-X

 2   WITNESS:                                        PAGE:

 3      DAVID CASTIEL

 4   Examination by Mr. Patterson                      7

 5   Examination by Mr. Goodman                      284

 6   CASTIEL DEPOSITION EXHIBIT:                     PAGE:

 7   No. 1   Amendment to Collateralized Loan agreement   63

 8   No. 2   Check to Robert Patterson                64

 9   No. 3   Letter from Castiel to Piper             65

10   No. 4   Letter from Castiel to Meadows           67

11   No. 5   Contract for Sale of Securities          69

12   No. 6   Facsimile from Castiel to Kimmel         79

13   No. 7   Letter from Castiel to Wolff             81

14   No. 8   Collateralized Loan Agreement           118

15   No. 9   E-mail from Kimmel, Dated 01/07/04      167

16   No. 10  E-mail from Castiel, Dated 12/11/04     167

17   No. 11  E-mail from Mann to Castiel, Dated 12/10/04   169

18   No. 12  E-mail from Castiel to Mann, Dated 12/10/04   169

19   No. 13  E-mail from Castiel to Patterson, Dated 11/16/04  170

20   No. 14  E-mail from Castiel to Patterson, Dated 10/20/04  170

21   No. 15  E-mail from Mann to Castiel, Dated 09/27/04   171

22   No. 16  E-mail from Castiel to Mann, Dated 09/23/04   172
```

33

1   at UBS?

2       A    I did.   In August 2004?

3       Q    Right.

4       A    I did.

5       Q    Anybody else?

6       A    No.  I think there were others prior to that,

7   but they had withdrawn from the company, so, their

8   signatory authority had expired.

9       Q    Did Ellipso have any other financial accounts in

10  any institutions other than the two we've talked about?

11      A    No.

12      Q    In 2004, did the board of directors hold regular

13  meetings?

14      A    I don't know what "regular" is.  We -- we did

15  have a few meetings.

16      Q    When were those meetings held?

17      A    I don't remember.  January, March.  I don't

18  know.  We did have a few meetings then.

19      Q    And do you recall where those meetings were

20  held?

21      A    At the offices of -- I don't know the law firm

22  name -- where the Honorable Witt Peters worked.  He made

34

```
 1    that facility available.   I don't recall the name of the

 2    law firm.

 3         Q    How did you communicate with the members of the

 4    board of directors?

 5         A    Either phone or e-mail, or I would ask Laury

 6    Blakley to call them for a board meeting or for a

 7    conference call, mostly conference calls.

 8         Q    Now, the documents that have been produced in

 9    this case have a number of what appear to be corporate

10    names.  I wondered if you could identify what these

11    corporate entities might be.  We've talked about Ellipso

12    and you've talked about MCHI.  There is a mention --

13    you've mentioned, I believe, EPH, Inc.

14         A    I didn't mention that today.

15         Q    Are you familiar with a corporate entity known

16    as --

17         A    Yes.

18         Q    And what is that?

19         A    It's a byproduct of the reverse merger that

20    Freed Frank, a law firm, organized in 1998, I believe.

21         Q    And what's the ownership of EPH, Inc.?

22         A    I think it's 100 percent owned by Ellipso, but
```

1          MR. GOODMAN:  That's your answer.

2     BY MR. PATTERSON:

3          Q     How high was it?

4          A     Probably closer to 80 -- $80 million.  But when

5     you say "invested," you have to be -- a lot of the

6     investment was spent back to the investor, like, most of

7     -- a lot of the money came from Boeing and it went back to

8     Boeing to build the system, not just to build the backups.

9          Q     Did Ellipso, on January 30, 2004, have any other

10    assets that we haven't mentioned?

11         A     Yeah.  It had -- just the 881 authorization from

12    the IT.

13         Q     Now, did Ellipso have any debts on January 30,

14    2004?

15         MR. GOODMAN:  Other than what was

16    testified to earlier?

17         MR. PATTERSON:  I don't think he testified

18    to any debts.

19         THE WITNESS:  Yes, it had debts.

20    BY MR. PATTERSON:

21         Q     And what were those debts?

22         A     To the best of my recollection, we owed some

53

1    attorneys' fees to a couple, two, three, firms and back

2    pay to the employees and perhaps a few bills, minor bills,

3    like FedEx and things that eventually got paid.  I don't

4    think of any other major debt.

5         Q    What was the magnitude of the total debts owed

6    to law firms on January 30, 2004, by Ellipso?

7         A    Well, a lot of the -- the majority of the debt

8    was incurred in the Virtual Geo litigation, which Virtual

9    Geo really was supposed to pay.

10             If you consolidate Ellipso -- Virtual Geo into

11   Ellipso, you can accrue, then, that detriment of Ellipso.

12   But if it's a Virtual Geo obligation, then Ellipso didn't

13   really have that obligation.

14             Putting that aside, I think Ellipso owed a few

15   patent development fees, probably between $1- and

16   $300,000, plus the salaries that I mentioned earlier.  In

17   January 2004, Ellipso was not 100 percent owner of Virtual

18   Geo, so, the Virtual debt did not accrue automatically to

19   Ellipso.

20        Q    Did Ellipso owe David Castiel any back pay on

21   January 30, 2004?

22        A    Yeah.

54

1       Q     How much?

2       A     I don't know, but I think my last paycheck was

3    in December.

4             MR. GOODMAN:  In January 2004 time period.

5    You can answer, but you just said your last

6    paycheck.

7             THE WITNESS:  No, no, but he asked me how

8    much.  Then I have to go back.  I -- I would say at

9    least one year of salary, if not more.

10   BY MR. PATTERSON:

11      Q     So, several hundred thousand dollars?

12      A     Yeah.

13      Q     Maybe more?

14            MR. GOODMAN:  Objection.  You can answer.

15            THE WITNESS:  Yeah.  I think I had

16   advanced money to the company to pay expenses.

17   BY MR. PATTERSON:

18      Q     What's the magnitude here?  Are we talking half

19   a million --

20      A     No, no, no.

21      Q     -- a million?

22      A     No, no, just 10,000, 20,000, perhaps.

55

1      Q    So, the total money owned to you by Ellipso on

2  January 30, 2004, was less than half a million dollars?

3           MR. GOODMAN:  Objection.  You can answer.

4           THE WITNESS:  I -- I -- it would be in

5  that order.  Maybe it's 400, maybe 600.  I have to

6  check -- check it.

7           MR. GOODMAN:  You can answer.

8  BY MR. PATTERSON:

9      Q    What was the magnitude of the legal fees owed by

10  Virtual Geo on January 30, 2004?

11      A    I need to consult with my attorney, because

12  virtual Geo is not a party here.

13           MR. GOODMAN:  If you know -- I'll object,

14  but if you know the answer, you can answer the

15  question.

16           THE WITNESS:  Probably --

17           MR. GOODMAN:  In January 2004.

18           THE WITNESS:  600,000, 800,000, combined,

19  maybe less.

20           MR. GOODMAN:  Do you know the answer?

21           THE WITNESS:  No, I -- I -- but the order

22  of magnitude.

56

1    BY MR. PATTERSON:

2        Q    On January 30, 2004, was Ellipso involved in any

3    litigation?

4        A    Yes.

5        Q    What litigation was Ellipso involved in on that

6    date?

7        A    Well, the -- there was the tail end of the

8    Sahagen suits that you helped manage.  I think we had --

9    they had -- in December 2003, there was an appeal hearing

10   in Delaware that they -- they appealed their loss, so, we

11   were awaiting the result of the appeal, which we -- was

12   determined in our favor.

13            There was also the New York litigation by

14   Sahagen that was basically the same thing as they tried in

15   Delaware, they tried in New York.  And I don't know the

16   status of that.

17            MR. GOODMAN:  Just what lawsuits pending.

18            THE WITNESS:  There was a Drame (ph.)

19   litigation.  We sued a former employee for stealing

20   our -- or breaching his fiduciary duty to the

21   company and taking proprietary information.

22            He sued us, also, for other -- there's

57

```
 1    another lawsuit part of that for his own claims.

 2    There was an Inciardi (ph.) lawsuit, another

 3    employee we sued.  He didn't sue us.  There was no

 4    counterclaim.  I don't believe there was another

 5    lawsuit.  I think that's it.

 6    BY MR. PATTERSON:

 7        Q    Was the ownership of the Ellipso technology at

 8    issue in the Drame litigation?

 9        A    The owner -- I'm sorry.  Could you repeat,

10    because I didn't understand?

11        Q    Was the ownership of the patents, Ellipso

12    patents, at issue in the Drame case?

13             MR. GOODMAN:  Objection.  You can answer.

14             THE WITNESS:  There were two Drame cases:

15    One, Drame -- Drame against us, that we sued Drame

16    for taking -- stealing our property; him against us,

17    claimed that we hadn't given him --

18             MR. GOODMAN:  Just answer the question.

19             THE WITNESS:  I'm trying to understand.

20             MR. GOODMAN:  Okay.

21             THE WITNESS:  I can't say yes or no,

22    because I don't know exactly if it is yes or no.
```

58

1           As a relief for us not honoring, in his

2      view, an oral agreement seven years before, he

3      wanted a rescission of the patent assignment.  So, I

4      don't know if that answers your question whether it

5      was in question or not.

6           One of the relief he sought, he -- I don't

7      think there was a lawsuit saying we didn't own our

8      technology.  He was asking the Court to rescind his

9      assignment.  It's an allegation or -- or a wish.

10     BY MR. PATTERSON

11          Q     That's the question.

12               Now, the Sahagen litigation, Sahagen was an

13     investor in Ellipso and its affiliated companies, was he

14     not?

15          A     Yes.

16          Q     And approximately how much did Mr. Sahagen

17     invest?

18          A     He invested in two -- in the two companies.  He

19     put -- invested $4.2 million in Ellipso, just piggybacking

20     on the Boeing deal --

21               MR. GOODMAN:  Just answer the question.

22               THE WITNESS:  -- And $5 million in Virtual

59

1    Geo, for 25 percent.

2          MR. PATTERSON: Mr. Goodman, I would

3    appreciate your not coaching your witness in the

4    middle of his answer.

5          MR. GOODMAN: Mr. Patterson, I've got a --

6          MR. PATTERSON: That is really improper.

7          MR. GOODMAN: Mr. Patterson --

8          MR. PATTERSON: And I would ask that you

9    refrain from doing so.

10         MR. GOODMAN: You can ask whatever you'd

11   like, Mr. Patterson. My obligation is to make sure

12   that --

13         MR. PATTERSON: No, your obligation is to

14   follow the rules, not to walk all over my

15   deposition. And I would kindly thank you to stop

16   doing it.

17         MR. GOODMAN: Mr. Patterson, you may ask

18   your questions and I will instruct my client to

19   answer the questions and keep his questions to the

20   answer.

21         MR. PATTERSON: If you have an objection,

22   you may make it before he starts his answer.

1          MR. GOODMAN:  It's not an objection.

2          MR. PATTERSON:  As long as he starts his

3   answer -- if you don't like the answer, that's too

4   bad.

5          MR. GOODMAN:  No.

6          MR. PATTERSON:  You cannot interrupt him

7   and try to change his answer.

8          MR. GOODMAN:  I did not.

9          MR. PATTERSON:  And I would ask that you

10  refrain from doing so.  Thank you.

11         MR. MAURO:  Let me just say for the record

12  that it's clear that you interrupted his answer,

13  Mr. Goodman.

14         MR. GOODMAN:  I instructed my client to --

15         MR. MAURO:  It's improper.

16         MR. GOODMAN:  -- to limit his answer to

17  the --

18         MR. MAURO:  In the middle of his answer.

19  You can't interrupt his answer.  That's totally

20  improper.

21  BY MR. PATTERSON:

22      Q    What was the magnitude of the dollar amounts at

61

1    stake in the Sahagen litigations?

2            MR. GOODMAN:  Objection to the form of the

3    question.  That's asking for a legal conclusion.  As

4    I indicated --

5            MR. PATTERSON:  Magnitude of the claims?

6            MR. GOODMAN:  Absolutely.  You're asking

7    for the ad damnum clause was?  Is that what you're

8    asking, what the ad damnum clause of those --

9            MR. PATTERSON:  Exactly, how much was he

10   -- how much was he seeking in damages in those

11   lawsuits.  That's not a legal question.

12           THE WITNESS:  Who is "he"?

13           MR. PATTERSON:  Sahagen, Sahagen.

14           THE WITNESS:  I don't know what he was

15   seeking.  I don't even know if he made a -- he was

16   seeking to steal the company.  He wanted control of

17   the company.  And I don't think there was a monetary

18   claim, but maybe there was.  I'd have to read the

19   document.

20   BY MR. PATTERSON:

21       Q    In going through Ellipso's assets on January 30,

22   2004, you didn't mention any bank accounts or cash on

1    had much bigger assets.  So, even as a selfish interest,

2    it made sense for him to -- okay, if Mann wants to give

3    him a kickback, he'll take it.  But long term, there was

4    more interest in Ellipso.

5            So, I -- I trusted that relationship.  And you

6    knew it.  And you continued working diligently on several

7    things; for example, the Sahagen settlement proposal that

8    you drafted as an expert Harvard-trained lawyer.  It was a

9    good document.  So, okay, he might pay you something one

10   day, but he's -- your allegiance, I believed, was still

11   with us, not to him.

12       Q    How much money did Ellipso receive during 2004

13   as a consequence of Mr. Patterson's efforts?

14       A    Net of our losses, probably negative, but in

15   terms of receipts, you can count what Mr. Mann reimbursed.

16   It's probably $200,000, if you add Mann Tech and TRS.  We

17   never received payment for Mr. Patterson's efforts in the

18   acquisition of -- whatever that company -- Locknet, since

19   they never paid us.

20       Q    How did Mr. Patterson's interests in Mann

21   Technologies cause you to be duped by entering into the

22   August 2nd amendment agreement?

143

1    problem, talk to them.

2              So I called Mr. Patterson and he said, Well,

3    let's sell the shares.  Let's get the money in and let's

4    negotiate.

5              And I lost it, just thinking of another

6    negotiating with John Mann.  I said, I would rather --

7    well, I didn't say I would rather go to jail.  I don't

8    know what jail is.  You do, Mr. Patterson.  But it's

9    something I didn't want to entertain.

10             I had been duped for a third or fourth time and

11   I just hung up the phone and used curse words.  And we

12   never talked after.

13             I did send an e-mail to Mr. Mann, explaining his

14   change of heart.  In a very aloof way, he denied any

15   agreement he ever told.  He even said that Mr. Patterson

16   had never agreed to that.  He knew of Mr. Patterson's

17   conscience at the time.

18             MR. GOODMAN:  I need a break.  Restroom.

19                  (A short recess was taken.)

20   BY MR. PATTERSON:

21      Q    Dr. Castiel, I'm going to hand you a copy of a

22   complaint, which Ellipso filed in the Superior Court for

144

1    the District of Columbia, against ICO Global, Limited, and

2    some other parties.  And I direct your attention to Page

3    18 and ask you to read the two sentences just above the

4    heading two-thirds of the way up.

5         A    Yeah.

6         Q    And my question is:  Is that an accurate

7    statement when it states that Ellipso and MCHI sold the

8    ICO shares in October of 2004 for 16 cents to 98 cents per

9    share?

10        A    I haven't read the thing, so, I can't answer

11   yet.

12             MR. GOODMAN:  I'll object to -- no, I'll

13   withdraw that objection.

14             THE WITNESS:  It is accurate.  It talks

15   about October.

16   BY MR. PATTERSON:

17        Q    Right, 2004.

18        A    The numbers I gave you earlier were through

19   December.

20        Q    Okay.  And how many shares were sold at that

21   price?

22             MR. GOODMAN:  Objection on relevance.  If

1   you would like to make a proffer, but I don't --

2   I've allowed questioning about the value of the

3   shares.

4        MR. PATTERSON:  The rules provide that you

5   can object as to relevance, but the question gets

6   answered anyway.

7        MR. GOODMAN:  Well, the rules actually

8   provide that the information to be relevant and

9   reasonably calculated to lead to discovery of

10  admissible evidence.

11       MR. PATTERSON:  Well, the amount of shares

12  that were sold at that price is certainly probative

13  of what the party thought the shares were worth.

14       MR. GOODMAN:  No, the price of the shares,

15  I believe, would be probative, and that's why I

16  allowed that questioning.  How many were sold, I

17  don't see how that's reasonably calculated.  With

18  that proffer, I don't find that you meet even the

19  broad --

20       MR. PATTERSON:  I don't care what you

21  find.  That's your objection.  Are you directing him

22  not to answer?

146

1          MR. GOODMAN:  If it's the number of shares

2     that were sold, yes; if it's the price, no.

3          MR. PATTERSON:  I'm asking for the

4     approximate number of shares that were sold.

5          MR. GOODMAN:  I'll instruct him not to

6     answer that question, based on your proffer, based

7     on your proffer.  If you have another proffer --

8          MR. PATTERSON:  You don't think the number

9     of shares that were sold is probative, whether it

10    was one share or a million shares?

11         MR. GOODMAN:  As to the price, no.  I

12    think the price is probative to the price.

13    BY MR. PATTERSON:

14       Q    What do you mean here in this document when it

15    says, Sold a large number of shares?  What's a large

16    number of shares?

17         MR. GOODMAN:  Same objection;

18    additionally, lack of foundation.

19         MR. PATTERSON:  You made it a matter of

20    public record.  You made an allegation in a public

21    complaint.  Are you instructing him not to answer?

22    It's a large number of shares.

147

1             MR. GOODMAN:  I don't think he signed the

2    document.

3             MR. PATTERSON:  It's a verified complaint.

4             MR. GOODMAN:  It's not a verified

5    complaint, Mr. Patterson, unless I'm missing

6    something.  I don't see where it's verified.

7    BY MR. PATTERSON:

8        Q    Okay.  Is that a false statement, when it says

9    Ellipso sold a large number of shares at that price?

10       A    No.  It is a correct statement.

11       Q    Your counsel's instructed you not to tell us

12   what a large number is.  Are you going to abide by that

13   advice or are you going to tell us what a large number is?

14       A    I will abide by my attorney's advice.

15            MR. GOODMAN:  Again, based on the proffer

16   that you made, Mr. Patterson.

17            MR. PATTERSON:  That's fine.  That's fine.

18            MR. MAURO:  I haven't made such a proffer

19   on behalf of Mr. Mann with respect to that question,

20   and it seems to me that your objection is completely

21   improper.  And it's disruptive.  And I think that's

22   your purpose.  And if this gets to the Court, that's

148

1    certainly the position that John Mann is going to

2    take.

3                MR. GOODMAN:  So you have the same proffer

4    as Mr. Patterson?

5                MR. MAURO:  I'm not going to tell you.

6    I'm not asking the question.

7                MR. GOODMAN:  Okay.  So, I'm NOT sure what

8    your -- if you're not asking the question, I'm not

9    sure what your statement on the record --

10               MR. MAURO:  John Mann -- I've made my

11   statement for the record.  Your conduct is

12   disruptive, Mr. Goodman, in my view.

13               MR. GOODMAN:  I understand every time I

14   object, you find it disruptive, but I will not

15   apologize to you for that.

16               MR. MAURO:  "Disruptive" is not the right

17   word.  I apologize for making it.  You are causing

18   your client's position, Mr. Castiel's position, in

19   this deposition to be evasive.

20               MR. GOODMAN:  Well, let me --

21               MR. MAURO:  You're allowing him to be

22   evasive on discovery.  That's my position

149

 1    Mr. Goodman.

 2            MR. GOODMAN:  I understand.  I want to get

 3    through, Mr. Patterson.  I understand, and I

 4    appreciate your clarification.

 5            Let me put this on the record as well: this is a

 6    legal case that was filed by another attorney.  And

 7    there's an additional basis for my objection, and that is:

 8    I do not know whether that information is -- I don't know

 9    how that information relates to the matters pending.  And

10    I do not want to prejudice Ellipso on something that is

11    very tangential or irrelevant to this case in another

12    matter that's pending before the Court, without his advice

13    of counsel in that matter.

14            Again, I just would reiterate that I think

15    the testimony as to the price of the shares has been

16    asked and answered several times.  So, go ahead.

17    I'm sorry.

18            MR. MAURO:  Don't accept my silence as

19    agreement.

20            MR. GOODMAN:  I'm not taking anything

21    about it.

22    BY MR. PATTERSON:

150

1      Q    When were the 492,611 shares of ICO stock

2    transferred from Ellipso to Mann Technologies?

3      A    I missed the beginning of the question.

4      Q    When, what date?

5      A    Sometime in August.  I don't know when John Mann

6    delivered the actual certificate to UBS for them to begin

7    the transfer.

8          MR. GOODMAN:  Let me ask for a break.  Let

9    me do this:  Let me talk to David about the last

10   question.  I'm trying to -- let me make sure and

11   talk to him and see if there's anything we can do,

12   because I'm not one to want to create mountains out

13   of molehills, but at the same time, I'm not

14   comfortable doing that now.  So, if you want to take

15   a break --

16         MR. PATTERSON:  Fine.  We'll go off the

17   record.

18         MR. GOODMAN:  -- because it's another

19   legal matter.

20         (A short recess was taken.)

21         MR. GOODMAN:  I briefly consulted with my

22   client about the other litigation and the question

151

1   that's pending to him about the number of shares

2   sold.  And in the spirit of cooperation and

3   hopefully to get this issue behind us, Mr. Castiel

4   is ready and we'll respond to that question.

5   BY MR. PATTERSON:

6       Q    What is the large number of shares that were

7   sold by Ellipso in 2004?

8       A    I don't recall the exact number.  It's probably

9   5-, 600,000, in that range.

10      Q    What income, if any, did Ellipso receive from

11  the Ineva transaction, sale of the Ineva ISP?

12      A    Zero.

13      Q    Did Ellipso receive any moneys from a credit

14  card merchant account of Ineva?

15          MR. GOODMAN:  I'll note an objection.  You

16  can answer.

17          THE WITNESS:  What -- the money billed by

18  Ellipso in the months preceding the sale of Ineva

19  was held by the credit card company.  As they

20  normally do, they hold accounts for a few weeks or a

21  month and then they pay.  So, they finally disbursed

22  to our account the money that was our money.  It has

152

1    nothing to do with the transaction.

2    BY MR. PATTERSON:

3        Q    And how much money was that, approximately?

4            MR. GOODMAN:  Continuing objection.

5            THE WITNESS:  I think maybe $19,000, or

6    20, in that range.

7    BY MR. PATTERSON:

8        Q    And when did Ellipso receive these funds?

9        A    I don't remember; either maybe June 2004 or May.

10    I don't remember.

11        Q    Could it have been a portion in June and a

12    portion in October?

13        A    I guess you know a little better than I do.

14            MR. GOODMAN:  Objection.  No.  I'm sorry.

15    Go ahead.

16            THE WITNESS:  I don't know.  It could be.

17    I don't think there were two payments.

18    BY MR. PATTERSON:

19        Q    What other income did Ellipso have from the sale

20    of ICO shares in 2004 other than the 5- or 600,000 shares

21    that we've already discussed and the share of the sale of

22    the 25,000 shares through the August 2nd agreement?  What

153

1    other sales of ICO stock did Ellipso make in 2004?

2              MR. GOODMAN:  Objection.

3              MR. PATTERSON:  Well, if you have to think

4    that long, it must not be much of an objection.

5              You can answer the question.

6              MR. GOODMAN:  Well, no.  Give me a second,

7    Mr. Patterson.  I'm trying to facilitate as best as

8    possible.  I'll note an objection and I'll allow

9    that answer to go.

10             THE WITNESS:  What is it again?

11   BY MR. PATTERSON:

12        Q    What other sales of ICO shares did Ellipso

13   and/or MCHI make during 2004?

14        A    I think there may have been a few more, maybe

15   100,000, as the price went up.

16        Q    And that would have been in December?

17        A    Yeah.

18        Q    Did Ellipso hold another stock certificate for

19   44,000-some-odd shares of ICO stock?

20        A    No.  Yeah, yeah.  Yes.  It was Class B stock.

21        Q    "Class B stock," what does that mean?

22        A    I don't know.  It's different voting rights.

197

1      Q     Was all of the stock that Ellipso and its

2    affiliates received from ICO restricted stock?

3      A     Yes.  It was privately held stock, restricted.

4      Q     So, how was it that Ellipso was able to transfer

5    20,000 shares of stock to Waller Capital in 2003?

6      A     We sent the 46,000 shares certificate to ICO and

7    asked them to issue two stock certificates for -- one for

8    Ellipso and one for Waller, or to the name of Ellipso in

9    the name of Waller, for the respective amounts.  And I

10   think the restrictive legend remained, was put in the new

11   certificates.  So, that was it.  That's how it happened.

12     Q     Now, the stock certificate that MCHI held, that

13   was for one million and five hundred and some-odd thousand

14   shares?

15     A     Yes.

16     Q     And was that stock -- that stock was also

17   restricted?

18     A     Yes.

19     Q     And when did the -- I think it was a 2-year

20   restrictive period?

21     A     Well, it doesn't say on the legend the number of

22   years.  You have to go to the SEC rules.

198

1         MR. GOODMAN:  Do you know how long the

2  restrictive period was?

3         THE WITNESS:  At the time, I didn't know.

4  I know now.

5         MR. GOODMAN:  What's the restrictive

6  period, he's asking?

7         THE WITNESS:  Well, now it's two years.

8  They all carry two years.

9  BY MR. PATTERSON:

10    Q    Okay.  When did the restrictive period expire on

11  the --

12    A    October 2004.

13    Q    The MCHI shares?

14    A    Yes.

15         (Castiel Deposition Exhibit No. 35 was

16  marked for identification.)

17  BY MR. PATTERSON:

18    Q    Okay.  The next document is marked Exhibit 35.

19  Again, it appears to be an e-mail from David Castiel to

20  Patterson, dated February 6, 2004.  I'll just ask you if

21  you recognize this document.

22    A    Yes.

219

1     within reason.

2                (Castiel Deposition Exhibit No. 44 was marked

3     for identification.)

4     BY MR. PATTERSON:

5          Q    Now, the next document I have marked as Exhibit

6     44, which appears to be an e-mail from Mr. Patterson to

7     David Castiel, dated December 23, 2003.

8          A    Okay.

9          Q    Did you receive this e-mail?

10         A    I must have, since my name is on the recipient

11    list.

12         Q    And did this memorandum of agreement accommodate

13    your concerns, as the cover e-mail indicates?

14         A    I don't think -- what concerns?  You wrote that.

15    I -- you said, Everyone's concerns.  I don't know what the

16    concerns were at the time.

17         Q    You don't recall what your concerns were?

18              MR. GOODMAN:  Do you recall what your

19    concerns were?

20              THE WITNESS:  No.

21              MR. GOODMAN:  Okay.

22              THE WITNESS:  No.  I thought I answered

220

1    that already.

2    BY MR. PATTERSON:

3        Q    Directing your attention to Page 2 of the

4    memorandum agreement, the third paragraph up from the

5    bottom --

6            MR. GOODMAN:  Page 2 of the exhibit?

7            MR. PATTERSON:  It's Page 3 of the

8    exhibit, dealing with the buyout provision.

9            THE WITNESS:  Yes.

10   BY MR. PATTERSON:

11       Q    Do you recall any discussions concerning that

12   particular provision?

13       A    Yeah.  That was -- it was an option for us, for

14   Ellipso, to bring in-house a function that really

15   shouldn't be outside the company as a subcontract to

16   perform database management, basically, and maybe some

17   marketing.

18       Q    Were the terms of that buyout provision

19   discussed among you and John Mann and Mr. Patterson?

20           MR. GOODMAN:  Objection.  You can answer.

21           THE WITNESS:  Yeah.  I think Mr. Mann

22   indicated that ultimately, that function should be

221

1    within Ellipso.  And that's why we put that

2    provision.

3              (Castiel Deposition Exhibit No. 45 was

4    marked for identification.)

5    BY MR. PATTERSON:

6        Q    Okay.  The next exhibit I've marked as Exhibit

7    45, an e-mail from Mr. Patterson to

8    Lockheed12A@starband.net, dated December 24, 2003.  Have

9    you seen this document?

10       A    Which document, the attachment or the memo?

11       Q    Either one, both.

12       A    Well, I wasn't copied on this.  This is a --

13            MR. GOODMAN:  Do you recall seeing the

14   document, is the question.

15            THE WITNESS:  Well, I recall seeing this

16   e-mail in the production by Mann.

17            MR. GOODMAN:  I don't think you're

18   referring to during the course of this litigation,

19   Mr. Patterson.

20            MR. PATTERSON:  No, no.

21            THE WITNESS:  You mean on December 24?

22   BY MR. PATTERSON:

222

1      Q     Right.

2      A     I was not copied on -- that is David's response

3    to our offer.

4      Q     You don't recall seeing this?

5      A     No, but if you'll let me read it, because I've

6    never seen -- never -- I don't think I've seen this before

7    -- okay.  What's the question?

8      Q     Have you seen this document before?

9      A     No.

10     Q     Do you see where it says on here, the e-mail

11   from David Castiel to Bob Patterson, Bob, attached are

12   changes that would make me happy.  Since we are including

13   881-2 as well, I think the proposed changes are fair,

14   David?  Did you write that?

15     A     No, no, no, no.  I meant -- of course, what I

16   wrote, I don't remember, but I probably --

17            MR. GOODMAN:  For the record, counsel's

18   referring to the bottom half of Exhibit --

19            THE WITNESS:  I have not seen the top

20   portion.

21   BY MR. PATTERSON:

22     Q     Just the bottom portion?

223

1     A     You're putting all of it together, so, I can't

2     answer.

3     Q     Okay.

4           MR. GOODMAN:  You've answered the

5     question.

6           THE WITNESS:  I think I've answered the

7     question.

8           MR. GOODMAN:  You've answered the

9     question.

10          THE WITNESS:  I've answered, yes.

11    BY MR. PATTERSON:

12    Q     I'm sorry.  And the answer was that you sent the

13    e-mail?

14    A     I -- I must have sent the e-mail, since my name

15    is indicated there.  I don't necessarily remember, but --

16    Q     With the attachment?

17    A     And that's, yeah, I suppose so.

18    Q     Okay.  Now, looking at the third page of this

19    exhibit, it indicates that there have been some editorial

20    changes to the document?

21    A     Yes.

22    Q     Who made those changes to the document?

224

```
 1        A    I must have made the changes, since I say, These

 2   are the changes that would make me happy.

 3        Q    So, you were involved in the negotiation of the

 4   881 agreement with TRSC?

 5             MR. GOODMAN:  Objection to the form of the

 6   question.  You can answer the question yes or no.

 7             THE WITNESS:  Mr. Patterson and myself

 8   were negotiating with TRSC in the negotiation of

 9   that agreement with TRSC.

10   BY MR. PATTERSON:

11        Q    Did Mr. Patterson at any time have signatory

12   authority to enter into contracts on behalf of Ellipso?

13        A    I -- I don't think so, no.

14        Q    In fact, every contract that Ellipso entered

15   into had to be executed by an officer of Ellipso, did it

16   not?

17        A    That's correct.

18        Q    And Mr. Patterson was never an officer of

19   Ellipso?

20        A    No.

21             (Castiel Deposition Exhibit No. 46 was marked

22   for identification.)
```



## Unknown

From:       Robert Patterson [rbplaw@hotmail.com]
Sent:       Tuesday, December 23, 2003 11:05 AM
To:         dcastiel@ellipso.com; lockheed12a@starband.net
Subject:    881 REGISTRY



MEMORANDUM OF
GREEMENT ...

.... have attempted to revise the proposed agreement to accomodate everyone's
.... mes suggesting a compromise of specific issues. Since David is leaving
....     John is unavailable until Friday, I
su...    ..ed by e-mail, and then conference call if necessary. I think it is in
ever.... .'erest to get this done asap.

Make .... ...u warm and cozy this winter with tips from MSN House & Home.
http: ... .al.msn.com/home/warmhome.armx

EXHIBIT

2

MANN 00042

MEMORANDUM OF AGREEMENT

WHEREAS, ELLIPSO, INC is in the process of implementing telephony services utilizing its unique 881 universal number series;

WHEREAS, ELLIPSO, INC wishes to establish a unified registration process for the marketing and implementation of its 881 Universal Number Series (the "Ellipso 881 Registry", or "THE REGISTRY");

WHEREAS, THE REGISTRY SOULTIONS COMPANY (TRSC) possesses expertise and experience in initiating, implementing, marketing and maintaining universal registration programs;

WHEREAS, ELLIPSO, INC. wishes to outsource the development, implementation and maintenance of the Ellipso 881 Registry;

WHEREAS, TRSC is willing to devote its resources and expertise to assisting ELLIPSO, INC. in developing the Ellipso 881 Registry;

IT IS AGREED THAT:

ELLIPSO, INC. hereby grants to TRSC the exclusive right to establish and maintain THE REGISTRY of the Ellipso 881 series universal numbers placed into service ("THE REGISTRY").

TRSC will use its best efforts to establish THE REGISTRY as soon as practicable, but in any event, within (60) days of the date of this agreement. TRSC will bear all costs for establishment of THE REGISTRY.

ELLIPSO, INC. will cooperate and assist TRSC in establishing THE REGISTRY by promptly providing all necessary information and support requested by TRSC pursuant to establishment of THE REGISTRY. To the extent ELLIPSO, INC provides services or other support to TRSC, ELLIPSO, INC. shall be reimbursed for the reasonable costs incurred.

ELLIPSO, INC. and TRSC shall, within 60 days of the date of this agreement, establish a fee per transaction for the services provided by TRSC to ELLIPSO, INC, of its affiliates.

*ELLIPSO/TRSC, p. 2.*

TRSC shall initiate an aggressive marketing campaign to expeditiously and extensively populate THE REGISTRY, and shall perform all functions necessary to assure the successful implementation of THE REGISTRY.

ELLIPSO, INC. and TRSC shall assist each other in the marketing of products associated with THE REGISTRY service, such as vanity number allocation, call forwarding, one number worldwide access and others. TRSC shall provide THE REGISTRY services for these activities, including validation of numbers using the unified database and associated support services of TRSC, for which TRSC shall receive the agreed upon charges.

In consideration for the exclusive right to establish and operate THE REGISTRY, TRSC shall compensate ELLIPSO, INC. as follows:

    A. Upon execution of this agreement, TRSC shall pay to ELLIPSO, INC. twenty-five thousand dollars ($25,000.00);

    B. On February 1, 2004, TRSC shall pay to ELLIPSO, INC. twelve thousand five hundred dollars ($12,500.00);

    C. On the first day of each successive month, commencing March 1, 2004, TRSC shall pay to ELLIPSO, INC. the greater of twelve thousand five hundred dollars ($12,500,00), or sixty percent (60%) of the net profits from the prior preceding months operations, [e.g. Profits from January 2004 shall to payable on March 1, 2004]. Net profits shall be determined by generally accepted accounting practices.

The term of this agreement shall be five (5) years, and shall thereafter automatically renew for additional terms of five (5) years, unless ELLIPSO, INC. exercises its option to acquire THE REGISTRY as set forth herein.

On the fourth anniversary of this agreement, ELLIPSO, INC. shall have the right to acquire THE REGISTRY by tendering to TRSC a cash payment equivalent to the gross revenues received by TRSC during the immediately preceding twenty-four (24) months. In the event ELLIPSO, INC. wishes to exercise this option, it must so notify TRSC one hundred eighty days (180) prior to exercise of the option. This is a one-time purchase option.

ELLIPSO, INC. and TRSC shall coordinate their efforts to successfully implement the 881 universal numbers and THE REGISTRY.

Any disputes concerning this agreement shall be submitted to binding arbitration pursuant to the rules of the American Arbitration Association, or such other arbitration procedures as the parties may agree.

MANN 00044

*ELLIPSO/TRSC, p. 3.*

This agreement contains the entire agreement and representations of the parties hereto and any representations not set forth herein are specifically disclaimed

AGREED THIS ____ DAY OF DECEMBER 2003:

ELLIPSO, INC.                          THE REGISTRY SOLUTIONS COMPANY
By:  David Castiel, Chairman           By: John Mann, Director


_____                _____  ___
David Castiel                          John Mann


MANN  00045

**Unknown**

| | |
|---|---|
| **From:** | Robert Patterson [rbpmanagement@hotmail.com] |
| **Sent:** | Wednesday, December 24, 2003 10:40 AM |
| **To:** | lockheed12a@starband.net |
| **Subject:** | FW: MEMORANDUM OF AGREEMENT |



MEMORANDUM OF
GREEMENT.doc (2..

Attached is David's response to our offer.  I would suggest we accept them
with two modifications.  First, the 70% of profits split should be 65%.
Second, the 12 months of gross revenues as a purchase price is troubling.
Maybe the formula should be 3.5 x annual earnings, reflecting the profits
split at ten times earnings.  I'll go either way.

David told me he did not want to insist on anything that you would not agree
to.  David is leaving for skiing today and returns next Wed.  I would urge
you to make what changes you want and send it to David for ratification
asap, for the reasons we discussed.  I think fax signatures would be fine
for this week with a final signature version next week.

Happy Humbug!!!    Bob   571-278-7076

>From: "David Castiel" <dcastiel@ellipso.com>
>Reply-To: <dcastiel@ellipso.com>
>To: "'Bob Patterson'" <rbpmanagement@hotmail.com>
>Subject: MEMORANDUM OF AGREEMENT
>Date: Tue, 23 Dec 2003 12:38:24 -0500
>
>
>
>Bob, attached are changes that would make me happy, since we are
>including 881-2 as well. I think the proposed changes are fair.

>David

_____

Take advantage of our limited-time introductory offer for dial-up Internet
access  http://join.msn.com/?page=dept/dialup

**EXHIBIT**

**3**

1

MANN  00046

MEMORANDUM OF AGREEMENT

WHEREAS, ELLIPSO, INC is in the process of implementing telephony services utilizing its unique 881 universal number series;

WHEREAS, ELLIPSO, INC wishes to establish a unified registration process for the marketing and implementation of its 881 Universal Number Series (the "Ellipso 881 Registry", or "THE REGISTRY");

WHEREAS, THE REGISTRY SOULTIONS COMPANY (TRSC) possesses expertise and experience in initiating, implementing, marketing and maintaining universal registration programs;

WHEREAS, ELLIPSO, INC. wishes to outsource the development, implementation and maintenance of the Ellipso 881 Registry;

WHEREAS, TRSC is willing to devote its resources and expertise to assisting ELLIPSO, INC. in developing the Ellipso 881 Registry;

IT IS AGREED THAT:

ELLIPSO, INC. hereby grants to TRSC the exclusive right to establish and maintain THE REGISTRY of the Ellipso 881 series universal numbers placed into service ("THE REGISTRY").

TRSC will use its best efforts to establish THE REGISTRY as soon as practicable, but in any event, within (60) days of the date of this agreement. TRSC will bear all costs for establishment of THE REGISTRY.

ELLIPSO, INC. will cooperate and assist TRSC in establishing THE REGISTRY by promptly providing all necessary information and support requested by TRSC pursuant to establishment of THE REGISTRY. To the extent ELLIPSO, INC provides services or other support to TRSC, ELLIPSO, INC. shall be reimbursed for the reasonable costs incurred.

ELLIPSO, INC. and TRSC shall, within 60 days of the date of this agreement, establish a fee per transaction for the services provided by TRSC to ELLIPSO, INC, of its affiliates.

MANN 00047

*ELLIPSO/TRSC, p. 2.*

TRSC shall initiate an aggressive marketing campaign to expeditiously and extensively populate THE REGISTRY, and shall perform all functions necessary to assure the successful implementation of THE REGISTRY.

ELLIPSO, INC. and TRSC shall assist each other in the marketing of products associated with THE REGISTRY service, such as vanity number allocation, call forwarding, one number worldwide access and others. TRSC shall provide THE REGISTRY services for these activities, including validation of numbers using the unified database and associated support services of TRSC, for which TRSC shall receive the agreed upon charges.

In consideration for the exclusive right to establish and operate THE REGISTRY, TRSC shall compensate ELLIPSO, INC. as follows:

A. Upon execution of this agreement, TRSC shall pay to ELLIPSO, INC. twenty-five thousand dollars ($25,000.00);

B. On February 1, 2004, TRSC shall pay to ELLIPSO, INC. fifteen thousand dollars ($15,000.00);

C. On the first day of each successive month, commencing March 1, 2004, TRSC shall pay to ELLIPSO, INC. the greater of twelve thousand five hundred dollars ($12,500,00), or sixty percent (70%) of the net profits from the prior preceding months operations, [e.g. Profits from January 2004 shall to payable on March 1, 2004]. Net profits shall be determined by generally accepted accounting practices.

| Deleted: twelve |
| Deleted: five hundred |
| Deleted: 12,500 |
| Deleted: 60 |

The term of this agreement shall be five (5) years, and shall thereafter automatically renew for additional terms of five (5) years, unless ELLIPSO, INC. exercises its option to acquire THE REGISTRY as set forth herein.

On the fourth anniversary of this agreement, ELLIPSO, INC. shall have the right to acquire THE REGISTRY by tendering to TRSC a cash payment equivalent to the gross revenues received by TRSC during the immediately preceding twelve (12) months. In the event ELLIPSO, INC. wishes to exercise this option, it must so notify TRSC one ninety days (90) prior to exercise of the option. This is a one-time purchase option.

| Deleted: twenty-four |
| Deleted: 24 |
| Deleted: hundred eighty |
| Deleted: 180 |

ELLIPSO, INC. and TRSC shall coordinate their efforts to successfully implement the 881 universal numbers and THE REGISTRY.

Any disputes concerning this agreement shall be submitted to binding arbitration pursuant to the rules of the American Arbitration Association, or such other arbitration procedures as the parties may agree.

MANN 00048

*ELLIPSO/TRSC, p. 3.*

This agreement contains the entire agreement and representations of the parties hereto and any representations not set forth herein are specifically disclaimed.

AGREED THIS _____ DAY OF DECEMBER 2003:

ELLIPSO, INC.                           THE REGISTRY SOLUTIONS COMPANY
By:  David Castiel, Chairman            By: John Mann, Director


_____          _____
David Castiel                           John Mann

MANN  00049

 **UBS** Wealth Management

**UBS Financial Services Inc.**
1200 Harbor Boulevard
10th Floor
Weehawken, NJ 07086
Tel. 201-352-9724
Fax 201-352-2451

Mercinth Pearce
Director
Assistant General Counsel
Subpoena Legal Group
mercinth.pearce@ubs.com@ubs.com

www.ubs.com

September 21, 2007

**_VIA OVERNIGHT MAIL_**
Christopher G. Hoge, Esq.
Crowley, Hoge & Fein, P.C.
1710 Rhode Island Avenue, NW
Washington, D.C. 20036-3125

      **_RE: Ellipso, Inc. v. John B. Mann, et al._**
      **_Case No. 1:05CV01186 (RCL)_**

Dear Mr. Hoge:

I am writing on behalf of UBS Financial Services Inc. ("UBSFS") in response to your subpoena in the above referenced matter. Pursuant to your request, enclosed are new account documents, corporate resolutions, operating agreements, articles of organization, letters of authorization, certificate of stock, joint sale orders and other documents, Bates stamped 001-067, pertaining to account WS 47874, registered to Mann Technologies LLC.

UBSFS requests that, unless otherwise required by law or court order, the enclosed documents be kept confidential and not disclosed to any third party outside the context of the above referenced legal proceeding. UBSFS also requests advance notice of any decision to disclose any of the documents provided pursuant to this subpoena. Finally, UBSFS requests that, upon completion of the above captioned legal proceeding that the documents are returned to the firm.

Enclosed is an invoice for the cost of this production. Please contact me at 201.352.9724, if you have any questions or concerns regarding this matter.

Very truly yours,

Mercinth C. Pearce
Enclosures

**EXHIBIT**

**4**

 **UBS**

**UBS Financial Services Inc.**

Account Number _WS 47874_

SS#/TIN _56-2445 397_

## Account Application and Agreement for Organizations, Businesses, and ERISA Plans

Shading indicates optional information.

### Account Ownership

Select the type of ownership:

☑ **Organization/Business**
Organization/Business Structure:

| ☐ Corporation | ☐ Association |
| ☐ Corp- Subchapter 'S' | ☐ State Charter-S&L Bank |
| ☑ Corp-Limited Liability | ☐ State Charter-Savings Bank |
| ☐ Govt Agency-Federal | ☐ State Charter-Comm Bank |
| ☐ Govt Agency-Local Ent | ☐ State Charter-Trust Co. |
| ☐ Govt Agency-State | ☐ State Charter-Credit Union |
| ☐ Partnership-General | ☐ State Charter-Indust Loan |
| ☐ Partnership-Limited | ☐ Fed Charter-Savings Assoc |
| ☐ Fed Charter-Credit Union | ☐ Fed Charter-Nat'l Bank |
| ☐ Sole Proprietorship | ☐ Fed Charter-Trust Co. |
| ☐ Foundation | ☐ Partnership-Invest Club |
| ☐ Endowment | ☐ Invest Club Membership |

☐ **ERISA Plan**
Type of Plan:

| ☐ Profit Sharing | ☐ Target Benefit |
| ☐ 401(k) | ☐ ESOP |
| ☐ Defined Benefit | ☐ Welfare |
| ☐ Money Purchase | |
| ☐ SIMPLE 401(k) | |

ERISA Plans must also complete the UBS Financial Services Inc. Trustee Certification and Agreement for ERISA Trusts.

Is there more than one Trustee for this account? ☐ Yes ☐ No
If yes, specify how many Trustees: ___, then complete the Account Ownership Information Addendum on page 7.

### Account Ownership Information

This section should be completed with the **Organization/Business** or **ERISA Plan** information. If this is a participant directed account for an ERISA plan, the participant must be designated as having the authority to act on behalf of the account on the Trustee Certification and Agreement for ERISA Trusts. A separate account must be opened for each participant in a participant directed ERISA Plan.

**Account Holder**

Organization/Business/Plan Name:
_MANN TECHNOLOGIES, L.L.C._

Organization/Business is:
1) ☑ Incorporated  ☐ Unincorporated
2) ☐ For Profit  ☐ Not For Profit

Industry Group (i.e., Construction, Service, etc.):

Place of Formation/Incorporation:
☑ USA  ☐ Other (specify):

TIN: _56-2445 397_   Date of Incorporation/Establishment: _Feb 25, 2004_

Tax Bracket: ___%   E-mail Address:

Location of Address:
☑ Business-Primary  ☐ Other (specify):

Street Address 1: (If a P.O. Box, complete the Additional Address Information on page 7.)

Street Address 2:
_9330 HARTS MILL Rd_

City: _WARRENTON_  State: _VA_  Zip: _20186_

**Telephone Contact Information**

Business 1:   Business 2:

Business Fax:   Mobile: _571-278-7076_

CL-BSA (Rev. 3/04)



1

©2004 UBS Financial Services Inc. All rights reserved. Member SIPC.
**Sign and date the application on page 6.**

Confidential Treatment Requested

UBS 004

 **UBS**

**UBS Financial Services Inc.**

Account Number  WS 47874

SS#/TIN  56-2445397

**Participant Directed ERISA Plans Only**
Select the duplicate parties option in the Account Features section and complete the Duplicate Party Addendum on page 7 for the participant below. This will ensure that the participant receives a duplicate copy of all trade confirmations and statements.

Participant First Name:                   Middle Name:

Last Name:

Country of Citizenship:                    SS#:
☐ USA  ☐ Other (specify): _____

Passport/CEDULA and Green Card#: (if non-U.S. and no SS# specified)
                                    /

Street Address: (Home-Legal Residence)

City:                State:        Zip:

Date of Birth:                    Gender:
                                  ☐ Male  ☐ Female

Marital Status (select one):
☐ Single  ☐ Married  ☐ Divorced  ☐ Widowed

Employment Status (select one):
☐ Employed      ☐ Self-Supported   ☐ Volunteer
☐ Retired       ☐ Student          ☐ Work in the Home
☐ Self-Employed ☐ Unemployed

Occupation:           Industry (i.e., Construction, Service, etc.):

Business Phone:       Business Fax:

➢ **Financial Information** *This information will be kept strictly confidential. If you share assets with another person, please provide financial information (e.g. annual income, liquid assets, net worth) per individual. For example, a total net worth of $50,000 should be split as you deem appropriate.*

➢ Complete this section for the organization/business or the participant for a participant directed ERISA Plan account.

Annual Income:           Liquid Assets:
1,000,000                500,000

Net Worth (exclusive of residence):   Fiscal Year End (indicate month):
1,000,000

➢ Investment Experience (in years):
O Equities  O Bonds  ___Futures  ___Options-Buy  ___Options-Sell

Do you currently have any loans outstanding? ☐ Yes ☐ No
If yes, please specify the loan amount and interest rate:
Loan 1 Amount   Rate    %   Loan 2 Amount   Rate   %

List financial firms where other accounts are held:

Does the organization/business own at least 10% of the shares of any publicly traded company?
☐ Yes ☐ No – If yes, please specify company and %:
_____%

Financial Services Reference – Firm Name:

Financial Services Reference – Firm Telephone Number:

**Principal Officer/Trustee Information**
Complete this section for the Principal Officer for the Organization/Business, ERISA plan trustee, or other individual authorized to give investment or distribution/transfer instructions on the account. Additional names can be added on page 7.

Principal Officer/Trustee Name:        SS#:
JOHN B MANN                           218549021

Country of Citizenship:               Date of Birth:
☑ USA  ☐ Other (specify):            06-17-49

Passport/CEDULA and Green Card#: (if non-U.S. and no SS# specified)
                                    /

Street Address: (Home – Legal Residence)
9330 HARTS MILL Rd

City:                State:        Zip:
WARRENTON            VA            20186

Telephone Number:    E-mail Address:

Are any of the business owners, trustees, directors/principal officers, or any of their immediate family members a control person of any publicly traded corporation (examples of control persons are policy making officers, directors or 10% shareholders)?
☐ Yes ☑ No  If yes, please specify company and %:
_____%

Are any of the business owners, trustees, directors/principal officers, or any of their immediate family members affiliated with any securities firms or other financial institutions (NYSE Rule 407)?
☐ Yes ☑ No  If yes, please specify the firm:

Are any of the business owners, trustees, directors/principal officers, or any of their immediate family members, an employee of UBS AG, its subsidiaries or affiliates (e.g., UBS Financial Services Inc., UBS Securities LLC)?
☐ Yes ☑ No  If yes, please specify:

Affiliate or Subsidiary        Employee Name and SS#

CL-BSA (Rev. 3/04)                2              ©2004 UBS Financial Services Inc. All rights reserved. Member SIPC.
                                                 Sign and date the application on page 6.

Confidential Treatment Requested

**❄ UBS**

**UBS Financial Services Inc.**

Account Number  WS 47874

SSA/TIN  56 - 2445 397

**Business Services Account BSA® Features**
If you would like to add Business Services Account BSA features to your account, please complete this section. Otherwise, skip to the Account Features section. The Business Services Account BSA annual fee is $150, and is deferred for the first year. None of these features are available to participant directed accounts. Complete the Sweep of Uninvested Cash Balances section for ERISA plans.

**MasterCard® BusinessCard®[1]**

☐ To receive a MasterCard BusinessCard, please indicate the number of cards by checking the appropriate box:[2]  ☐ 1  ☑ 2

If your name(s) exceeds 21 characters, including spaces, please indicate below how your name(s) should appear (not exceeding 21 characters):

Name 1:  John B. MANN, ~~PARTNER~~

Name 2:  Robert B. PATTERSON, PARTNER

[1] A MasterCard BusinessCard is not available for ERISA plan accounts.
[2] Only two cards per account can be issued.

**UBS Rewards**

☐ Earn points toward merchandise, travel and gift certificates by using your Platinum MasterCard debit card for purchases. If you would like to enroll in this program, please check this box. Annual program fee of $50 applies. Points are capped at 200,000 per year for Business Services Account BSA members. The UBS Rewards catalog contains a complete description of the program, including terms and conditions.

**Check Writing**
If you would like to receive checks for your account, please enroll by selecting a check style:
☑ Wallet[1]   ☐ 3-page business   ☐ Other[2]

[1] Initial order of wallet checks is free. All other orders involve a fee.
[2] To order a different check style, please contact your branch office.

☐ Check here if dual signatures are required, in which case you must complete the Authorized Agent/Dual Signer Addendum on page 11.

Please print the full name and address that you would like to appear on your checks.[3]

MANN TECHNOLOGIES, L.L.C.
9330 HARTS MILL Rd.
WARRENTON, VA 20186

[3] The full name of the account specified in the Account Ownership Information Section (page 1).

**Alternate Address for Cards and Checks**
Print the mailing address for the delivery of ☐ card(s) and/or ☐ checks if different from the address on the account:

Special Delivery Instructions for ☐ Cards and/or ☐ Checks:
(Branch Use Only)

**Electronic Funds Transfer (EFT) Service**
EFT Service allows the transfer of money electronically between UBS Financial Services Inc. accounts and accounts held with outside financial institutions (within the U.S.). To enroll make a selection below and complete the account information on the Electronic Funds Transfer Service Addendum on page 9.

Please select how you would like to use the service: (Check all that apply)
☑ Transfer funds using Online Services.[1] (Web)
   Type of transfer: ☑ Incoming/Outgoing  ☐ Incoming Only
☑ Transfer funds using ResourceLine®, the toll-free telephone voice response system. (Voice)
   Type of transfer: ☐ Incoming/Outgoing  ☐ Incoming Only

**Bill Payment Service**
Bill Payment Service allows you to pay your bills and/or make payments to a third party vendor without writing and mailing a check. To enroll make a selection below and complete the vendor/payee information on the Bill Payment Addendum on page 10. If Online Services is selected, vendor/payee information can be entered online.

Please select how you would like to use the service: (Check all that apply)
☐ Pay bills using Online Services.[1] (Web)
☐ Pay bills using ResourceLine®, the toll-free telephone voice response system. (Voice)

[1] To use the Bill Payment or EFT Services via the web you must be enrolled in Online Services.

**Account Features**

**Online Services**
☑ Check here for online access to account information, the latest research and market data at no additional charge. Premier accounts are entitled to this service, including Business Services Account BSA, Resource Management Account® (RMA®), and Managed Accounts.

**Direct Deposit**
☐ If you would like to have your payroll or other recurring payments automatically deposited into your account, please check this box. Complete the Direct Deposit Application on page 12 and send it to the employer, organization or financial institution making the deposit.

**Duplicate Parties**
☐ Check here if you would like duplicate trade confirmations and statements sent to additional individuals. If checked, please complete the Duplicate Party Addendum on page 7.

CL-BSA (Rev. 3/04)    3

©2004 UBS Financial Services Inc. All rights reserved. Member SIPC.
Sign and date the application on page 6.

Confidential Treatment Requested

UBS 006

# ✳ UBS

**UBS Financial Services Inc.**

Account Number  WS 47874

SS&ITN  56-2445397

---

**Account Features** continued

**Margin**[1]
Accounts automatically come with margin unless they are Retirement, UGMA/UTMA, Estate, 529 Plan, or certain other accounts. Most managed programs cannot have margin.

☐ Check here if you do not want margin.  If your account will have margin, you are required to answer the following questions:

1- Do you intend to engage in "pattern day trading" as defined by NYSE Rule 431?[1]  ☐ Yes  ☑ No

2- Do you have any other margin accounts with UBS Financial Services Inc.?  ☐ Yes  ☑ No  If yes, complete the information below:

Account Number _____    Account Number _____    Account Number _____    Account Number _____

[1] Margin is not suitable for all clients. Please review UBS Financial Services' Loan Disclosure Statement carefully for information on the risks involved with using margin. [2] "Day trading" means purchasing and selling or selling and purchasing the same security in the same day in a margin account. "Pattern day trading" means executing four or more day trades within five business days if the number of day trades exceeds six percent of the total trades during that period.

**Sweep of Uninvested Cash Balances**
Please select a sweep option from section A for Organizations/Businesses (except Sole Proprietors and Government Agencies). ERISA plans can only select a sweep option from section B (ERISA plans that participate in ACCESS℠, MAC, PMP, and SELECTIONS℠ are automatically assigned a sweep option - No selection is required). Sole Proprietors and Government Agencies (FDIC Eligible Participants) can only select a sweep option from section C. If this is a non-ERISA account with a Managed Program (ACCESS, MAC, PMP, and SELECTIONS) select a sweep option from section D.

**A ORGANIZATIONS/BUSINESSES (except Sole Proprietors and Government Agencies)**

**Business Services Account BSA Options**[1,2]
☑ Money Market Portfolio   ☐ New York Municipal Fund
☐ New Jersey Municipal Fund   ☐ California Municipal Fund
☐ Tax-Free Fund   ☐ U.S. Government Portfolio

**Basic Investment Account Option**[1]
☐ Cashfund

**B ERISA PLANS**[1]
Do not make a selection below if the ERISA plan is part of a managed program.

**Business Services Account BSA Options**
☐ Money Market Portfolio   ☐ U.S. Government Portfolio

**Basic Investment Account Options**
☐ Retirement Money Fund   ☐ Cashfund

**C SOLE PROPRIETORS AND GOVERNMENT AGENCIES (FDIC ELIGIBLE PARTICIPANTS)**

**I – Taxable Sweep Options**
Sole proprietor and government agency accounts automatically default to the UBS Bank USA Deposit Account Sweep Option. If you are an Eligible Participant, have a Business Services Account BSA and prefer to select a tax-free sweep option, skip to section II.

☐ Check here if you would like to cap the amount of funds that will sweep into the UBS Bank USA Deposit Account Sweep Option ($100,000 per account, on a per account basis.), and select a secondary sweep option below for amounts in excess of the cap. If you have multiple accounts at UBS Financial Services Inc. held in the same recognized legal capacity that will sweep into the UBS Bank USA Deposit Account Sweep Option, once those accounts exceed the aggregate the $100,000 threshold, then your aggregate funds on deposit with UBS Bank USA will exceed FDIC insurance coverage limits. UBS Financial Services Inc. will not be responsible for any insured or uninsured portion of the Deposit Accounts. (Refer to the UBS Financial Services Deposit Account Sweep Program Disclosure Statement terms and conditions for more details.)

If you selected a cap by checking the box above, choose a secondary sweep option below. Please note, the secondary sweep option for Basic Investment Accounts (Non-Business Services Account BSA) is automatically Cashfund.[1,2]

☐ Money Market Portfolio   ☐ New York Municipal Fund   ☐ New Jersey Municipal Fund
☐ California Municipal Fund   ☐ Tax-Free Fund   ☐ U.S. Government Portfolio

**II – Tax-Free Sweep Options (Business Services Account BSA Only)**[1,2]
☐ New York Municipal Fund   ☐ New Jersey Municipal Fund   ☐ California Municipal Fund   ☐ Tax-Free Fund

Note: If you selected a secondary sweep option or Tax-Free Sweep Option above, the annual Business Services Account BSA fee will apply.

**D MANAGED PROGRAMS (ACCESS, MAC, PMP, and SELECTIONS)**
Select a sweep option below if this account is utilizing one of the following Managed Programs: ACCESS, MAC, PMP, and SELECTIONS.

**Business Services Account BSA Options**[1,2]
☐ Money Market Portfolio   ☐ New York Municipal Fund   ☐ New Jersey Municipal Fund
☐ California Municipal Fund   ☐ Tax-Free Fund   ☐ U.S. Government Portfolio

[1] Money market funds, Retirement Money Fund, and UBS Cashfund Inc. are sold by prospectus only.   [2] State municipal funds are available only to residents of those states, respectively.

CI-BSA (Rev. 3/04)    4    ©2004 UBS Financial Services Inc. All rights reserved. Member SIPC.
Sign and date the application on page 6.

Confidential Treatment Requested

UBS 007

# ❖ UBS

**UBS Financial Services Inc.**

Account Number  _US  47874_

SSA/TIN  _56-2445  397_

---

**Account Investment Objectives**

**Return Objective** (select one):

☐ Capital Appreciation -- Investments seeking growth of principal rather than the generation of income.

☑ Current Income and Capital Appreciation -- Investments seeking both the generation of income and the growth of principal.

☐ Current Income -- Investments seeking the generation of income.

**Primary Risk Profile** (select one):

☑ Aggressive/Speculative -- Seeks the potential for significant appreciation; willing to accept a high degree of loss of principal.

☐ Moderate -- Seeks potential returns with a lower risk of loss of principal.

☐ Conservative -- Seeks securities that are most likely to preserve principal with low risk.

*Please Note: If this is a participant directed account for an ERISA Plan, the participant should complete this section.*

**Secondary Risk Profile** (optional):

*This may be applicable if you intend to engage in options trading.*

☐ Aggressive/Speculative

☐ Moderate

☐ Conservative

---

**Senior Political Affiliation**

Is the account holder, any authorized signatories, beneficial owners, trustees, power of attorneys or other individuals with authority to effect transactions, or any of their immediate family members (including in-laws) or close associates (persons they are "widely and publicly known" to maintain an unusually close relationship with), a current or former senior non-U.S. political official?

☐ Yes    ☑ No  If yes, please complete the following information:

| Political Official's Name | Current or Former Position | Relationship to Client(s) |
|---|---|---|
|  |  |  |

---

**Source of Funds**

This section is not applicable for ERISA plans.

Please indicate the source of funds in the account: *(Check all that apply)*

If funds are from investments transferred from another firm, please indicate the source of funds to purchase the initial investments.

☑ Income from the business/organization

☐ Inheritance -- From whom:_____

☐ Sale of Real Estate -- Location of real estate sold:_____

☐ Sale of Business -- Name of business sold:_____

☑ Investors/Venture Capital

☐ Gifts -- From whom:_____

☐ Legal Settlement

☐ Other -- Please specify:_____

---

©2004 UBS Financial Services Inc. All rights reserved. Member SIPC.
Sign and date the application on page 6.

Confidential Treatment Requested

UBS 008

**❖ UBS**

**UBS Financial Services Inc.**

Account Number ⎯ ⎯ S 47874

SSA/TIN  56-2445 397

## Client Agreement

BY SIGNING BELOW, ACCOUNT HOLDER UNDERSTANDS, ACKNOWL-EDGES AND AGREES:

A. that UBS Financial Services Inc. does not provide legal or tax advice;

B. that in accordance with the last paragraph of the Master Account Agreement entitled "Arbitration" the Account Holder agrees in advance to arbitrate any controversies which may arise with, among others, UBS Financial Services Inc. in accordance with the terms outlined therein;

C. if the account is established with margin, that pursuant to the Master Account Agreement, certain of the securities in the account may be loaned to UBS Financial Services Inc. or to others;

D. if no Business Services Account BSA features have been selected, the account will be opened as a Basic Investment Account and the Account Holder will be bound by the terms and conditions of the Master Account Agreement;

E. if any Business Services Account BSA features have been selected, an annu-al service fee will be charged as described in the Business Services Account BSA Fee section of the Master Account Agreement;

F. that UBS Financial Services Inc. will not supply the Account Holder's name to issuers of any securities held in the account so the Account Holder will not receive information regarding those securities directly from the issuer, but rather will receive information from UBS Financial Services Inc. instead, unless Account Holder notifies UBS Financial Services Inc. in writing otherwise;

G. that the Account Holder has received and read a copy of this Client Agreement and the attached Master Account Agreement (which contains a copy of this Paragraph for Account Holder reference) and agrees to be bound by the terms and conditions contained therein (which terms and conditions are hereby incorporated by reference);

H. that, if eligible, the Account Holder has received and read a copy of the UBS Financial Services Deposit Account Sweep Program Disclosure Statement;

I. that, upon execution of this Account Application and Client Agreement, the

Account Holder will have supplied all of the information requested in the Account Application and declare it as true and accurate and further agree to promptly notify UBS Financial Services Inc. in writing of any material changes to any or all of the information contained in the Account Application includ-ing, but not limited to, information relating to the Account Holder's financial situation or investment objectives;

J. that the Account Holder has received a copy of, read and understands the "Account Information" booklet which contains, among other things, UBS Financial Services Inc.'s Privacy Statement, Statement of Credit Practices describing interest charges, the Bill Payment and Electronic Funds Transfer Services Agreement, Instructions for W-9 Preparation, Selected Fees & Charges and other important information regarding the account and relationship with UBS Financial Services Inc., which booklet and terms and conditions (other than the Privacy Statement) are incorporated herein by reference;

K. that, if the Account Holder elected the Electronic Funds Transfer Service as contained herein, the Account Holder authorizes: (a) UBS Financial Services Inc. and its processing institution (the "Processing Bank") to initiate the types of transactions indicated in the Description of the Electronic Funds Transfer Service section of the Account Information booklet, and adjustments for any entries made in error, to or from Account Holder's account(s) as contained herein, and authorize the depository(ies) named on the Account Holder's bank account(s) or UBS Financial Services Inc. to debit and/or credit the same to Account Holder's bank account(s); (b) the Processing Bank and Account Holder's bank to comply with any instructions regarding electronic fund trans-fers between this Business Services Account BSA Account Holder's bank account, and/or other accounts with UBS Financial Services Inc. provided that such instructions are given to UBS Financial Services Inc. with the Account Holder's PIN/Password and (c) UBS Financial Services Inc., the Processing Bank and the Account Holder's bank to make changes and/or cancellations request-ed by the Account Holder.

## W-9 Form Certification

I certify as the Account Holder by signing below, or in my representative capacity for the Account Holder by signing below, and, under penalties of perjury that: (1) the taxpayer identification number set forth herein is the Account Holder's correct taxpayer identification number (or the Account Holder is waiting for a number to be issued to Account Holder), and (2) the Account Holder is not subject to backup withholding because (a) the Account Holder is exempt from backup withholding, or (b) the Account Holder has not been notified by the Internal Revenue Service (IRS) that Account Holder is subject to backup withhold-ing as a result of a failure to report all interest or dividends, or (c) the IRS has notified Account Holder that Account Holder is no longer subject to backup with-holding, and (3) the Account Holder is a U.S. person (including a U.S. resident alien).

**Certification Instruction:** The Account Holder understands that Account Holder must strike out item (2) above if Account Holder has been notified by the IRS that Account Holder is subject to backup withholding because Account Holder failed to report all interest or dividends on Account Holder's tax return. The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.

X _____  Date  Aug 14 2004

X _____  Date  8/13/2004
Additional Trustee/Party Signature                                      Date
(The participant of a participant directed ERISA plan is required to sign above.)

X _____  Signature                              Date

X _____  Additional Trustee/Party Signature       Date

## For UBS Financial Services Inc. Branch Use Only

X _____  Date  8/14/04
Branch Office Manager Temporary Approval

X _____
Financial Advisor Approval

X _____  Date  8/16/04
Branch Office Manager Final Approval

Is the FA registered in both the client's state of residence and mailing address?  ☐ Yes  ☐ No    **Initial Trade Information**
What was the initial transaction for this account?  ☐ Buy  ☐ Sell  ☑ Deposit  ☐ Transfer of Accounts  Security Name: _ICO H 7_
How was the account obtained?  ☐ Walk-In / Call-In / Mail-In  ☐ Referral  Existing Ellipso  Security Symbol: _____
Interest/Dividends:  ☐ Monthly  ☐ Weekly  ☐ Hold in Account  Value: _$200,000_
Account Settles:  ☐ Assets in Account  ☐ Equity DVP  ☐ Government DVP  ☐ Transfer/Ship  or
Loan Eligible:  ☐ Yes  ☐ No  Shares: _____

Please Note: If the Account Holder, or their immediate family members, are affiliated with a securities firm or financial insti-tution (NYSE Rule 407) a letter of authorization from the firm specified must be obtained before the account can be opened.

☐ BG  ☐ EZ  ☐ LG  ☐ ML  ☐ WS  ☐ NB.  Sweep Fund: _____  Bank Code: _____  Plan Code: _____  Assoc Code: _____
Managed Account Code: _____  Family of Account Code: _____

Plan Structure:  ☐ (Y)Pooled  ☐ (N)Non-Pooled       Plan Setup:  ☐ (P)Participant  ☐ (N)Non-Participant
If plan setup is "P", enter employer's account number: _____

UBS Financial Services Inc. is a service mark of UBS AG. RMA and Business Services Account BSA are registered service marks of UBS Financial Services Inc. MasterCard BusinessCard and MasterCard are registered trademarks and service marks of MasterCard International Incorporated.

CL-BSA (Rev 3/04)                              6                    ©2004 UBS Financial Services Inc. All rights reserved. Member SIPC.

Confidential Treatment Requested

UBS 009

 **UBS**

UBS Financial Services Inc.
Account Number _WS 47874_
Branch/FA _WS PM_

## Partnership Form - For General and Limited Partnerships

Full Account Name/Title: _MANN TECHNOLOGIES, L.L.C._

Social Security/Tax ID#: _56-2445397_

In consideration of your* carrying a partnership account in the name of _MANN TECHNOLOGIES LLC_ a duly organized partnership of which each of the undersigned is a general or limited partner. The undersigned jointly and severally agree that each of the persons named immediately below (hereinafter "authorized individuals"): _JOHN B. MANN_ and

_Robert B PATTERSON_

shall have authority on behalf of the partnership account to buy, sell and otherwise deal in, through you as brokers, stocks, bonds, options (indices, interest rates, foreign currency), and other securities and commodities, on cash or margin (including short sales); to borrow and obtain credit (including all manner of credits and/or letters of credit) from time to time from you or, as applicable, your affiliate and guarantee obligations of others to you or, as applicable, your affiliate, in United States dollars or any foreign currency; to pledge, mortgage, assign or subject to a security interest or lien any property of any sort of the partnership as security for any liability of the partnership; to receive on behalf of the partnership account demands, notices, confirmations, reports, statements of account, and communications of every kind; to receive on behalf of the partnership account money, securities and property of every kind, and to dispose of same; to make distributions/transfers from the partnership account by check, automatic fund transfer, debit card (if used) or otherwise to any of the authorized persons (including, without limitation, transfers to an authorized individual as directed by that same

authorized individual) and others; to make on behalf of the partnership account agreements relating to any of the foregoing matters and to terminate or modify same or waive any of the provisions thereof; and generally to deal with you or, as applicable, your affiliate on behalf of the partnership account as fully and completely as if he alone were interested in said account. If the person(s) listed above are not General Partners of the partnership, then the undersigned hereby warrant and represent that such person(s) have been vested such authority by the partnership.

Authorized individuals must complete the additional information on page 2. **Note: All General Partners who are authorized individuals must be listed above in addition to signing the form.**

The authority hereby conferred shall remain in force until written notice of its revocation is delivered to your office at: _1501 K ST. N.W. # 1100_ _WASHINGTON, D.C. 20005_

The undersigned hereby certify that the general and limited partners of said partnership are as follows: (List the names, address and occupation of all general partners and all the limited partners. If additional space is required attach a separate sheet.)

Specify whether the partnership is a: ☐ general partnership or ☑ limited partnership. If this is a limited partnership you must indicate the type of partner (i.e., general or limited) for each person listed below.

Name: _John B MANN_     Address: _9330 HARTS MILL Rd_     Occupation: _INVESTOR_
☐ general partner or ☑ limited partner     _WARRENTON VA 20186_

Name: _Robert B PATTERSON_     Address: _Box 2051, Middleburg, VA_     Occupation: _CONSULTANT_
☐ general partner or ☑ limited partner     _20118_

Name: ____     Address: ____     Occupation: ____
☐ general partner or ☐ limited partner

Name: ____     Address: ____     Occupation: ____
☐ general partner or ☐ limited partner

The undersigned further authorize you, in the event of death or retirement of any of the members of said partnership or the termination of the partnership, to take such proceedings, require such papers, retain such portion of or restrict transactions in said account as you may deem advisable to protect you against any liability, penalty or loss under any present or future law or otherwise. It is further agreed that in the event of the death or retirement of any member of the said partnership the remaining members will immediately notify you of such fact. The undersigned hereby acknowledge that you will rely on the representations made herein. Subject to the provisions hereof, all notices or communications for the undersigned relating to the partnership account are to be directed to:

Name: _John B MANN_     Address: _9330 HARTS MILL Rd, WARRENTON VA 20186_

This agreement shall enure to your benefit and the benefit of any successor corporations or firms, and of the assigns of your present corporation or any successor corporations or firms.

All general partners must sign.     Very truly yours,

Date: _July 14, 2004_     General Partner: _[signature]_

Date: _8/3/2004_     General Partner: _[signature]_

Date: ____     General Partner: ____

Date: ____     General Partner: ____

Dated, _July 14, 2004_     _Alexandria_     _VA_
(City)     (State)

* "You" and "your" refer to UBS Financial Services Inc.

Item #L008 (Rev. 11/03)
©2003 UBS Financial Services Inc. All rights reserved. Member SIPC.

1

Confidential Treatment Requested

 **UBS**

**UBS Financial Services Inc.**

Account Number _WS 47874_

Branch/FA _WSPM_

**Additional Information**

Partner Name:
_John B MANN_

Country of Citizenship:
☑ USA ☐ Other (specify):_____

Passport/CEDULA and Green Card#: (if non-U.S. and no SS# specified)
_____/_____

Address:
_9330 HARTS Mill Rd,_

City: _WARRENTON_   State: _VA_   Zip: _20186_

Partner Name:
_Robert B PATTERSON_

Country of Citizenship:
☐ USA ☐ Other (specify):_____

Passport/CEDULA and Green Card#: (if non-U.S. and no SS# specified)
_____/_____

Address:
_Box 2051_

City: _Middleburg_   State: _VA_   Zip: _20118_

Partner Name:


Country of Citizenship:
☐ USA ☐ Other (specify):_____

Passport/CEDULA and Green Card#: (if non-U.S. and no SS# specified)
_____/_____

Address:


City:   State:   Zip:


Partner Name:


Country of Citizenship:
☐ USA ☐ Other (specify):_____

Passport/CEDULA and Green Card#: (if non-U.S. and no SS# specified)
_____/_____

Address:


City:   State:   Zip:


Item #L0C0B (Rev.
©2003 UBS Financial Services Inc. All rights reserved.   Member

2

Confidential Treatment Requested

UBS 011

Yahoo! Mail - legalmanagement@yahoo.com                                    Page 1 of 4

Yahoo!  My Yahoo!  Mail

**YAHOO!** MAIL    Welcome, **legalmanagement**
[Sign Out, My Account]

Search
the Web                    Search

Mail Home - Help

| Mail | Addresses | Calendar | Notepad |                   Mail Upgrades - Options

Check Mail    Compose                         Search Mail    Search the Web

Folders    [Add - Edit]
Inbox (6134)

Draft
Sent
Bulk      [Empty]
Trash     [Empty]

My Folders    [Hide]
doc review
resumes (2)

Search Shortcuts
My Photos
My Attachments

Previous | Next | Back to Messages

Delete    Reply    Forward    Spam    Move...

This message is not flagged. [ Flag Message - Mark as Unread ]          Printable View

From:    "David Castiel" <dcastiel@ellipso.com>  View Contact Details  Add Mobile Alert

To:      legalmanagement@yahoo.com

Subject:  FW: Ellipso's holdings in ICO

Date:    Fri, 9 Jul 2004 19:16:46 -0400

FYI

-----Original Message-----
From: David Castiel [mailto:dcastiel@ellipso.com]
Sent: Thursday, July 08, 2004 6:51 PM
To: 'Jim.Bailey@verizon.net'
Subject: RE: Ellipso's holdings in ICO

Jim,

Just to clarify:

1) The July 12, 2002 Purchase Agreement specifies that ICO bought from
EPH
its Common shares in MCHI and Series A shares in MCHI (referred to as
Holdings). ICO intended at the time to acquire the totality of MCHI
(then
the licensee) and therefore requested the stock be issued to EPH and
agreed
to issue ICO stock to EPH (the Seller of MCHI stock). MCHI's
recapitalization and issuance of P-1 certificate, together with the
physical
submission of stock certificates #55 and P-1, is evidence that the
consideration for ICO stock was paid on July 12, 2002. No contingencies
existed and MCHI, EPH and Ellipso had no say whatsoever to alter the
transaction in any way after July 12, 2002.

2) As we all know, rather than acquiring MCHI from EPH, ICO desired to
acquire from MCHI a newly formed entity ESBH, after certain assets of
MCHI
(license and IP) were transferred to ESBH. The prior MCHI stock
issuance to
EPH would be then replaced by ESBH stock issuance to ICO and MCHI (this
one
until the second closing). The replacement of MCHI by ESBH as the
acquired
entity happened on October 2, 2002 after the FCC agreed to the
pro-format
change of control of the license.

3) ICO's initial issuance of the purchased ICO stock was (or was to be)

PATT 000154

**EXHIBIT**

**5**

in
the name of EPH, and in October, 2002 it was made in the name of MCHI
to
reflect the movement one step downward in corporate structure of the
transaction. This was merely a pro-format housekeeping step to
accommodate
ICO's desire to acquire assets (ESBH) without known or unknown
liabilities
(MCHI). So from our point of view July 12, 2002 is when everything
occurred.
Ellipso, EPH, MCHI and soon to be ESBH had no say, and no consideration
and
nothing else to pay to ICO after July 12, 2002. Our obligation was to
merely
sign assignement documents. Since we complied to accommodate ICO, we
shouldn't be penalized by that fact.


David


-----Original Message-----
From: Jim Bailey [mailto:Jim.Bailey@verizon.net]
Sent: Thursday, July 08, 2004 4:24 PM
To: Weston, Julie
Subject: RE: Ellipso's holdings in ICO

Thanks, Julie, for this note and the call.  There was no "issuance" by
us in
July of 2002.

I am glad to hear that Dave Baca is back and look forward to hearing
from
you on your thoughts.

Jim

James H. Bailey
Bailey Law Office
1275 K Street, NW ~ Suite 770
Washington, DC 20005, U.S.A.

Telephone: 202.862.3980
Facsimile:  202.862.3999
Mobile:     202.374.1990
Residence: 703.333.2888
Res. Fax:   703.333.2889

-----Original Message-----
From: Weston, Julie [mailto:julieweston@dwt.com]
Sent: Thursday, July 08, 2004 4:11 PM
To: 'Jim.Bailey@verizon.net'
Subject: RE: Ellipso's holdings in ICO

Jim, as we discussed yesterday we are working on this.  Neither
Ellipso, nor
MCHI, issued shares to ICO on July 12.  There was a pledge of shares
held by
EPH for the $1,000,000 promissory note, but I'm not sure I understand
where
this "issuance" idea comes in.  Please give me a call to discuss.

-----Original Message-----
From: Jim Bailey [mailto:Jim.Bailey@verizon.net]
Sent: Thursday, July 08, 2004 12:43 PM
To: Ben Wolff
Cc: Julie Weston

**PATT 000155**

Subject: Ellipso's holdings in ICO

Ben,

What moves the stock market is always a bit of mystery to me, but I have
been very intrigued to see the recent movement in ICOHA, since there is
"limited" public information about it.  Be that as it may, the last several
days have seen substantial volumes, with the price today - and for a few
days - remaining in the $0.58 - .59 range.

David is trying to build our asset base for obtaining a line of credit. One
asset that we could very much use is Ellipso's holdings in ICO, resulting
from the transaction closed July 12, 2002.  On that date, Ellipso issued
appropriate stock certificates to ICO and, as I recall, those certificates
were replaced with new ones, once ESBH had been created and the FCC had
approved the pro forma application to move the license down to ESBH.

As to the ICO shares, rather than issue certificates on that date, ICO
pledged to do so upon the issuance of the replacement, "post-ESBH" shares.
The certificate was, in fact, issued October 2, 2002.  Consequently, the
2-year restrictive legend is, apparently, not removable until October 2 of
this year.  We certainly could use some creative help in getting that legend
removed earlier.

I don't recall the July 2002 rationale for ICO's not issuing the
certificates at that time.  If ICO had issued the certificate, subject to
later replacement, then the change of title as well as beneficial ownership
would have occurred in July, not October.

My request for your "good neighbor" consideration is that Ellipso and ICO
retroactively amend the transaction to have ICO issue a certificate for the
shares bargained away, effective with the date of closing the transaction,
i.e., July 12, 2002, and we would return the certificate with the October
2nd date.  Ellipso would then be able to remove the restrictive legend
immediately, and that would be - at least for us - a good thing.

I have discussed the goal, in general terms, with Julie Weston, and she's
been exploring the matter with Dave Baca.  When I spoke with Julie
yesterday, for reasons she described as Dave's travel, she had not been able
to further discuss the matter with him.  Her knowledge of the instant
request comes only through her copy of this note.

Thanks for your consideration,

Jim                                             **PATT 000156**

Yahoo! Mail - legalmanagement@yahoo.com                    Page 4 of 4

```
James H. Bailey
Bailey Law Office
1275 K Street, NW ~ Suite 770
Washington, DC 20005, U.S.A.

Telephone: 202.862.3980
Facsimile:  202.862.3989
Mobile:     202.374.1990
Residence:  703.333.2888
Res. Fax:   703.333.2889
```

**Attachments**

Files:

⌗ **Summary_One.doc** (38k) [Preview]        Scan and Save to Computer - Save to Yahoo! Briefcase

⌗ **Stock_Purch_Excerpts.doc** (1.5MB) [Preview]   Scan and Save to Computer - Save to Yahoo! Briefcase

| Delete | Reply ▾ | Forward ▾ | Spam | Move... ▾ |

Previous | Next | Back to Messages                         Save Message Text | Full Headers

| Check Mail | Compose |                          | Search Mail | Search the Web |

Copyright © 1994-2007 Yahoo! Inc. All rights reserved. Terms of Service - Guidelines
NOTICE: We collect personal information on this site.
To learn more about how we use your information, see our Privacy Policy

**PATT 000157**

**John Mann**

| | |
|---|---|
| **From:** | rb patterson [legalmanagement@yahoo.com] |
| **Sent:** | Saturday, January 01, 2005 10:27 AM |
| **To:** | john mann |
| **Subject:** | Fwd: Response.efx |

John,

    Hope you had an enjoyable holiday. I have returned from S.D. and found this message from David. I cannot open it. If you can open it, please send it to me in a different format. Call when you can.
Bob

Note: forwarded message attached.

Do you Yahoo!?
Yahoo! Mail - You care about security. So do we.

**EXHIBIT**

**6**

**John Mann**

| | |
|---|---|
| **From:** | David Castiel [dcastiel@ellipso.com] |
| **Sent:** | Thursday, December 23, 2004 6:27 PM |
| **To:** | John Mann; Robert Patterson-Yahoo |
| **Subject:** | Response.efx |



Response.efx (24
KB)

Please see attached.

Thank you.

**John Mann**

| | |
|---|---|
| **From:** | John Mann [john.mann@starband.net] |
| **Sent:** | Saturday, January 01, 2005 2:22 PM |
| **To:** | rb patterson |
| **Subject:** | RE: Response.efx |

Bob,

Happy New Year!

I can't open it either.  I've emailed David to convert the format for me, but I've not heard from him since I got back from Mexico last week.

I think John and Jeff want to get together, which seems like a good idea to me.  How's Tuesday look for you?

John


-----Original Message-----
**From:** rb patterson [mailto:legalmanagement@yahoo.com]
**Sent:** Saturday, January 01, 2005 10:27 AM
**To:** john mann
**Subject:** Fwd: Response.efx

John,
      Hope you had an enjoyable holiday. I have returned from S.D. and found this message from David.  I cannot open it.  If you can open it, please send it to me in a different format.  Call when you can.          Bob

Note: forwarded message attached.

---

Do you Yahoo!?
Yahoo! Mail - You care about security. So do we.