**Unknown**

| From: | Robert Patterson [rbpmanagement@hotmail.com] |
|---|---|
| Sent: | Wednesday, December 24, 2003 10:40 AM |
| To: | lockheed12a@starband.net |
| Subject: | FW: MEMORANDUM OF AGREEMENT |



MEMORANDUM OF
.GREEMENT.doc (2..

Attached is David's response to our offer.  I would suggest we accept them
with two modifications.  First, the 70% of profits split should be 63%.
Second, the 12 months of gross revenues as a purchase price is troubling.
Maybe the formula should be 3.5 x annual earnings, reflecting the profits
split at ten times earnings.  I'll go either way.

David told me he did not want to insist on anything that you would not agree
to.  David is leaving for skiing today and returns next Wed.  I would urge
you to make what changes you want and send it to David for ratification
asap, for the reasons we discussed.  I think fax signatures would be fine
for this week with a final signature version next week.

Happy Humbug!!!    Bob  571-278-7076

>From: "David Castiel" <dcastiel@ellipso.com>
>Reply-To: <dcastiel@ellipso.com>
>To: "'Bob Patterson'" <rbpmanagement@hotmail.com>
>Subject: MEMORANDUM OF AGREEMENT
>Date: Tue, 23 Dec 2003 12:38:24 -0500
>
>
>
>Bob, attached are changes that would make me happy, since we are
>including 881-2 as well. I think the proposed changes are fair.

>David

Take advantage of our limited-time introductory offer for dial-up Internet
access  http://join.msn.com/?page=dept/dialup

**EXHIBIT**

**1**

1

MANN 00046

MEMORANDUM OF AGREEMENT

WHEREAS, ELLIPSO, INC is in the process of implementing telephony services utilizing its unique 881 universal number series;

WHEREAS, ELLIPSO, INC wishes to establish a unified registration process for the marketing and implementation of its 881 Universal Number Series (the "Ellipso 881 Registry", or "THE REGISTRY");

WHEREAS, THE REGISTRY SOULTIONS COMPANY (TRSC) possesses expertise and experience in initiating, implementing, marketing and maintaining universal registration programs;

WHEREAS, ELLIPSO, INC. wishes to outsource the development, implementation and maintenance of the Ellipso 881 Registry;

WHEREAS, TRSC is willing to devote its resources and expertise to assisting ELLIPSO, INC. in developing the Ellipso 881 Registry;

IT IS AGREED THAT:

ELLIPSO, INC. hereby grants to TRSC the exclusive right to establish and maintain THE REGISTRY of the Ellipso 881 series universal numbers placed into service ("THE REGISTRY").

TRSC will use its best efforts to establish THE REGISTRY as soon as practicable, but in any event, within (60) days of the date of this agreement. TRSC will bear all costs for establishment of THE REGISTRY.

ELLIPSO, INC. will cooperate and assist TRSC in establishing THE REGISTRY by promptly providing all necessary information and support requested by TRSC pursuant to establishment of THE REGISTRY. To the extent ELLIPSO, INC provides services or other support to TRSC, ELLIPSO, INC. shall be reimbursed for the reasonable costs incurred.

ELLIPSO, INC. and TRSC shall, within 60 days of the date of this agreement, establish a fee per transaction for the services provided by TRSC to ELLIPSO, INC, of its affiliates.

MANN 00047

*ELLIPSO/TRSC, p. 2.*

TRSC shall initiate an aggressive marketing campaign to expeditiously and extensively populate THE REGISTRY, and shall perform all functions necessary to assure the successful implementation of THE REGISTRY.

ELLIPSO, INC. and TRSC shall assist each other in the marketing of products associated with THE REGISTRY service, such as vanity number allocation, call forwarding, one number worldwide access and others. TRSC shall provide THE REGISTRY services for these activities, including validation of numbers using the unified database and associated support services of TRSC, for which TRSC shall receive the agreed upon charges.

In consideration for the exclusive right to establish and operate THE REGISTRY, TRSC shall compensate ELLIPSO, INC. as follows:

A. Upon execution of this agreement, TRSC shall pay to ELLIPSO, INC. twenty-five thousand dollars ($25,000.00);
B. On February 1, 2004, TRSC shall pay to ELLIPSO, INC. fifteen thousand dollars ($15,000.00);
C. On the first day of each successive month, commencing March 1, 2004, TRSC shall pay to ELLIPSO, INC. the greater of twelve thousand five hundred dollars ($12,500,00), or sixty percent (70%) of the net profits from the prior preceding months operations, [e.g. Profits from January 2004 shall to payable on March 1, 2004]. Net profits shall be determined by generally accepted accounting practices.

The term of this agreement shall be five (5) years, and shall thereafter automatically renew for additional terms of five (5) years, unless ELLIPSO, INC. exercises its option to acquire THE REGISTRY as set forth herein.

On the fourth anniversary of this agreement, ELLIPSO, INC. shall have the right to acquire THE REGISTRY by tendering to TRSC a cash payment equivalent to the gross revenues received by TRSC during the immediately preceding twelve (12) months. In the event ELLIPSO, INC. wishes to exercise this option, it must so notify TRSC one ninety days (90) prior to exercise of the option. This is a one-time purchase option.

ELLIPSO, INC. and TRSC shall coordinate their efforts to successfully implement the 881 universal numbers and THE REGISTRY.

Any disputes concerning this agreement shall be submitted to binding arbitration pursuant to the rules of the American Arbitration Association, or such other arbitration procedures as the parties may agree.

Deleted: twelve
Deleted: five hundred
Deleted: 12,500
Deleted: 60
Deleted: twenty-four
Deleted: 24
Deleted: hundred eighty
Deleted: 180

MANN 00048

*ELLIPSO/TRSC, p. 3.*

This agreement contains the entire agreement and representations of the parties hereto and any representations not set forth herein are specifically disclaimed.

AGREED THIS ____ DAY OF DECEMBER 2003:

ELLIPSO, INC.                           THE REGISTRY SOLUTIONS COMPANY
By:  David Castiel, Chairman            By: John Mann, Director


_____               _____
David Castiel                           John Mann

MANN  00049

## AGREEMENT FOR SERVICES

**THIS CONSULTING AGREEMENT** ("Agreement") is entered into and effective as of the 1st day of October 2002, by and among Consulting Management, Ltd,, P.O. Box 2051, Middleburg, Virginia 20118 (referred to as "Consultant"), Ellipso, Inc., and Ellipso Private Holdings, LLC, with offices at 1133 21st Street, N.W., Eighth Floor, Washington, DC 20036 USA (together with their subsidiaries and affiliates the "Company").

**WHEREAS,** Company has conceived and is implementing two innovative mobile satellite systems known as the Ellipso® System and the Virtual Geo® System, designed to provide communications services worldwide, including voice and data, to and between mobile and fixed users (the "Services" or the "Systems"); and

**WHEREAS,** Consultant has significant expertise and contacts to assist the Company in establishing beneficial business relationships with certain third parties, who may be interested investing in or in any other way financing all or a portion of the Ellipso System or the Virtual Geo System, as well as significant expertise and experience to assist the Company in developing its business strategy to protect Company's intellectual property, trade marks, and other assets (the "Strategy"); and

**WHEREAS,** the parties desire to enter an agreement whereby Consultant would be encouraged to introduce Company to certain third parties who may be interested in lending for, investing in, or in any other way financing all or a portion of the Ellipso System or the Virtual Geo System, and to assist Company in protecting Company's assets ("Consultant's Services").

**WHEREAS,** Consultant has established contacts, sources, and procedures for securing for the Company, at favorable rates and terms, assistance and representation for protecting the Company's intellectual property and other assets, and for pursuing the Company's general businesses objectives;

**NOW THEREFORE,** in consideration of the mutual promises and undertakings contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Company and Consultant agree as follows:

### 1. TERM

Commencing on the date hereof, and continuing until September 30, 2003 (or such later date as may be mutually agreed pursuant to Clause 17.1 of this Agreement), Consultant shall use its best efforts to introduce Company to the parties listed in Exhibit "A" hereto ("Financiers") for the purpose of facilitating arrangements through which those Financiers finance and/or invest in the Systems or their associated Services and/or other aspects of the Company's business. Consultant will further establish a practical business strategy aimed at protecting and preserving the Company's assets and shall assist in the implementation of that Strategy. The foregoing period of time is hereinafter referred to as the "Term".

**EXHIBIT**

**2**

## 2.    COMPENSATION

2.1    Upon execution of this Agreement, Consultant shall receive an option to purchase 30,000 shares of Ellipso Private Holdings LLC ("EPHLLC") stock. These options shall vest on the first day of each calendar month of this Agreement at the rate of 2,500 shares per month. At the election of Consultant, these shares may take the form of Options at par value ($.01 per share) and will carry a maturity of a number of years sufficient to allow Consultant to optimize the tax impact of such award. A separate stock allocation and/or option agreement will be executed by the parties concurrently with this Agreement. Consultant shall also receive a payment of $5,000 per month for the months of October, November, and December 2002, payable $2,500 on the 1st and 15th of each month. Thereafter monthly cash compensation will be renegotiated each calendar quarter during the Term of this Agreement.

2.2    If Company enters into an agreement with a Financier to invest in, lend for, or finance all or a portion of the Ellipso System or the Virtual Geo System, or other Company business, with one or more of the Financiers to whom Consultant introduced the Company during the Term of this Agreement, then Consultant shall receive a success bonus ("Success Bonus") calculated as follows (Lehman plan):

2.2.1    5% for the first million dollars, or fraction thereof, received as by the Company, plus

2.2.2    4% of the second million dollars, of fraction thereof, received by the Company, plus

2.2.3    3% of the third million dollars, or fraction thereof, received by the Company, plus

2.2.4    2% of the fourth million dollars, or fraction thereof, received by the Company, plus

2.2.5    1% (one percent) of any received investment amount exceeding five millions dollars (US$ 5,000,000).

The Success Bonus shall be based upon the cumulative and aggregate amount of funds actually paid by Financiers to Company and received by Company pursuant to each individual Investment Agreement.

Consultant shall be compensated only for Amounts obtained by Advisor's efforts. However, Consultant shall be compensated for Amounts obtained as a result of subsequent introductions by a Financier or intermediate third party, who was first introduced to Company by Consultant, and which resulted in a financing agreement within one year of the Term of this Agreement. Consultant shall receive the Success Bonus if and when Company actually receives and has the unrestricted right to use the

Amounts. Intermediate third parties may be compensated by Company at its discretion.

If Consultant is independently compensated by Financier, Advisor will promptly notify the Company of such compensation. In this case, Consultant shall be entitled to a Success Bonus per this Section 2.2 reduced by any amounts Consultant receives from other parties to the transactions. It is the intention of the Parties to avoid "double dipping" but ensure that the total compensation received by Consultant from all sources for any specific investment is at least equal to that contemplated by this Section 2.2.

2.3     Company will reimburse Consultant for the reasonable costs and expenses incurred by Consultant in the performance of this Agreement, provided that Consultant first obtained Company's prior written approval for such costs and expenses.

2.4     Consultant will help establish a Strategy to defend and protect the Company in all business matters including litigation of pending and future actions. This S trategy w ill h ave a s its primary aim to preserve the Company's assets. Consultant will have primary responsibility to effectuate the initiation of actions against former employees who have breached their contracts with the Company, former directors and officers w ho h ave breached t heir fiduciary d uty to the Company, and any other person(s) similarly situated. The primary thrust of this Strategy shall be for the purpose of recovering damages and ensuring the Company is not exposed to litigation as a form of extortion. Consultant will also use its best efforts to secure personnel to assist and effectuate these efforts at the best possible terms and rates.

2.5     In the event Company requests, and Consultant accepts, to provide other services to Company, such additional services will be billed to Company at an agreed rate and invoiced monthly. .Any amounts owed by Company to Consultant pursuant to this Agreement, which remain unpaid for more than thirty days shall be assessed one percent (1%) interest per calendar month on the entire outstanding balance, commencing the first full month following invoicing.

3.     COORDINATION

In order to coordinate and maximize all contacts with Financiers, Consultant will provide Company with prior notification of Consultant's strategies and efforts to contact and meet with Financiers. The Chief Executive Officer, or his designee, shall serve as Consultant's point of contact at Company for coordination purposes.

With respect to additional potential investors, Consultant agrees not to contact any potential investors, other than the Financiers specified in Exhibit "A," on

Company's behalf without prior written authorization from Company's Chief Executive Officer, which authorization shall not be unreasonably withheld.

Consultant will take steps to ensure an orderly conduct of all litigation in coordination with the CEO, law firms, experts, witnesses, investigators, financial sources, and others involved in various legal actions against individuals associated, or formerly associated with the Company.

## 4.    COMPANY'S OBLIGATIONS

Consultant is hereby acknowledged as the procuring cause of Investment Agreements that result from Consultant's introduction of the Company to the Financiers specified in Exhibit "A" hereto.

## 5.    NO OBLIGATION

Nothing in this Agreement obligates Consultant to obtain an Investment Agreement and/or Beneficial Agreement, nor shall anything in this Agreement obligate Company to enter into an agreement with a Financier.

## 6.    NO SALE OF SECURITIES

Consultant acknowledges that it is acting solely in the capacity of a "finder" and shall not sell or offer to sell securities related to the development and/or implementation of the Ellipso System or the Virtual Geo System. Consultant represents and warrants that its activities will relate solely to accredited investors as defined in Section 230.501 of the Securities Act of 1933, if applicable. Consultant agrees to comply with all applicable state and federal securities laws. Consultant agrees to indemnify and hold Company harmless from any and all claims, losses, expenses, and damages (including reasonable attorneys' fees) in connection with a breach of this provision.

## 7.    NO ADDITIONAL BROKERS OR FEES

Consultant hereby expressly acknowledges and agrees that Consultant has not employed, engaged, or utilized the services of any brokers, agents, finders, or similar third parties and that except for the Success Bonus expressly provided for by this Agreement, Company has no obligation to pay any commissions, fees, or other amounts to any brokers, agents, or finders in connection with Consultant's efforts to pursue Financiers or investors on behalf of Company.

In the event a third party claims to be the procuring cause of an Investment Agreement or a Beneficial Agreement with a Financier, Company shall have the right, exercisable in its sole discretion, to determine which party will receive the applicable Success Bonus and Consultant shall have no further rights or recourse against Company for such disputes.

Consultant agrees to indemnify and hold Company, and its affiliates, officers, directors, employees, agents, successors and assigns, harmless from any and all claims, losses, expenses and damages (including reasonable attorneys' fees), whether finally awarded or agreed to in settlement, arising from or in connection with this Agreement.

*Attack Indemnification Clause*

## 8.    RELATIONSHIP OF PARTIES

Consultant is an independent contractor. Nothing herein contained shall be construed to place Consultant and Company in the relationship of principal and agent, master and servant, partners, joint ventures or employer and employee, and neither party shall have, whether expressly or by implication, nor shall represent itself as having, any authority to make contracts in the name of or binding upon the other, or to obligate or bind the other in any manner whatsoever.

Consultant shall not be deemed to be employed by Company for purposes of any tax by the U.S. federal government or any state or local government with respect to employment or compensation for employment, including but not limited to income tax withholding, social security, and unemployment taxes. Consultant has or will file all tax forms required of an independent contractor. Consultant, its directors, officers, employees and/or agents shall not be entitled to participate in any retirement plan, medical plan and/or any other benefit plan or program of the Company.

## 9.    CONFIDENTIALITY

Subject only to legally compelled disclosure, Consultant shall maintain the terms and conditions of this Agreement and any information, reports, or other data furnished hereunder in strict confidence.

## 10.    COMPLIANCE WITH LAWS AND REGULATIONS

In the performance of this Agreement, Consultant and any individuals or entities acting on behalf of Consultant will comply in all respects with all applicable laws and regulations, including but not limited to those identified in this Agreement. Consultant represents that neither Consultant nor any individuals or entities acting on behalf of Consultant will, directly or indirectly, make, offer, or agree to make or offer any loan, gift, donation, payment, or any other form of value, whether in cash or in kind, for the benefit of or at the direction of any candidate, committee, political party, government or a subdivision thereof, or any individual elected, appointed, or otherwise designated as an employee or officer thereof, for the purpose of influencing any act, omission, or decision of such entity or individual or inducing such entity or individual to do or omit to do anything, in order to obtain or retain business or other benefits in violation of the United States Foreign Corrupt Practices Act.

Bob Patterson
Compensation Agreement
1 October 2002

5

11.    **NOTICES**

All notices, reports, accountings, or other communications which either party may be required to or desires to send to the other party, shall be sufficiently given if in writing, delivered personally (by courier with a reliable system for tracking delivery) or by confirmed facsimile or upon receipt of next business day air express, addressed as follows:

If to Consultant:            Robert B. Patterson, Director
                             Consulting Management, Ltd.
                             Box 2051
                             Middleburg, VA  20118
                             Telephone:  (703) 338-0944
                             Facsimile:

If to Company:               Ellipso, Inc.
                             Ellipso Private Holdings, LLC
                             1133 21st Street, N.W.
                             Suite 800
                             Washington, D.C.  20036
                             Telephone:  (202) 466-4488
                             Facsimile:  (202) 466-4493
                             Attn: David Castiel, President and
                                   Chief Executive Officer

or to such other person or persons or to such other address as may be designated in writing by the applicable party from time to time.  Notices shall be deemed received when personally delivered, or five days after mailing if sent by mail, or upon actual receipt by the designated receiving party of a telex or facsimile transmission from the other party.

12.    **ENTIRE AGREEMENT/AMENDMENT**

This Agreement constitutes the entire agreement between the parties with reference to this matter, and supersedes all prior agreements or communications, written or oral, relating to the subject matter.  This Agreement cannot be amended except by a written instrument signed by both parties.

13.    **GOVERNING LAW AND JURISDICTION**

This Agreement is made, and is to be construed under the laws of the District of Columbia except for its conflict of laws provisions.  Both parties agree to accept service of process to appear in any legal proceeding pertaining to this agreement in the District of Columbia.

14.    **ASSIGNMENT**

Consultant may not assign its rights or obligations hereunder. This Agreement is binding upon and shall inure to the benefit of the respective successors and assigns of the parties, except where rights of assignment are prohibited or limited.

15.    **SEVERABILITY**

If any provision of this Agreement shall be found invalid or unenforceable, then such provision shall not invalidate or in any way affect the enforceability of the remainder of this Agreement.

16.    **TERMINATION**

Either party may terminate this Agreement upon ten (10) days written notice. Although cause is not required to terminate this Agreement, either party may terminate this Agreement immediately upon a material breach of its terms or conditions by the other party. The Term of this Agreement shall expire at 5:00 p.m. (D.C. Time) on September 30, 2003, at which time this Agreement shall automatically terminate.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date set forth above.

**ELLIPSO, INC.**                                **CONSULTING MANAGEMENT, LTD**
**ELLIPSO PRIVATE HOLDINGS, LLC**

By: _____              By: _____

Its: _____             Its: _____

Bob Patterson
Compensation Agreement
1 October 2002

7

**ADDENDUM TO AGREEMENT OF OCTOBER 1, 2002.**

**WHEREAS,** the undersigned wish to amend their agreement dated October 1, 2002, it is agreed as follows:

1. Section 2.1, is replaced in its entirety with the new Section 2.1.     *Compensation amended*

    2.1   Upon execution of this Addendum, Consultant shall receive retroactively options to purchase 10,000 shares of Ellipso Private Holdings LLC ("EPHLLC") stock per month at par value, up to a maximum of 120,000 shares or share options, commencing with the month of October 2002, and continuing for twelve months thereafter, unless modified upward by both parties. For the purpose of this Amendment the first 60,000 shares shall immediately vest, and the remaining 60,000 options shall vest on the first day of each calendar month of this Amendment at the monthly rate at which they are acquired. At the election of Consultant, these share options may take the form of Options at par value of ($0.01 per share) and will carry a maturity of a number of years sufficient to allow Consultant to optimize the tax impact of such award. A separate stock allocation and/or option agreement will be executed by the parties concurrently with this Addendum. Consultant shall also receive payment of $10,000 per month, payable $2,500 on the first, $2,500 on the fifteenth of each month, and $5,000 deferred pending the availability of corporate funds commencing February 1, 2003. The aforementioned cash payment may also be adjusted upward by both parties subject to the same conditions. In addition, Consultant shall receive a one time amount of $20,000 of incentive deferred compensation subject to the conditions below. For the purpose of this Amendment, in the event that EPHLLC or any affiliated business entity is placed into receivership, Consultant's unpaid cash compensation, if any, including the incentive deferred cash compensation, and one half of all shares or share options vested as to the date of receivership shall be treated as salary and wages at the rate of $1.00 per share or share option.

ELLIPSO, INC.  
ELLIPSO PRIVATE HOLDINGS, LLC

BY: _____

ITS: *President & CEO*

*2/9/03.*

CONSULTING MANAGEMENT, LTD.

BY: _____

ITS: *Director*

# Mann Technologies

August 12, 2004

Receipt is acknowledged of 492,611 shares of ICO Common Stock in the form of Stock Certificate A2008. The shares will be ~~immediately~~ *timely* deposited into Mann Technologies, LLC account # _____ *after the legend has been removed.*

Signed:

_____

UBS Financial Services

9330 Harts Mill Road  •  Warrenton, Virginia 20186
Phone: (540) 349-7872 • Facsimile : (540) 349-4654 • Cell (540) 974-3725
Email: john.mann@starband.net

Confidential Treatment Requested

**EXHIBIT**

**3a**

PZBA135256-X46
2085893 - 000002

**UBS Financial Services Inc.**
1501 K STREET NW
SUITE 1100
WASHINGTON, DC 20005

PZBA135256-X46  -  0804 - WS - 0

**Your Financial Advisor**
MCMILLAN/PIPER
202-585-4000/800-382-9989

# Business Services Account BSA®

**Account Number:** WS 47874 PM

*August 2004*

MANN TECHNOLOGIES LLC
9330 HARTS MILL RD
WARRENTON        VA  20186-8538

## This month at a glance

| | | Year-to-date |
|---|---|---|
| Value on July 31 | $ | .00 |
| Value on August 31 | $ | 183,626.90 |
| Money fund and other sweep option balance in 08/31 value | $ | 5,934.72 |

## Activity highlights

| | | Current period | | Year-to-date |
|---|---|---|---|---|
| Withdrawals | $ | -5,934.73 | | -5,934.73 |
| Securities transferred in (valued at time of transfer) | | 236,453.28 | | 236,453.28 |
| Net change from activity listed above | $ | 230,518.55 | $ | 230,518.55 |

## Portfolio summary

| | | Current period | | Year-to-date |
|---|---|---|---|---|
| Opening value | $ | .00 | $ | .00 |
| Net change from Activity Highlights | | 230,518.55 | | 230,518.55 |
| Change in value of investments | | -46,891.65 | | -46,891.65 |
| Value on August 31 | $ | 183,626.90 | $ | 183,626.90 |

## Asset summary
*Refer to the disclosure on the back of the first page for information on assets excluded from this summary.*

| | % of portfolio | | Value |
|---|---|---|---|
| Equities | 96.77 | | 177,692.18 |
| Money funds/sweep options | 3.23 | | 5,934.72 |
| Net invested assets | 100.00 | $ | 183,626.90 |
| Value on August 31 | | $ | 183,626.90 |

**Account Instructions**
The account record was signed by your Financial Advisor and approved by a Principal of the Firm.

**Bulletin Board**
YOUR INVESTMENT PORTFOLIO MAY BE ABLE TO
SUPPORT YOUR BORROWING NEEDS. OUR PREMIER
CREDIT LINE USES YOUR ELIGIBLE PORTFOLIO
TO OFFER CREDIT AT COMPETITIVE RATES.
RESOURCELINE 1-800-BSA-0140: ACCOUNT #: 021047874
VISIT OUR WEB SITE AT WWW.UBS.COM.

## Investment objectives
*The following return objective and risk profile(s) describe overall goals for this account. For each account held, you must provide one return objective, one primary risk profile and, if applicable, a secondary risk profile. A full description of the alternatives is included on the back of the first page. If you have questions regarding these objectives, disagree with or wish to change them, please notify your Financial Advisor or Branch Manager at your branch office, in writing or by telephone.*

**Return objective:**    Current Income & capital appreciation
**Risk profile:**    Primary:    Aggressive/Speculative
              Secondary: None selected

Page  1 of  3

August 04/ WS 47874 PM

**EXHIBIT**

**3b**

**H**

# Business Services Account BSA®

**Statement Period: August 2004**

Account Number: WS 47874 PM
Your Financial Advisor
MCMILLAN/PIPER
202-585-4000/800-382-9989

## Asset portfolio

When available, prices, income and current values may be approximate and thus gains/losses may not be accurately reflected. An asterisk (*) indicates the calculation of unrealized gains/losses based upon a UBS Financial Services adjustment to cost basis. The number "1" indicates cost basis information has been provided by a source other than UBS Financial Services. See the back of the first page for additional information. Gains/losses are not calculated for zero coupon investments. "Pending adjustments" or "P/A" indicates cost basis has not yet been allocated as a result of a spin-off or taxable exchange.

### Equities

#### Common stock

| Total shares | Description | Price | Current value | Est. annual income | Trade date | Closing share price | Shares purchased | Average rate | Purchase price | Dividend/ interest period | Cost basis | Days in period | Unrealized Gain/loss |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 467,611 | ICO GLOBAL COMMUNICATIONS HOLDINGS LTD DE CL A | .380 | 177,692.18 | | | | 467,611.000 | | —This information was unavailable— | | | | |
| | **Total** | | **$ 177,692.18** | | | | | | | | | | |

### Money funds and other sweep options

| Description | | Opening balance | Closing balance | | | Average rate | | Dividend/ interest period | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RMA MONEY MKT. PORTFOLIO | | .00 | 5,934.72 | 1.00 | 467,611.000 | 0.81% | | 07/26 - 08/24 | | 30 | | |
| **Total** | | **$ .00** | **$ 5,934.72** | | | | | | | | | |

### Notice of Availability

Independent, third-party research on certain companies covered by UBS Research is available to customers of UBS in the United States at no cost. Customers can access this research at www.ubs.com/independentresearch or can call 1-877-208-5700 to request that a copy of this research be sent to them.

## Monthly activity

### Cash flow and security transactions

Refer to the disclosure on the back of the first page regarding the Price/Value presented for restricted securities.

| Date | Activity | Description | Quantity/ Face value | Price / Value | Cash amount | Cash & Total Money fund/sweep balance |
|---|---|---|---|---|---|---|
| 07/31 | | **Cash, Money fund and other sweep option balance** | | | $ | .00 |
| 08/24 | TRANSFER | ICO GLOBAL COMMUNICATIONS HOLDINGS LTD DE CL A FM  WS 31501 0100 | 492,611.000 | 236,453.28 | | |
| 08/27 | TRANSFER | TO  WS 31501 0100 | | | -5,934.73 | |

Continued on page 3

**Page  2 of  3**

August 04/ WS 47874 PM

# Business Services Account BSA®

**Account Number:** WS 47874 PM
Your Financial Advisor
MCMILLAN/PIPER
202-585-4000/800-382-9989

**Statement Period:** August 2004

PZBA135268-X46
2085893 - 0000040...

## Cash flow and security transactions - continued
*Refer to the disclosure on the back of the first page regarding the Price/Value presented for restricted securities.*

| Date | Activity | Description | Quantity/ Face value | Price / Value | Cash amount | Cash & Total Money fund/sweep balance |
|---|---|---|---|---|---|---|
| 08/27 | SOLD | ICO GLOBAL COMMUNICATIONS HOLDINGS LTD DE CL A UNSOLICITED | -25,000.000 | 50 CENTS | 11,869.45 | 5,934.72 |
| 08/31 | | Closing cash, Money fund and other sweep option balance | | | | $ 5,934.72 |
| | | Total Money fund and other sweep option balance | | | | $ 5,934.72 |

## Money funds and other sweep options
*The RMA Money Mkt. Portfolio is your primary sweep fund.*

| Date | Activity | Amount | Balance |
|---|---|---|---|
| 07/31 | Opening RMA Money Mkt. Portfolio | | .00 |
| 08/30 | BOUGHT | $ 5,934.72 | 5,934.72 |
| 08/31 | Closing RMA Money Mkt. Portfolio | $ 5,934.72 | |

## Realized gains and losses
*Estimated realized gains/losses are not for tax purposes. The oldest security lot is liquidated first to calculate gains/losses (first-in, first-out or FIFO accounting method) unless you specified which lot to close when you placed your order (e versus purchase or VSP order). An asterisk (N*) indicates a UBS Financial Services adjustment to cost basis. The number "1" indicates cost basis information has been provided by a source other than UBS Financial Services. See the back of the first page for additional information. Gains/losses may not be adjusted for all capital changes and are not calculated for zero coupon securities. Cost basis for tax-exempt and AMT eligible coupon municipal securities had been adjusted automatically for estimated amortization of bond premiums. Estimates in the "Unclassified" section can not be classified as short-term or long-term due to missing information or the product is one which gain/loss calculation is not provided.*

| Security description | Method | Quantity/ Face value | Purchase date | Sale date | Sale amount | Purchase amount | Loss | Gain | Net gain/loss |
|---|---|---|---|---|---|---|---|---|---|
| Gains/Losses not calculated: | | | | | | | | | |
| ICO GLOBAL COMMUNICATIONS HOLDINGS LTD DE CL A | | 25,000.000 | | 08/24/04 | $ 11,869.45 | ---This information was unavailable--- | | | |
| **Total** | | | | | $ 11,869.45 | | | | |

August 04/ WS 47874 PM



# Collateralized Loan Agreement

This 30th day of January 2004

NOW COMES: Ellipso, Inc. whose address of record is 4410 Massachusetts Avenue, NW #385, Washington, DC. 20016 (the "Borrower") and Mann Technologies, LLC, a limited liability company chartered in the State of Virginia having a principal place of business at 9330 Harts Mill Road, Warrenton, VA 20186 (the "Lender").

WHEREAS: The Borrower has requested that the Lender provide a loan in the amount of Ninety Thousand Dollars ($90,000),

WHEREAS: The Lender is willing to furnish such loan only upon the terms and conditions contained herein including, without limitation, the execution, delivery and where appropriate, the filing and/or recording of certain collateral security instruments.

NOW THEREFORE: In consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, it is agreed as follows:

SECTION 1. **DEFINITIONS:** As used in this Agreement, the following terms shall have the following meanings:

1.1    "Collateral" shall mean Four Hundred Ninety Two Thousand Six Hundred and Eleven (492,611) free trading shares of ICO GLOBAL COMMUNICATIONS (HOLDINGS) LTD (Other OTC: ICOHA.PK)

1.2    "Default" shall mean any event specified in Section 7.1 hereof.

1.3    "Event of Default" shall mean any event specified in Section 7.1 hereof.

1.4    "Fair Market Value" shall mean, with respect to each of the shares included in the Collateral and for any day:

    (a)   if the principal market for the Collateral is a national securities exchange, the average of the highest and lowest sales prices per share of the Collateral on such day as reported by such exchange or on a composite tape reflecting transactions on such exchange, or;

    (b)   if the principal market for the Collateral is not a national securities exchange and the Collateral is quoted on The Nasdaq Stock Market ("Nasdaq"), and,

    (i)   if actual sales price information is available with respect to the Collateral, the average of the highest and lowest sales prices per share of the Collateral on such day on Nasdaq, or

    (ii)   if such information is not available, the average of the highest bid and lowest asked prices per share of the Collateral on such day on Nasdaq, or

    (c)   if the principal market for the Collateral is not a national securities exchange and the Collateral is not quoted on Nasdaq, the average of the highest bid and lowest asked prices per share of the Collateral on such day as reported on the OTC Bulletin Board Services or by the National Quotation Bureau, Incorporated or a comparable service.

1.5    "Index Price" shall mean the closing bid price as quoted on the exchange/medium on which the Collateral is normally traded on the date specified herein.

1.6    "Lien" shall mean, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset.

1.7    "Loan" shall mean the amount of monies borrowed by Borrower from Lender under Section 2.1 hereof.

1.8    "Loan Agreement" shall mean this Loan Agreement including all Exhibit and Schedules hereto as amended or supplemented from time to time.

1.9    "Loan Documents" shall mean collectively, this Loan Agreement, the Closing Summary, the Note and the Pledge Agreement, and all other agreements, documents, instruments or certificates delivered in connection with the Loan Agreement.

EXHIBIT

4

1.10    "Maturity" is the date on which this Loan is due and payable.

1.11    "Maturity Date" the maturity date for this Loan Agreement and Note is January 30, 2007.

1.12    "Note" shall mean the non-recourse promissory note described in Section 2.1 hereof and attached hereto as Exhibit 2. I(b) or any promissory note issued in exchange therefore.

1.13    "Obligation/s" shall mean all obligations and liabilities of the Borrower to Lender whether now or hereafter existing, including but not limited to under the Loan Documents.

1.14    "Person" shall mean any individual, corporation, company, voluntary association, partnership, joint venture, trust, unincorporated organization or government (or any agency, instrumentality or political subdivision thereof).

1.15    "Pledge Agreement" shall mean the Agreement attached hereto as Exhibit 4.1.

1.16    "Prime Rate" shall mean the posted prime rate of JP Morgan Chase New York, New York on any given day.

1.17    Use of Defined Terms  All terms defined in this Loan Agreement shall have such defined meanings when used without definition in the Note, Pledge Agreement, certificates or other documents made or delivered pursuant to this Loan Agreement.

1.18    Lender's Discretion  The terms "satisfactory to," "determined by," "acceptable to," "shall elect," "shall request," or similar terms used in this Loan Agreement or any attachment or exhibit made part of this Agreement, shall mean satisfactory to, at the election of, determined by, acceptable to, or requested by the Lender in its sole discretion, unless otherwise specifically provided for or excepted.

1.19    Statements of Knowledge  Any statements, representations or warranties which are based upon the knowledge of the Borrower shall be deemed to have been made after due inquiry with respect to the matter in question but without Borrower being required to seek an opinion of counsel with respect thereto.

SECTION 2. AMOUNT AND TERMS OF LOAN

2.1    Loan. In accordance with the terms and conditions of this Loan Agreement, the Lender agrees to advance to Borrower funds in the amount of Ninety Thousand Dollars ($90,000), which sum shall be delivered at closing after confirmation of receipt and final acceptance of collateral. This Loan Agreement shall be evidenced by a non-recourse Note attached hereto as Exhibit 2.1(b) which shall have a term commencing on the date hereof and terminating on January 30, 2007, (the "Maturity Date"). The Maturity Date may be extended by mutual agreement of the Lender and Borrower may mutually agree, provided, however that the term of this Agreement may not exceed 4 years. Lender agrees that upon the payment of a fee equal to one (1%) percent of the principal amount being borrowed, this Agreement's term may be extended for an additional period of one year.

2.2.    Fees and Interest                                    *who was the broker?*

(a) The Lender will assess a fee equal to five percent (5%) of the principal amount being borrowed and will deduct that fee from the principal upon delivery of the Loan proceeds, and pay this brokerage fee to the broker of record. Borrower shall assume no other liability to any other broker.

(b) The Borrower shall pay to the Lender interest on the unpaid principal amount of the Loan, for the period commencing on the date hereof until such Loan is paid in full at a rate per annum equal to the prevailing Prime Rate plus 100 basis points (1.0%), adjusted for changes in the Prime Rate, but in no event in excess of the maximum permitted under applicable law.

(c) Interest on the Loan shall be computed on the basis of a 360-day year and shall be due and payable quarterly, commencing on April 15, 2004 for the preceding three months.

(d) In the event Borrower fails to pay any interest or principal hereunder when due or upon the occurrence of any Event of Default ⟶ (hereinafter defined) or otherwise breaches this Agreement, this Agreement will terminate and the Lender shall be entitled to and shall take whole possession of the pledged collateral. Notwithstanding such termination, Borrower shall remain responsible for any and all payments herein for the full term hereof. However, this loan is non-recourse.

2.3.    Principal Payment. Principal payment of the Note shall be due and payable January 30, 2007. The principal payment due shall increase by and become equal to the sum total of Borrower's obligations to Lender then outstanding on January 30, 2007. Subordinate to the provisions of Section 2.2(d), at loan maturity, Borrower shall be entitled to a cash or Collateral credit against Borrower's liability to Lender in an amount equal to fifty (50) percent of any appreciation in the value of the Collateral over the value at closing, with the remainder for the account of the Lender.

2.4.    Application of Recurring Payments.  Funds received from or on behalf of the Borrower pursuant to the terms and provisions of the Loan Agreement and Note shall be applied in the following manner:

        (a)    the payment of fees, penalties and expenses pursuant to any provision of the Loan Documents, then

        (b)        the payment of accrued and/or unpaid interest on the Note, then

        (c)        when specifically allowed by the Loan Agreement, applied against the principal balance.

2.5.    Prepayment

        (a)    No prepayment of principal is permitted the first eighteen (18) months of the note, then,