IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ELLIPSO, INC.                          )
                                       )
        Plaintiff/Counter-Defendant,   )
                                       )
                v.                     ) CA No.: 05-01186(RCL)
                                       )
JOHN B. MANN, et al.                   )
                                       )
        Defendants/Counter-Plaintiffs.)

**JOINT PRETRIAL STATEMENT**

COME NOW Plaintiff Ellipso, Inc., and Defendants Robert Patterson, John B. Mann, and Mann Technologies, L.L.C., through their respective undersigned counsel, and submit the following Joint Pretrial Statement.

A. **Certification of Meeting of Counsel:**

On July 1, 2008, Vanessa Carpenter Lourie, counsel for plaintiff Ellipso, Inc.; Robert B. Patterson representing himself; and, Christopher Hoge, counsel for defendants John Mann and Mann Technologies, Inc., met at the offices of Christopher Hoge, 1710 Rhode Island Avenue, N.W., Suite 700, Washington, D.C. 20036-3125.  Counsel were unable to settle this case, and the parties are prepared to proceed to trial.

### B. <u>Parties and Counsel</u>:

<u>Plaintiff</u>:

Ellipso, INC.
4410 Massachusetts Ave.
Suite 385
Washington, DC 20016

<u>Defendants</u>:

John B. Mann
9330 Harts Mill Road
Warrenton, VA 20186

Mann Technologies, Inc.
9330 Harts Mill Road
Warrenton, VA 20186

Robert B. Patterson
1643 Hunting Creek Drive
Alexandria, VA 22314

<u>Plaintiff's Counsel</u>:

Vanessa Carpenter Lourie
4400 MacArthur Blvd., NW
Suite 205
Washington, D.C. 20007

<u>Defendants' Counsel</u>:

Christopher Hoge
Crowley, Hoge & Fein, P.C.
1710 Rhode Island Avenue, N.W.
Suite 700
Washington, D.C. 20036-3125
Counsel for Defendants
John B. Mann and Mann Tech

### C. <u>Statement of the Case</u>:

This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 1331 and 1332(a). The amount in controversy exceeds $75,000.

Plaintiff, Ellipso, Inc., entered into a collateralized loan agreement with defendant Mann Technologies, L.L.C. (hereinafter "Mann Tech") on January 30, 2004. Defendant, Robert B. Patterson (hereinafter "Patterson"), a business consultant for Ellipso since October 2002, was hired to identify debt and/or investor financing on favorable rates and terms and to protect Ellipso's intellectual property and assets. Patterson introduced

Ellipso to Mann Tech and John Mann (hereinafter "Mann") and conducted much of the negotiations with Mann Tech and Mann on behalf of Ellipso. Both Mann and Patterson incorporated Mann Tech on February 25, 2004, a month after they had entered the collateralized loan agreement with Ellipso on January 30, 2004.

In December 2003, Patterson negotiated a loan agreement with Mann Tech, which provided Ellipso a loan of $90,000 which was secured by over 492,000 shares of publicly traded ICO Global Communications Ltd. stock (hereinafter "ICOHA Shares"). As of December 2003, the ICOHA Shares were Ellipso's sole asset of any significant value. The loan documents also provided that a default allows Mann Tech to take possession of the collateral.

The loan documents required Ellipso to pledge all its ICOHA Shares as collateral for the loan. Although the loan documents only required Ellipso to pledge its ICOHA Shares as collateral, plaintiff argues Patterson later advised Ellipso that the loan documents required that title and possession to the ICOHA Shares be transferred to and in the sole name of Mann Tech. Thus, on or about August 12, 2004, UBS Financial Services in Washington, DC deposited the ICOHA Shares into Mann Tech's account. As a result, Ellipso lost all ownership and control of its major asset and Mann Tech. obtained full title and control of the ICOHA shares.

Plaintiff alleges that the loan documents contained terms and conditions extremely favorable to Mann Tech, and onerous and

unconscionable to Ellipso.   According to plaintiff, Patterson presented the loan as Ellipso's only realistic option.   Relying on the advice of Patterson, Ellipso's financial consultant, Ellipso executed the loan documents in January 2004.   Plaintiff also contends that Mann Tech never provided Ellipso notice of default as required under the loan documents, and despite that the entire loan transaction was fraudulent and is unenforceable.   Plaintiff also contends that Mann Tech wrongfully exercised the power of sale provision in the loan documents without notice to Ellipso and, sold approximately 200,000 of the ICOHA Shares.

**D.** **Statement of Claims Made by the Party:**

**Ellipso asserts the following claims against Mann Tech, Mann and Patterson:**

1.    In October 2002, Ellipso engaged Patterson as a consultant to, *among other things*, provide legal assistance and introduce Ellipso to individuals and entities that could invest and/or loan cash to Ellipso.

2.    As a close confident of Castiel during the period of his engagement, Patterson was privy to Ellipso's poor financial situation, and need for cash.   Patterson also became aware that Ellipso held as its primary tangible asset shares of ICO Global Communications (Holdings) Ltd. (the "ICOHA Shares").

3.    In or about December 2003, Patterson introduced Ellipso to Mann whom Patterson claimed was an individual who could provide the cash infusion to Ellipso on reasonable terms.

4.    Unbeknownst to Ellipso, Patterson and Mann were associates and had devised a plan to jointly own a company that would provide financing to Ellipso in exchange for, upon a default, 492,611 shares of ICOHA.

5.    In January 2004, Patterson convinced Ellipso to agree to a $90,000 cash loan secured by Ellipso's pledge of the ICOHA Shares.  At no time, whether orally or in writing, did Patterson or Mann inform Castiel or any other agent of Ellipso that Patterson and Mann were in business together. Thus, at the same time that Patterson was convincing Ellipso of the wonderful benefits of this deal, Patterson secretly was working with Mann to secure the best deal possible for Mann Tech.

6.    On or about January 30, 2004, Ellipso and Mann Tech executed a Collateralized Loan Agreement, Promissory Note and Pledge Agreement (the "Loan Documents") respecting the $90,000 loan and pledge of the ICOHA Shares.

7.    Patterson convinced Ellipso on August 2, 2004 to execute an Amendment to the Collateralized Loan Agreement ("Amendment").

8.    Under the Amendment, Ellipso would be provided with additional cash, via a sale of up to all of the pledged ICOHA Shares that both companies would share. This would cure the unpaid interest payments, and would also allow the parties to sell the remaining shares and equally share the proceeds.

9.    Mann and Patterson insisted that this procedure be made possible with Mann Tech delivering the actual stock certificate to the banker UBS and Ellipso executing a transfer of these shares to Mann Tech, remove the legend and prepare them for sale.

10.    After a meeting to execute the Amendment, Ellipso, for the first time, learned in detail the full extent of Patterson's duplicity and secret business arrangement with Mann.

11.    After October 1, 2004 Mann Tech, Mann and Patterson were unwilling to agree to further perform the sale of the remaining ICOHA shares on the basis of splitting the proceeds as agreed at the August meeting when the Amendment was executed.

12.    Mann Tech then began secretly selling the ICOHA Shares and by the time Ellipso initiated this litigation, Mann Tech had sold approximately 450,000 of the ICOHA Shares and reaped over $500,000 from its stock sales.

13. All the proceeds of the sales were kept by Mann, Patterson and Mann Tech.

14. John Mann further instructed UBS to not divulge any details of any transaction involving the sale of the ICOHA stock to Ellipso.

15. The proceeds of the IOCHA shares amount to about $519,000, plus about 37,000 shares frozen during the injunction period valued at approximately $140,000 for a total of close to $660,000.

16. As a result of the aforesaid, and in view of the Court's rulings, plaintiff's legal claims are as follows:

a) <u>Fraudulent Nondisclosure and Fraud (Counts IV, VI and VIII)</u> – The gravaman of these fraud counts is that Mann, Patterson and Mann Tech induced Ellipso to agree to the Loan Documents and, thereafter, the Amendment, by deliberately concealing the fact that Patterson was an owner of Mann Tech.

The Defendants/Counter Plaintiffs are liable under these counts by their concerted acts in intentionally concealing or failing to inform Ellipso of Patterson's role with Mann Tech, a material fact given Patterson's contractual and fiduciary relationship with Ellipso. The intent of the parties was to deceive Ellipso so as to gain control over the ICOHA Shares. Finally, Ellipso acted in reliance on the Defendants/Counter Plaintiffs' deception, and reasonably so,

by agreeing to the loan terms proposed by Mann and strenuously advocated for by Patterson. <u>Park v. Sandwich Chef, Inc.</u>, 651 A.2d 798 (D.C. 1994);

         b)   <u>Breach of Contract (Count V)</u> – This claim lies solely against Patterson for his breach of his consulting agreement with Ellipso. Patterson breached the parties' agreement by failing to the provide promised legal services, by failing to introduce Ellipso to any financing sources other than his associate Mann, and by failing to execute his contractual obligations in good faith.

         c). <u>Breach of Fiduciary Duties (Count VII)</u> - This claim also lies against Patterson alone for his breaches of the duty of loyalty, fair dealing, to act in Ellipso's best interests and to not personally benefit at Ellipso's expense.

    That Patterson was Ellipso's agent is evidenced by the parties' contract and actions. Through the contract and the parties' actions, Patterson agreed to conduct his activities on behalf of Ellipso, and Ellipso retained a certain amount of control over Patterson's actions. <u>Johnson v. Bechtel Associates Professional Corp.</u>, 545 F. Supp. 783, 785 (D.D.C. 1982), <u>rev'd on other grounds,</u> 717 F.2d 574 (D.C. Cir. 1983); <u>Rose v. Silver</u>, 394 A.2d 1368 (D.C. 1978). That Ellipso did

not have day-to-day control over the means and methods of Patterson's work does not mean that no agency relationship exists.   To the contrary, the "degree of control exercised need not be great.   It is only necessary that the principal retain some measure of control over the agent's activities." 545 F. Supp. at 785 (internal quotations and citations omitted).                    Here, Ellipso defined Patterson's activities and the parameters within which it expected Patterson to perform, maintained oversight over Patterson's work; and retained the right to reject Patterson's work, redirect his efforts or to change the amount of oversight Ellipso would provide.   Although the parties by no means had a master-servant relationship, there existed an agent-independent contractor relationship and, thus, Patterson owed Ellipso fiduciary duties.   <u>Id</u>.

d)   <u>Conversion (Count IX)</u> – In taking the ICOHA Shares and the proceeds therefrom and converting them to its own use, to the exclusion of Ellipso, Mann Tech committed the tort of conversion.   <u>Duggan v. Kato</u>, 554 A.2d 1126, 1137 (D.C. 1989).   Given Mann Tech's fraud against Ellipso, Mann Tech did not have the right to own and/or possess the ICOHA Shares.   Accordingly, its exclusive retention of the ICOHA Shares and the proceeds therefrom is conversion.   <u>Id</u>.

e) <u>Replevin (Count X)</u> – Similar to its conversion claim, Mann Tech's exclusive possession and use of the ICOHA Shares, to which it has no lawful right of ownership or possession, requires it to return the ICOHA Shares to Ellipso, the only rightful owner.

f) <u>Civil Conspiracy (Count XI)</u> – Mann, Patterson and Mann Tech agreed to a plan to obtain from Ellipso 492,611 ICOHA Shares. To achieve this goal, the Defendants/Counter Plaintiffs agreed to secretly enter into a business relationship and intentionally conceal this relationship from Ellipso so as to induce Ellipso into agreeing to pledge the ICOHA Shares as security for a loan. Ellipso, the Defendants/Counter Plaintiffs knew, would agree to do this because it relied on the advice of its consultant and agent, Patterson, and did not know that Patterson was an owner of Mann Tech.

Despite the many meetings, e-mail and other correspondence between the parties, not until after Defendant/Counter Plaintiffs had achieved the purpose of their scheme did they inform Ellipso of their secret relationship. Defendant/Counter Plaintiffs' plan and overt acts in furtherance of their plan constitute a conspiracy. <u>Second</u>

Amend. Foundation v. U.S. Conf. of Mayors, 274 F.3d 521, 524 (D.C. Cir. 2004).

There was no default on the Loan.

**Mann Tech asserts as follows:**

1.    The surviving counts of Mann Tech's Counterclaim are Count I (breach of contract) and Count II (fraudulent inducement).

2.    Count I asserts that Ellipso breached the Loan Agreement by failing to make any payments whatsoever, even though the Agreement required quarterly payments of interest commencing in April, 2004.

3.    Count II asserts that Ellipso made fraudulent misrepresentations to Mann Tech in order to induce it to make the $90,000 loan.

**E. Statement of Defenses Raised by the Parties:**

1.    Ellipso asserts the following defenses in the remaining counterclaim counts of breach of contract (Count One) and fraudulent inducement (Count Two):

a) Integration.  The Loan Agreement, even if found valid, contains an integration clause prohibiting the reliance on verbal assurances such as the "loading" of the 881 number in various countries, as alleged by Defendant/Counter Plaintiffs.

b) <u>Allegation is false</u>. Even if the integration of the contract is overlooked, the fact is that, contrary to Mann's assertions, the loading of the 881 numbers, on which Mann claims he relied to enter into the loan agreement was real and actual. Mann's own witness testified that the number had been loaded in various jurisdictions representing over twenty carriers, before the loan was entered into. Several documents, contemporaneous with the events and including a certification by the International Telecommunication Union – ITU- confirm that loading of 881 number had occurred by the fall of 2003, before negotiation and execution of the loan agreement.

c) <u>Disclosures were known to Patterson</u>. Mann Tech alleges the loan document contains a representation that Ellipso was not party to litigation at the time it entered into the loan agreement. However, Patterson, an owner of MannTech, was aware of every lawsuit Ellipso was involved in at the time, and indeed prepared briefs and settlement documents for these cases. It is not possible for Mann Tech to claim it was unaware of these facts. Furthermore, Mann was familiar with Ellipso for over a year and was made aware of the litigation in December 2001 when he

ng Ellipso as an executive. Thus, there is no breach of contract.

d) <u>No damages</u>. Since as of today John Mann and Mann Tech received close to $700,000 for a $90,000 loan in about eight months, an exorbitant return indeed, they can claim no damages even if their allegations under Count One and Two were proven true, which they are not as explained above.


2. The Mann defendants asserts the following defenses in the remaining counterclaim counts of breach of contract (Count One) and fraudulent inducement (Count Two):

a) The Mann Defendants deny that they made any misrepresentations or that they failed to communicate any significant facts to Dr. Castiel. In fact, Dr. Castiel, the CEO and apparently the only current employee of Ellipso, has made numerous material misrepresentations to Mann, both in the discussions leading up to the loan agreement and in the loan agreement itself. Those misrepresentations had to do with the viability of Ellipso's business, and particularly the state-of-readiness of its proposed 881 venture, as well as its financial status and lack of involvement in other lawsuits. Dr. Castiel knew from the very beginning of his relationship with Mann that he and

Defendant Patterson planned to work together.  Mann was unaware until this lawsuit was filed that Patterson, whom he knew socially, had a criminal conviction or had been disbarred.

Starting in late 2003, Castiel and  Patterson proposed to Mann a venture which involved forming a business, The Registry Solutions Company ("TRSC"), to be owned by Mann and Patterson and to afford a Registry function for Ellipso's 881-service offerings, which were falsely alleged by Castiel to be imminent.  Mann thereupon invested hundreds of thousands of dollars and thousands of hours of time in that project.  During the course of the discussions, in January, 2004, Ellipso/Castiel asked Mann for a loan.  Castiel and Patterson proposed that the loan be made by a company they had previously suggested be formed to buy shares in Ellipso, Mann Technologies, LLC ("Mann Tech").  Castiel and Patterson also proposed that Patterson have an interest in this company.  Castiel knew all along, and felt comfortable with the notion, that Patterson would be a co-venturer in Mann Tech, just as he was in TRSC.  Mann Tech was not formally incorporated until February, 2004, after the loan had been made.

In short, Castiel/Ellipso knew full well, before accepting the $90,000 loan in January, 2004, that Mann and Patterson planned to own Mann Tech jointly..

b)    Even if, *arguendo*, Mann and Patterson failed to disclose the nature of their relationship, Ellipso affirmed the loan

agreement *after* learning, no later than June of 2004, of Mr. Patterson's stake in Mann Tech.   It did this by negotiating and executing an amendment of the loan agreement in August, 2004, as well as accepting a $10,000 check from Mann Tech pursuant to the amendment, and transferring 492,611 shares of ICOHA stock from Ellipso's account to Mann Tech's.   The loan agreement between Ellipso and Mann Tech was an executory contract, and the amendment incorporated all terms of the original agreement except those affected by the amendment.   This ratification by Ellipso of the loan agreement bars its claim for fraud.

c)   The loan agreement in question was a completely integrated contract, because the parties intended the writing to be a complete expression of all the terms agreed upon, as well as a final expression of the terms it contains.   Accordingly, any promises, assurances or omissions made prior to the signing of the contract are irrelevant.   Hercules & Co., Ltd. v. Shama Restaurant Corp., 613 A.2d 916 (D.C. 1992).

d)   Defendant Patterson was not an agent of Ellipso, because his consulting agreement specified that he was an independent contractor, not an agent.   Furthermore, the actual course of dealings between Patterson and Ellipso demonstrate that he was an independent contractor.

e)   Even if Ellipso could prove it was defrauded, it has not alleged any specific damages that were proximately caused by the

fraud.  Without damages, the fraud claim fails.

f)   In its Answers, the Mann Defendants have also raised the affirmative defenses of failure to state a claim upon which relief can be granted; estoppel; laches; Statute of Frauds; and bad faith. The Mann Defendants seek their costs and attorneys' fees as provided in the Loan Agreement.

3.    Defendant Patterson asserts the following defenses:

a. There was no concealment of Patterson's interest in Mann Technologies, or The Registry Solutions companies, as Castiel/Ellipso knew from the beginning of Patterson's interest.  In fact, it was Castiel who conceived of the idea and encouraged Patterson to seek an interest in these ventures, as well as others, as part of scheme whereby Castiel could remove assets from Ellipso, which was failing financially, and create a place where he, David Castiel could go when/if, Ellipso failed.

b. There was no concealment of Patterson's conviction or disbarment as Castiel/Ellipso knew of these events long prior to the transactions at issue here.

c. At the time Ellipso hired Patterson as a consultant, Ellipso knew Patterson was not a member of the D.C. Bar and thus could not provide legal services to Ellipso.

d. Patterson provided the services specified in the contract with Ellipso from October 2002 until November 2004, including locating several potential sources of financing for Ellipso.

e. The contract specified that Patterson was an independent contractor, and at no time did Patterson act as Ellipso's fiduciary.

f. Patterson never made any effort to conceal his interest in MannTech, and his interest was a matter of public record from the time the company was incorporated in February 2004. Fraud cannot rest on matters that are public record.

g. Castiel's emails show that he knew of Patterson's interest in MannTech at least as early as June 2004. Thereafter, Ellipso continued to employ Patterson as an independent contractor; soliciting his work and making partial payments to Patterson for that work until October 2004. Ellipso's actions constitute ratification of its agreement with Patterson and waive any fraud claims.

8. Ellipso knowingly, and deliberately, chose to forfeit the ICOHA shares by refusing to pay even the interest due on the loan from MannTech in October 2004. The ICOHA shares had no value at that time and the loan was non-recourse. Only when the shares had gone back up in value ten months later did

Ellipso/Castiel take any action – the filing of the instant lawsuit.

9.    This action is based entirely on the perjured testimony and misrepresentations of David Castiel.

## F. <u>A Schedule of Witnesses to be Called by the Parties:</u>

Ellispo plans to call the following witnesses:

1.    David Castiel – Dr. Castiel is expected to testify on all facts relating to Ellipso's claims and Mann Tech's counterclaims.  Dr. Castiel's testimony is expected to require 4 hours.

2.    Robert Patterson – Mr. Patterson is expected to testify on all facts relating to Ellipso's claims and Mann Tech's counterclaims. Mr. Patterson's testimony is expected to require 4 hours.

3.    John Mann – Mr. Mann is expected to testify on all facts relating to Ellipso's claims and Mann Tech's counterclaims. Mr. Mann's testimony is expected to require 4 hours.

4.    John Piper – Mr. Piper is expected to testify on the circumstances surrounding the Amendment of August 2004, the sale of stock by Mann Tech and the disposition of the

vestment in Coastal.  Mr. Piper's testimony is expected to require 1 hour.

5.  Juan Tomassoni – Mr. Tomassoni is expected to testify on the loading of the 881 codes and their status in the fall of 2003.  Mr. Tomassoni's testimony is expected to require 1 hour.

### The Mann Defendants' schedule of witnesses:

1.  David Castiel - party.  Full knowledge of all relevant transactions.  4 hours.

2.  John B. Mann - party.  Full knowledge of all relevant transactions.  4 hours.

3.  Robert Patterson - party.  Full knowledge of all relevant transactions.  4 hours.

4.  John Piper, UBS Financial Services, Inc., 1501 K Street, N.W., Suite 1100, Washington, D.C.  1 hour.  Will testify on transactions involving ICOHA stock, Ellipso and Mann Tech and opening brokerage accounts.

Defendant Patterson intends to call himself as a witness.  Time 4 hours.

## G. A List of Exhibits to be Offered in Evidence by the Party:

In addition to any exhibit listed by the defendants, Ellipso intends to offer the follow

1.   RBP Consulting Agreement

2.   Email RBP to DC 12-23-03

3.   E-mail RBP to JM 12-23-03

4.   E-mail RBP to JM 12-24-03

5.   Collateralized Loan Agreement

6.   E-mail JM to RBP 1-31-04

7.   E-mail RBP to JM 2-11-04

8.   E-mail RBP to JM 6-9-04

9.   E-mail RBP to JM 6-16-04

10.   E-mail RBP to JM 7-15-04

11.   Amendment to Loan Agreement August 2004

12.   Sales of ICOHA stock by Mann Tech

13.   E-mails DC-JM 12-10-04

14.   Letter DC to JM 12-23-04

15.   Declaration of John Mann 9-27-05

16.   Excerpts of Deposition of Patterson

17.   Excerpts of Deposition of David Castiel

18.   Excerpts of Deposition of Tomassoni

19.   Loaded Carriers as of October 2003

20.   MOU Entel-Ellipso

21.   Telecom Argentina Presentation Sept-03

22.   ITU Zhao Letter October 2003

23.   Shareholders List Coastal Services Group 1-24-06

24.   Reimbursement to Mann Tech 2-9-2006

25.   Report of Mann-Mann Tech 14 Nov 2005

26.   Convertible Promissory Note 23 Dec 2004

27.   Secured Promissory Note 30 Aug 2005

28.   UBS Statement Feb 2005

Defendants Mann and Mann Tech have attached hereto an excel spreadsheet with their list of exhibits.

Defendant Patterson designates the following list of exhibits:

1.     Ellipso consulting agreement and all amendments thereto.

2.     Payments made by Ellipso to Patterson from October 2003 to October 2004.

3.     Exhibits attached to David Castiel's deposition.

4.     Exhibits attached to Robert Patterson's deposition.

5.     Patterson's Request for Admissions to Ellipso/Castiel.

6.     Letter from David Castiel to Patterson, April 27, 2004.

7.     Pleadings and attachments thereto in this proceeding.

**H. A Designation of Depositions, or Portions Thereof, to be Offered in Evidence by the Party:**

Ellipso's designation of deposition testimony:

**a)**   Excerpts of Deposition of Patterson. Pages 50-53, 170-173.

**b)**   Excerpts of Deposition of David Castiel. Pages 76-87 and 122

**c)**   Excerpts of Deposition of Tomassoni. Pages 117-153 The Mann **Defendant's Designation of Deposition Testimony**

**(**1)   Deposition of David Castiel, May 2, 2007:

-   P. 7, L. 8 - P. 15, L. 10.

-   P. 16, L. 8 - P. 49, L. 11.

-   P. 51, L. 12 - P. 59, L. 1.

-   P. 60, L. 21 - P. 63, L. 9.

-   P. 64, L. 1 - P. 109, L. 5.

-   P. 115, L. 8 - P. 144, L. 19.

            - P. 147, L. 8 - 10.

            - P. 150, L. 1 - P. 240, L. 11.

            - P. 249, L. 11 - P. 282, L. 18.

            - P. 285, L. 13 - P. 293, L. 17.


    Defendant Patterson designates the following depositions to be offered in evidence:

        1. Excerpts of Deposition of David Castiel. Pages 1-
           line 1 - p. 240 line 11;
           Page 249 line 11 - p. 293 line 17.


    I.   **An Itemization of Damages the Party Seeks to Recover:**

         **Ellipso's itemization of damages:**


    (1)  Restitution of 492,611 ICOHA shares illegally obtained from Ellipso

    (2)  Punitive damages arising out of the fraud perpetrated by John Mann and Robert Patterson, acting in the guise of Mann Tech.

    (3)  Restitution of all consideration received by Patterson from Mann Tech in violation of his consulting agreement with Ellipso: at a minimum 50% of Mann Tech and TRSC, at least $60,000 received in cash from Mann Tech, plus interest; and, punitive damages associated therewith.

(4) <u>Loss of Value</u>. Had the Mann Tech shares remained in Ellipso's hand, as they should have absent the fraud perpetrated by Mann and Patterson, in order to generate the $196,461 Ellipso generated through the sale of its other ICOHA stock when prices were depleted rather than through the normal course of business in the eight months Mann Tech held the stock certificate, at an average price of $.622/shares over the course of the loan through Mann's unilateral confiscation, Ellipso would have sold 315,853 shares leaving 176,758 (difference between 492,611 and 315,853) which plaintiff values at an average price of 3.29 (average since 2004) or $581,534 of net loss to Ellipso.

(5) <u>Consequential Loss</u>. Mann-Patterson's unilateral confiscation of Ellipso's 492,611 shares forced Ellipso to generate cash late in 2004 when ICO stock was at the lowest, thus disposing of a large number of shares at an average price of $.21 resulting in a loss of at least an additional $3,050,000.

(6) <u>Opportunity Loss</u>. Loss in business opportunity for having those large sums unavailable when needed have resulted in even larger losses to Ellipso.

**Mann Defendants' Itemization of Damages:**

As a result of Ellipso's breaches of the Loan Agreement and fraudulent misrepresentations, Mann Tech contends that it suffered loss of the value of the collateral, namely, the 492,611 shares of ICOHA stock, between the date of the Loan Agreement, January, 2004, and the date the agreement was terminated and the collateral forfeited in October, 2004.  At the time the collateral was forfeited, it was worth approximately $.10 per share, as opposed to the $.46 per share it was worth when the Agreement was entered into.

As a further result, the Mann Defendants have expended substantial attorneys' fees, time and resources in conjunction with this frivolous litigation instituted by Ellipso, which has just had its third anniversary.

**Defendant Patterson's Damages: NONE**

**J.  A Request For Other Relief Sought by the Party:**

As a result of their actions and fraud, Ellipso lost much more than the shares since plaintiff lost the opportunity to develop its business with the assets that belonged to Ellipso and were practically confiscated by Mann and Patterson. Consequential damages can be proven by tracking Mann's loans and outlays with the actual value of the collateral which Ellipso could have made liquid rather than take a loan to benefit from the "upside" which it did not because of fraud

es can also be

f the deliberate concealment of the fraud and
the intent to defraud.

**Defendants' request for other relief: NONE**

       **K.**    <u>**Stipulated Facts:**</u>

None.

       **L.**    <u>**Requested Stipulations of Facts:**</u>

<u>Plaintiff requests that defendants stipulate to the
following facts:</u>

1. Sometime in the spring of 2002, Dr. David Castiel met
attorney Robert Patterson, then an attorney with the law firm of
Barkats and Associates.

2. At the time of their introduction, Ellipso was a client
of Barkats and Associates.

3. In November 2002, Ellipso engaged Patterson via a
consulting agreement to provide a variety of legal and business
advisory services.

4. Among other promised services, Patterson agreed to locate
and introduce Ellipso to sources of financing.

5. At the time of Patterson's engagement and at all times
relevant to this case, Ellipso was under financial duress and was
in a near constant state of need for cash infusions.

6.   Patterson became a trusted advisor and confidante of Ellipso and Castiel by drafting and editing contracts and preparing litigation-related documents.

7.   Patterson had knowledge of Ellipso's financial status and the fact that Ellipso, via a 2001 stock swap with ICO Communications Holdings, Ltd. (ICOHA), owned 492,611 shares of ICOHA stock.

8.   ICOHA is a global satellite company whose investors include Bill Gates and Craig McCaw; and, its stock is valued on the basis of the promise of its future services and return on investment.

9.   In December 2003, Patterson informed Castiel that a friend of his, John Mann, might be interested in doing business with Ellipso.   In particular, Patterson told Castiel that Mann might be willing to make either an investment or a loan to Ellipso.

10.   Patterson negotiated, on behalf of Ellipso, a loan deal with Mann Technologies.

11.   Castiel believed that Mann founded Mann Technologies, LLC ("Mann Tech") for purposes of the parties' loan transaction and that Mann was the sole owner of Mann Tech.

12.   At no time before August 2004 did Mann, Patterson or anyone else provide legal documentation establishing Patterson's interest and executive position in Mann Tech. Two emails in October and November 2004 written by Castiel mention potential knowledge of

certain relationship between Patterson and Mann Tech as of June 2004.

13. In January 2004, neither Ellipso nor Castiel knew that Patterson was a co-owner of Mann Tech and had been a co-owner at the time Patterson negotiated the loan deal on behalf of Ellipso.

14. There are no memoranda or any other written document between December 1, 2003 and including August 1, 2004 in which Patterson and/or Mann informed Castiel of Patterson's ownership interest in Mann Tech.

15. The terms of the loan agreement negotiated by Patterson called for a $90,000 loan to Ellipso secured by all 492,611 ICOHA shares.

16. Pursuant to the terms negotiated by Patterson, Ellipso was required to, and did, turn over to Mann Tech, or its agents, stock certificate #A2008 for 492,611 ICOHA shares.

17. Of the $90,000 received by Ellipso, it paid Patterson a $4500 commission for brokering the loan deal, in conformity with the consulting agreement between Patterson and Ellipso.

18. The legal minutiae of the loan documents was read and approved by Patterson and he warranted to Castiel that the documents were appropriate and reasonable.

19. Castiel did not question Patterson's judgment given Castiel's high regard for Patterson's legal and business acumen.

20.   Patterson led Castiel to believe that the loan transaction with Mann Tech represented the best financing terms Ellipso could hope to find.

21.   On August 2, 2004, Ellipso and Mann Tech executed an amendment to their loan transaction which permitted the parties, under certain conditions, to liquidate the ICOHA shares, repay the loan principal, cure the interest payments and share in the upside of the ICOHA stock.

22.   Patterson prepared all the necessary documents for the August 2nd amendment and did not inform Castiel or Ellipso of the impact such amendment could or would have on the validity of the Loan Agreement as a result of Patterson's undisclosed direct ownership of Mann Tech.

23.   Prior to preparing the loan amendment documents, in June 2004, Patterson informed Castiel that if Mann Tech experienced a substantial return on the loan transaction, Mann had promised Patterson some monetary bonus.

24.   Although dismayed that Patterson was doing business with Ellipso's loan partner, given Patterson's history of seeming loyalty and honorable service to Ellipso, Castiel did not protest the arrangement.

25.   The drafts of the amendment documents bore Mann's name as the signatory for Mann Tech.

26.   On  August  2,  2004,  Castiel  and  Patterson  met  at  UBS Financial  Services'  Washington,  DC  office  to  execute  the  loan amendment.

27.   On  this  final  signature  copy  of  the  amendment,  Patterson was  identified  as  the  signatory  for  Mann  Tech.

28.   Patterson  executed  the  loan  amendment  on  behalf  of  Mann Tech.

29.   After  the  meeting,  Castiel  expressed  surprise  when Patterson,  rather  than  John  Mann,  executed  the  amendment  on  Mann Tech's  behalf.

30.   Per  the  amendment,  the  loan  interest  payments  were  cured through  October  1,  2004,  hence  the  next  interest  payment  on  the unpaid  balance  of  the  loan  was  December  31,  2004.

31.   Ellipso  made  no  interest  payments  on  the  loan  after  the August 2nd amendment.

32.   In  November  and  December  2004  Mann  Tech  instructed  UBS  to sell  most  of  Ellipso's  ICOHA  shares  it  held  as  collateral.  Based  on the  UBS  statements,  these  sales  together  with  additional  sales  in the  spring  of  2005  resulted  in  the  liquidation  of  close  to  450,000 shares  for  net  proceeds  of  $519,000.  The  remaining  37,000  were frozen  during  the  injunction  period  and  no  information  is  available concerning  its  disposition.

32.   In  a  December  2004  letter  to  Mann,  Ellipso  sought rescission  of  the  loan  agreement  based  on  the  fact  that

Ellipso did not know that Patterson represented both sides during the transactions in January and August.

**Defendant Mann:**

1)   That Ellipso never made any payments of principal or interest under the Loan Agreement.

2)   The prices of ICO stock between November, 2003 and October, 2004 as set forth in the Wall Street Journal.

3)   That David Castiel at all relevant times knew about Robert Patterson's criminal conviction and disbarment and did not tell John Mann about them.

4)   The authenticity of all documents produced by any party in discovery.

**Defendant Patterson:**

Defendant Patterson does not agree with any of plaintiff's 32 proposed stipulated facts except for number four (4), as each contains misstatements of facts, or self serving assertions that are disputed.   Patterson intends to consult further with plaintiff's counsel to see if some statement of stipulated facts can be made.

## M.   Stipulations Concerning Authenticity of Documents and Admissibility of Exhibits:

The parties have not stipulated to the authenticity of any documents or to the admissibility of exhibits. Plaintiff will consider stipulation upon review of the documents prior to trial.

Defendant Mann requests that the parties stipulate that

all documents produced by any party during discovery are authentic and do not require formal proof for admission into evidence.

Defendant Patterson states that he anticipates no disputes concerning authenticity of documents or their admissibility.

**N.    A List of Motions to be Decided Before or at the Commencement of Trial:**

Plaintiff Ellipso:

Plaintiff intends to file a Motion In Limine to exclude certain of the exhibits and testimony that defendants have identified in this statement.

Defendant Mann:

The Mann Defendants may file one or more motions *in limine* to exclude irrelevant or improper evidence.  They may also file a motion for damages resulting from the Court's issuance of the preliminary injunction, per this Court's Memorandum Opinion of November 14, 2005.

Defendant Patterson intends to make the following motions:

1.    Oral motion to dismiss Consulting Management as a party.

2.    Oral motion to dismiss those Counts of the Complaint as to Patterson, which have previously been dismissed as to the other defendants, Count II,

Lender Liability; Count III, Implied Covenant of Good Faith and Fair Dealing; Count XIII, R.I.C.O.

3.    Motion to exclude testimony of oral representations made outside the written contracts which contain integration clauses.

4.    Motion to exclude testimony that plaintiff was unaware of Patterson's interest in MannTech after June 2004.

5.    Motion to exclude evidence of the value or disposition of the ICOHA stock after October 2004, when the stock was forfeited for non-payment of the loan.

**O.**    **Proposed Amendments to the Pleadings:**

None.

**P.**    **An Estimate of Trial Time:**

Four (4) days.

**Q.**    **Proposed and Agreed Upon Voir Dire Questions:**

Ellipso and the Mann Defendants agree on the following Voir Dire Questions:

This lawsuit involves claims and counterclaims for breach of contract, fraudulent misrepresentation and related allegations, arising out of agreements entered into by the Plaintiff, Ellipso, Inc., Consulting Management, Ltd., Robert Patterson, and Mann Technologies, LLC, in January 2004.  Ellipso is in the satellite

oing business as

ultant hired by

Mann Technologies, also known

as Mann Tech, which is owned by John Mann and Robert Patterson was

created in order to invest in technology companies.

1.  From what I have told you, do any members of the jury

panel believe they have heard or read about this case anywhere, or

do you have knowledge about this case from any other source?

2.  Plaintiff in this case is Ellipso, Inc., with offices at

4410 Massachusetts Ave., N.W., Washington, D.C.  The CEO of Ellipso

is Dr. David Castiel, who is here in the courtroom.  Do any members

of the jury panel have any familiarity with either Ellipso or Dr.

Castiel?

3.    Ellipso is represented by Attorneys Vanessa Carpenter

Lourie and Linda Nanline Awkard, who practice here in Washington,

D.C.  Do any jury panel members know Ms. Lourie or Ms. Awkard?

4    There are four Defendants and one Counter-Plaintiff in

this case.  The Defendants are John B. Mann of Warrenton, Virginia;

Mann Technologies, LLC, also of Warrenton; Robert B. Patterson, of

Middleburg, Virginia; and Consulting Management, Ltd., also of

Middleburg.  The Counter-Plaintiff is Mann Technologies, LLC.  Do

any members of the jury panel have any familiarity with any of

these Defendants or the Counter-Plaintiff?

5.    Defendants John B. Mann and Mann Technologies, LLC are represented by Attorney Christopher G. Hoge, of the law firm of Crowley, Hoge & Fein, P.C. , whose offices are located at 1710 Rhode Island Avenue, N.W., Washington, D.C.   Do any of you know Mr. Hoge or his law firm?

6.    In presenting its case, in addition to their own testimony, the parties intend to call the following witnesses: Please listen carefully to the following list of potential witnesses and raise your hand if you know one or more of them:

       a)    John Piper of UBS Financial Services, Inc..

       b)    Juan Tomassoni.

8.    Has any member of the jury panel ever been involved, either as a plaintiff, defendant, or witness, in a civil lawsuit, or do any of you have close friends or relatives who have been involved in a civil lawsuit?

9.   Have any of you, or have any of your close friends or relatives, had any experience with the satellite telephone business?   If so, please describe.

10.   Have any of you, or have any of your close friends or relatives, worked as a lawyer, or received any type of legal training?

11.    Have any of you, or have any of your close friends or relatives, ever been employed by a law firm that engages in civil litigation or representation of business entities?

12.     Has any member of the jury panel served on a jury in the past ten years?

13.     If so, was there anything about your prior experience as a juror which might make you either unwilling or unable to serve as a juror again?

14     Has any member of the jury panel ever been involved in a contract dispute or a dispute over a loan or investment which would make it difficult for you to render a fair and impartial verdict in this case?

15.   We expect the trial of this case to take approximately four to five days.   Have any of you on the jury panel got any prior commitments, urgent appointments, or the like which would make it difficult for you to serve as a juror in a week-long trial?

16.   Finally, now that you have heard a little bit about this case, do any of you have any reason at all why you might not feel comfortable sitting as a juror in this matter, or why you might have difficulty arriving at a verdict that is impartial and fair to both sides?

Defendant Patterson requests the following Voir Dire questions:

1.   Has any prospective juror been involved in a dispute or a lawsuit regarding any loan transaction?

2.   Has any prospective juror had property repossessed for non-payment of a loan?

3.   Does any prospective juror know anyone who has had property repossessed for non-payment of a loan?

4.   Has any prospective juror ever made a loan that was not paid back?

5.   Has anyone on the jury ever been involved in a lawsuit?

6.   Is any prospective juror currently behind on any financial obligations?

7.   Has any prospective juror ever retained the services of an attorney?

8.   Has any prospective juror ever purchased stocks or bonds?

**Q.   Proposed and Agreed Upon, Jury Instructions, Together with Objections Thereto, and Supporting Memoranda of Law if Appropriate:**

The parties request the following Standard Jury Instructions:

Plaintiff Ellipso:

1-1:        Function of the court.

1-2:        Function of the jury.

1-4:        Juror's duty to deliberate.

1-5:        Attitude and conduct of jurors.

1-6:        Instructions to be considered as a whole.

1-7:        Court's commenting on the evidence.

1-8:        Court's questions to witnesses.

1-9:        Jury not to take cue from Judge.

1-10:       Ruling on objections.

1-12:       Equality of litigants - individuals.

2-1/2-2:    Evidence in the case.

2-3:        Inferences.

2-4:        Inadmissible and stricken evidence.

2-5:        Statements of counsel.

2-6:        Jury's recollection and controls.

2-7:        Evidence Admitted Against One Party Only.

2-8:        Burden of proof.

2-9:        Evidence Produced by Adversary.

2-10:       Direct and Circumstantial Evidence.

3-1:        Determine credibility of witnesses.

3-4:        Failure to Produce Stronger Available Evidence.

3-5:        Deposition as evidence.

3-8:        Impeachment by prior inconsistent statements.

4-3:        Multiple Defendants.

4-4:        Counterclaims.

11-1:       Contract defined.

11-12:      Contract considered as a whole.

11-13:      Terms of a contract - evidence.

11-14:      Contract's interpretation: course of
            performance.
11-15:      Contract's interpretation: custom and issue.

11-16:      Condition precedent.

11-17:      Breach of contract defined.

11-19:      Excuse from performance.

11-20:      Prevention of a condition.

12-1:       Damages - Jury to Award.

12-2:       Extent of Damages - Proximate Cause.

12-3:       Burden of Proof - Speculative Damages.

12-4:       Multiple Defendants - Size of Verdict.

12-7:       Duty to Mitigate Damages.

20-1:       Fraudulent Misrepresentation - Elements of the
            Claim.

20-2:       Fraudulent Misrepresentation - Elements Defined.

20-3:       Fraudulent Misrepresentation - Burden of Proof.

20-4:       Fraudulent Misrepresentation - Determination of
            Liability and Damages.

See    attached    Ellipso's    Proposed    Special    Jury
Instructions.

**MANN DEFENDANTS' REQUESTED JURY INSTRUCTIONS**

### A.   Standard Jury Instructions

The Mann Defendants agree with all of Plaintiff's

requests for Standard Instructions.

The Mann Defendants request the following Standard

Instructions in addition to those requested by Plaintiff:

20 - 6:   Fraudulent Misrepresentation - Plaintiff's Reliance

          Upon Own Investigation.

20 - 10:  Reliance Where Falsity Obvious - Duty to

          Investigate.

The Mann Defendants request the following Special Instructions:

### Special Instruction No. 1:

A party to an executory contract who learns that he has been induced by fraud to enter into the contract and then insists on performance by the other party, waives any action for the fraud.

**Authority:** *Horning v. Ferguson*, 52 A.2d 116, 118 (D.C. 1947); *Simon v. Rossier*, 127 A.2d 394 (D.C. 1956).

### Special Instruction No. 2:

An "executory contract" is one which is yet to be executed or performed, which remains to be carried into operation or effect, which is incomplete, or which depends upon a future performance or event.  The Loan Agreement between Mann Technologies and Ellipso was, as of August, 2004, an executory contract because it had not, by that time, been fully performed.

**Authority:** *Black's Law Dictionary*, Revised Fourth Edition (West 1968).

### Special Instruction No. 3:

Civil conspiracy consists of four elements: "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the

agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme."

   **Authority:**   *Second Amendment Found. v. U.S. Conf. of Mayors*, 348 U.S.App.D.C. 238, 274 F.3d 521, 524 (2001) (citing *Halberstam v. Welsch*, 227 U.S.App.D.C. 167, 705 F.2d 472, 477 (1983)).

   **Defendant Patterson: NONE**


   **R.   Proposed   and   Agreed   Upon,   Verdict   Forms,
          Together   with   Objections   Thereto,   and
          Supporting Memoranda of Law if Appropriate:**


          See attached.


                           Respectfully submitted,

                                 /s/
                           _____
                           Vanessa Carpenter Lourie, #250068
                           4400 MacArthur Blvd., N.W.
                           Suite #205
                           Washington, D.C. 20007-2521
                           (202) 342-8000 (Telephone)
                           (202) 342-9000 (Facsimile)
                           vlourie@carpenterlourie.com
                           Counsel for Ellipso, Inc.


                                 /s/
                           _____
                           Christopher Hoge, Esquire
                           Crowley, Hoge & Fein, P.C.
                           1710 Rhode Island Avenue, N.W.
                           Suite 700
                           Washington, D.C. 20036-3125
                           (202) 483-2900 (Telephone)
                           chfcgh@aol.com
                           Counsel for John Mann and MannTech


                                 /s/
                           _____
                           Robert B. Patterson, Pro Se
                           P.O. Box 3106
                           Reston, Virginia 20195
                           (571) 278-7076
                           legalmanagement@yahoo.com