IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ELLIPSO, INC.                        )
                                     )
    Plaintiff/Counter-Defendant,     )
                                     )
            v.                       ) CA No.: 05-01186(RCL)
                                     )
JOHN B. MANN, et al.                 )
                                     )
    Defendants/Counter-Plaintiffs.)

### AMENDED JOINT PRETRIAL STATEMENT

COME NOW Plaintiff Ellipso, Inc., and Defendants Robert Patterson, John B. Mann, and Mann Technologies, L.L.C., through their respective undersigned counsel, and submit the following Joint Pretrial Statement.

### A. Certification of Meeting of Counsel:

On July 1, 2008, Vanessa Carpenter Lourie, counsel for plaintiff Ellipso, Inc.; Robert B. Patterson representing himself; and, Christopher Hoge, counsel for defendants John Mann and Mann Technologies, Inc., met at the offices of Christopher Hoge, 1710 Rhode Island Avenue, N.W., Suite 700, Washington, D.C. 20036-3125.  Counsel were unable to settle this case, and the parties are prepared to proceed to trial.

**B. Parties and Counsel:**

Plaintiff:

Ellipso, INC.
4410 Massachusetts Ave.
Suite 385
Washington, DC 20016

Defendants:

John B. Mann
9330 Harts Mill Road
Warrenton, VA 20186

Mann Technologies, Inc.
9330 Harts Mill Road
Warrenton, VA 20186

Robert B. Patterson
1643 Hunting Creek Drive
Alexandria, VA 22314

Plaintiff's Counsel:

Vanessa Carpenter Lourie
4400 MacArthur Blvd., NW
Suite 205
Washington, D.C. 20007

Defendants' Counsel:

Christopher Hoge
Crowley, Hoge & Fein, P.C.
1710 Rhode Island Avenue, N.W.
Suite 700
Washington, D.C. 20036-3125
Counsel for Defendants
John B. Mann and Mann Tech

**C. Statement of the Case:**

This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 1331 and 1332(a). The amount in controversy exceeds $75,000.

This lawsuit involves claims and counterclaims for fraudulent misrepresentation, breach of contract and related allegations, arising out of a loan agreement entered into by the Plaintiff, Ellipso, Inc., and Mann Technologies, LLC in January of 2004. Ellipso is in the satellite telephone business, and Mann Technologies, also known as Mann Tech, were created to invest in technology companies.

- 2 -

**D.** <u>Statement of Claims Made by the Party</u>:

Ellipso asserts the following claims against Mann Tech, Mann and Patterson:

1.    In October 2002, Ellipso engaged Patterson as a consultant to, *among other things*, provide legal assistance and introduce Ellipso to individuals and entities that could invest and/or loan cash to Ellipso.

2.    As a close confident of Castiel during the period of his engagement, Patterson was privy to Ellipso's poor financial situation, and need for cash.  Patterson also became aware that Ellipso held as its primary tangible asset shares of ICO Global Communications (Holdings) Ltd. (the "ICOHA Shares").

3.    In or about December 2003, Patterson introduced Ellipso to Mann whom Patterson claimed was an individual who could provide the cash infusion to Ellipso on reasonable terms.

4.    Unbeknownst to Ellipso, Patterson and Mann were associates and had devised a plan to jointly own a company that would provide financing to Ellipso in exchange for, upon a default, 492,611 shares of ICOHA.

5.    In January 2004, Patterson convinced Ellipso to agree to a $90,000 cash loan secured by Ellipso's pledge of the ICOHA Shares.  At no time, whether orally or in writing,

did Patterson or Mann inform Castiel or any other agent of Ellipso that Patterson and Mann were in business together. Thus, at the same time that Patterson was convincing Ellipso of the wonderful benefits of this deal, Patterson secretly was working with Mann to secure the best deal possible for Mann Tech.

6.    On or about January 30, 2004, Ellipso and Mann Tech executed a Collateralized Loan Agreement, Promissory Note and Pledge Agreement (the "Loan Documents") respecting the $90,000 loan and pledge of the ICOHA Shares, and Ellipso delivered to Mann Tech a stock certificate for 492,611 ICOHA shares.

7.    Patterson advised Ellipso on August 2, 2004 to execute an Amendment to the Collateralized Loan Agreement ("Amendment").

8.    Under the Amendment, Ellipso would be provided with additional cash, via a sale of up to all of the pledged ICOHA Shares that both companies would share. This would cure the unpaid interest payments, and would also allow the parties to sell the remaining shares and equally share the proceeds.

9.    Mann and Patterson insisted that this procedure be made possible with Mann Tech delivering the actual stock certificate to the banker UBS and Ellipso executing a transfer

of these shares to Mann Tech, remove the legend and prepare them for sale.

10. After a meeting to execute the Amendment, Ellipso, for the first time, learned in detail the full extent of Patterson's duplicity and secret business arrangement with Mann.

11. After October 1, 2004 Mann Tech, Mann and Patterson were unwilling to agree to further perform the sale of the remaining ICOHA shares on the basis of splitting the proceeds as agreed at the August meeting when the Amendment was executed.

12. Mann Tech then began secretly selling the ICOHA Shares and by the time Ellipso initiated this litigation, Mann Tech had sold approximately 450,000 of the ICOHA Shares and reaped over $500,000 from its stock sales.

13. All the proceeds of the sales were kept by Mann, Patterson and Mann Tech.

14. John Mann further instructed UBS to not divulge any details of any transaction involving the sale of the ICOHA stock to Ellipso.

15. The proceeds of the IOCHA shares amount to about $519,000, plus about 37,000 shares frozen during the injunction period valued at approximately $140,000 for a total of close to $660,000.

16.  As a result of the aforesaid, and in view of the Court's rulings, plaintiff's legal claims are as follows:

a)  <u>Fraudulent Nondisclosure and Fraud (Counts IV, VI and VIII)</u> – The gravamen of these fraud counts is that Mann, Patterson and Mann Tech induced Ellipso to agree to the Loan Documents and, thereafter, the Amendment, by deliberately concealing the fact that Patterson was an owner of Mann Tech.

The Defendants/Counter Plaintiffs are liable under these counts by their concerted acts in intentionally concealing or failing to inform Ellipso of Patterson's role with Mann Tech, a material fact given Patterson's contractual and fiduciary relationship with Ellipso.  The intent of the parties was to deceive Ellipso so as to gain control over the ICOHA Shares.  Finally, Ellipso acted in reliance on the Defendants/Counter Plaintiffs' deception, and reasonably so, by agreeing to the loan terms proposed by Mann and strenuously advocated for by Patterson.  <u>Park v. Sandwich Chef, Inc.</u>, 651 A.2d 798 (D.C. 1994);

b)  <u>Breach of Contract (Count V)</u> – This claim lies solely against Patterson for his breach of his consulting agreement with Ellipso.  Patterson breached the parties' agreement by failing to the provide promised legal services, by failing to introduce Ellipso to any financing

sources other than his associate Mann, and by failing to execute his contractual obligations in good faith.

c). <u>Breach of Fiduciary Duties (Count VII)</u> - This claim also lies against Patterson alone for his breaches of the duty of loyalty, fair dealing, to act in Ellipso's best interests and to not personally benefit at Ellipso's expense.

That Patterson was Ellipso's agent is evidenced by the parties' contract and actions. Through the contract and the parties' actions, Patterson agreed to conduct his activities on behalf of Ellipso, and Ellipso retained a certain amount of control over Patterson's actions. <u>Johnson v. Bechtel Associates Professional Corp.</u>, 545 F. Supp. 783, 785 (D.D.C. 1982), <u>rev'd on other grounds,</u> 717 F.2d 574 (D.C. Cir. 1983); <u>Rose v. Silver</u>, 394 A.2d 1368 (D.C. 1978). That Ellipso did not have day-to-day control over the means and methods of Patterson's work does not mean that no agency relationship exists. To the contrary, the "degree of control exercised need not be great. It is only necessary that the principal retain some measure of control over the agent's activities." 545 F. Supp. at 785 (internal quotations and citations omitted). Here, Ellipso defined Patterson's activities and the parameters within which it expected Patterson to perform, maintained oversight over

Patterson's work; and retained the right to reject Patterson's work, redirect his efforts or to change the amount of oversight Ellipso would provide. Although the parties by no means had a master-servant relationship, there existed an agent-independent contractor relationship and, thus, Patterson owed Ellipso fiduciary duties. Id.

d) Conversion (Count IX) – In taking the ICOHA Shares and the proceeds therefrom and converting them to its own use, to the exclusion of Ellipso, Mann Tech committed the tort of conversion. Duggan v. Kato, 554 A.2d 1126, 1137 (D.C. 1989). Given Mann Tech's fraud against Ellipso, Mann Tech did not have the right to own and/or possess the ICOHA Shares. Accordingly, its exclusive retention of the ICOHA Shares and the proceeds therefrom is conversion. Id.

e) Replevin (Count X) – Similar to its conversion claim, Mann Tech's exclusive possession and use of the ICOHA Shares, to which it has no lawful right of ownership or possession, requires it to return the ICOHA Shares to Ellipso, the only rightful owner.

f) Civil Conspiracy (Count XI) – Mann, Patterson and Mann Tech agreed to a plan to obtain from Ellipso 492,611 ICOHA Shares. To achieve this goal, the Defendants/Counter Plaintiffs agreed to secretly enter into a

business relationship and intentionally conceal this relationship from Ellipso so as to induce Ellipso into agreeing to pledge the ICOHA Shares as security for a loan. Ellipso, the Defendants/Counter Plaintiffs knew, would agree to do this because it relied on the advice of its consultant and agent, Patterson, and did not know that Patterson was an owner of Mann Tech.

Despite the many meetings, e-mail and other correspondence between the parties, not until after Defendant/Counter Plaintiffs had achieved the purpose of their scheme did they inform Ellipso of their secret relationship. Defendant/Counter Plaintiffs' plan and overt acts in furtherance of their plan constitute a conspiracy. Second Amend. Foundation v. U.S. Conf. of Mayors, 274 F.3d 521, 524 (D.C. Cir. 2004).

There was no default on the Loan.

**Mann Tech's counterclaim asserts as follows:**

1.    The surviving counts of Mann Tech's Counterclaim are Count I (breach of contract) and Count II (fraudulent inducement).

2.    Count I asserts that Ellipso breached the Loan Agreement by failing to make any payments whatsoever, even though the Agreement required quarterly payments of interest

commencing in April, 2004.

3.    Count II asserts that Ellipso made fraudulent misrepresentations to Mann Tech in order to induce it to make the $90,000 loan.

**E.** <u>**Statement of Defenses Raised by the Parties**</u>:

1.    Ellipso asserts the following defenses in the remaining counterclaim counts of breach of contract (Count One) and fraudulent inducement (Count Two):

a) <u>Integration.</u> The Loan Agreement, even if found valid, contains an integration clause prohibiting the reliance on verbal assurances such as the "loading" of the 881 number in various countries, as alleged by Defendant/Counter Plaintiffs.

b) <u>Allegation is false</u>. Even if the integration of the contract is overlooked, the fact is that, contrary to Mann's assertions, the loading of the 881 numbers, on which Mann claims he relied to enter into the loan agreement was real and actual. Mann's own witness testified that the number had been loaded in various jurisdictions representing over twenty carriers, before the loan was entered into. Several documents, contemporaneous with the events and including a certification by the International Telecommunication

Union – ITU- confirm that loading of 881 number had occurred by the fall of 2003, before negotiation and execution of the loan agreement.

c) <u>Disclosures were known to Patterson</u>. Mann Tech alleges the loan document contains a representation that Ellipso was not party to litigation at the time it entered into the loan agreement. However, Patterson, an owner of MannTech, was aware of every lawsuit Ellipso was involved in at the time, and indeed prepared briefs and settlement documents for these cases. It is not possible for Mann Tech to claim it was unaware of these facts. Furthermore, Mann was familiar with Ellipso for over a year and was made aware of the litigation in December 2001 when he considered joining Ellipso as an executive. Thus, there is no breach of contract.

d) <u>No damages</u>. Since as of today John Mann and Mann Tech received close to $700,000 for a $90,000 loan in about eight months, an exorbitant return indeed, they can claim no damages even if their allegations under Count One and Two were proven true, which they are not as explained above.

2. The Mann Defendants asserts the following defenses to the remaining counts of the Complaint:

a) The Mann Defendants deny that they made any misrepresentations or that they failed to communicate any significant facts to Dr. Castiel. In fact, Dr. Castiel, the CEO and apparently the only current employee of Ellipso, has made numerous material misrepresentations to Mann, both in the discussions leading up to the loan agreement and in the loan agreement itself. Those misrepresentations had to do with the viability of Ellipso's business, and particularly the state-of-readiness of its proposed 881 venture, as well as its financial status and lack of involvement in other lawsuits. Dr. Castiel knew from the very beginning of his relationship with Mann that he and Defendant Patterson planned to work together. Mann was unaware until this lawsuit was filed that Patterson, whom he knew socially, had a criminal conviction or had been disbarred.

Starting in late 2003, Castiel and Patterson proposed to Mann a venture which involved forming a business, The Registry Solutions Company ("TRSC"), to be owned by Mann and Patterson and to afford a Registry function for Ellipso's 881-service offerings, which were falsely alleged by Castiel to be imminent. Mann thereupon invested hundreds of thousands of dollars and thousands of hours of time in that project. During the course of the discussions, in January, 2004, Ellipso/Castiel asked Mann for a loan. Castiel and Patterson

proposed that the loan be made by a company they had previously suggested be formed to buy shares in Ellipso, Mann Technologies, LLC ("Mann Tech"). Castiel and Patterson also proposed that Patterson have an interest in this company. Castiel knew all along, and felt comfortable with the notion, that Patterson would be a co-venturer in Mann Tech, just as he was in TRSC. Mann Tech was not formally incorporated until February, 2004, after the loan had been made.

In short, Castiel/Ellipso knew full well, before accepting the $90,000 loan in January, 2004, that Mann and Patterson planned to own Mann Tech jointly.

b) Even if, *arguendo*, Mann and Patterson failed to disclose the nature of their relationship, Ellipso affirmed the loan agreement *after* learning, no later than June of 2004, of Mr. Patterson's stake in Mann Tech. It did this by negotiating and executing an amendment of the loan agreement in August, 2004, as well as accepting a $10,000 check from Mann Tech pursuant to the amendment, and transferring 492,611 shares of ICOHA stock from Ellipso's account to Mann Tech's. The loan agreement between Ellipso and Mann Tech was an executory contract, and the amendment incorporated all terms of the original agreement except those affected by the amendment. This ratification by Ellipso of the loan agreement bars its claim for fraud.

c)  The loan agreement in question was a completely integrated contract, because the parties intended the writing to be a complete expression of all the terms agreed upon, as well as a final expression of the terms it contains.  Accordingly, any promises, assurances or omissions made prior to the signing of the contract are irrelevant.  Hercules & Co., Ltd. v. Shama Restaurant Corp., 613 A.2d 916 (D.C. 1992).

d)  Defendant Patterson was not an agent of Ellipso, because his consulting agreement specified that he was an independent contractor, not an agent.  Furthermore, the actual course of dealings between Patterson and Ellipso demonstrate that he was an independent contractor.

e)  Even if Ellipso could prove it was defrauded, it has not alleged any specific damages that were proximately caused by the fraud.  Without damages, the fraud claim fails.

f)  In its Answers, the Mann Defendants have also raised the affirmative defenses of failure to state a claim upon which relief can be granted; estoppel; laches; Statute of Frauds; and bad faith. The Mann Defendants seek their costs and attorneys' fees as provided in the Loan Agreement.

3.     Defendant Patterson asserts the following defenses:

a. There was no concealment of Patterson's interest in Mann Technologies, or The Registry Solutions companies, as

Castiel/Ellipso knew from the beginning of Patterson's interest. In fact, it was Castiel who conceived of the idea and encouraged Patterson to seek an interest in these ventures, as well as others, as part of scheme whereby Castiel could remove assets from Ellipso, which was failing financially, and create a place where he, David Castiel could go when/if, Ellipso failed.

b. There was no concealment of Patterson's conviction or disbarment as Castiel/Ellipso knew of these events long prior to the transactions at issue here.

c. At the time Ellipso hired Patterson as a consultant, Ellipso knew Patterson was not a member of the D.C. Bar and thus could not provide legal services to Ellipso.

d. Patterson provided the services specified in the contract with Ellipso from October 2002 until November 2004, including locating several potential sources of financing for Ellipso.

e. The contract specified that Patterson was an independent contractor, and at no time did Patterson act as Ellipso's fiduciary.

f. Patterson never made any effort to conceal his interest in MannTech, and his interest was a matter of public

record from the time the company was incorporated in February 2004. Fraud cannot rest on matters that are public record.

g. Castiel's emails show that he knew of Patterson's interest in MannTech at least as early as June 2004. Thereafter, Ellipso continued to employ Patterson as an independent contractor; soliciting his work and making partial payments to Patterson for that work until October 2004. Ellipso's actions constitute ratification of its agreement with Patterson and waive any fraud claims.

8. Ellipso knowingly, and deliberately, chose to forfeit the ICOHA shares by refusing to pay even the interest due on the loan from MannTech in October 2004. The ICOHA shares had no value at that time and the loan was non-recourse. Only when the shares had gone back up in value ten months later did Ellipso/Castiel take any action – the filing of the instant lawsuit.

9. This action is based entirely on the perjured testimony and misrepresentations of David Castiel.

## F. A Schedule of Witnesses to be Called by the Parties:

Ellispo plans to call the following witnesses:

1.    David Castiel – Dr. Castiel is expected to testify on all facts relating to Ellipso's claims and Mann Tech's counterclaims.  Dr. Castiel's testimony is expected to require 4 hours.

2.    Robert Patterson – Mr. Patterson is expected to testify on all facts relating to Ellipso's claims and Mann Tech's counterclaims. Mr. Patterson's testimony is expected to require 4 hours.

3.    John Mann – Mr. Mann is expected to testify on all facts relating to Ellipso's claims and Mann Tech's counterclaims. Mr. Mann's testimony is expected to require 4 hours.

4.    John Piper – Mr. Piper is expected to testify on the circumstances surrounding the Amendment of August 2004, the sale of stock by Mann Tech and the disposition of the proceeds, including Mann Tech's investment in Coastal.  Mr. Piper's testimony is expected to require 1 hour.

5.    Juan Tomassoni – Mr. Tomassoni is expected to testify on the loading of the 881 codes and their status in the fall of 2003.  Mr. Tomassoni's testimony is expected to require 1 hour.

**MANN DEFENDANTS' SCHEDULE OF WITNESSES**

1.    David Castiel - party.  Full knowledge of all relevant transactions.  4 hours.

2.    John B. Mann - party.  Full knowledge of all relevant transactions.  4 hours.

3.    Robert Patterson - party.  Full knowledge of all relevant transactions.  4 hours.

4.    John Piper, UBS Financial Services, Inc., 1501 K Street, N.W., Suite 1100, Washington, D.C.  1 hour.  Will testify on transactions involving ICOHA stock, Ellipso and Mann Tech and opening brokerage accounts.

Defendant Patterson intends to call himself as a witness. Time 4 hours.

### G. A List of Exhibits to be Offered in Evidence by the Party:

In addition to any exhibit listed by the defendants, Ellipso intends to offer the follow

1.    RBP Consulting Agreement
2.    Email RBP to DC 12-23-03

3.    E-mail RBP to JM 12-23-03

4.    E-mail RBP to JM 12-24-03

5.    Collateralized Loan Agreement

6.    E-mail JM to RBP 1-31-04

7.    E-mail RBP to JM 2-11-04

8.    E-mail RBP to JM 6-9-04

9.    E-mail RBP to JM 6-16-04

10.    E-mail RBP to JM 7-15-04

11.    Amendment to Loan Agreement August 2004

12.    Sales of ICOHA stock by Mann Tech

13.    E-mails DC-JM 12-10-04

14.    Letter DC to JM 12-23-04

15.    Declaration of John Mann 9-27-05

16.    Excerpts of Deposition of Patterson

17.    Excerpts of Deposition of David Castiel

18.    Excerpts of Deposition of Tomassoni

19.    Loaded Carriers as of October 2003

20.    MOU Entel-Ellipso

21.    Telecom Argentina Presentation Sept-03

22.    ITU Zhao Letter October 2003

23.    Shareholders List Coastal Services Group 1-24-06

24.    Reimbursement to Mann Tech 2-9-2006

25.    Report of Mann-Mann Tech 14 Nov 2005

26.    Convertible Promissory Note 23 Dec 2004

27.    Secured Promissory Note 30 Aug 2005

28.    UBS Statement Feb 2005


    Defendants Mann and Mann Tech have attached hereto an Excel spreadsheet with their list of exhibits.

Defendant Patterson designates the following list of exhibits:

1.    Ellipso consulting agreement and all amendments thereto.

2.    Payments made by Ellipso to Patterson from October 2003 to October 2004.

3.    Exhibits attached to David Castiel's deposition.

4.    Exhibits attached to Robert Patterson's deposition.

5.    Patterson's Request for Admissions to Ellipso/Castiel.

6.    Letter from David Castiel to Patterson, April 27, 2004.

7.    Pleadings and attachments thereto in this proceeding.

**H.**  **A Designation of Depositions, or Portions Thereof, to be Offered in Evidence by the Party:**

Ellipso's designation of deposition testimony:

**a)**    Excerpts of Deposition of Patterson. Pages 50-53, 170-173.

**b)**    Excerpts of Deposition of David Castiel. Pages 76-87 and 122

**c)**    Excerpts of Deposition of Tomassoni. Pages 117-153

**Mann Defendant's Designation of Deposition Testimony:**

**(**1) Deposition of David Castiel, May 2, 2007:

-  P. 7, L. 8 - P. 15, L. 10.

-  P. 16, L. 8 - P. 49, L. 11.

-  P. 51, L. 12 - P. 59, L. 1.

-  P. 60, L. 21 - P. 63, L. 9.

-  P. 64, L. 1 - P. 109, L. 5.

-  P. 115, L. 8 - P. 144, L. 19.

-  P. 147, L. 8 - 10.

                        -  P. 150, L. 1 - P. 240, L. 11.

                        -  P. 249, L. 11 - P. 282, L. 18.

                        -  P. 285, L. 13 - P. 293, L. 17.


    Defendant Patterson designates the following depositions to be
offered in evidence:
                1.  Excerpts of Deposition of David Castiel. Pages 1-
                    line 1 – p. 240 line 11;
                    Page 249 line 11 – p. 293 line 17.


    I.  **An Itemization of Damages the Party Seeks to
        Recover:**

        **Ellipso's itemization of damages:**


    (1)  Restitution of 492,611 ICOHA shares illegally
obtained from Ellipso


    (2)  Punitive damages arising out of the fraud
perpetrated by John Mann and Robert Patterson, acting in the
guise of Mann Tech.


    (3)  Restitution of all consideration received by
Patterson from Mann Tech in violation of his consulting
agreement with Ellipso: at a minimum 50% of Mann Tech and
TRSC, at least $60,000 received in cash from Mann Tech, plus
interest; and, punitive damages associated therewith.

(4) <u>Loss of Value</u>. Had the Mann Tech shares remained in Ellipso's hand, as they should have absent the fraud perpetrated by Mann and Patterson, in order to generate the $196,461 Ellipso generated through the sale of its other ICOHA stock when prices were depleted rather than through the normal course of business in the eight months Mann Tech held the stock certificate, at an average price of $.622/shares over the course of the loan through Mann's unilateral confiscation, Ellipso would have sold 315,853 shares leaving 176,758 (difference between 492,611 and 315,853) which plaintiff values at an average price of 3.29 (average since 2004) or $581,534 of net loss to Ellipso.

(5) <u>Consequential Loss</u>. Mann-Patterson's unilateral confiscation of Ellipso's 492,611 shares forced Ellipso to generate cash late in 2004 when ICO stock was at the lowest, thus disposing of a large number of shares at an average price of $.21 resulting in a loss of at least an additional $3,050,000.

(6) <u>Opportunity Loss</u>. Loss in business opportunity for having those large sums unavailable when needed have resulted in even larger losses to Ellipso.

**Mann Defendants' Itemization of Damages:**

As a result of Ellipso's breaches of the Loan Agreement and fraudulent misrepresentations, Mann Tech contends that it suffered loss of the value of the collateral, namely, the 492,611 shares of ICOHA stock, between the date of the Loan Agreement, January, 2004, and the date the agreement was terminated and the collateral forfeited in October, 2004. At the time the collateral was forfeited, it was worth approximately $.10 per share, as opposed to the $.46 per share it was worth when the Agreement was entered into.

As a further result, the Mann Defendants have expended substantial attorneys' fees, time and resources in conjunction with this frivolous litigation instituted by Ellipso, which has just had its third anniversary.

**Defendant Patterson's Damages: NONE**

**2)    A Request For Other Relief Sought by the Party:**

As a result of their actions and fraud, Ellipso lost much more than the shares since plaintiff lost the opportunity to develop its business with the assets that belonged to Ellipso and were practically confiscated by Mann and Patterson. Consequential damages can be proven by tracking Mann's loans and outlays with the actual value of the collateral which Ellipso could have made liquid rather than take a loan to benefit from the "upside" which it did not because of fraud

perpetrated by Mann-Patterson. Punitive damages can also be added because of the deliberate concealment of the fraud and the intent to defraud.

**Defendants' request for other relief: NONE**

**I.    Stipulated Facts:**

None.

**II.   Requested Stipulations of Facts:**

Plaintiff requests that defendants stipulate to the following facts:

1.    Sometime in the spring of 2002, Dr. David Castiel met attorney Robert Patterson, then an attorney with the law firm of Barkats and Associates.

2.    At the time of their introduction, Ellipso was a client of Barkats and Associates.

3.    In November 2002, Ellipso engaged Patterson via a consulting agreement to provide a variety of legal and business advisory services.

4.    Among other promised services, Patterson agreed to locate and introduce Ellipso to sources of financing.

5.    At the time of Patterson's engagement and at all times relevant to this case, Ellipso was under financial duress and was in a near constant state of need for cash infusions.

6.   Patterson became a trusted advisor and confidante of Ellipso and Castiel by drafting and editing contracts and preparing litigation-related documents.

7.   Patterson had knowledge of Ellipso's financial status and the fact that Ellipso, via a 2001 stock swap with ICO Communications Holdings, Ltd. (ICOHA), owned 492,611 shares of ICOHA stock.

8.   ICOHA is a global satellite company whose investors include Bill Gates and Craig McCaw; and, its stock is valued on the basis of the promise of its future services and return on investment.

9.   In December 2003, Patterson informed Castiel that a friend of his, John Mann, might be interested in doing business with Ellipso.  In particular, Patterson told Castiel that Mann might be willing to make either an investment or a loan to Ellipso.

10.   Patterson negotiated, on behalf of Ellipso, a loan deal with Mann Technologies.

11.   Castiel believed that Mann founded Mann Technologies, LLC ("Mann Tech") for purposes of the parties' loan transaction and that Mann was the sole owner of Mann Tech.

12.   At no time before August 2004 did Mann, Patterson or anyone else provide legal documentation establishing Patterson's interest and executive position in Mann Tech. Two emails in October and November 2004 written by Castiel mention potential knowledge of

certain relationship between Patterson and Mann Tech as of June 2004.

13. In January 2004, neither Ellipso nor Castiel knew that Patterson was a co-owner of Mann Tech and had been a co-owner at the time Patterson negotiated the loan deal on behalf of Ellipso.

14. There are no memoranda or any other written document between December 1, 2003 and including August 1, 2004 in which Patterson and/or Mann informed Castiel of Patterson's ownership interest in Mann Tech.

15. The terms of the loan agreement negotiated by Patterson called for a $90,000 loan to Ellipso secured by all 492,611 ICOHA shares.

16. Pursuant to the terms negotiated by Patterson, Ellipso was required to, and did, turn over to Mann Tech, or its agents, stock certificate #A2008 for 492,611 ICOHA shares.

17. Of the $90,000 received by Ellipso, it paid Patterson a $4500 commission for brokering the loan deal, in conformity with the consulting agreement between Patterson and Ellipso.

18. The legal minutiae of the loan documents was read and approved by Patterson and he warranted to Castiel that the documents were appropriate and reasonable.

19. Castiel did not question Patterson's judgment given Castiel's high regard for Patterson's legal and business acumen.

20. Patterson led Castiel to believe that the loan transaction with Mann Tech represented the best financing terms Ellipso could hope to find.

21. On August 2, 2004, Ellipso and Mann Tech executed an amendment to their loan transaction which permitted the parties, under certain conditions, to liquidate the ICOHA shares, repay the loan principal, cure the interest payments and share in the upside of the ICOHA stock.

22. Patterson prepared all the necessary documents for the August 2nd amendment and did not inform Castiel or Ellipso of the impact such amendment could or would have on the validity of the Loan Agreement as a result of Patterson's undisclosed direct ownership of Mann Tech.

23. Prior to preparing the loan amendment documents, in June 2004, Patterson informed Castiel that if Mann Tech experienced a substantial return on the loan transaction, Mann had promised Patterson some monetary bonus.

24. Although dismayed that Patterson was doing business with Ellipso's loan partner, given Patterson's history of seeming loyalty and honorable service to Ellipso, Castiel did not protest the arrangement.

25. The drafts of the amendment documents bore Mann's name as the signatory for Mann Tech.

26.   On August 2, 2004, Castiel and Patterson met at UBS Financial Services' Washington, DC office to execute the loan amendment.

27.   On this final signature copy of the amendment, Patterson was identified as the signatory for Mann Tech.

28.   Patterson executed the loan amendment on behalf of Mann Tech.

29.   After the meeting, Castiel expressed surprise when Patterson, rather than John Mann, executed the amendment on Mann Tech's behalf.

30.   Per the amendment, the loan interest payments were cured through October 1, 2004, hence the next interest payment on the unpaid balance of the loan was December 31, 2004.

31.   Ellipso made no interest payments on the loan after the August 2nd amendment.

32.   In November and December 2004 Mann Tech instructed UBS to sell most of Ellipso's ICOHA shares it held as collateral. Based on the UBS statements, these sales together with additional sales in the spring of 2005 resulted in the liquidation of close to 450,000 shares for net proceeds of $519,000. The remaining 37,000 were frozen during the injunction period and no information is available concerning its disposition.

32. In a December 2004 letter to Mann, Ellipso sought rescission of the loan agreement based on the fact that Ellipso did not know that Patterson represented both sides during the transactions in January and August.

**Mann Defendants:**

**The Mann Defendants do not stipulate to any of the foregoing matters requested by Ellipso. They do request the following stipulations:**

1) That Ellipso never made any payments of principal or interest under the Loan Agreement.

2) That the prices of ICO stock between November, 2003 and October, 2004 were as set forth in the Wall Street Journal.

3) That David Castiel at all relevant times knew about Robert Patterson's criminal conviction and disbarment and did not tell John Mann about them.

4) The authenticity of all documents produced by any party in discovery.

**Defendant Patterson:**

Defendant Patterson does not agree with any of plaintiff's 32 proposed stipulated facts except for number four (4), as each contains misstatements of facts, or self serving assertions that are disputed. Patterson intends to consult further with plaintiff's counsel to see if some statement of stipulated facts can be made.

**J.  Stipulations     Concerning     Authenticity     of
Documents and Admissibility of Exhibits:**

The parties have not stipulated to the authenticity of
any documents or to the admissibility of exhibits. Plaintiff will
consider stipulation upon review of the documents prior to trial.

The Mann Defendants request that **t**he parties stipulate
that all documents produced by any party during discovery are
authentic and do not require formal proof for admission into
evidence.

Defendant Patterson states that he anticipates no
disputes concerning authenticity of documents or their
admissibility.

**K.  A List of Motions to be Decided Before or at
the Commencement of Trial:**

Plaintiff Ellipso:

Plaintiff intends to file a Motion In Limine to exclude
certain of the exhibits and testimony that defendants have
identified in this statement.

Mann Defendants:

The Mann Defendants may file one or more motions *in limine* to
exclude irrelevant or improper evidence.  They may also file a
motion for damages resulting from the Court's issuance of the
preliminary injunction, per this Court's Memorandum Opinion of
November 14, 2005.

Defendant   Patterson   intends   to   make   the   following motions:

1.   Oral motion to dismiss Consulting Management as a party.

2.   Oral motion to dismiss those Counts of the Complaint as to Patterson, which have previously been dismissed as to the other defendants, Count II, Lender Liability; Count III, Implied Covenant of Good Faith and Fair Dealing; Count XIII, R.I.C.O.

3.   Motion to exclude testimony of oral representations made outside the written contracts which contain integration clauses.

4.   Motion to exclude testimony that plaintiff was unaware of Patterson's interest in MannTech after June 2004.

5.   Motion to exclude evidence of the value or disposition of the ICOHA stock after October 2004, when the stock was forfeited for non-payment of the loan.

**L.**   **Proposed Amendments to the Pleadings:**

None.

**M.**   **An Estimate of Trial Time:**

Four (4) days.

## N.    **Proposed and Agreed Upon Voir Dire Questions:**

Ellipso and the Mann Defendants agree on the following Voir Dire Questions:

This lawsuit involves claims and counterclaims for fraudulent misrepresentation, breach of contract and related allegations, arising out of agreements entered into by the Plaintiff, Ellipso, Inc., and Defendants Consulting Management, Ltd., Robert Patterson, and Mann Technologies, LLC, in January 2004.  Ellipso is in the satellite telephone business. Robert Patterson, at the time doing business as Consulting Management, Ltd., was a business consultant hired by Ellipso to identify financing for Ellipso.  Patterson introduced Ellipso to Mann Tech and John Mann. Mann Technologies, also known as Mann Tech, which is owned by John Mann and Robert Patterson, was created in order to invest in technology companies.

1.  From what I have told you, do any members of the jury panel believe they have heard or read about this case anywhere, or do you have knowledge about this case from any other source?

2.  Plaintiff in this case is Ellipso, Inc., with offices at 4410 Massachusetts Ave., N.W., Washington, D.C.  The CEO of Ellipso is Dr. David Castiel, who is here in the courtroom.  Do any members of the jury panel have any familiarity with either Ellipso or Dr. Castiel?

3.    Ellipso is represented by Attorneys Vanessa Carpenter
Lourie and Linda Nanline Awkard, who practice here in Washington,
D.C.  Do any jury panel members know Ms. Lourie or Ms. Awkard?

4    There are four Defendants and one Counter-Plaintiff in
this case.  The Defendants are John B. Mann of Warrenton, Virginia;
Mann Technologies, LLC, also of Warrenton; Robert B. Patterson, of
Middleburg, Virginia; and Consulting Management, Ltd., also of
Middleburg.  The Counter-Plaintiff is Mann Technologies, LLC.  Do
any members of the jury panel have any familiarity with any of
these Defendants or the Counter-Plaintiff?

5.    Defendants John B. Mann and Mann Technologies, LLC are
represented by Attorney Christopher G. Hoge, of the law firm of
Crowley, Hoge & Fein, P.C. , whose offices are located at 1710
Rhode Island Avenue, N.W., Washington, D.C.   Do any of you know
Mr. Hoge or his law firm?

6.    In presenting its case, in addition to their own
testimony, the parties intend to call the following witnesses:
Please listen carefully to the following list of potential
witnesses and raise your hand if you know one or more of them:

a)    John Piper of UBS Financial Services, Inc.

b)    Juan Tomassoni.

7.    Has any member of the jury panel ever been involved,
either as a plaintiff, defendant, or witness, in a civil lawsuit,

or do any of you have close friends or relatives who have been involved in a civil lawsuit?

8.  Have any of you, or have any of your close friends or relatives, had any experience with the satellite telephone business?  If so, please describe.

9.  Have any of you, or have any of your close friends or relatives, worked as a lawyer, or received any type of legal training?

10.   Have any of you, or have any of your close friends or relatives, ever been employed by a law firm that engages in civil litigation or representation of business entities?

11.   Has any member of the jury panel served on a jury in the past ten years?

12.   If so, was there anything about your prior experience as a juror which might make you either unwilling or unable to serve as a juror again?

13.   Has any member of the jury panel ever been involved in a contract dispute or a dispute over a loan or investment which would make it difficult for you to render a fair and impartial verdict in this case?

14.  We expect the trial of this case to take approximately four to five days.  Have any of you on the jury panel got any prior commitments, urgent appointments, or the like which would make it difficult for you to serve as a juror in a week-long trial?

15. Finally, now that you have heard a little bit about this case, do any of you have any reason at all why you might not feel comfortable sitting as a juror in this matter, or why you might have difficulty arriving at a verdict that is impartial and fair to both sides?

**Defendant Patterson requests the following Voir Dire questions:**

1. Has any prospective juror been involved in a dispute or a lawsuit regarding any loan transaction?

2. Has any prospective juror had property repossessed for non-payment of a loan?

3. Does any prospective juror know anyone who has had property repossessed for non-payment of a loan?

4. Has any prospective juror ever made a loan that was not paid back?

5. Has anyone on the jury ever been involved in a lawsuit?

6. Is any prospective juror currently behind on any financial obligations?

7. Has any prospective juror ever retained the services of an attorney?

8. Has any prospective juror ever purchased stocks or bonds?

O.  **Proposed and Agreed Upon, Jury Instructions, Together with Objections Thereto, and Supporting Memoranda of Law if Appropriate:**

The parties request the following Standard Jury Instructions:

1-1:      Function of the court.

1-2:      Function of the jury.

1-4:      Juror's duty to deliberate.

1-5:      Attitude and conduct of jurors.

1-6:      Instructions to be considered as a whole.

1-7:      Court's commenting on the evidence.

1-8:      Court's questions to witnesses.

1-9:      Jury not to take cue from Judge.

1-10:     Ruling on objections.

1-12:     Equality of litigants – individuals.

2-1/2-2:  Evidence in the case.

2-3:      Inferences.

2-4:      Inadmissible and stricken evidence.

2-5:      Statements of counsel.

2-6:      Jury's recollection and controls.

2-7:      Evidence Admitted Against One Party Only.

2-8:      Burden of proof.

2-9:      Evidence Produced by Adversary.

2-10:     Direct and Circumstantial Evidence.

3-1:      Determine credibility of witnesses.

3-4:      Failure to Produce Stronger Available Evidence.

3-5:      Deposition as evidence.

3-8:      Impeachment by prior inconsistent statements.

4-3:      Multiple Defendants.

4-4:      Counterclaims.

11-1:     Contract defined.

11-12:    Contract considered as a whole.

11-13:    Terms of a contract – evidence.

11-14:    Contract's interpretation: course of
          performance.

11-15:    Contract's interpretation: custom and issue.

11-16:    Condition precedent.

11-17:    Breach of contract defined.

12-1:     Damages - Jury to Award.

12-2:     Extent of Damages - Proximate Cause.

12-3:     Burden of Proof - Speculative Damages.

12-4:     Multiple Defendants - Size of Verdict.

12-7:     Duty to Mitigate Damages.

20-1:     Fraudulent Misrepresentation - Elements of the
          Claim.

20-2:     Fraudulent Misrepresentation - Elements Defined.

20-3:     Fraudulent Misrepresentation - Burden of Proof.

20-4:     Fraudulent Misrepresentation - Determination of
          Liability and Damages.

Plaintiff Ellipso:

11-28:     Fraud In The Inducement

11-29:     Undue Influence

11-31:     Breach of Contract-Damages

16-01:     Punitive Damages Against Individual

16-02:     Punitive Damages Against A Corporation

16-03:     Computation of Punitive Damages

See attached Ellipso's Proposed Special Jury Instructions.

## MANN DEFENDANTS' REQUESTED JURY INSTRUCTIONS

### A.   Standard Jury Instructions

The Mann Defendants request the following Standard Instructions in addition to those requested by Plaintiff:

20 - 6:    Fraudulent Misrepresentation - Plaintiff's Reliance Upon Own Investigation.

20 - 10:   Reliance Where Falsity Obvious - Duty to Investigate.

The Mann Defendants request the following Special Instructions:

### Special Instruction No. 1:

A party to an executory contract who learns that he has been induced by fraud to enter into the contract and then insists on performance by the other party, waives any action for the fraud.

**Authority:** *Horning v. Ferguson*, 52 A.2d 116, 118 (D.C. 1947); *Simon v. Rossier*, 127 A.2d 394 (D.C. 1956).

- 38 -

**Special Instruction No. 2:**

An "executory contract" is one which is yet to be executed or performed, which remains to be carried into operation or effect, which is incomplete, or which depends upon a future performance or event.  The Loan Agreement between Mann Technologies and Ellipso was, as of August, 2004, an executory contract because it had not, by that time, been fully performed.

**Authority:** *Black's Law Dictionary*, Revised Fourth Edition (West 1968).


**Special Instruction No. 3:**

Civil conspiracy consists of four elements: "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme."

**Authority:** *Second Amendment Found. v. U.S. Conf. of Mayors*, 348 U.S.App.D.C. 238, 274 F.3d 521, 524 (2001) (citing *Halberstam v. Welsch*, 227 U.S.App.D.C. 167, 705 F.2d 472, 477 (1983)).

**Defendant Patterson's Jury Instructions:**

Defendant Patterson objects to the following jury instructions requested by plaintiff, Ellipso:

27.  Condition precedent 11-16;

29.  Excuse from performance 11-19;

30.  Prevention of a condition 11-20.


Defendant Patterson requests the following standard jury instructions:

31.  Elements of fraud 2-1;

32.  Definitions of fraud 2-2;

33.  Burden of proof 2-3;

34.  Investigation 2-6;

35.  Failure to produce evidence 3-4;

36.  Proof of cause of damages 12-2;

37.  Burden of proof of damages 12-3

38.  Duty to mitigate 12-6.


**Defendant Patterson requests the following special jury instructions:**

1.  A party to a contract cannot collect damages based on that contract when the damages were caused by that party's own actions, or inactions.

2.  A party who fails to perform his obligations pursuant to a contract cannot collect damages caused by his own breach of that contract.

3.    A party who learns of a misrepresentation made pursuant to a contract cannot thereafter collect damages based on that misrepresentation, if he fails to take actions to protect his interests.

4.    A fiduciary is one who has the independent authority to act on another's behalf, without prior approval.

5.    A party cannot claim fraud when the facts constituting the fraud are a matter of public record.

6.    Creation of the attorney/client relationship for legal representation requires a specific agreement between both the client and the attorney specifying the matters upon which the client wishes representation and the specific services to be provided.

7.    An independent contractor, who has no authority to independently act on behalf of the principle, is not a fiduciary for the principle.

8.    A conspiracy requires a specific agreement to perform an illegal act, or to perform a legal act by an illegal means. The mere agreement of two or more people to act together is not a conspiracy.

9.    A party who claims fraud must prove by clear and convincing evidence that he reasonably relied on the false statement, or concealment, and suffered damages as a direct result of the false statement, or concealment. The party who

claims fraud, must prove by clear and convincing evidence that he used every reasonable means to protect his interests.

10.    A party who fails to utilize readily available means, that would have prevented the claimed fraud, cannot show by clear and convincing evidence that he reasonable relied on the alleged fraud as any damages suffered were caused by his own actions, or inactions.

11. To be a fraudulent concealment, the fact concealed must be false at the time it was concealed. A future possibility cannot be a fact which constitutes fraud.

12.    A party to a contract who learns of a fraud must take affirmative actions to protect his interests.    If that party fails to take actions to protect his interests, he cannot claim damages there by, as any damages he suffers are self inflicted.

13.    If a party to a contract learns of a fraud, and then enters into an amendment of that contract whereby he receives material consideration, such as money, he cannot thereafter seek damages based on the prior fraud.    Any damages are limited to damages suffered as a result of the amended contract.

14.    Financial difficulties are not duress and cannot justify any actions or inactions.    Duress requires the physical threat of personal injury or physical harm to an

individual or a close relative or associate, such as pointing a loaded gun to a persons head to make them sign a document.

15.    A party to a loan transaction, who fails to repay the loan and forfeits the collateral, cannot recover the collateral as its loss was caused by his own actions of failing to repay the loan.

16.    A fraudulent statement must be a false statement of fact. Statements of opinion, sales talk, or puffery are not fraud. The party claiming fraud must prove by clear and convincing evidence that the alleged false statement was, in fact untrue. The party claiming fraud must also prove by clear and convincing evidence that the party making the claimed false statement knew that the statement was untrue at the time he made it. False statement must also be proved to be material to the contract at issue.

17.    A claim of fraudulent inducement requires that the party making the claim prove by clear and convincing evidence that he would not have entered the contract, in the absence of the false statement.

18.    The creation of a fiduciary relationship requires a specific agreement by both parties to create such a relationship, either by specific contract language or by specific, unequivocal actions by each.

19.    If a party hires someone to provide personal services, and then learns of some actions which would be the basis for terminating the service contract, but then decides to continue to accept the personal services and to pay for those services, he cannot thereafter claim he was injured by the prior actions.

**P.    Proposed and Agreed Upon, Verdict Forms, Together with Objections Thereto, and Supporting Memoranda of Law if Appropriate:**

See attached.

Respectfully submitted,

_____/s/_____

Vanessa Carpenter Lourie, #250068
4400 MacArthur Blvd., N.W.
Suite #205
Washington, D.C. 20007-2521
(202) 342-8000 (Telephone)
(202) 342-9000 (Facsimile)
vlourie@carpenterlourie.com
Counsel for Ellipso, Inc.

_____/s/_____

Christopher Hoge, Esquire
Crowley, Hoge & Fein, P.C.
1710 Rhode Island Avenue, N.W.
Suite 700
Washington, D.C. 20036-3125
(202) 483-2900 (Telephone)
chfcgh@aol.com
Counsel for John Mann and MannTech

_____/s/_____

Robert B. Patterson
P.O. Box 3106
Reston, Virginia 20195
(571) 278-7076
legalmanagement@yahoo.com
Pro Se