```
              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA

ELLIPSO, INC.                        )
                                     )
     Plaintiff/Counter-Defendant,    )
                                     )
                 v.                  )  CA 05-01186(RCL)
                                     )  Next Event: Trial
JOHN B. MANN, et al.                 )  07/28/2008
                                     )
     Defendants/Counter-Plaintiffs.  )
```

**PLAINTIFF'S MOTION FOR RECONSIDERATION OF PRETRIAL ORDER EXCLUDING EVIDENCE OF THE VALUE OF ICOHA SHARES BASED ON DEFAULT ON THE LOAN**

Plaintiff respectfully requests the Court to reconsider its grant of Mann's Motion to exclude evidence of value or disposition of ICOHA Shares subsequent to October 2004. The basis for this decision is the conclusion that there was a default, a conclusion contradicted by the facts, the loan agreement itself, the behavior of the parties at the time of the alleged defaults, and the applicable law. Plaintiff bases its request on the following:

**I. Default on Interest**

Prior to October 1, 2004, default for failure to pay interest can be established if interest is not paid on April 15, 2004, and on July 15, 2004 and such default is not cured or waived. Plaintiff was not in

default of the Collateralized Loan Agreement ("Agreement").

Plaintiff's first quarterly interest payment was due in April 2004. At that time Mann was entitled to, and had the option to, take possession of the collateral and dispose of it as if it were its own property ¶7.2. Mann also had the option to proceed or not proceed against the Collateral in its sole discretion. Rather than proceed against the Collateral, Mann chose to enter into not one amendment but two amendments to the Agreement:

1) Defendant Exhibit 41: "Amendment to Collateralized Loan Agreement" executed April 21, 2004, six days into the presumed interest default, was to cure any default and distribute the proceeds in accordance with the terms of the Amendment. It establishes that the parties will proceed to sell about 92,611 shares "which [are] subject to the Collateralized Loan Agreement dated January 30, 2004, pursuant to the terms and conditions of that agreement" and indeed indicated a split of the proceeds according to the conditions of the loan agreement. Since at that time Mann Tech had physical possession of the collateral, the implementation of

the April 21 amendment was under its exclusive control. Mann Tech then exclusively held the capability to perform on the amendment and get paid interest and partial principal as agreed. As a consequence, despite interest not being paid as of April 15, 2004, the default was waived by Mann Tech. Indeed pursuant to ¶7.2 Lender "may or may not" effect a default condition. In this case it chose not to.

Importantly, this Amendment was drafted and negotiated on behalf of Ellipso by Patterson whose dual role was, by this Court's own conclusion, not yet known to Ellipso.

2) A second interest payment was due on July 15, 2004. Despite interest not being paid, Mann Tech agreed on August 2, 2004 to the execution of the second Amendment to Collateralized Loan Agreement (Defendant Exhibit 88). This <u>Amendment</u> recognizes that Ellipso "has failed to timely make the interest payments to Mann Tech"; still it does not declare a default and forfeiture of the collateral. It thus shows that the Loan Agreement was still in effect and if there was default, it was waived.

3) Indeed, as a consequence of the August 2004 Amendment, the Lender received $6,250.00 (through a partial sale of stock in September, 2004), as well as 50,000 shares of stock as partial payment of principal. It is important to note that at all times relevant, Mann Tech was the Lender, the loan was a secured transaction, and the loan documents were governed by §28:9101 et. seq. of the District of Columbia Uniform Commercial Code (UCC).

Certainly the Lender had rights under the UCC, but it likewise had duties and obligations under the UCC. So too, the borrower has rights and obligations under the UCC.

4) The August 2, 2004 amendment, as indicated above states that 50,000 out of the 492,611 ICOHA shares held as collateral were to be paid as "partial payment of the principal of the loan". If Mann Tech had already taken possession of the shares as it says it did, and pursuant to a default with no notice (either on April 15 or on July 15), why and how would Ellipso grant to Mann Tech 50,000 shares that Mann Tech already owned? It is absurd that a consideration to Mann Tech pursuant to the amendment would consist

4

of a property already owned and possessed by Mann Tech. Hence, if there was a default, it was again waived per ¶7.2. At a minimum, Plaintiff should have been able to quickly determine what happened to the payment of $6,250.00 received by the Lender. Certainly, the payment of $6,250 was more than sufficient to cover what could be no more than $2,700.00 due in interest to that point. In any secured transaction the Lender's interest in the collateral is only to the extent of the borrower's obligation.

Plaintiff had every reason to believe that the payments of cash and stock as partial payment against the principal (See August Amendment [4 and 6]) made to the Lender under the August 2004 Amendment cured any default to that point.

5) The precise calculation of the re-computation and reduction of the collateral described in the August Amendment shows that the loan was alive and well as of August 2, 2004 and the collateral shares were just that, collateral. If the shares already belonged to Mann Tech as a result of an un-cured and un-waived default, why would Mann Tech offer to split the proceeds, more or less according to the loan

5

agreement, giving in this case a windfall of $250,000 or more to Ellipso? Clearly, Mann Tech believed as of the date of the Amendment that the loan agreement was still in effect.

6) The amendment also states as of October 1, 2004 the "shares not sold shall be treated subject to the terms of the original January 16, 2004 Loan Agreement", a statement that can only be interpreted that the Loan Agreement is current and in good standing and interest and principal payments commence as of October 1st with the remaining shares, if any. To contend that these same shares were already forfeited is absurd: "subject to the original loan agreement" cannot reasonably mean forfeited. It they were, a clear declaration (notice) that the shares belong to Mann Tech should have been so stated in the Amendment. Obviously Mann Tech and Ellipso agreed in August, 2004 that as of October 1st, 2004 the remaining shares were still collateral to the balance of the loan due then, and that the interest payments were cured. Hence the next interest payment was due December 31, 2004.

**II. Default on Value of Collateral**

Mann Tech unilaterally states that the shares were worth 4 cents sometime in October 2004, which is contradicted by facts. A plain review of the NASDAQ Stock Market (as specified by the loan agreement at ¶1.4) indicates that the <u>average</u> price never fell to $.04 per share. The average is what the loan agreement prescribed to calculate "fair market value", not a minimum given by a newspaper on a certain day. Hence the average, at a minimum, must be computed against the remaining collateral due, in order to establish whether there was a default. Plaintiff should be afforded that opportunity.

Assuming *arguendo*, that a default occurred and the value of the stock was worth less than 80% of the Plaintiff's outstanding loan obligations, not all breaches of loan agreements give the Lender the right to declare a default. Courts generally examine the alleged default to see if it warrants the lender's resort to the remedies it chooses. Courts have found that a lender's conduct in calling a loan for a several hour delay in payment, the failure of the loan to specify time was of the essence, the lack of

prejudice to the bank, was bad faith. *Sahadiv. Continental Illinois National Bank & Trust of Chicago,* 706 F2d 193 (7th Cir. 1983). Courts have also found that foreclosure was unjustified where time was not of the essence in making payments and has disapproved the use of foreclosure for mere technical default. *Trowbridge v. Malex Realty Corp.,* 191 N.Y.S. 97 (N.Y. App Div. 1921.

In this case, nothing in the Agreement states that time is of the essence. If the value of the stock was worth less that 80% of Ellipso's outstanding loan obligations Defendants have not shown whether that occurrence was for a day or two, or just a few hours. The outstanding obligation was certainly reduced given payments made under the Amendments and a precise computation was not submitted by Defendants.

The possible drop in value was during an unspecified, but at most very limited time of what could only be construed as a technical default, where time was not of the essence. In any event, the default was self cured immediately when the stock began to rise again and there was lack of prejudice to the Lender which did not begin to dispose of the stock for close to two months after that presumed unsupported

8

technical default. As a result, these facts did not give rise to the Defendant's right to foreclose on the Collateral.

Further, assuming *arguendo*, Plaintiff was in default under the Agreement as to the technical default, Defendants were required to give Plaintiff notice of the disposition of the collateral, notwithstanding, the language of the Agreement ¶ 7.2. This is especially true given that Defendants fraudulently induced Plaintiff to enter into the Agreement in the first instance and the Agreement contained a provision purportedly allowing the Defendant to take possession of the collateral without notice or demand, and dispose of it.

Under DC Code § 28:-602 - Waiver and variance of rights and duties" - the rules are explicit as to prohibiting the waiver of rights of the debtor and duties of the secured party.  Indeed, the rules regarding strict foreclosure of collateral § 28:9-620 with respect to a secured party's acceptance of collateral in full satisfaction of the obligation cannot be waived; nor can the right granted by §28:9-623, which gives the debtor the right to redeem his collateral be waived; nor §28:9-625 regarding the

9

secured party's liability for failure to comply with the rules under § 28:9-101 et. seq. be waived.

D.C. Code § 28:9-620(c)2 regarding the strict foreclosure of collateral further states that the secured party's acceptance of collateral in full satisfaction of the obligation it secures occurs only if the debtor agrees to the terms of the acceptance in a record authenticated **after default.** DC Code § 28:9-624 further states that a debtor may waive the right to notification of disposition of the collateral <u>only by an agreement</u> to that effect entered into and **authenticated after default.** § 28:9-623 (a) (b) (c) further provides that a debtor may redeem collateral by tendering fulfillment of all obligations secured by the collateral and reasonable expenses and attorney's fees. Redemption may occur any time before a secured party has disposed of collateral or entered into a contract for disposition.

Lastly, § 28:9-615 provides for disbursement of suplus proceeds after the sale of collateral to be returned to the debtor. Obviously, the Defendants failed to return any proceeds to Plaintiff.

Clearly, Plaintiff was entitled to consent to Defendant's disposition of the collateral by giving its authenticated written record of its acceptance of the collateral as full satisfaction of the debt. Lender never provided the Plaintiff with any opportunity to consent to acceptance since Lender, by hiding behind not having to provide any notice of default, but also not providing the notice required under the UCC. By not knowing about the default or the disposition of the collateral after default, Plaintiff was not afforded any opportunity to redeem its collateral or cure any default, technical or otherwise.

Defendant's intent was to manipulate the rules governing secured transactions by inducing the Plaintiff to enter into an agreement which included terms and conditions which violate the letter and spirit of the law and none of which provided the Borrower any recourse whatsoever. This transaction was set up by the Lender, Mann Tech and its owners, one of whom was a Harvard trained lawyer, extremely knowledgeable about the laws of secured transactions and who was acting as an infiltrator. Even as the loan

was extremely one-sided, Defendants' conduct totally ignored the rights of the Plaintiff, evaded the spirit of the contract, and willfully sought to render Plaintiff's performance imperfect and prevent it from performing even under the terms created by Plaintiff's own then trusted counsel, Mr. Patterson, whose conflict of interest was unconscionable.

### III. Default in Light of the Fraudulent Inducement

This court rejected several times requests to dismiss the fraud counts (Orders of April 1, 2008 and May 23, 2008). It based its opinion upon the fact that "Mann has failed to establish that a reasonable jury could not find that Mann's fraud resulted in it unlawfully taking possession and selling the ICOHA shares" Memorandum of April 1, 2008, page 13). The Court further stated that "at the very least, Ellipso would likely have consulted a truly independent advisor" (Memorandum of April 1, 2008, pages 11-12).

As the Court concluded, had Ellipso been aware of Patterson's dual role, it would in all likelihood have sought independent legal advice. It is thus probable that an impartial counsel would have recognized and noted the pitfalls devised by Patterson in complicity

with Mann: unilaterally declared default with no notice; no possibility of cure and other remedies not afforded to Ellipso and in _explicitly_ keeping consistent with the law (§ 28:9101 et. seq. of the District of Columbia Uniform Commercial Code (UCC) as discussed above). Hence, without the fraud, the alleged default in all likelihood would not have occurred, or would have been cured by Ellipso upon notice.

For the following reasons, a ruling establishing a default *a priori*, before the fact finder has an opportunity to review the evidence, and especially the impact of the fraud on the validity of such alleged default is premature. Plaintiff should be afforded the opportunity to present these facts to a jury.

Respectfully submitted,

_____/s/_____
Vanessa Carpenter Lourie, #250068
4400 MacArthur Boulevard, N.W.
Suite 205
Washington, D.C. 20007-2521
(202) 342-8000 (Office)
(202) 342-9000 (Facsimile)
vlourie@carpenterlourie.com

13

>              /s/
> Linda Awkard, #38748
> 4201 Cathedral Avenue, N.W.
> Suite 1416 W
> Washington, D.C. 20016
> (202) 237-1535 (Telephone)
> (202) 237-1204 (Facsimile)
> lawkard@earthlink.net (e-mail)
>
> Counsel for Plaintiff

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of Plaintiff's Motion for Reconsideration of Pretrial Order Excluding Evidence of the Value of ICOHA Shares Based on Default on the Loan was served this July 27, 2008 on:

> Christopher Hoge, Esquire
> Crowley, Hoge & Fein, P.C.
> 1719 Rhode Island Avenue, N.W.
> Suite 700
> Washington, D.C. 20036-3125

by electronic delivery by CM/ECF and on:

> Robert B. Patterson
> PO Box 3106
> Reston, Virginia 20195

by first class mail, postage prepaid.

>              /s/
> Vanessa Carpenter Lourie