```
1                      UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA
2         --------------------------X
          ELLIPSO, INC.                  Docket No. CA 05-1186
3                         Plaintiff,
                    v.                   Washington, D.C.
4                                        July 28, 2008
                                         2:06 p.m.
5         JOHN B. MANN, ET AL
                          Defendants.
6         --------------------------X
                   DAY 1 – JURY TRIAL – AFTERNOON SESSION
7               BEFORE THE HONORABLE ROYCE C. LAMBERTH
                      UNITED STATES DISTRICT JUDGE
8         APPEARANCES:
          For the Plaintiff:   VANESSA CARPENTER LOURIE, P.C.
9                              By:  Ms. Vanessa Carpenter Lourie
                               4400 MacArthur Boulevard, N.W.
10                             Suite 205
                               Washington, D.C.  20007
11                             202.342.8000

12                             AWKARD & ASSOCIATES, CHARTERED
                               By:  Ms. Linda Nanline Awkard
13                             4201 Cathedral Avenue, N.W.
                               Suite 1416 West
14                             Washington, D.C.  20016
                               202.237.1535
15
          For the Defendants:  CROWLEY, HOGE & FEIN, P.C.
16        JOHN B. MANN         By:  Mr. Christopher C. Hoge
                               1710 Rhode Island Avenue, N.W.
17                             Suite 700
                               Washington, D.C.  20036
18                             202.483.2900

19        ROBERT B. PATTERSON  PRO SE
                               By:  Mr. Robert B. Patterson
20                             P.O. Box 3106
                               Reston, VA 20195
21                             571.278.7076

22        Court Reporter:      Catalina Kerr, RPR
                               U.S. District Courthouse
23                             Room 6716
                               Washington, D.C.  20001
24                             202.354.3258
          Proceedings recorded by mechanical stenography, transcript
25        produced by computer.
```

```
 1                          C O N T E N T S

 2   OPENING STATEMENT BY MR. PATTERSON................   3

 3   COURT REPORTER'S CERTIFICATE.....................  99

 4   WITNESSES:                DIRECT  CROSS  REDIRECT  RECROSS

 5   David Castiel
       By Ms. Lourie            30
 6

 7   EXHIBITS:  DESCRIPTION                 OFFERED   ADMITTED

 8   PX-1       Agreement for Services        54        54

 9   PX-6       Collaterized Loan Agreement   75        75

10   PX-29      Amendment to Collaterized Loan  87      87
                Agreement dated 1/30/04
11
     MANN EX. 41 Amendment to Collaterized Loan  87     87
12               Agreement dated 1/30/04

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              P-R-O-C-E-E-D-I-N-G-S

 2         (2:06 P.M.; OPEN COURT; JURY NOT PRESENT.)

 3         THE COURT:  Is there an agreement now on the

 4  protective order?

 5         MS. LOURIE:  Yes, Your Honor.

 6         THE COURT:  Okay.  I assume you give that to the

 7  clerk to process and you can bring the jury.

 8         And is Dr. Castiel your first witness?

 9         MS. LOURIE:  Yes.

10         THE COURT:  Okay.

11         (JURY PRESENT.)

12         THE COURT:  All right.  Good afternoon, ladies and

13  gentlemen.

14         Plaintiff will call your first witness.

15         MS. LOURIE:  Mr. Patterson gets his opening

16  statement.

17         THE COURT:  Oh, I'm sorry.  Mr. Patterson, I'm sorry

18  to overlook you.  Go ahead.  I had too good a lunch.

19         MR. PATTERSON:  Good afternoon.  I'm Bob Patterson,

20  and I'm representing myself in this case, which is a little

21  bit unusual, but I was a lawyer for a number of years, and

22  although I may have a fool for a client, I am representing

23  myself.

24         I want to do a number of things with you this

25  afternoon, and I hope I keep you awake after lunch, but first
```

1    I want to talk to you about the parties in this case.  You

2    have heard something about the individuals that are involved.

3    I want to give you little more background on them so that

4    you're in a position to take that into consideration when you

5    consider their testimony and the believability of their

6    testimony.

7              I want to talk a little bit more about the corporate

8    entities that are involved and their interrelationships and

9    the interrelationships with the individuals as well that

10   control those corporations.

11             And I want to talk to you about my conviction and my

12   disbarment that's been mentioned.  I'll give you the details

13   on that.

14             And finally, I want to then go through the

15   transactions that are at issue here.  You've had some brief

16   overview of what's involved, and I want to add some more

17   detail to it and hopefully make it a little more

18   understandable for you.

19             But first let me pose the question of why are we

20   here?  This is a case about a loan.  A man took out a loan for

21   $100,000.  He didn't pay the loan back.  In fact, he didn't

22   make a single payment on the loan, and now he's in here suing

23   the other party who made the loan saying he ought to get more

24   money.  Doesn't this strike you as being backwards?  And the

25   answer is, of course, it is backwards, and we're going to

1   explain why it's backwards.

2          But first, let me talk to you a little bit about the

3   individuals that are involved.  Let me give you a little bit

4   of my background.  I was born in a small rural community in

5   Missouri.  I grew up -- my parents were shopkeepers.  I grew

6   up working cotton, among other things.  I chopped cotton, I

7   picked cotton, I mowed yards, I did what everybody does

8   growing up when they're working to make some spending money.

9          I went to the local college there, worked my way

10  through that and I was fortunate enough that I did

11  extraordinarily well on the law boards, and my brother, my

12  twin brother and I were able to go to Harvard Law School and

13  it changed my life.  Suddenly I was in the big leagues.

14         I graduated from Harvard.  I did my time in the U.S.

15  military, was honorably discharged.  I came here to

16  Washington.  I went to work for the United States Department

17  of Justice.  I was a prosecutor for three years.

18         I married.  I have three grown children.  I'm now

19  divorced.  After my three years with government service, I

20  moved over to Amtrak and I spent five years helping that

21  organization get started.

22         After that, I went into private practice.  I was

23  with two law firms.  I was with the law firm of Bryan Cave,

24  which is a very large international firm, and I was with a

25  government contracts firm by the name of the Pettit & Martin,

1   which has gone out of business, no longer exists.

2          After that I went into private practice and

3   ultimately got more and more into consulting and business

4   advising more than the straight practice of law.  And

5   ultimately, in 2002, I was -- became acquainted with

6   Dr. Castiel.  We developed a business relationship in which I

7   began to advise and assist his company, Ellipso, and

8   principally, as has been indicated, my obligations there were

9   to see if I could assist Ellipso in securing financing for its

10  satellite communications business.

11         Now, that still doesn't quite answer the question of

12  why we're here.  Why we're here has to do with Dr. Castiel.

13  Dr. Castiel is very well educated, as has been indicated.

14  He's never really worked as a scientist using his doctorate in

15  physics.  He's been really on the business side his entire

16  career, using more his economics degree and his business

17  expertise.

18         He founded Ellipso in the early 1990s and he

19  developed a satellite technology.  The company holds 30-some

20  patents for this particular technology.  The technology is

21  very, very good.  In fact, it's so good that when the Pentagon

22  did a study of the various satellite technologies out there

23  for communication, their consultants came back and said that

24  the Ellipso system is far and away the best system, if the

25  military has to replace its current satellite fleet.  That's

1  how good that technology is.  That's how good Dr. Castiel is

2  and the team that he put together that developed it.

3         And as you've been told, he raised almost $100

4  million that was invested in developing that technology and

5  securing those patents.  And in fact, not too many years ago,

6  the Boeing Company made an offer to Dr. Castiel to buy

7  controlling interest in Ellipso for $750 million.

8         Dr. Castiel was on the verge of becoming one of the

9  wealthiest men in the world, and within weeks of when that

10 transaction was to close, the satellite company Iridium went

11 into bankruptcy followed by every other satellite

12 telecommunications company.  The Boeing deal went up in smoke.

13        Ellipso had a technology, as good as it was, nobody

14 bought it.  You couldn't sell it.  To put it up and implement

15 it you needed at least $2 billion to put the system up.  There

16 was no market for it.

17        Dr. Castiel was desperate.  He lost the big offices

18 over on M Street.  He moved the company into a post office

19 box.  The address that was given here in court today is not an

20 office.  It's a post office box.  He practices out of his

21 home, out of his laptop computer.  He runs a business out of

22 his Jaguar limousine that he still has, but it's a far cry

23 from the company that it was a few years ago, and that changed

24 the entire picture.

25        When I came in, the most pressing need was to come

1    up with immediate cash.  Now, Ellipso itself didn't need a lot

2    of money because its expenses were the cost of the post office

3    box and the cost of the lease on Dr. Castiel's limo and the

4    cost of the health insurance for Dr. Castiel and his family

5    and his secretary, and there were a couple of storage bins out

6    in Rockville that the company had where it had stored its

7    corporate records.

8         That's all the money that Ellipso needed, except for

9    the fact that Ellipso was involved in a large number of

10   lawsuits.  Ellipso, while it had raised $100 million, had

11   never succeeded in getting a business going.  It had never

12   paid a dividend, it had never made a profit, and one of its

13   investors, a fellow by the name of Peter Sahagen, was very

14   upset that he had lost almost $10 million, and he had brought

15   a number of lawsuits against Dr. Castiel.

16        A number of former employees who had not been paid

17   by Ellipso were also suing Ellipso for back salary, and we'll

18   give you the names.  We'll show you the cases.  In fact, over

19   the past 10 years, Ellipso's been engaged in over 20 lawsuits.

20   It's the only business that the company has.  And a lot of

21   these lawsuits initiated just like this one, by Ellipso, and

22   they're initiated against former employees who were owed money

23   because rather than paying these people, Ellipso sues them.

24        And the claims are always the same, fraud, breach of

25   fiduciary duty, breach of loyalty, breach of contract, some

people even has been accused of filing the Foreign Corrupt Practices Act, and to man these lawsuits, Ellipso has retained at least a dozen law firms.  These law firms collectively have thousands of lawyers.  Ellipso has learned that if you sue an individual and you have a big law firm, that individual can't stay in the game, they don't get paid, they go away.

It's a way of relieving Ellipso's financial difficulties.  That, ladies and gentlemen, is why we're here, because Dr. Castiel and Ellipso owe me.  I worked for them for two-and-a-half years and I didn't get paid.  And for my work I get the pleasure of having to defend against charges of fraud.

Now, Mr. Hoge indicated that one of the central issues in this case is who are you going to believe, and that is a central issue.  And of course, in this case, the first thing that Dr. Castiel told the Court was that he never knew that I had an ownership interest in Mann Tech.

Well, I sent him an interrogatory, and he said, well, yes, he did find out on August the 12th of 2004, and we'll show you these documents, and he goes into an elaborate detail about how he took me to coffee at Starbucks for coffee and I confessed that I had an ownership interest in the Mann Tech Company.

Well, then he produced an e-mail in which he says he knew in October.  Then he says, oh, well, no, I didn't know till October.  We'll show you that e-mail.  And then we

produced an e-mail off of my computer in which he admits that he knew in June, "I knew in June you had a 50 percent interest in Mann Tech."

Well, what story do you want to believe?  Pick it. And of course, the answer is, none of them are believable. They're all made up.  And the reason is, when I arrived at Ellipso, and this was in late 2002, Ellipso was essentially broke.  It had no business; it had no income.  It only had a handful of employees who were not being paid.

Dr. Castiel was very interested in finding anyone who would assist Ellipso in raising cash, and I, of course, at that point was vulnerable.  I told you I would tell you about my conviction, and let me tell you what happened.

I had been a partner in two major law firms.  I left that partnership and went into private practice.  And while I was making a living, I really wasn't making a great living, and I had a client, a major client much like Dr. Castiel who wasn't paying me and eventually did not pay me.  He sued me, too.

But in the course of this, I had three children, a wife and two aging in-laws.  My father-in-law passed away and my mother-in-law went into an extended illness.  She was in and out of nursing homes.  She was suffering from cancer. Medicare at the time had a rule that you couldn't have oxygen at home.  The only reason she needed oxygen was because she

1   also had a heart condition.

2          Well, she hated the nursing home.  She was phobic,

3   and we decided to bring her home and we did, and I paid for

4   her care.  And she died comfortably surrounded by her children

5   and her grandchildren, and after she died, I found that I

6   didn't have the money to support my own family, and the

7   Veteran's Administration continued to send her retirement

8   checks.

9          It was a temptation I could not resist.  I cashed

10  some of those checks to provide for my family.  I never

11  intended to keep the money.  I always intended to pay it back

12  and I expected my client to pay me, which he never did.  As a

13  consequence, when the Government came around and wanted to

14  know what happened, I said, "Here's what happened.  Yes, I did

15  cash the checks."  And I pled guilty to a single count of

16  theft of Government property.  I was sentenced to six months

17  in prison, six months in a halfway house, and I was required

18  to pay back every penny that I had borrowed or taken, and I

19  did, with interest.

20         I paid the costs of prosecution, I did the time, I'm

21  square, and there's no loser there.  My mother-in-law died

22  comfortably at home, Medicare got paid, didn't have to pay for

23  her care, I did.  The Veteran's Administration got paid back,

24  and I lost my bar license.

25         Would I do it again to take care of my family?

1   Well, I'll take that up with a higher authority, but there is

2   one aspect of this that still haunts me, and that aspect is

3   that I encounter people like Dr. Castiel who see me coming.

4        They see somebody who might be used that they can

5   help, and in the end of the day they turn around and say, "I'm

6   not going to pay you because you're a convicted felon."  Well,

7   that's one reason we're here because he just doesn't want to

8   pay his bills, and I'm not alone.  We will give you the names

9   of at least 20 people who have worked for Dr. Castiel over the

10  last 10 years who haven't been paid, and in fact, it is my

11  belief that he hasn't paid anybody in the past 10 years that

12  has worked for him fully.

13        In the meantime, of course, Dr. Castiel has his own

14  life.  He told me at one point that his monthly requirements

15  were $22,000 a month to pay his mortgage on his

16  six-million-dollar home in Spring Valley, to pay the tuitions

17  for his three children in Sidwell Friends, to pay for his

18  Jaguar limousine, to pay for his skiing vacations, to pay for

19  his Caribbean vacations.  He maintains his lifestyle, but he

20  hasn't paid the people that have worked for him.

21        And In fact, one of the most egregious examples is a

22  fellow by the name of Captain John Draim.  He was really the

23  genesis of the Ellipso technology.  He was a captain in the

24  Navy, and he was the first person to come up with this

25  concept, and he worked on it for years and he signed on with

1    Ellipso after his retirement to be a consultant.

2          Captain Draim has been in litigation in this court

3    with Dr. Castiel now for eight years trying to collect for the

4    work he performed in developing that technology.  That's why

5    we're here.

6          Now, let me tell you about John Mann.  I first met

7    John Mann 20 years ago.  Actually, I can pinpoint it.  It's 22

8    years ago because that's the age of our sons.  He and I

9    attended the same church, we became social friends, our kids

10   played together.  After a few years, we kind of drifted apart.

11   I would still see him occasionally.  There were years when I

12   wouldn't see him at all, I wouldn't speak to him, but I did

13   know that John was -- held an engineering degree with

14   Princeton, that he'd been involved with MCI, that he was

15   familiar with satellite technology and he was someone that I

16   respected and liked.

17         And so, in talking with Dr. Castiel about how to

18   address the financial requirements of Ellipso and Dr. Castiel

19   himself, it occurred to me that John Mann, because of his

20   background in the technical field and his investment

21   background, might be interested in working with Ellipso.  So I

22   arranged a meeting, and this meeting took place in the spring

23   of 2003, and I was at the initial meeting.

24         There was a luncheon meeting and John met with

25   Dr. Castiel and another fellow there by the name of -- an

1    investor Gerald Helman, who was the vice president of Ellipso.

2    He's one of the gentlemen that hasn't been paid, by the way.

3    And they discussed Ellipso's financial requirements and this

4    and that.  And there were a couple of subsequent meetings

5    between John Mann and Dr. Castiel and some of the other people

6    at Ellipso that I wasn't party to.

7         I subsequently learned that John Mann had indicated

8    that he didn't think he would be able to raise the billions of

9    dollars that Ellipso was seeking to launch its satellite

10   system.

11        I went away, compliments of United States Department

12   of Prisons, in May of 2003 and did not return until October.

13   That was my six months.  When I returned, I contacted

14   Dr. Castiel again and indicated my willingness to continue to

15   assist Ellipso, and he was happy to have me do so.

16        And frankly, I was grateful.  I needed a job.  The

17   arrangement was that I was to be paid -- or was to accrue

18   $10,000 a month in salary.  I say "accrue" because Ellipso

19   wasn't paying it.  The arrangement was basically that when I

20   needed money, and I didn't need very much, I would go and ask

21   David for it and then he would write me a small check, and all

22   of the amounts that were deferred and accrued, I was promised,

23   would be doubled.

24        I subsequently learned that this was a ploy that

25   Dr. Castiel used with a lot of his employees to say if you

1   defer your salary, I'll double it when we get our money, and

2   there were a lot of people that sort of signed on for that and

3   a lot of people that have never been paid.

4        So, in discussing what to do with Dr. Castiel in

5   November of 2000 -- October, November of 2003, Dr. Castiel's

6   principal concern was that Ellipso was failing.  He liked to

7   use the ship analogy.  He would say, "Well, where we going to

8   go when Ellipso sinks?  Where can we hang our hat?"  And so

9   his concept was that there were certain assets or certain

10  potential businesses that Ellipso had that needed to be moved

11  out of the Ellipso corporate entity, so that if the

12  litigation, which was ongoing, went badly for Ellipso, there

13  would be something saved.

14       And the idea was that he and/or I or both would take

15  an interest in these new ventures as they were moved out of

16  the Ellipso corporate entity.  It was Dr. Castiel's idea.  It

17  was his concept.  It wasn't something that I brought in and

18  said, "Gee, why don't you spin this stuff out and let me take

19  it."  I mean, that didn't make any sense, but it made sense,

20  from Dr. Castiel's perspective, to move these particular

21  assets out.

22       Now, one of the assets that was going to be moved

23  out has been referred to as the Registry business.  This was

24  viewed as having great potential.  You-all are familiar that

25  when you dial overseas there are country codes.  You dial 1-1

1   or 4-1 or whatever.  The satellite communications companies

2   had been given country codes.  They were called the 881 codes,

3   and Ambassador Gerald Helman, who had worked for Ellipso, had

4   been the ambassador to the ITU, which is International

5   Telecommunications Union in Geneva, Switzerland, which is the

6   national organization that gives out the country codes.

7           And so Ellipso had obtained two of these country

8   codes, 881-2 and 881-3, and there were four or five other

9   companies that had these codes, but the business concept was

10  that we would set up and use these numbers, and in fact,

11  Gerald -- Ambassador Helman went back to the ITU and

12  specifically got permission for Ellipso to put these numbers

13  into service, even though Ellipso had no satellite service at

14  that time, but to put these into service using the existing

15  telephone networks, and the concept was that we were going to

16  sell vanity numbers, 881 to Hilton, 881 to chief judge, 881 to

17  John Smith.

18          And we would charge, Dr. Castiel's concept was, $3

19  per month for each number.  Well, we thought we could sell

20  millions of these.  We thought it was just going to be like

21  printing money, and it seemed so easy.  We had the code, we

22  had the permission, all we had to do was start the service,

23  and Dr. Castiel represented that, well, that was just a matter

24  of picking up the phone and telling somebody to throw the

25  switch.

1        I said, "Well, okay."  John Mann was one of the

2   founders of Network Solutions, the main name company that

3   keeps the registry of the main names.  He's perfect because he

4   knows how to set up a company to keep track of names and

5   numbers.  So we contacted John, and he was quite enthusiastic

6   about it.

7        David and I went out to John's home in Warrenton,

8   and this was the Saturday after Thanksgiving, 2003, and we sat

9   in John's living room in front of the fireplace and we

10  discussed this concept.  At the same time, Ellipso was

11  attempting to sell the ICO stock that it had, and ICO is

12  I-C-O, and this is the company that, as mentioned, was founded

13  by Bill Gates and Craig McCaw, and it's a satellite

14  communications company although it doesn't -- at that time it

15  had no satellites that were actually up but it had ground

16  facilities and various other things.

17       But it had just come out of bankruptcy and it was

18  traded on the pink sheets, which means that it doesn't have

19  the reporting requirements of a company that is traded on the

20  New York Stock Exchange or the American Stock Exchange, so

21  when you go to buy a pink sheet stock, you can't find out that

22  much about it.  Basically it's whatever the company wants to

23  release.

24       And Mr. Gates and Mr. McCaw were not releasing much

25  information about the company, so it was really kind of buying

1   a pig-in-a-poke.  The stock at that time was selling for 55,

2   56 cents a share and Dr. Castiel made the offer to John Mann.

3   He made it directly.  I wasn't the one that made it.  He

4   offered to sell 250,000 shares to John Mann for 50 cents a

5   share, a slight difference, and there we'll show you the

6   contract.

7          Now, Dr. Castiel has stated in this litigation that

8   he had nothing to do with it.  You heard his lawyer stand up

9   and say, "I'm the one who did the whole thing."  We'll show

10  you the document, we'll show you the document that Dr. Castiel

11  revised.  I didn't prepare the document.  He did.  Well,

12  there's another misstatement.

13         In any event, the stock sale did not go through

14  because before that could be consummated, a company named

15  Argyll Investments that I had identified -- Argyll Investments

16  is a national company that among other things makes stock

17  margin loans.  It's been doing this for years.  There is

18  several other companies that do, and in fact, in my efforts to

19  raise capital for Ellipso, I contacted probably a dozen such

20  companies.

21         And one of the allegations here, of course, is that

22  I haven't -- I didn't make enough effort to raise money for

23  Ellipso, and I will go through literally hundreds of people

24  that I contacted, the things that I did to attempt to raise

25  capital for Ellipso, and I'll explain that in some detail.

1      But suffice it to say that Argyll Investments was

2  one of the entities that I identified, and they had a standard

3  loan contract that they used for all of their stock margin

4  loans, and we'll show you that contract.  It's

5  fill-in-the-blank.  It's like your mortgage loan.  You fill in

6  the blank, name of borrower, name of lender, rate, amount,

7  whatever, and then it's got, you know, 16 pages of

8  boilerplate, which we all know you can't change.  When you go

9  in, you fill in your name and you sign it at the bottom.  You

10  go to start changing that stuff, well, there's no deal.

11      Now, this deal worked the same way as all of them.

12  My consulting contract was that I would identify the funding

13  sources, I would bring them in and then Dr. Castiel, on behalf

14  of Ellipso, would negotiate the deal.  I had no authority to

15  negotiate the deal.  I had no authority to sign anything.  I

16  simply brought it in.  And likewise, Ellipso had no obligation

17  to accept any deal that I brought.  It could be the best deal

18  in the world, they could turn it down and I wouldn't get my

19  fee.

20      So, it was kind of an arm's-length deal.  I would

21  identify them and they'd vet them, they would negotiate them.

22  This was not a situation where I was Gepetto and he was my

23  puppet.  No, I brought the deal in, and he negotiated the

24  deal.

25      I don't know what happened, but we will show you the

term sheet where Dr. Castiel filled it out and said, "I want to borrow on the full amount of the stock that I have, the 492,000 shares, and here is the discount rate and here is the amount of money that's going to come out of it," da-da, da-da, da-da.  He did that, I didn't do that, he did that.

Now, the 492,611 shares is a share certificate, and we'll show you the certificate.  That was a certificate that Ellipso received from ICO in December of 2001 when they were discussing the transaction between the two.  Now, the date is important because under the Securities and Exchange Commission rules, when you have this kind of asset swap between two companies, they put a restrictive legend on the stock which says you can't trade it for two years, and that's to avoid speculation.

So, in December of 2003, Ellipso had been holding this certificate for two years, so the restrictive legend was ready to come off, and I had tried to get a stock margin loan from a number of people prior to that, and they'd all turned it down because they said, "Well, you can't sell the stock because it's restricted," and that's a very important consideration, and I'll explain to you why in just a minute.

But whatever happened, and I don't know what happened, but Argyll backed out.  And I tried calling my contact down there, a fellow by the name of March Kimmel who was dealing with Castiel, and I found that March Kimmel had

1   left the company, so I don't know whether it had to do with

2   Ellipso or whether it had to do with March Kimmel or what, but

3   in any event, Argyll backed out and said, "We don't want to do

4   the transaction."

5          So now it's January.  Ellipso is still in desperate

6   need of cash.  David Castiel was in desperate need of cash.  I

7   kind of like to be paid something, too, so we discussed what

8   do we do about this.  And I said, "Well, John Mann didn't want

9   to buy the stock, but maybe he'd be interested in the stock

10  margin loan."

11         So David Castiel urged me to approach John Mann with

12  the loan agreement.  Now, let me explain a stock margin loan

13  to you.  I think the best way to think about it, it's not like

14  a car loan or a mortgage because in those situations you're

15  personally liable.  You don't pay the mortgage.  Well, the

16  house gets foreclosed and doesn't sell for enough to cover the

17  mortgage, you still owe the difference.  If it sells for more

18  than the mortgage, well, you get the difference back.  But

19  that's not the way this works.

20         The best way to think about a stock margin loan is

21  it's like a pawnbroker.  You take your watch, or in this case,

22  your stock in, and you're the pawnbroker.  So I give you the

23  stock and I say, "Here is $250,000 worth of ICO stock.  I want

24  you to loan me $100,000 on it."  I rounded the numbers here,

25  but you'll see the actual numbers, but usually it's 35 or

1   40 percent on a stock margin loan.

2          Okay.  You don't know anything about the stock I'm

3   giving you.  I mean, it might be worth nothing tomorrow or it

4   might be worth $10 a share tomorrow, you don't know.  So why

5   would you -- why would you -- and you can't find out because

6   it's traded on the pink sheets, so why would you make the

7   loan?  Well, here's why.  Because you can make it a no-risk

8   transaction.  As soon as you get the stock, you immediately

9   turn around and you sell 100,000 dollars' worth of it.  Now

10  you got your $100,000 back.

11         Dr. Castiel is paying you interest on that $100,000

12  that you've got in your pocket and you're still holding the

13  other 300,000 shares of stock as additional collateral, so

14  it's no risk to you.  If the stock goes down to nothing,

15  because it's a non-recourse loan, which means he doesn't have

16  to pay you, then your only recourse is to sell the stock.  If

17  you don't get the loan paid back, you keep the stock, and

18  that's what happened here.

19         But what happens if the stock goes up?  Well, the

20  arrangement is, under the loan agreement, you'll see the

21  provision, it says if the stock goes up above the 40 percent

22  of the stock price, then you and the borrower will split the

23  difference.  So it's a win/win proposition.  You can't lose

24  anything because you've already got your money back, and if

25  the stock goes up, you get a bonus.  If the stock goes down,

1   well, you get the interest and you're covered.

2          So, it's really kind of a clever transaction in the

3   sense that both parties are protected.  Dr. Castiel gets the

4   cash he needs, you get a chance to make some money on really a

5   no-risk situation.

6          So what happened here?  What happened here that

7   turned a no-risk situation into a lose/lose proposition?

8   Well, the problem was that when Mann Tech went to sell the

9   stock, sell the 40 percent of stock to get their $100,000

10  back, they couldn't sell it and they couldn't sell it because

11  they needed a corporate resolution from Ellipso that said, "We

12  authorize Mann Tech to take this stock and have authority to

13  sell it."

14         Now, the loan agreement required Ellipso to provide

15  that corporate resolution, but Dr. Castiel never provided it.

16  He didn't provide it in April, he didn't provide it in July,

17  and in fact, he never provided it.  And the reason was, he

18  admitted to me, that he lied to his board about the

19  transaction.  He never told the board what the transaction

20  was, so he could not go back to his board and get the

21  authorization to consummate this deal.

22         So what was the ultimate resolution?  Well, the

23  stock was being held in Ellipso's account at UBS, and

24  Dr. Castiel did have signatory authority on the account at

25  UBS, so the arrangement that he ultimately made was that Mann

1   Tech would return the share certificate, Dr. Castiel would put

2   it in the Ellipso account at UBS and then using his signatory

3   authority in that account, without going back to his board, he

4   would transfer the stock out to Mann Tech, and that's what

5   happened in August of 2004, and that's how Mann Tech

6   ultimately came to get the collateral that it should have

7   received in January.

8          Now, the underlying claim here is that John Mann and

9   I conspired to defraud Ellipso.  We were going to get this ICO

10  stock away from Ellipso.  Well, how were we to do that?  We

11  were going to loan Ellipso money.  We didn't have any legal

12  claim to the stock unless Ellipso defaulted.  What was the

13  conspiracy?  What was the plan?  You know, we -- I suggest you

14  will wait here all week and you'll never hear anybody

15  articulate what that plan was because there just is no plan

16  that's even conceivable that would cause that to happen.

17         But even more importantly, walk through the

18  sequence.  It's now April.  There's an interest payment due on

19  the loan.  He doesn't make the interest payment.  The loan's

20  in default.  Well, if John Mann and I were conspiring to take

21  the stock in April, we could have taken the stock.  He was in

22  default.  At that point the stock was selling at one point was

23  selling for over a dollar a share.  We could have simply taken

24  it and said, "It ours now.  Sorry, Charlie."

25         That isn't what happened.  No, we negotiated an

amendment.  We said, "Okay, look, let's sell roughly 100,000 shares, 20 percent of the collateral.  We'll split the difference."  We had a formula.  We'll split the difference, but of course, that well couldn't be consummated because Dr. Castiel never delivered the corporate resolution.  That's why we couldn't sell the stock in April.

So we continued to negotiate.  It's now July.  There's another interest payment due.  Well, once again, "Hey, John and I are conspiring.  We're going to take this stock."  Well, he's now missed two interest payments.  Why didn't we just take the stock if that's what our intention is?  No, we didn't take the stock.  We continue to negotiate with him, and on August the 2nd there's another amendment to the agreement.

Now, remember, Dr. Castiel has now admitted that as of June he knew that I was a 50 percent owner of Mann Tech, so there's no more hidden interest here.  He knows it.  On August the 2nd, he enters into another agreement, an amended agreement, and that agreement basically is a new agreement, and the new agreement says, "Okay, the old one isn't working out.  Here's what we're going to do.  We're going to sell all the stock and basically unwind the transaction."  Stock was then selling for about 45 cents, and we'll split it.  We'll split the proceeds, which basically meant that Mann Tech would get back its $100,000 and a modest profit.

Nothing great.  Get back about 125,000 on its, or

1  less, on its $100,000.  I mean, is this the action of somebody
2  who set out to defraud this man, who set out to take his
3  stock?  No.  It's somebody who's bending over backwards time
4  and again to try and make accommodations to try to make it
5  work.

6         Well, why didn't it -- and by the way, at that point
7  Dr. Castiel receives a 10,000-dollar additional payment as
8  consideration.  So now he's holding $100,000 instead of the
9  original ninety on which he's never made a payment.

10        Well, unfortunately, for all of us, the value of the
11  ICO stock plunged like a rock, and by October it was down to
12  essentially being worthless.  There was no market for it.
13  Nobody wanted to buy stock that was selling for 4 cents or 9
14  cents or whatever.  And while they come in here and sort of
15  try to intimate that they think the stock was worth something,
16  Dr. Castiel has indicated that in October or November of 2003,
17  he, Ellipso, sold over 600,000 shares of ICO stock that they
18  held for approximately 9 cents a share.

19        So, they might come in here and say they thought the
20  stock was valuable, but their actions say something else.  So
21  here we are now in October, and where do we sit?  Well, let's
22  back up just one bit because we've talked about now the 881
23  service.  What happened with that?

24        Well, the Registry company, using John Mann's money,
25  paid Ellipso directly royalties in the amount of $90,000 for

the privilege of setting up and operating the registry service

for the 881 vanity service.  And the Registry spent

considerably -- almost an equal amount of money setting up,

getting ready to provide that service.

Well, what happened was that Ellipso was never able

to put that telephone service into operation because while

they had the authority from the ITU to use the numbers, they

had to get the telephone companies around the world to do it,

which meant that every telephone company, MCI and Sprint and

AT&T and the Belgium company and the Congo company and all

over the world had to agree to handle the calls on that

exchange, and Ellipso was never able to put the agreements in

place to make that happen.

Now, Ellipso could make test calls.  They did have

some lines up.  They could make some test calls, and they

ultimately put in, in operation, an audio text service, which

is basically a phone sex service, which is not permitted by

the ITU, but they instituted that service, which of course,

didn't require a registry because it only had one number.  You

just call 881-SEX or whatever the number was, but that was the

only service that was ever offered and it wasn't the vanity

service that the Registry had contracted for.

So, here sits Mr. Mann and me in October, November

of 2004, we're out a quarter of a million dollars.  No

telephone service, no registry service, the stock is

1  worthless, what do we do?  We call up Dr. Castiel and say,

2  "Come on, let's talk about how Ellipso's going to pay us

3  back."

4       And his statement was, "I never want to talk to

5  either you or John Mann again about this."

6       Now, remember, the loan was a non-recourse loan.  He

7  didn't have to pay it back.  He had every right to walk away,

8  which he did.  So, of course, he only had the right to walk

9  away if he wasn't -- he hadn't committed fraud, and that's the

10  subject of the counterclaim here.

11       But we're here because, instead of waiting for us to

12  sue him, he took the initiative and sued us figuring he could

13  come in here and accuse us of fraud, and mind you, this is the

14  reward I get for two-and-a-half years of work, and in that

15  two-and-a-half years I raised for Ellipso a quarter of a

16  million dollars when nobody else on the face of this earth

17  could raise a penny for Ellipso, and I'm accused of not

18  performing under my consulting agreement.  And I'll go through

19  in detail the steps I took, and I'll go through in detail the

20  deals that I brought to Ellipso that Ellipso walked away from.

21       This is a story about a man who was desperate,

22  desperate for money to pay for his mortgage, desperate to pay

23  for his kids' education and a man who did some things that he

24  really shouldn't have done.  And I'm not unsympathetic to

25  that, as you know from my own experience, but there is one

1   incident here that I think probably captures it.

2            In April of 2004, I became aware of the fact that on

3   the registry service that the Registry company had bought and

4   was paying royalties for had already been sold to another

5   company.  He sold the fighter twice, out and out fraud.

6            And what happened?  Well, we studied the contract

7   and what we found was that the fellow that he had sold it to

8   first had a year to perform certain obligations under the

9   agreement.  That man was not able to perform, so at the end of

10  April we were able to void his contract and renegotiate with

11  him such that the service that had been sold to the Registry

12  company was able to actually be sold, although of course it

13  never came to anything because there was never a telephone

14  service that worked.

15           But I think this epitomizes things to which

16  Dr. Castiel and Ellipso were willing to go to raise money, and

17  I think this goes very much to the credibility issues that

18  you're going to have to decide.

19           Now, let me talk just a minute about the specific

20  claims that are leveled against me because there is a separate

21  consulting agreement.  I'll show you that consulting

22  agreement, and it spells out in some detail what I'm supposed

23  to do.  I'm supposed to raise money.  I'm supposed to protect

24  Ellipso's assets, and I will show you what steps I took to

25  raise money for Ellipso and what the results were.  I will

```
 1   show you what steps I took to protect Ellipso's assets, and

 2   I'll show you what the results were, and then you can judge

 3   whether or not I performed under that agreement.  And of

 4   course, keep in mind for all of that service and all of that

 5   work I haven't been paid.  Thank you.

 6              THE COURT:  All right.  Plaintiffs may proceed.

 7              MS. LOURIE:  Plaintiff calls Dr. David Castiel.

 8              THE DEPUTY CLERK:  Please raise your right hand.

 9              (WITNESS SWORN BY THE DEPUTY CLERK.)

10                          DAVID CASTIEL,

11   having been duly sworn, testified as follows:

12                        DIRECT EXAMINATION

13   BY MS. LOURIE:

14   Q    Would you state your full name, please.

15   A    My name is David Castiel.

16   Q    And Dr. Castiel, what relation do you have to the

17   Plaintiff Ellipso?

18   A    I'm sorry, could you repeat?

19   Q    What relation do you have to the Plaintiff Ellipso in

20   this case?

21   A    I'm the CEO of Ellipso.

22   Q    And how long have you held that position?

23   A    Since its inception.

24   Q    And when was the inception?

25   A    Well, the company started out as MCHI in 1991 and was
```

1   merged into a company in 1998 called Ellipso.

2   Q    And what was the purpose of Ellipso?

3   A    MCHI/Ellipso had the objective of building the satellite

4   system to provide -- to provide low-cost telephony.  I'm

5   sorry.

6             (BACKGROUND NOISE.)

7             THE DEPUTY CLERK:  Anyone have a Blackberry or a

8   cell phone, please cut it off at this time.

9             THE COURT:  Go ahead.

10  A    The purpose of Ellipso was to, as Mr. Patterson

11  indicated, is based on a technology that would reduce the cost

12  of telephone calls via satellite that would give, therefore,

13  access to satellite telephone into the entire world.

14            I don't want to take too much time, but if I could

15  express a little bit about it.

16  Q    (BY MS. LOURIE)  Well, let's go back to that.  Why don't

17  you tell us what your educational background is first.

18  A    Yeah.  I -- university -- starting in university, I did a

19  bachelor's in science in physics at the University of Montreal

20  in Canada and to -- went for master's program at Miguel

21  University.

22            Then I got a scholarship to go and do a doctorate in

23  Paris, France, and when I finished my doctorate, I was offered

24  a -- all in physics, offered a postdoctorate fellowship at the

25  University of California where I worked for three years as a

1  research scientist in solid state physics -- theoretical solid

2  state physics.

3  Q   And do you have any other training?

4  A   I'm sorry?

5  Q   Any other training?

6  A   I did take, when I was in Europe, a business degree to

7  expand my horizons a little bit, but I didn't -- never worked

8  as an economist or in business.  I was -- throughout the

9  postdoctoral fellowship, I was a scientist.

10  Q   Okay.  Have you written any publications of any type?

11  A   Yes, yes.  I publish in physical review -- physical

12  review letters, the Surface Sciences magazine and actually I

13  had one publication in Normal Symposium in 1974 of which I'm

14  proud, I guess.

15  Q   And could you give us a brief description of your work

16  history.

17  A   When I left the University of California where I was

18  doing a postdoc, I joined General Electric Corporation in

19  California and I -- where I designed systems, computer

20  systems, network systems, very engineering oriented, and then

21  they moved me to their headquarters or that division, which is

22  right here in Rockville, Maryland, and I continued doing work

23  like that, especially in telecommunications networks.

24          Back at the time it was packet switch networks, the

25  precursor of the internet, before the internet was

1    implemented.

2          After that I left General Electric and went for a

3    short time to work for a company called Booz Allen Hamilton.

4    It's a consulting firm that does defense work and commercial

5    work, and I worked on system design for microwave transmission

6    systems and others.

7          After that I went to work for a company that was

8    acquired by Hughes.  Hughes Aircraft Corporation, which is --

9    was one of the leaders -- or they were the leader in satellite

10   manufacturing and I continued working in satellite technology.

11         One of the new satellite concepts that was being

12   created in the mid '80s and late '80s is what's called Mobile

13   Satellite Service, MSS, and that is the ability of having a

14   satellite system talk or communicate directly to the user as

15   opposed through a dish and then broadcast out.  So basically

16   you would have a cell phone type via satellite, and the

17   advantage of that is it would cover the whole world, not just

18   where the cellular systems are because the satellites can

19   actually see a lot of the footprint, whether we are in the

20   Sahara or the ocean, et cetera, you are covered.  That was the

21   novel idea.

22         So I joined the company that was a consortium of

23   companies called AMSC, American Members [sic] of Satellite

24   Consortium.  I was vice president there.  They recruited me.

25   So I left Hughes, and AMSC ultimately became, I think is a

1    parent or the precursor of XM radio that you probably know.

2    So I was involved in that type of thing at the outset.

3            There was a lot of movement in that field at the

4    time, and I'm taking too long, but the new ideas were coming

5    up.  One of them was the new global system beyond what was

6    there, was the -- it was called the Iridium system that

7    Mr. Patterson mentioned earlier, and that's when I decided to

8    take my chances and implement my ideas.

9            So I created a concept that was named later Ellipso

10   and it's based on elliptical orbits that allow you to increase

11   dual time of the satellite.  The dual time of the satellite

12   over populated areas, therefore, you would concentrate your

13   investments in the markets, and therefore, you could increase

14   your return on investment.  That was the whole revolutionary

15   idea, so we filed for patents, et cetera.  Am I going too far?

16   Q   Well, you're past now your work history into Ellipso,

17   which is what I was getting to next.

18           Did you -- when Ellipso was created, did you have

19   other persons or entities involved with the founding of the

20   company or the operation of the company?

21   A   The company was initially -- well, MCHI, because Ellipso

22   wasn't -- the name Ellipso was later.  The -- it was created

23   by me and I had another company that joined, an engineering

24   company early on, and that expanded into additional companies

25   as we moved along.

1       We -- because of the concept was of using this

2   elliptical orbits to minimize -- maximize dual time and

3   therefore minimize the investment was quite revolutionary.  We

4   hit the press very, very much in the early '90s and we

5   attracted a lot of major companies.  We attracted Fairchild,

6   Westinghouse, Orbital Sciences, Israel Aircraft Industries,

7   Harris, all big, big names and they all came and started

8   making investments and the company grew that way.

9       Of course, later in the late '90s we signed up with

10  Boeing, as you probably heard.  They came to us, made the

11  investment and they wanted to build the system and control it,

12  et cetera.

13  Q   So what was your relationship with Boeing?

14  A   Well, Boeing became a shareholder and we used to call it

15  strategic partner, basically the main -- maybe the shareholder

16  was not the largest but they were the main partner that would

17  take control of the construction of the system, launch of the

18  system and operation and incorporating the market, et cetera.

19  It was a pretty big deal.  It was on the Wall Street Journal

20  and things like that.

21  Q   And so how did the company operate over the course of the

22  next few years?

23  A   Well, we -- we obviously were a development stage

24  company, which means we raise investments to build something.

25  So we attracted a lot of investments, we hired a lot of

1   people.  We had, I think, about 48 people on staff, and Boeing

2   had 140 people working on Ellipso.

3           So, the investments carried the, literally, the

4   operation, hoping to bring the product to market and a return

5   to -- on investment to the shareholders.

6   Q   Well, was Ellipso successful in launching it?

7   A   Well, we started, I think you the heard the number, 80

8   million or $100 million.  I think it was 85 million that we

9   raised in that period.  Almost all of it went back to the

10  manufacturers, to Boeing, Harris, et cetera, I mean, because

11  we needed to buy is gear.  So we started buying the gear, and

12  as Mr. Patterson explained in late 1990, early 2000 it was a

13  collapse.

14          The Iridium that I mentioned earlier had invested

15  $7 billion, and overnight lost it all.  So it was very

16  difficult to attract new investments when somebody else had

17  lost 7 billion.

18          So there were a slew of bankruptcies -- a string of

19  bankruptcies in that sector, and therefore, Boeing decided to

20  notify us that they wanted to put the investment on hold.  So

21  we put it on hold, we had no choice, and the hold became more

22  and more permanent until it disappeared.

23          To this day, Boeing is still a shareholder of

24  royalties, so the guys are still shareholders.

25  Q   Okay.  Did Ellipso file bankruptcy during that time?

1  A   No.

2  Q   Did Ellipso ever file bankruptcy?

3  A   No.

4  Q   Okay.  So what was the effect of the industry's downturn

5  on Ellipso's operations?

6  A   Well, one of subsidiaries of Ellipso filed bankruptcy,

7  MCHI, which had no assets at one time, except it had a major

8  lease on the huge office space we held.  I know Mr. Mann was

9  quoted as recommending that we move out.  That's easier said

10 than done when you have a contract which you have to respect,

11 so you had to get out of it.

12        But anyway, the net effect on Ellipso, since we

13 didn't accumulate much debt, we didn't go into bankruptcy, so

14 we just became poorer, but we still owned our property.  The

15 shareholders -- the shareholding has not changed basically,

16 since then.  Everybody is still there.  Now, the value may not

17 be the same, but we did have to restructure and give the

18 company to somebody else.

19        And what we tried to do is to see if we could team

20 with other people in our situation to see if we could get

21 stronger, and that's what led us to the ICO that you hear

22 about deal.

23 Q   Well, how did you acquire the ICO?

24 A   Well, ICO approached us and said, "Look, guys, there's a

25 problem in the industry" -- that was in mid -- early 2001.

1    "Nobody is going to make it a loan.  We are stronger than you

2    are because we have more common delegates with us."  So we

3    acknowledged that, "But if we pool our resources together, we

4    could get perhaps something going."

5              So we agreed with them, and they -- we transferred

6    our assets and they gave us equity that was worth a lot of

7    money actually on -- at least on paper what they told us.  It

8    was about $44 million.

9              So we said in this -- in this situation, since we

10   invested 80 million, recovered 40 million and hopefully it

11   goes up, it's not a bad deal; at least we retain that and

12   let's see what happens, and ICO invested and not only in

13   shares but in money, in cash also, which allowed the operation

14   to continue in 2001 and 2002.

15   Q    Does Ellipso still own the patents?

16   A    Yeah, we do have patents.  I don't think it's as many as

17   Mr. Patterson said.  I think it's only at 23 or 25 patents

18   combined in various sectors.

19   Q    Now, Mr. Patterson also indicated litigation that Ellipso

20   has been involved in.  Is that --

21   A    Oh, yeah, that was a major factor.  When there was -- we

22   had this subsidiary with -- called Virtual GEO, it's wholly

23   owned subsidiary of Ellipso that had slightly different

24   technologies, similar but more useable for broadband,

25   broadband meaning direct to home television, military

1    applications and things beyond telephony, and it was very,

2    very exciting.  That's the one that had the report from the

3    consultants, that the DOD would consider that as, quote, the

4    best replacement that Mr. Patterson mentioned.

5           The -- that technology attracted some investments

6    independent of the Boeing, et cetera, a small investor that in

7    our humble view took advantage of the situation in the

8    downturn to strike, and he struck very hard.  In 15 -- in the

9    two weeks we got like nine lawsuits served on us of all kinds

10   of things.

11          It's important to say, just to dispel the impression

12   that Mr. Patterson may have given, is they filed these

13   lawsuits and they lost them all and they lost them all in

14   appeal, but we lost a lot of -- millions in defending that.

15   Q    So Ellipso was the Defendant in those lawsuits?

16   A    Yes.  We had counterclaims, obviously.

17   Q    Any other lawsuits other that the one dealing with

18   Virtual GEO?

19   A    The major lawsuit that controlled all of the other

20   diversionary lawsuits launched by that minority shareholder

21   who actually is no longer a shareholder, he settled out

22   because of his losses, I guess, there was a ruling in Delaware

23   in September 2000 in which his actions were declared illegal,

24   and everything he had done was declared -- had to be

25   rescinded, and there was -- there is a permanent injunction

1  upon him and his associates, which were many of our own

2  employees who defected to him, and they have been paid full,

3  in full all the time, despite what Mr. Patterson said.

4       So they left and the injunction prohibited them from

5  even pretending that they were Virtual GEO, et cetera.  So,

6  what they did is they created a company to try to compete with

7  us and go into another one.  So they launched lawsuits against

8  us.  So the employees that took our secrets to him, to these

9  other people, they actually sued us.

10      Mr. Patterson names Captain Draim.  Well, I know

11  Captain Draim very well.  He sued us.  We didn't sue him.  He

12  had been paid every penny the day he resigned.  As a matter of

13  fact, he actually got two weeks' additional, not severance, so

14  he was paid in full, and he had been paid bonuses for

15  everything that he had done.

16      He sued us two years later because a patent that we

17  obtained years or months or years after he left the company,

18  he said, well, that was -- my name is on that patent.  You owe

19  me a bonus, although I left the company and I left the company

20  to compete with you and to take your technology with me.

21      Well, needless to say that he lost that lawsuit.  He

22  initially got a ruling in his favor and that was reversed and

23  remanded by the Court of Appeals right here.

24      So, we are not the litigators.  We have been

25  aggressed pretty bad, badly.  It is true that we launched a

1  lawsuit against Mr. Draim to counter his -- his -- his desire

2  to get a bonus for taking our technology.  I just never

3  understood that.

4  Q   That's all of it?

5  A   There were a couple of other employees, but we just gave

6  up.  We just settled it.  We didn't want to pursue.  We

7  settled all that stuff, and this is -- we settled in July in

8  2005 most of it.  And by the way, Mr. Patterson helped a lot

9  with these lawsuits as an attorney.  He drafted a lot of the

10  briefs, including the settlement agreement with Mr. Sahagen,

11  so that has to be put in context with what -- the story he

12  told earlier.

13  Q   Okay.  How did you come to know Mr. Patterson?

14  A   When Mr. Draim sued us, we hired a law firm to defend us,

15  and to countersue called Barkats & Associates, and they are in

16  Washington, D.C., I think in Lafayette Square, and they had

17  several attorneys.

18      And one day Mr. Barkats, the principal, called me

19  and he said that they had hired a brilliant attorney, that I

20  need to talk to him because it's really the greatest thing for

21  us, and I needed to meet that person.  That person, obviously,

22  was Mr. Patterson, and I have to say he is pretty convincing

23  and pretty smart and...

24  Q   Did he work on matters for Ellipso while he was --

25  A   Oh, yes, yes, at Barkats, he was an attorney and they

1   were representing us and he wrote the briefs.  I don't know

2   what he did, but he was introduced to me as an attorney at

3   Barkats.

4   Q    And how did it come about that he came to work directly

5   for Ellipso?

6   A    Well, at one point he disappeared and I don't know why,

7   and Mr. Barkats said he had resigned and that he had personal

8   problems.  He was a bit crazy.  I think that's what he told

9   me, that Mr. Patterson was crazy in the head.  That's exactly

10  the expression.  He said, "crazy in the head."

11          So I said, "Fine.  Too bad.  I like the guy."  And

12  about six months or so later, Mr. Patterson gave me a call,

13  and he said he was -- he was busy doing some personal business

14  and he -- he remembered us and liked us and he knew we were

15  right in our litigation, in our defense and he wanted to help.

16          So I said, "Well, we spent so much money on

17  litigation with literally millions, and now we have a Harvard

18  educated person that is brilliant that understand what we need

19  and he wants to do it kind of directly, that at least would

20  save cost, and he's a nice guy.  I like the guy."

21  Q    When was that?

22  A    In September, October 2002.

23  Q    And did you reach an agreement with Mr. Patterson as to

24  what services he would provide to Ellipso?

25  A    Yeah, they were of two sorts.  He said he had a lot of

1   business experience.  I think he had worked at Business

2   Solutions or AOL or both, I don't remember now, but he had a

3   lot of business experience, Amtrak, as he mentioned, and he

4   knew how to raise money and put together deals, et cetera, and

5   that is true, actually.

6           So -- and he had the legal expertise.  So we crafted

7   a consulting agreement by which he would do both, protect the

8   company's assets, which meant handle all litigation, maybe not

9   directly because we had other law firms, but at least as a

10  coordinator of all these.

11  Q   At the time that you had these initial discussions with

12  Mr. Patterson, were there any discussions about the status of

13  his bar license?

14  A   No.

15  Q   Okay.

16          MS. LOURIE:  Your Honor, if I may approach the

17  witness.

18  Q   (BY MS. LOURIE)  Dr. Castiel, I'm handing you what's been

19  marked as Plaintiff's Exhibit 1.  Can you identify that

20  document.

21  A   Yes.  It's the consulting agreement Ellipso signed with

22  Mr. Patterson, which is called here Consulting Management,

23  Limited in Middleburg, Virginia.

24  Q   And does that agreement spell out the services that he's

25  to render for Ellipso?

1    A    Yeah.  Yes.

2    Q    And would you just briefly review it and describe for us

3    what those services were exactly.

4    A    I think it says, (reading)  2.4, Consultant will help

5    establish a strategy to defend and protect the company in all

6    business matters, including litigation of pending and future

7    actions.

8           (Reading)  This strategy will have as its primary

9    aim to preserve the company's assets.  Consultant will have

10   primarily -- primary responsibility to effectuate the

11   initiation of actions against former employees who have

12   breached their contract with the company, former directors and

13   officers who have breached their fiduciary duty to the company

14   and any other persons similarly situated.

15          (Reading)  The primary thrust of the strategy shall

16   be for the purpose of recovering damages and ensuring the

17   company is not exposed to litigation as a form of extortion.

18   Consultant will also use its best efforts to secure personnel

19   to assist and effectuate these efforts at the best possible

20   terms and rates.

21   Q    And how is this agreement reached?  How were the terms

22   agreed upon?

23   A    How?  We -- it is a standard agreement that we use for

24   consultants, and of course, we customize it depending on what

25   the consultant is going to do and what he's going to be paid.

1          So, I think I e-mailed the standard form that was

2     used in the past to Mr. Patterson and he put in his own

3     descriptions.  And we had also -- he was -- by the way, he was

4     to raise money also, and there is a schedule of compensation,

5     percentage commission for money he would raise for the

6     company, either in form of loan or investment.  That is in

7     Section 2.2.

8          And I think there is a prohibition for him

9     double-dipping, you know the words.  If a financier or an

10    investor or somebody pays him -- well, he's not suppose to pay

11    him.  We pay.  And I think it's called, "no additional brokers

12    or fees."  I have to find it.  But there is no double-dipping.

13    Oh, here it is.  (Reading)  In the event of -- no, no.

14    Q    If I could help you, just above paragraph 2.3 on page 3,

15    it seems to be the paragraph you're searching for.

16    A    Okay.  (Reading)  In the event the company requests and

17    consultant accepts to provide other services to company, such

18    additional services would be --

19          COURT REPORTER:  You need to slow down.

20    A    Oh, I'm sorry.  Going too fast.  Okay.

21          (Reading)  In the event the company requests and

22    consultant accepts to provide other services to company, such

23    additional services will be billed to company at an agreed

24    rate and invoiced monthly.  Any amount owed by company to

25    consultant, pursuant to this agreement, which -- I'm sorry,

1   you said 2.5 or 2. --

2   Q   2.3, the paragraph above.

3   A   Oh, I'm sorry, I was reading the wrong paragraph.   I

4   apologize.

5        Okay.   2.3 says, (reading)   Company will reimburse

6   consultant for all reasonable costs and expenses incurred by

7   consultant in the performance of this agreement, provided that

8   consultant first obtained company's prior written approval for

9   such costs and expenses.

10        I think you're talking about --

11   Q   No, I'm talking about the paragraph above 2.3.

12   A   2.2, okay.

13   Q   You're on the right page.

14   A   I'm on the right page.   Okay.   Again.   All right.

15   Q   Read it to yourself and then just --

16   A   All right.   Well, it says, (reading)   If the Consultant

17   is independently compensated by a third party, advisor will

18   promptly notify the company of such compensation.   In this

19   case, consultant shall be entitled to a bonus per Section 2.2,

20   reduced by any amount consultant receives from other parties

21   to the transaction.

22        (Reading)   It is the intention of the parties to

23   avoid double-dipping but ensure that the total compensation

24   received by consultant from all sources for any specific

25   investment is at least equal to that contemplated by this

1   Section 2.2.

2   Q    And paragraph 2.4, just could you tell us briefly what

3   task he was to perform and compliance with that paragraph.

4   A    From the description here, I would say chief litigator or

5   litigation coordinator, not necessarily that he was litigating

6   every single defense, because at this time we still had

7   several lawsuits open.

8   Q    At the time that he joined you?

9   A    Yeah.

10  Q    And what specific task did he actually perform?

11  A    Well, he obviously read a lot of the briefs and

12  complaints and things, and he started hiring or recruiting

13  people to help.  One of the persons he brought to the company

14  is an attorney named Mr. Tom Mitchell who I learned much later

15  was his brother-in-law, apparently, but anyway a very fine

16  fellow.

17          He represented us in various litigations, and he

18  worked with Mr. Patterson.  Mr. Mitchell was, as I said, a

19  fine fellow, but to be brutal about it, Mr. Patterson is more

20  of a brilliant mind.  So Mr. Patterson would do the strategy

21  and the drafting, and it would be submitted by Mr. Mitchell

22  and supported by Mr. Mitchell.

23  Q    Did you understand why that was happening at the time?

24  A    Well, no, I understood -- when it happened, I understood

25  because it took awhile to get there because Mr. Patterson was

1  not capable of representing us because he had been disbarred,

2  as he said.

3   Q    Did you have a specific conversation with him after he

4  joined you in which you discovered that he had been disbarred?

5   A    Yes.  When we signed this agreement, I was all excited

6  and we were ready to go.  And shortly after, I don't know if

7  it's the same day or a week later or a few days later, late in

8  the evening, he came to my office and told me that he was

9  very, very happy to be working with us, that he -- that I was

10  a very nice person, at least at that time, and he was honored

11  to work with me and I felt the same.

12       And we had signed an agreement and because of that

13  he felt an obligation to tell me certain things.  And I said,

14  "What things."  And that's when he told me he had -- I don't

15  remember -- he didn't tell me he had a criminal conviction or

16  disbarment, but he did indicate that he had some problems with

17  the law, and his status was iffy.  That's what I recall.  I

18  understood that he had had problems with his marriage and/or

19  divorce or something like that and I didn't want to get into

20  that.  Some of these things are messy, and I said, well -- he

21  said, "You can terminate if you want," but I made the decision

22  then that, well, I had already signed.

23       Yes, I could terminate because he didn't tell me

24  before, or I could take the risk of working with him, and

25  whatever he had done bad or things had gone bad for him, I

would give him another chance because I truly believed and I

still believe he was very capable.  So I said I'll look the

other -- well, I didn't say that.  I thought that I would

overlook that and give him a chance to work with us and

perhaps rebuild whatever he had lost.

          And at that time I didn't know if he was disbarred

or suspended or -- and I didn't even know the difference

anyway.

Q    When did you find out?

A    It was about six months later.  We worked very well.

He -- at Christmas we were pretty low on cash.  I was not

being paid at all and I paid him a little bit.  I actually

took money and paid him before I paid myself, and I paid

others in the company before I paid myself; not much, but

that's what we had.

          He took a ski trip with his children, which I met,

by the way, and I found very, very lovely.  They are very nice

kids.  So I actually like the guy, so I said why not.

          Anyway, he had taken a ski trip and broken his leg,

and to go to work every morning, I actually would take a

detour and pick him up in my car, not a limousine, by the way,

not the Jaguar limousine.  It's an old Citroen that I have, a

beige 30-year-old car, and I would pick him up and take him to

the office and give him a ride back because it was easier than

to go by taxi, then by on crutches.

1          So, this is the strength of the relationship and the

2    trust.  And then suddenly in April he disappeared.  He didn't

3    come to work.  He was always very early to work.  He was there

4    all the time.  He was very good.  He was always good about --

5    full of ideas and great, great guy.

6          And in April he wasn't there.  He was late.  So we

7    called and there was no answer.  We called home, we called the

8    cell phone, I even called the old number in Leesburg or

9    Middleburg and I was yelled at by the lady who answered, which

10   I assume was his ex-wife who told me, "Don't you ever dare

11   call this number again."  And I was a bit shocked.

12         So a few weeks -- a couple of weeks later,

13   Mr. Mitchell came to my office and explained to me that he

14   knew then where Mr. Patterson was.  I said, "Well, where is

15   he?"

16         He said, "He's in jail."

17         I said, "In jail?"

18         And I don't know exactly what had happened, but I

19   think he told me that in -- he was in court defending

20   something, some personal matter and he had been very

21   disrespectful to the judge, and that's what I was told.  I

22   wasn't there.  I don't know.  And that he had told the judge

23   how to read the law because Mr. Patterson knew more and that

24   was not appreciated.  That's what he told me.

25         So he spent some time in jail.  We had even

1    arranged -- Mr. Mitchell arranged for certain conversation

2    from jail.  Myself and Ambassador Helman, a retired U.S.

3    Ambassador who spent his entire life in Europe, were a bit

4    uncomfortable to -- when Mr. Mitchell called the jail to ask

5    for Mr. Patterson.  He asked for Prisoner No. X.  We weren't

6    used to that language, but I still liked Mr. Patterson, for

7    some reason, and we -- we just did -- we started forgetting

8    about him and he -- he vanished.

9         And then one day in October he called me and said he

10   was out of his sabbatical.  He came back.

11   Q    And you hired him back?

12   A    Well, I was very torn.  I didn't know what to do, and he

13   told me that there was a lot of potential in what we're doing

14   and now he's cleared and he's going to rebuild, et cetera, and

15   he can be very persuasive.  I guess he can be very charming

16   and eloquent, and I said, "Well, if that's behind us, why

17   not."

18        And I -- I agreed to -- excuse me -- to let him look

19   for opportunities, and if I have some extra money, I would pay

20   him.  We didn't have much at the time.  So I think I may have

21   given him a couple of thousand dollars, which probably was

22   useful coming from where he came, and that has to be seen in

23   the context of me not having had a cent in salary for over a

24   year, zero.

25        As a matter of fact, I would deposit my own savings

1    into the Ellipso account so I could pay checks out of Ellipso.

2    So that's when he started renewing his contacts, including Mr.

3    Mann.

4    Q    And he introduced you to Mr. Mann?

5    A    A year earlier he had introduced me to Mr. Mann.  As I

6    said earlier, Mr. Mann came to our office.  He didn't come as

7    an investor -- or potential investor.  He came as a potential

8    executive, not that we were going to pay him, because we

9    couldn't afford it really at his level, but he was going to

10    come in for equity, kind of a partner executive.  But he

11    disappeared, he wasn't interested.  So, I even invited

12    Mr. Mann to my wife's birthday party, but he didn't come.

13    So, a year later, he contacted Mr. Mann and he told

14    me that he had talked to him, that there could be a potential

15    to renew because Mr. Mann was a perfect candidate to build the

16    registry, that 881 registry, and I said, "Well, we need all

17    the help we can get."

18    Q    And so that was the purpose for renewing the relationship

19    with Mr. Mann was the 881 registry at the time?

20    A    Well, I don't know because I wasn't on that first call.

21    Mr. Patterson approached Mann -- John Mann to see where he was

22    up to -- what he was up to, and then I don't know what he

23    proposed.  I wasn't there.  Mr. Patterson told me that he had

24    contacted him and Mr. Mann could help us raise money or

25    perhaps even invest himself because he was relatively wealthy.

1        Now, I think at one -- we did have a meeting, and

2   Mr. Patterson said that we met on the Saturday of

3   Thanksgiving.  Well, on Tuesday before Thanksgiving, I went to

4   New York with my family to visit my family in New York, and I

5   have -- and returned by car.  We have New Jersey turnpike, gas

6   and food and tolls because I checked that because of other

7   testimony.  I wasn't here on Saturday night of Thanksgiving.

8   I was in New York.  So -- so I didn't meet Mr. Mann on

9   Thanksgiving, but it may not be that important.  I don't know.

10        I don't know if I met Mr. Mann before December 3rd

11   or December 10.  I think I met him in December sometime, but

12   in any case, there was proposal of a contract for sell of

13   securities that floated back and forth.

14   Q    Now, back to Plaintiff's Exhibit No. 1, it indicates a

15   termination date of September 30, 2003.  Was that when the

16   relationship terminated?

17   A    Well, the term says it's September 30, 2003 or such later

18   date as may be mutually agreed pursuant to Clause 17 of this

19   agreement, but there is no 17.1.  I think it's termination.  I

20   guess we agreed to verbally or by fiat to just continue the

21   relationship, so it was extended.

22   Q    And there appears to be an addendum to the agreement

23   attached that was dated February 9, 2003.  Do you recall how

24   that came about?

25   A    Yeah.  Yeah, he -- he -- he was -- Mr. Patterson was

1  concerned, if I recall, that if he accrued too many unpaid

2  fees as a consultant and there were an instance of bankruptcy,

3  he would be treated as a creditor as opposed to an employee,

4  and I think that's when we crafted something in which he would

5  be like everybody else.

6          So if there were any money left, I, in lieu of

7  taking it, he has to share with me.  My understanding, in

8  bankruptcy, you have employees, creditors, shareholders, so

9  that was a way to protect him from that situation, so...

10  Q   And did he continue to work with you under the terms of

11  the agreement after this time?

12  A   Yes.

13          MS. LOURIE:  Your Honor, I wanted to move in

14  admission of Plaintiff's Exhibit No. 1.

15          THE COURT:  Received.

16          (PLAINTIFF'S EXHIBIT 1 ADMITTED.)

17          MS. LOURIE:  It's okay.  Oh, I'm sorry.  I didn't

18  hear you.

19  Q   (BY MS. LOURIE)  Now, in the fall when Mr. Patterson came

20  back to work with you, did he in fact identify sources of

21  financing for Ellipso?

22  A   Yes.  He identified -- identified many sources.  He also

23  participated in the pursuing -- opening of the 881 that you

24  heard earlier with a company in Pittsburgh.  He established a

25  contact.

```
 1          Of course, he just told us that he was shocked eight
 2   months later to find out that that company existed, but he's
 3   the one who discovered them and we negotiated a contract that
 4   was executed later in March of 2003.
 5          So, financing, business opportunities, I can't
 6   recall all the names because we have been focused on John
 7   Mann, Mann Tech and Argyll, but there were others that
 8   obviously didn't pan out.
 9   Q    So you didn't consummate any deal with anyone else?
10   A    No.
11   Q    Okay.  In the course of working for -- with you during
12   that time, was Mr. Patterson privy to the operations
13   completely of Ellipso?
14   A    Oh, yes.  He -- well, he knew everything; perhaps except
15   the exact balance in the bank account, which wasn't that much
16   of a secret anyway.  But yeah, he was -- because of his
17   involvement in the litigation, he had to have access to almost
18   everything we had; otherwise, he wouldn't be able to do his
19   job.
20   Q    Okay.  Now, there came a time when Mr. Patterson brought
21   the Argyll possibility to you?
22   A    Yeah.  I don't know how that happened because in December
23   we were negotiating with John Mann for him to do something,
24   whether it's a loan or sell securities, and then a registry
25   agreement that came later, actually, not before, at least from
```

1    my point of view.  Maybe in Mr. Mann's mind it was different,

2    but -- and then it kind of slowed down and it was also

3    Christmas holidays.

4           And then in early January, Mr. Patterson said that

5    he had uncovered a better opportunity.  Rather than sell the

6    stock that he thought was very valuable, maybe we could -- we

7    could borrow against it and share the upside, and I think he

8    explained quite well what the deal was.  So I thought, wow,

9    getting half the upside is better than zero; selling at a low

10   price today, it doesn't make sense, so actually I agreed with

11   him.

12          So he -- we pursued Argyll.  I had an exchange, I

13   think, by mail or fax or e-mail and maybe I talked to the guy

14   in person, I don't know, on the phone.  And then one day he

15   called and said Argyll is out.  I think he just told us.  He

16   didn't say why.  I didn't understand why.

17   Q    Did you in fact make modifications or suggestions for

18   changes on the term sheet from Argyll?

19   A    Yes.

20   Q    And did you discuss that with Mr. Patterson?

21   A    Yeah.  Well, yes.  I think -- I think there was a

22   35 percent margin, that value-to-loan ratio, and I said why

23   not 40 percent.  So Mr. Patterson said just mark it up and fax

24   it back to him and see what he says.

25          And actually I remember now, I did call Mr. Kimmel

1    and he said, "Yeah, that's fine," so he agreed to 40 percent

2    instead of 35 percent and a few other points, but it was a

3    term sheet of business terms, rate, length and that kind of

4    thing.

5    Q    Had any actual agreement ever been put in front of you to

6    consider for the Argyll loan?

7    A    Yes.  Mr. Patterson send me a draft or a contract form

8    that apparently he couldn't open or it was encrypted or he

9    couldn't do anything with it and he asked me if I could do

10   something with it.

11           And I don't remember how I opened it, but I could

12   use it as a file, and so he said, "Well, just type in the

13   name," et cetera, and so we filled out the form.  I guess he

14   was on the phone with me while I was doing that.

15   Q    And did you discuss the specific terms with him?

16   A    No.  Well, what I considered terms is how much do I get,

17   how much do I have to pay, what's the upside, is it 50/50,

18   because I think the first Argyll thing was we get 30 percent

19   on the upside and Argyll keeps 70 and that was changed to

20   50/50, so these kind of terms I did discuss and negotiated, if

21   that's the word.

22   Q    Did you discuss with him the terms and conditions of the

23   loan, default provisions, payment -- time provisions, things

24   like that?

25   A    No, no, I did not discuss that.  I --

1   Q   Did he make any representations to you as to whether he

2   suggested that the loan was a good loan for Ellipso?

3   A   Well, he said he was -- he just said it earlier.  He said

4   it was a good loan and it was boilerplate forms that we should

5   accept it.  There is nothing drastically dangerous or bad

6   about it.  I -- it's a lot of fine print.  It's a very thick

7   document.  I -- I didn't really pay attention to every detail.

8           You talked about the default provisions.  I finally

9   learned them after the lawsuit was filed.

10  Q   I'm speaking of the Argyll provision.

11  A   The Argyll, I'm sorry.  Well, I assumed they are the same

12  default provisions, which I'm not even sure because I haven't

13  read them recently, but I did not review the Argyll default.

14  Except for the term sheet, I didn't review anything of the

15  Argyll.

16  Q   Okay.  So what happened next with respect to attempting

17  to identify funds?

18  A   Well, when he called me and said Argyll was gone, he

19  said, "I will call John Mann and see if we can do a similar

20  deal."

21          I said, "Fine.  That's great."

22          We had the option at that time to just sell the

23  shares in the pink sheet open market, which are -- would have

24  give us a quarter of a million dollars, but then we would have

25  lost the upside, so he contacted John Mann and apparently John

1    Mann was very interested in that form of investment.  So I

2    asked him to draft a contract, and he said, "No, we'll use the

3    Argyll form."

4            I said, "But the Argyll is totally confusing.  I

5    don't know -- nobody -- I don't understand what it says.  Why

6    don't we draft our own agreement since Mr. Mann is somebody we

7    know."

8            He said, "No, no, it's better to use the Argyll."

9    If I recall, he said, "Because then the board won't complain

10   if there is an issue."

11   Q   So, did you have any direct communications with Mr. Mann

12   regarding the terms of the loan?

13   A   No.

14   Q   And did there come a time when there was some agreement,

15   at least between you and Mr. Patterson, as to what the terms

16   of the loan would be?

17   A   Well, we took the 40 percent and a few other numbers and

18   we -- we proposed that to Mr. Mann, and I was relying on

19   Mr. Patterson to negotiate whatever was necessary to negotiate

20   of other terms with Mr. Mann.  Mr. Patterson was our

21   consultant.

22   Q   Did he have any discussions with you about the legal

23   effect of any of the terms included in the loan agreement?

24   A   No.

25   Q   Did you ask him?

1    A    I'm sorry?

2    Q    Did you ask him?

3    A    Well, I asked if the rest is okay.  He said, "Yeah, it's

4    the same as Argyll.  It's boilerplate.  It's, you know, there

5    was no red flag or anything."

6    Q    And so over the course of what period of time did this

7    occur, the proposal to the actual loan agreement?

8    A    Well, about two, two or three weeks, culminating on

9    January 30th, 2004.

10   Q    Okay.  Now, briefly, how much money were you to get and

11   what did you give in return?

12           THE COURT:  Let's do that when we come back.  We'll

13   take our afternoon recess.  10 minutes.

14           MS. LOURIE:  How long, Your Honor?

15           THE COURT:  10 minutes.

16           MS. LOURIE:  10 minutes.

17           THE DEPUTY CLERK:  All rise.  This honorable court

18   stands in recess for 10 minutes.

19           (A BRIEF RECESS WAS TAKEN.)

20           THE COURT:  Go ahead and bring the jury.

21           (JURY PRESENT.)

22           THE COURT:  All right.  You may proceed.

23           MS. LOURIE:  Thank you, Your Honor.

24   Q    (BY MS. LOURIE)  Now, after the Argyll deal fell by the

25   wayside, you were still sort of in negotiations about the

1  possible -- or were you still in negotiations about the possible

2  contract for sale of securities?

3  A   Well, Mr. Patterson said that that was not available,

4  that Mr. Mann wanted a loan type of agreement.

5  Q   Okay.  Well, let me ask you to --

6           MS. LOURIE:  If I may approach, Your Honor?

7           THE COURT:  Yes.

8  Q   (BY MS. LOURIE)  I'm handing you what's been marked as

9  Mann's Exhibit No. 8.  Do you recognize that document?

10  A   Yes.

11  Q   And what is that document?

12  A   It's a document that is called, "Contract For Sale of

13  Securities."

14  Q   Was this the document that was being considered?

15  A   Yes.  There were various versions, I think, or drafts,

16  but this is one of them.

17  Q   Well, let me hand you a couple of other Mann exhibits, if

18  I may.  Mann has marked as Exhibit No. 5 and as Exhibit No. 9,

19  they all appear to be sales of securities.  Do you remember

20  looking at each of these different documents, or are they

21  different?

22  A   Any one of them could be the -- I'll have to study each

23  to see which one should be first and which one evolved to the

24  next one.

25  Q   Could you take your time and look at them and see if

1   there is a difference.

2    A   Well, the first thing I look is -- they have no date

3   so -- on the first two seem to be --

4    Q   Identify them by number, please.

5    A   Oh, No. 8 and 9 seem to be exactly -- no.  Seem to be

6   similar in that they offer the sale of 500,000 shares to Mann

7   Technologies from Ellipso.

8           MR. HOGE:  I'm sorry, which exhibit are you looking

9   at there?

10           THE WITNESS:  8 and 9.

11           MR. HOGE:  8 and 9?

12           THE WITNESS:  Yeah.

13    A   So -- and it says that commensurate with the execution of

14   this agreement, Ellipso shall deliver the stock to an escrow

15   agent for the benefit of John Mann and said escrow agent shall

16   deliver once full payment has been received by Ellipso.

17           I think -- and then it said that the consideration

18   would be $250,000, 50,000 at the outset and then 25,000 for

19   each month.  Okay.  This one says beginning January 1st.

20    Q   When you say "this one," you need to refer --

21    A   No. 8 says January 1st and No. 9 says February 1st,

22   so I suppose that one moved.  It was later.  And it's

23   important, I think, that both of them say, (reading)  It is

24   further agreed that as further consideration of this stock

25   certificate, Ellipso shall receive 50 percent of any net

1    proceeds received by Mann from any subsequent sale of

2    conversion of said stock certificate, or any portion thereof,

3    to the extent such net proceeds exceed one dollar per share.

4    Net proceeds means funds received by Mann Technology, Limited

5    net sales -- net of sales commission.  Such funds or other

6    proceeds shall be remitted to Ellipso within 10 days of

7    receipt by Mann Technologies.

8         And I think it says the same thing in No. 9.  And it

9    says that in the event -- well, I guess No. 8 says, (reading)

10   In the event that no subsequent sale of -- or conversion of

11   the stock has occurred by the time of the third anniversary of

12   this agreement, December 2006, on that date Mann Technologies,

13   Limited shall remit 250,000 shares of ICO Holdings common

14   stock to Ellipso.

15        So I guess if the price goes up, we split the

16   profit.  If nothing has been sold, then we split 50/50 -- we

17   return the shares.

18        (Reading)  As an additional consideration, Ellipso

19   grants Mann the right to purchase an additional 500,000 shares

20   of ICO.  This option shall apply only to shares of ICO stock

21   that are issued to Ellipso after January 31st, 2004,

22   pursuant to currently existing agreements between Ellipso and

23   ICO, and the terms shall be the same, except that the purchase

24   price shall be $500,000, I guess, instead of two-fifty that

25   Ellipso -- we expect it to be more valuable.  And the 50

1  percent division of proceeds shall apply to proceeds exceeding

2  $2 per share.

3          So it's not a straight sale.  It's a sale with some

4  sharing of the upside.

5          (Reading)  In case of breach of this agreement, by

6  nonpayment of monthly amount herein committed, this agent

7  shall return the stock certificate to Ellipso, which shall

8  then issue, or cause ICO to issue, a certificate to the

9  benefit of Mann Technologies drawn for a number of ICO shares

10 equal to the sum of all payments made until that date of

11 default divided by two.

12         So, if Mann Technologies does not continue paying

13 for the shares, they are supposed to return the shares but

14 they get the number of shares they have paid for at the time

15 they stop payment.

16         And I guess it's -- will be governed by the District

17 of Columbia, et cetera, and the American Bar Association --

18 Arbitration Association.  And this one has -- No. 9 has an

19 additional page.  I guess the -- it's the same additional

20 option for 500,000 shares but I don't see the price.  It just

21 gives a way how to pay the next $500,000 if Mann Tech decides

22 to buy more shares, and then there is a redemption at the end

23 just like the other one.  I guess that's what I can do with

24 these two here.

25         No. 5, or the first difference is that the contract

1   for sale of securities title is not centered, so it indicates

2   it's a different document, so -- but it's still 500,000 shares

3   for $250,000, but payable -- $25,000 upon execution and then

4   $25,000 each month.  So, whereas, this one is $50,000 first

5   and then $25,000 each month.  So this one gives less money up

6   front.  I don't know which can -- comes first.

7           And then the proceeds are divided by two, and if

8   there is no conversion, Mann Technologies return 250,000

9   shares -- if they don't sell, if Mann Tech doesn't sell that.

10  If they sell, we split 50/50 the cash.  If they don't sell, we

11  get 250,000 shares back after we pay the loan on the tenth

12  anniversary.  Wow, 2013.  So, they have 10 years to decide to

13  sell it.

14          And then for one year we grant Mann an additional

15  option for 500,000 shares.  It appears that this one is

16  earlier because it's less complex or less --

17  Q    "This one" you're referring to --

18  A    This one, No. 5, seems to be earlier because it is less

19  wording.

20  Q    Did you participate in any of the variations in those

21  three versions?

22  A    I don't remember.  I've seen those.  I can't answer.  It

23  doesn't look like my style in terms of syntax, but it's

24  probably Mr. Patterson and I did it together by e-mail back

25  and forth.  That's all I can recall.  It does -- it does

 1   track, except for the option, it does track the Argyll, but

 2   it's clearer, at least to me.

 3   Q   Okay.  So -- but you never signed any versions of that

 4   agreement?

 5   A   No.  Mr. Mann, according to Mr. Patterson, didn't want

 6   this, and Mr. Patterson then says -- discovered or uncovered

 7   Argyll and he said that is a standard agreement.  And when

 8   Argyll collapsed, he want back to Mr. Mann and said Mr. Mann

 9   wants to do the deal but it's the Argyll deal.

10            In terms of terms, the Argyll and this is very

11   similar.  You pay something and you split the difference --

12   you split the profits, but this is clearer to me.  The Argyll

13   is not clear to somebody like me.

14   Q   I'm handing you what has been also marked as Mann

15   Exhibit, this one is No. 13.  Can you please identify that

16   document.

17   A   It's an e-mail from Mr. Kimmel at Argyll, Argyll Group,

18   to rbplaw@hotmail.

19   Q   And do you know whose e-mail address that is?

20   A   Robert B. Patterson Law, I guess his law firm or law

21   something.

22   Q   Is there numbers on the bottom of that, "PATT" numbers?

23   A   That's supplied by Patterson, I suppose, in his

24   discovery.

25   Q   Can you -- I'm directing your attention to PATT00392.

1    A    Yeah.  Yes.

2    Q    And can you identify that portion of the document.

3    A    It's the term sheet in which Argyll -- which is marked

4    "Confidential."  It has the letterhead "Argyll."  I assume

5    it's their proposal.  It says, (reading)  Pledged collateral:

6    ICO Global Communications; Loan Recipient:  R.B. Patterson;

7    Number of Shares:  500,000; Traunch Size:  100,000; Traunch

8    Frequency:  7 to 10 business days; Currency:  U.S. dollars;

9    Closing Date:  TBD; Loan Term:  Three-year loan term, 18 month

10   Lock Out on repayment, interest only paid quarterly, principal

11   paid at the end of the term.

12            (Reading)  Synthetic Loan Protection:  As a benefit

13   to the borrower, 30 percent of any appreciation of the

14   collateral shall be protected for the account of the borrower.

15   At loan maturity, borrower shall be entitled to recoup the

16   first 30 percent of any available appreciation in the value of

17   the collateral over the value at closing, with the remainder,

18   if any, for the account of the lender.

19            (Reading)  Interest rate:  Prime rate plus 100 basis

20   points adjusted quarterly; Loan to Value:  35 percent.

21            Well, actually it says 35 percent in numbers,

22   parenthesis, 40 percent, so I think there is a typo somewhere.

23   Q    So, Mr. Patterson is identified as a loan recipient?

24   A    Yeah.

25   Q    But it's your understanding that that was a loan he was

1   negotiating for Ellipso?

2   A   That's what he told me, I suppose, yes.  It says, "Loan

3   Recipient:  Patterson."  I don't know why it says that.

4   Q   Okay.

5   A   And estimated gross amount, $105,000.

6   Q   Now, there came a time when you actually entered into an

7   agreement with Mann Tech, correct?

8   A   Uh-huh.

9   Q   Do you recall when that was?

10  A   I'm sorry?

11  Q   Do you recall when that was?

12  A   In January 30th.

13  Q   Okay.  I'm going to hand you what's been marked again as

14  Mann Exhibit No. 22.  Can you identify this document?

15  A   It's an e-mail from me to legalmanagement@yahoo.com.  I

16  guess yahoo.com is Mr. Patterson's Yahoo e-mail.

17  Q   And what's attached to it?

18  A   It's a document called, "Collateralized Loan Agreement,"

19  has 19 pages or more.  Am I supposed to --

20  Q   No, I just want you to identify it.  Is that the document

21  that represents the 90,000-dollar loan to you from Mann Tech?

22  A   No, hold on one second.  Yes, it says $90,000, has

23  definitions.

24  Q   You have to keep your voice up if you're --

25  A   Yeah.  It says $90,000, loan; fees and interest,

1  5 percent.

2  Q    I just want you to identify that as a document that is

3  the subject of this litigation.

4  A    I don't know if it's executed, so I can't answer.  But

5  the last page has Argyll equities as an attachment, so

6  obviously it's a draft in which we are converting the Argyll

7  document into a Mann Tech document.

8  Q    So you did work from the Argyll loan agreement?

9  A    Yes.  As I said earlier, Mr. Patterson couldn't figure

10  out how to work on it, so he sent it to me and I guess he got

11  it from Mr. Kimmel.  I made some changes, like the name, and I

12  put Mann Technologies, the address, to give it to me, and then

13  he asked me also to change the logo from Argyll to Ellipso to

14  look more official.  I said, "Fine, I know how to do that," so

15  I don't think he knew how to do that.  So we -- we created

16  that document.

17  Q    Okay.  Did there come a time when you actually signed an

18  agreement?

19  A    Yeah, on January 30th I signed an agreement.

20  Q    I'm handing you what has been marked as Plaintiff's

21  Exhibit No. 6.  Can you identify that document.

22  A    It's the Collateralized Loan Agreement between Ellipso

23  and Mann Tech, and it is -- it is executed, I believe, on --

24  there is no date on the signature page, but maybe there is.

25  Yeah, January 30, 2004.  That's the notary public

1   certification.

2   Q    Okay.  Is that the -- is that the final loan document

3   that you signed for the $90,000?

4   A    Yes, I believe so.

5   Q    Did you receive the $90,000?

6   A    Well, I received a check for $90,000, and then I

7   deposited it and I wrote a check to Mr. Patterson for $4500,

8   which is 5 percent of that as a commission per the agreement,

9   the consulting agreement, and three days later I got -- or

10  two, or the next day, I got frantic calls from the bank

11  because the check had bounced.  And both the bank and me, I

12  guess, or Ellipso, we were out at least $4500 and a few other

13  dollars that were uncovered, so I had to cover that personally

14  or assure the bank that I would cover personally unless --

15  until we fix it.

16         I also called Mr. Mann and asked him for

17  explanations of why the check didn't clear.  I think it was

18  three days after that it got bounced back.

19  Q    And did you get an explanation?

20  A    Well, he said he didn't understand that I was -- that

21  Mr. Patterson was supposed to give me the check, because he

22  hadn't received the documents and the stock certificate, and I

23  said, "But on January 30th, I signed everything and I gave

24  it back to Mr. Patterson to carry to you, since you both live

25  in Virginia.  Didn't he do that?"

1    And I don't know what the response was, maybe

2  Mr. Mann was somewhere else or not available, I don't know,

3  but he was concerned, and I said, "Well, I signed everything.

4  I've done everything that is required."

5  Q   Did you give Mr. Patterson the stock certificate?

6  A   Yes.

7  Q   And did you sign any other documents in conjunction with

8  that loan agreement?

9  A   Yes.  I signed a letter to the General Counsel of ICO

10 requesting the transfer of the shares from Ellipso to Mann

11 Tech and effective immediately.

12    So, they had the stock and the power to transfer the

13 stock to their name that same day.

14 Q   When you signed the loan agreement or any time prior

15 thereto, did Mr. Patterson tell you that he was also Mann

16 Tech?

17 A   No.

18 Q   Did Mr. Mann tell you that Mr. Patterson was also his

19 partner?

20 A   No.

21 Q   When you were trying to come up with the terms in that

22 document, that loan agreement, were you consulting with

23 Mr. Patterson?

24 A   Yes.  I was focusing, I think the issue was whether it's

25 30 percent or 40 percent ratio, so I obviously wanted the

1  maximum loan amount for the collateral, and there was also the

2  issue of which strike price do we adopt.  Is it 55 cents, 45

3  cents, 48 cents, because that stock kept shifting every day,

4  every hour.

5  Q   Would you explain what a "strike price" is.

6  A   Well, I don't know if the word "strike price" is correct,

7  bit I think there is a term here.  The -- there is a price, I

8  think they call it, index price showing the closing bid price

9  as quoted in the exchange medium on which the collateral is

10  normally traded on the date specified herein.  So that would

11  have been Nasdaq.

12       So the closing bid price.  Well, let's say on

13  January 29, I don't know what the price was but it could have

14  been 48 cents, and January 30, 55 cents, and February 1st,

15  47 cents.  I mean, it did have a fluctuation.  So if you --

16  since the stock certificate had a set number of shares on it,

17  492,611, that's what we had.  You multiply that by the 45

18  cents and you get the 40 percent of that.  Then you may end up

19  with $90,000 or 92- or 89-, or -- now, I wanted $100,000, but

20  because of this discussion and the variation, we took the

21  safest -- the safest route for Mr. Mann, that means the lowest

22  collateral -- at the lowest cash for the same collateral.

23       And if you compute the value of the collateral and

24  apply 40 percent, I don't even know what number you get,

25  whether it's $90,000 or 82- or -- I mean, or 89- or 92-, but

 1   it's a ballpark, so this, we discussed this with

 2   Mr. Patterson, and there was -- I won't say contention -- but

 3   there was a back and forth of -- to try to maxi- -- optimize

 4   the terms.

 5   Q   Was he talking to Mr. Mann about these issues related to

 6   the strike price, to your knowledge?

 7   A   Yeah, yeah, because we did it to fill in the blanks, and

 8   Mr. Patterson was the go-between.  He had the relationship for

 9   many years with Mr. Mann, so it was easier for him to

10   negotiate.  So he would come back with one number or one

11   condition, and I say, "Well, tell him X," and then he will

12   come back and say, "Great, he'll accept it," or "Let's do

13   this, let's propose something slightly different," or -- so

14   Mr. Patterson was negotiator with Mr. Mann.

15   Q   Okay.  After you came to the conclusion about the amount

16   of the loan and the stock price minimum and that sort of

17   thing, did you have discussions with Mr. Patterson about the

18   legal obligations of both parties in the document?

19   A   Yeah.  Actually before we signed this, I did tell

20   Mr. Patterson, and I may have said that earlier, this is very

21   complicated, and I understand that Argyll wants that, but if

22   we do a deal with somebody we know that is not an institution

23   that Mr. Mann, he doesn't need this.  Why don't we do the

24   original easy-to-understand text, which is one of the exhibits

25   we discussed earlier, 8 and 9, et cetera.

1       And he said, "No, no, it's better to do Argyll so no

2  one can question this agreement later on, like the board."

3       I said, "Okay.  Well, why would they question it?

4  But if you say so."

5       But I didn't discuss the legalese.  It was very

6  complex.  I scanned it.  I didn't -- I didn't pay attention to

7  the detail.  But I did ask him if it was okay, since he was

8  the legal expert, and I couldn't come close to him.  He said

9  it was okay, that it was safe to sign this because it was the

10 same as Argyll.  So I -- I said, "Okay.  Fine."  But I didn't

11 know what the fine print really said.

12 Q   Who did you understand Mann Tech to be?

13 A   John Mann.

14 Q   And from where did you get that understanding?

15 A   Well, I met him in early December, although there is a

16 confusion about when, but let's say I met him sometime then,

17 and he was -- well, the check that was covering this loan came

18 from an account in the Virginia bank called -- the name of the

19 account was Mann Enterprises.

20      So, it was clear to me that it was John Mann's

21 money, not Mr. Patterson, I mean, or anybody else.  So it was

22 a personal Mann Enterprises -- I don't know if it's personal,

23 but it's a check from Mann -- John Mann.

24 Q   Is -- in all those pages is Mr. Patterson identified as

25 an agent for Mann Technologies?

 1   A    No.

 2   Q    Mann Tech, John Mann, any of that?

 3   A    Well, as a matter of fact, the only person identified or

 4   the only entity is Mann Tech, L.L.C., and Mr. Mann signs as

 5   director or managing director or something like that.  I don't

 6   know what title, or executive director or something for Mann

 7   Tech.

 8          Well, this document doesn't even have the signature

 9   of John Mann that I can see, unless it's in somewhere else.

10   Okay, "John Mann, managing director for Mann Technologies,

11   L.L.C., the lender."

12   Q    And did Mr. Patterson receive any compensation from

13   Ellipso as a result of this loan agreement?

14   A    Yes.  He received the same day $4500, which is 5 percent

15   commission, consistent with the consulting agreement for the

16   introduction and negotiation on behalf of Ellipso.

17          MS. LOURIE:  Your Honor, I would move admission of

18   Plaintiff's Exhibit No. 6, Your Honor.

19          MR. HOGE:  No objection.

20          THE COURT:  Received.

21          (PLAINTIFF'S EXHIBIT 6 ADMITTED.)

22   Q    (BY MS. LOURIE)  Now, Dr. Castiel, the loan agreement

23   calls for certain payments by Ellipso; is that correct?

24   A    Yes.

25   Q    And did you understand, when you entered into this

1   agreement, that you were required to make certain payments?

2   A    Yes.

3   Q    And what was your understanding as to the payments that

4   were due?

5   A    They were quarterly payments on interest, so I don't know

6   if it's 5 percent or 6 percent.  But on a quarterly basis,

7   $90,000 would be around $1200, in that range.

8   Q    So when was the first payment due?

9   A    April 15.  Actually, I don't know if it's April 15.  It

10  should have been -- well, April 15, we keep saying that

11  because this is dated January 30th, but -- Okay.  I think I

12  remember it was April 15.  Maybe there is a word here, but

13  maybe it's April 30.

14  Q    Okay.  So the first payment was due in April?

15  A    In April, yeah.

16  Q    Did you make that payment?

17  A    No.

18  Q    And why didn't you make that payment?

19  A    We were very low on cash, and as explained earlier, we --

20  we were expecting royalty payments from Mr. Mann, GLSC, the

21  other company with whom we had signed an agreement for the 881

22  number.

23          He made the first payment, I think, in early

24  February and decided that that was it.  So we never received

25  what we expected as a royalty, so we were very strapped for

1   cash; however, in early April I asked Mr. Patterson, "Aren't

2   we supposed to pay interest?"

3           And he said, "Yeah, but, look, John is an easygoing

4   guy.  We -- you know, I'll talk to him.  We can -- we can pay

5   later or see what happens.  We don't have a lot of cash."

6           And Mr. Patterson needed to be paid to eat, as he

7   mentioned earlier, and I concurred with that need.  So he --

8   he suggested that I pay him something so he can -- he didn't

9   say the word "eat."  He told me something quite touching that

10   he couldn't even buy books for his son who was in school, and

11   I really felt bad because I just couldn't do anything, so I

12   paid him, I think, about $5000 in March, April, in that time

13   frame, and he said that he was going to take care of John Mann

14   and we would pay the interest when the TRSC payment comes,

15   maybe it will be a week later or so.

16   Q   Now, going back to the TRSC deal, did -- was there an

17   understanding that Mr. Patterson was also involved with that

18   transaction?

19   A   Well, it's a confusion as to the word "involvement."

20   Mr. Patterson is pretty smart, and he understood the 881

21   business, he understood the potential and he could build it.

22   So I was very much in favor, once we get going, of him joining

23   TRSC as an executive or an employee, basically.  It never

24   occurred to me that he may be a 50 percent owner.  TRSC was

25   John Mann's company, he put all the money, so I had no reason

1   to believe that Mr. Patterson would own a company, 100 percent

2   owned -- funded by John Mann and that he would own 50 percent.

3   For what?

4           Now, I did support the fact that Mr. Patterson would

5   join TRSC as a worker, as an employee and do things and make a

6   lot of money, perhaps.  That, I totally -- so his involvement,

7   which I supported, was that as -- of a -- not public servant

8   but corporate servant, I guess, as opposed to an owner.  So,

9   that's my understanding.

10  Q   So, under the arrangement with TRSC, how often were you

11  to received royalty payments?

12  A   I think it was -- well, it was every month beginning

13  February 1st or 15.  Dates kept changing.  I don't know

14  which version we finally executed, but let's say the first of

15  each month, $12,500 worth of royalties for a year, and after,

16  there are other conditions I don't remember.

17  Q   Okay.  And that was the same year as this loan agreement?

18  A   Yeah.  It was executed concurrently.

19  Q   So, when did you -- when did the payments stop?

20  A   When they started.  We received the payment and in

21  February and in March we didn't get it anymore.

22  Q   And did you have any discussions with Mr. Patterson about

23  that?

24  A   Yeah.  I said, "What's going on?"

25          He said, "Well, you know, John is concerned.  Let me

1    talk to him."

2    Q    Concerned about what?  Did he tell you?

3    A    About the status of the 881 implementation.

4    Q    Did you ever speak directly with Mr. Mann about his

5    concerns?

6    A    Yeah.  Yes.

7    Q    And what conversations did you have?

8    A    We used to meet regularly at a restaurant.  He would

9    drive from Warrenton and would meet for late breakfast, and

10   one of the main concerns of Mr. Mann was really not with our

11   efforts, but the efforts of the company we had signed the deal

12   with, that really a year earlier -- I think I mentioned that

13   earlier, a company called Sunburst in Pittsburgh, and

14   Mr. Patterson identified that company and negotiated the

15   agreement with them in March 2003.

16          And that company was -- that person who run the

17   company was a bit paranoid of competition and what have you,

18   so he was very slow in implementing the service.  And we had

19   an agreement with them, different from what the Registry would

20   do.  Mr. Patterson said earlier that we sold twice the same

21   thing.  That's not correct.

22          Sunburst's role was to bring an international

23   carrier.  It's called "transit carrier."  When people are

24   going to make phone calls out of Indonesia or Kenya or France

25   or Croatia and they dial 881, it has to go somewhere.  If you

1    dial 1-202 from anywhere in the world, the local carrier

2    brings it to America.  If you dial 011-44, you are routed to

3    England or UK.  Well, if you dial 881-2, where do you go?

4    Ellipso line doesn't exist, so it's a country code, but it's a

5    virtual code.  So we needed to find a home so the calls would

6    be homed -- would be going to -- that home had to be a major

7    carrier, very reputable so the other guys, the other carriers

8    in the world would respect them and send the calls.

9         That carrier was KPN, which is the national

10   telephone company of the Netherlands, and that connection was

11   brought by the Sunburst.  That has nothing to do with the

12   Registry.  It's a completely different function.  That was the

13   core of having the calls going somewhere.

14        Now, KPN, when they would receive calls from

15   anywhere in the world, would then route them out to their

16   destination, which in some cases would be determined by the

17   Registry.  The Registry would say, "This call goes there, this

18   call goes somewhere else."  So, we didn't sell twice the same

19   thing, as was said earlier.

20        Now, this relationship with KPN was key to build the

21   system and convince 180 or 200 countries and carriers in these

22   countries to actually implement the service so you can -- but

23   that was done in the summer of 2003.

24        KPN had sent a letter to all of them and said, "I am

25   the exclusive carrier and I want all the calls routed to me.

1   I represent Ellipso."  That was a major achievement, and they

2   got responses from many.  I think it was 22 or 23 that had

3   programmed the switches to do so.

4            But then we entered into problems of, I guess, greed

5   with the Sunburst person, and the service was delayed and

6   delayed.  And so this are the type of discussions we had with

7   Mr. Mann.  Mr. Mann advocated to give them an ultimatum and

8   terminate Sunburst and go with somebody else.

9            In normal circumstances you could do that, but

10  losing KPN meant losing the lifeblood of the service.  I mean,

11  how do you replace that?  You have to convince AT&T or British

12  Telecomm or some biggy like that and it takes forever.  So, I

13  didn't want to risk that.  These are the discussions we had on

14  881 at the time.

15  Q   So are you saying that he only made one royalty payment?

16  A   Before the April, I think so.  He may have made a second

17  one.  I'm not sure.

18  Q   Okay.

19  A   But he didn't make three or four as prescribed by the

20  agreement.

21  Q   Okay.  So come April and the interest payment is due, are

22  you tying in your mind the royalty payment and the interest

23  payment?

24            MR. HOGE:  Objection.

25            THE COURT:  Sustained.

1   Q    (BY MS. LOURIE)   Okay.   What conversations did you have

2   with Mr. Patterson about what to do about this interest payment

3   that was going to be due?

4   A   As I said earlier, I said, "Don't we owe a payment?"

5        And he said, "John Mann is an easygoing guy."   And

6   it was true.   We met the guy every time.   If we were late, he

7   would have said, "Hey, you need to pay."   He didn't say

8   anything, so I assumed it was okay to be a few days late or to

9   wait until the TRSC payment, royalty payment is -- we give

10  enough details that satisfied Mr. John Mann that we had made

11  enough progress for him to make a payment in TRSC that he --

12  he supposed to make anyway with or without progress.

13       But we humored -- I humored him to give him time to

14  feel comfortable and hoping that he would also give me time to

15  make the payment on interest.

16  Q   Now, there was some discussion also about whether you had

17  the authority to enter into this transaction in the first

18  place.   Did have you the authority, the collateral loan

19  agreement?

20  A   Yes, I have authority.

21  Q   Did Mr. Patterson counsel you on any obligations you had

22  with respect to the board and this loan agreement?

23  A   No.   He never told me there was an issue with the board.

24  Q   Was anybody else engaged in managing Ellipso other than

25  you at that time?

1  A   Well, we had Ambassador Gerald Helman and was the chief

2  scientist part-time, also Jack Anderson part-time, a lot of

3  people who used to work full-time, we may not associate

4  part-time because they had other part-time jobs, but I was the

5  main dedicated person to the company.

6  Q   Okay.  So did you in fact enter into an amendment to the

7  loan agreement after the interest payment was due in April?

8  A   I believe so.  The loan -- the amendment was April 21st,

9  2004.

10  Q   I'm handing you what's been marked as Mann Exhibit No.

11  41.  Can you identify that document.

12  A   Sure.  Yes.  It's an executed document dated

13  April 21st, 2004, and it's an amendment -- it's called,

14  "Amendment to Collateralized Loan Agreement on January 30,

15  2004 between Ellipso and Mann Technologies."

16  Q   And who negotiated that amendment?

17  A   I guess for Mann Tech, Mr. Mann, and for Ellipso,

18  Mr. Patterson or me through Mr. Patterson.

19  Q   Who proposed that amendment?

20  A   It could have been Mr. Patterson or myself.  The stock

21  price had gone very high very quickly up in April, so it was

22  $1.30 or something coming from 45 cents, so that was tripled.

23  So we said, "Well, let's get some money out before it goes

24  down again or at least minimize some that would cover

25  Mr. Mann's investment or cash outlay, give us some cash and

1   then we can wait for the rest later."

2           So it seemed like a good idea, and we agreed to --

3   we agreed to do so, to sell 92,000 shares.

4   Q   And were any shares sold, to your knowledge?

5   A   No.

6   Q   Do you know what happened?

7   A   I don't know why Mr. Mann didn't want to do it.  He had

8   the shares, he had the transfer authorization, and anything

9   else he needed, I would have sold this and more because we

10  needed cash, so we weren't blocking the sale.  We needed the

11  cash.  Anything he would have -- that he needed extra and --

12  we would have done it.

13          We wanted to sell, and I kept reminding

14  Mr. Patterson, "What happened?  We sent an amendment.  Can you

15  talk to Mann to see if he wants to accelerate that sale?"  And

16  I don't know if Mr. Mann didn't seem interested.  He executed

17  that, but he wasn't interested.

18  Q   Did you know at the time that you executed that amendment

19  that Mr. Patterson had an interest in Mann Tech?

20  A   No.

21  Q   Did you ever have any discussions with Mr. Mann around

22  the time that amendment was done that led you to believe that

23  Mr. Patterson may have an interest in Mann Tech?

24  A   No.

25  Q   And what was the financial condition of Ellipso around

1  the time that that agreement was done -- that amendment was

2  done?

3  A   Well, not better than when we entered into the first

4  agreement, and then we had additional obligations because we

5  had Mr. Tomassoni that had joined us more actively.  It's an

6  executive of telephone -- international telephone companies,

7  pretty experienced executive, and we thought he was very --

8  could be very useful in developing the 881 and he had a lot of

9  the contacts worldwide.

10        And he already had an agreement with Ellipso, but in

11  order to bring him back more actively, we had to pay him

12  something, not just deferred, so that was an additional

13  liability for which we needed the TRSC royalty, which was

14  frozen or on hold or something.

15  Q   Now, when you executed that amendment in April, did you

16  consider that you were in default of the loan?

17  A   No.  I -- I can't talk -- at the time I didn't even know

18  there was a default if you didn't pay the interest on the

19  spot.  I learned that after like when the lawsuit was filed

20  and I read the fine print.  So I never thought there was a

21  default.  Well, I knew we hadn't paid, but I didn't know there

22  was an incurable fatal irreversible default.  That's my

23  answer.

24  Q   Okay.  Now, did Mr. Patterson ever have discussions with

25  you about the consequence of failure to pay interest?

1  A    No.

2  Q    Did you --

3  A    No.  He said it was okay because Mr. Mann was easygoing.

4  Q    Now, and is it your testimony that the stock could have

5  been sold at that time by Mann Technologies?

6  A    Oh, yeah.  It was trading at 1.30, 1.50.  It was pretty

7  high.

8  Q    Well, practically.  There was some assertions in opening

9  statement that you had failed to provide a corporate

10  resolution and other documentation required for the sale of

11  this stock.

12  A    Anything they needed to sell the stock, I would have

13  given them.  I needed to sell the stock.  We needed the cash.

14  We weren't holding.  The first time a corporate resolution,

15  the word that I understood, was uttered was probably in July

16  or something, and I understood they wanted a board resolution,

17  which -- I said, "Why do you want a board resolution?"  So

18  there was a confusion between corporate resolution and board

19  resolution, and it's when I actually talked to the bankers

20  that they explained to me that it was not a board resolution

21  but a corporate resolution, which is a form for a bank that

22  recognizes the executive as the true signatory authorized to

23  do the transaction.

24        I said, "Oh, so we don't need a board resolution."

25  They said, "No.  As a matter of fact, you already have a

1   corporate resolution at UBS.  We know who you are and we know

2   you're authorized.  So all they have to do is come here."

3           So, technically, they could have gone to UBS, open

4   an account and transfer the stock.  They had authorization

5   from ICO and seized the stock and do whatever.  I mean, I

6   wouldn't have known anything.

7   Q   How much cash did you understand you would realize if

8   action had been taken on that amendment?

9   A   Well, at $1.50 as an average, so that would have been

10  $150,000 divided by two, 75,000 each, he would have recovered

11  most of his principal and still maintain a lot of upside and

12  would have had enough to make a push in 881 at a time when it

13  was needed, but unfortunately, it didn't happen.

14          MS. LOURIE:  I move admission of -- it's Defendant's

15  Exhibit No. 4, Your Honor.

16          MR. HOGE:  May I ask the court reporter --

17          MS. LOURIE:  41.

18          THE COURT:  Your next number is 29.  Plaintiff's 29

19  is the same as Mann's 41, is received without objection.

20          (PLAINTIFF'S EXHIBIT 29 AND MANN EXHIBIT 41

21  ADMITTED.)

22  Q   (BY MS. LOURIE)  So, when was the next interest payment

23  due?

24  A   My recollection is about three months later, July 15 or

25  something.

1    Q    Did you have discussions with Mr. Patterson over the

2    course of that period of time from the April amendment to the

3    next interest payment due?

4    A    Discussions about the interest?

5    Q    Discussions about the loan, discussions about receipt of

6    income.

7    A    Well, the constant -- there were three subjects every

8    time we talked.  Progress of 881, implementation, because that

9    would be the revenues; the royalty payments, which were

10   tied to the -- shouldn't be tied to that, but they were tied

11   to that in the eyes of Mr. Mann because he needed to feel

12   comfortable to continue to make payments that he had already

13   committed to, and that created, obviously, cash shortfalls for

14   us; and the third was let's sell all the shares or some of it

15   before the value goes down.  If it goes down, let's sell

16   something.

17          So that was a constant discussion.  Since we didn't

18   sell this April amendment, well, let's do something.  Let's --

19   let's find a way to liquidate some to recover the money.  And

20   I made a lot of proposals, which they rejected -- or Mr. Mann

21   rejected, according to Mr. Patterson, and so we -- we were out

22   of ideas.  Well, we culminated that into the amendment of

23   August 2nd.  I can describe some of the ideas I had, if you

24   wish.

25   Q    Did there come a time when you entered into another

1  amendment?

2  A    Yes, in August 2000 -- yes, 2004.

3  Q    Can I hand you what's been marked as Plaintiff's

4  Exhibit 12, would you identify that document?

5  A    It says -- it's the next document executed on July -- on

6  August 2nd, and it's called, "Amendment To Collateralized

7  Loan Agreement."  I guess it's the second amendment, but it

8  doesn't say second.  And it says that we will sell -- we will

9  dispose of the 492,611 shares, get all the shares in the

10 following manner.  442 will be sold and split 50/50 between

11 Mann Tech and Ellipso, the proceeds of those, provided we sell

12 at no less than 55 cents per share.

13         If I recall, in July, the price was around 78 -- or

14 no, about 60, 70 cents, so there was a little buffer, we had

15 room.  And there was the $10,000 that Mr. Mann mentioned

16 earlier or Mr. Patterson, and there was a recovery of $12,500

17 to Mann Tech after we sell the 100,000 shares, so it's 50/50,

18 but we need to take $12,000 and give it back to him.

19         But if the market falls below 55 cents, Mann Tech

20 may, at its discretion, sell all or portion of the unsold

21 shares and distribute the proceeds among Ellipso and Mann

22 Technology.  So if it was below 55 cents, he had a veto not to

23 sell them.  And then 50,000 shares, which is 492 minus 442,

24 become or remain the property of Mann Tech and constitute

25 partial payment of the principal of the loan as set forth in

1    paragraph 8.

2         And paragraph 8 says each share is -- you take the

3    $90,000 divided by the number of shares, multiplied by the

4    price, and then you get the number of shares to adjust the

5    principal.  And it says also, as of October 1st, all shares

6    not sold shall be subject to the terms of the original

7    January 16 loan agreement.

8         Okay.  I think that's where the 15 comes from.  It's

9    January 16 -- oh, this is 30.  But anyway, this is what it

10   says.

11        Now, it's very interesting that the 50,000 shares

12   reduced the principal, which in my mind means that the loan is

13   still due and we're paying a principal.  If we forfeited the

14   loan because we didn't pay the interest, why we paying the

15   principal?

16   Q   Now, were any shares sold as a result of that agreement?

17   A   Yes, 25,000 shares at 55 cents a share, which give, as we

18   said earlier, 12,000, $13,000 divided by two, minus the fees,

19   the brokerage fees, which were split equally by UBS.  We paid

20   half the commission, brokerage commission, and Mann Tech paid

21   half the broker's commission.

22   Q   Did you understand how much interest had been due and

23   unpaid by that time?

24   A   Well, I think about $2700.

25   Q   Did Mr. Patterson ever give you a calculation of

1   interest?

2   A   No.

3   Q   Did Mr. Mann ever give you a calculation of interest due?

4   A   No.

5   Q   Did you have any detailed discussions with Mr. Patterson

6   subsequent to that amendment as to the status of the loan?

7   A   Yes, we had many discussions.  We -- well, first we sold

8   25,000 shares and were trying to sell more, but as discussed

9   earlier, in -- it took a long time to get the restrictive

10  legend removed, so we didn't have that much time to sell the

11  shares before the price went down.

12          So we continued discussing how do we -- do we sell

13  more, do we sell less.  At one point Mr. -- I talked to

14  Mr. Mann and he said, "Look, we can sell below 55 cents a

15  share provided we don't split 50/50.  I get 22 cents

16  and-a-half and you take the rest.  So if we sell at 40 cents,

17  we'll get 18 and he gets 22.  If it's 55, it's 50/50.

18          I guess it's the power -- Well, no comment.

19  Q   What did you have to do in order to accomplish the sale

20  at that point?  Did you have to sign a resolution of some

21  type?

22  A   No.  The shares were at the UBS account, and when we --

23  we all went to UBS.  They opened the account and I agreed to

24  transfer the shares from Ellipso.  They were put first in an

25  Ellipso account, and I guess you have to ask UBS on the

1   technicalities of this transaction, and then we transferred

2   the shares from the Ellipso account to Mann Tech in the same

3   transaction, and the condition was that both Mann Tech and

4   Ellipso would authorize the sale, and that was very important

5   to Mr. Mann because I had been a UBS client for many, many

6   years and I know the person very personally and he wanted to

7   make sure that Mann Tech believed they were protected.

8          So -- and I remember he said, "We're on the table.

9   It's all above board.  When you call me, I'll tell everybody

10  else, and when you call me, I'll call the others.  Okay.

11  Everybody has to agree."

12         So this were the conditions for the sale.  All we

13  had to do is call UBS and say, "I just talked to John Mann.

14  He agrees to sell 20,000 at 62 cents."

15         And UBS would say, "Thank you."  They would call

16  John Mann and say, "Do you agree?"  And if he says, "yes,"

17  they sell.

18         That was the procedure, very simple.  We had got rid

19  of all this bureaucratic difficulties.

20  Q    And did that ever occur?

21  A    Well, it occurred in September.  That's exactly what was

22  done when we sold these 25,000 shares, and then the price went

23  down and we hit October 1st -- or October and the price went

24  really down, and then it started recovering.

25         And so there was another instance in which we

```
 1   attempted to sell shares in November or December, early
 2   December.  The press had jumped --
 3              MR. HOGE:  Objection.
 4              THE COURT:  I didn't hear him.  Let her rephrase the
 5   next question.
 6              MS. LOURIE:  I guess the question was whether there
 7   was an attempt and as a part of that agreement to sell the
 8   shares under the process that they had agreed upon.
 9              THE COURT:  Okay.  The objection is sustained.
10              MS. LOURIE:  Okay.
11   Q   (BY MS. LOURIE)  Did you ever have any communications with
12   Mr. Patterson after October regarding the loan?
13   A   Yes.
14   Q   What were your communications?
15   A   Well, I guess the communication was to sell additional
16   shares.
17   Q   And what was his response?
18   A   He agreed to sell jointly 150,000 shares, and we called
19   UBS to authorize that.
20   Q   Did you ever have any conversations with Mr. Mann after
21   October?
22   A   Concerning the shares?
23   Q   Yes.
24   A   No, just e-mails.
25   Q   And what communications -- I mean, what were you
```

1   communicating in those e-mails?

2   A    Well, when Mr. Patterson and I authorized UBS to sell

3   150,000 shares, UBS said they would check with John Mann, and

4   they called me back saying that John Mann had refused to do

5   that because there was no agreement between the parties, that

6   the agreement had expired and we weren't -- we weren't part of

7   the deal and we had no -- nothing to say.

8          So I sent an e-mail to Mr. Mann and said, what --

9   "What's this?  I mean, we -- I just talked to Patterson and

10  you guys agreed that we would sell."

11         And his response was, "It's impossible that

12  Mr. Patterson could have agreed to this."  And he didn't

13  agree.

14         He said that he represented Mr. Patterson had never

15  said such thing, and then -- so I complained again.  I don't

16  know what I -- I think there was an e-mail somewhere, and I

17  said that that's not the spirit nor the letter, and that's

18  when he said, "You have been in default five times."

19         I went to see counsel, not Mr. Patterson this time,

20  but just an objective independent authorized --

21  Q    When Mr. Mann indicated to you that you had been in

22  default five times, when was this?  When did Mr. Mann say to

23  you you have been in default five times?

24  A    I think it was December 11.

25  Q    Prior to December 11, had Mr. Mann ever said to you, "You

1  are in default"?

2  A   No.

3  Q   Now, did you understand that there was a waiver of notice

4  of default in your loan agreement?

5  A   I know this now.  I didn't know then.  I never realized

6  that.

7  Q   Did Mr. Patterson ever bring it to your attention that

8  you were signing a document that waived notice of default?

9  A   No, he never told me that.

10  Q   Okay.  Did you understand what the default provisions

11  were in the document?

12  A   Not at the time.

13  Q   What do you mean "not at the time"?

14  A   Well, I understand them now, because they have been

15  argued here, but I never knew that by missing an interest

16  payment, even by a minute, you would waive the entire

17  collateral.  I have never heard of such thing.  I should have

18  read it more carefully but I never heard of a loan where you

19  don't even know if you're in default and your property is

20  seized with no opportunity to cure, not even an hour.

21  Q   Now, from the time you signed the loan agreement to at

22  least April, what did you consider Mr. Patterson's role to be

23  with Ellipso?

24  A   Well, he was what he had been for a year-and-a-half.  He

25  was a trusted advisor and consultant trying to put deals

1   together and raise money, and he had found a home, I think,

2   maybe not the most comfortable home because of our situation,

3   but it was his job, even if he were not an employee --

4   full-time employee, but it was his home.  That's what I

5   understood.

6   Q    And between April and the next interest payment that was

7   due, what role did Mr. Patterson serve with Ellipso?

8   A    Consultant and advisor, legal advisor.  We -- we had

9   still a lot of litigation activity and Mr. Patterson helped

10  draft motions and especially a settlement agreement with the

11  other major lawsuits we had that were comprehensive.  That was

12  drafted by Mr. Patterson.

13          Oh, and in May 2004, we signed an amendment with the

14  881 transit carrier company, the Sunburst that was aligned

15  with KPN.  I mentioned that earlier, that we sent an amendment

16  crafted by Mr. Patterson actually that give us much more

17  reflexibility and now the service could start rolling.  So

18  actually Mr. Patterson did a pretty good job in negotiating

19  with them, and I won't say threatening them but say, "Look, we

20  need to get moving."

21          So, we amended on May 17, I think, and KPN -- when

22  KPN saw the resolution of issues between Sunburst and Ellipso,

23  they started moving full speed.

24  Q    And was Mr. Patterson continuing to receive compensation

25  from Ellipso?

1   A   As we could afford now and then, he would get something;

2   unfortunately, not enough and not what I would have wanted,

3   but we just didn't have it.

4   Q   Did Mr. Patterson ever say to you that you were -- you

5   had run the risk of losing the collateral if you didn't make

6   the interest payments?

7   A   No.

8   Q   Did Mr. Patterson ever tell you or sit down and go over

9   with you -- through the loan agreement with you to tell you

10  what the various default provisions were?

11  A   No.

12  Q   Did you have an understanding of what they were?

13  A   No.

14  Q   Now, included in the loan agreement, I don't know if --

15          THE COURT:  Before you do that, we'll continue

16  tomorrow morning at 10:00 o'clock, in light of the hour.

17          The Court is going to have an abbreviated day

18  tomorrow.  We'll come in at 10:00.  I have an obligation to be

19  out of the city in the afternoon, so we're going to stop at

20  12:30, and then we'll start back on Wednesday at 10:00, so you

21  don't have to report back to your employer tomorrow.  You'll

22  be here, but if you'd like a nice afternoon off, maybe the

23  weather will be good.  You-all will be able to go to 12:30

24  tomorrow anyway.

25          We'll reconvene here at 10:00 in the morning.  Don't

1 talk about the case, don't let anyone talk to you about the

2 case, leave your notes in the jury room and I'll see you-all

3 tomorrow at 10:00.

4                    (JURY NOT PRESENT.)

5                    THE COURT:  You can step down, Dr. Castiel.  How

6 much -- you can step down.  How much longer do you expect your

7 direct?

8                    MS. LOURIE:  I wouldn't say more than half an hour.

9                    THE COURT:  Okay.  And then cross is likely to take

10 the morning, I take it?

11                    MR. HOGE:  Your Honor, I'll be frankly fortunate if

12 I finish tomorrow morning.

13                    THE COURT:  All right.  Okay.  And who is your

14 second witness then for Wednesday?

15                    MS. LOURIE:  Probably will be Mr. Mann.

16                    THE COURT:  Okay.  All right.  Anything else you-all

17 want me to do today?

18                    MR. HOGE:  Well, Your Honor, we do have this issue

19 of looking at the computer, and I think what the agreement

20 would be is we would stay and look at it together.

21                    MS. LOURIE:  We can do that, and then we'll figure

22 out what to do after that.

23                    THE COURT:  Right.

24                    MS. LOURIE:  We might have to do some modification.

25                    THE COURT:  Okay.  I'll be in chambers till 6:30, so

1   if you need me to do something.

2        MS. LOURIE:  Am I to keep the admitted exhibits or

3   will the Court be keeping them?

4        THE COURT:  No, you do.

5        MS. LOURIE:  Thank you.

6        THE COURT:  All right.  I'll see you-all at

7   10:00 o'clock tomorrow morning.

8        THE DEPUTY CLERK:  All rise.  This honorable court

9   stands adjourned.

10        (PROCEEDINGS END AT 5:00 P.M.)

11                    *-*-*-*-*

12

13

14                **CERTIFICATE OF REPORTER**

15        I, Catalina Kerr, certify that the foregoing is a

16   correct transcript from the record of proceedings in the

17   above-entitled matter.

18

19

20

21

22   _____  _____

     Catalina Kerr                     Date

23

24

25