```
 1              UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLUMBIA
 2     --------------------------X
       ELLIPSO, INC.            Docket No. CA 05-1186
 3               Plaintiff,
            v.                  Washington, D.C.
 4                             August 5, 2008
                                10:08 p.m.
 5     JOHN B. MANN, ET AL
                     Defendants.
 6     --------------------------X
                     DAY 7 – JURY TRIAL
 7          BEFORE THE HONORABLE ROYCE C. LAMBERTH
                UNITED STATES DISTRICT JUDGE
 8     APPEARANCES:
       For the Plaintiff:   VANESSA CARPENTER LOURIE, P.C.
 9                          By:  Ms. Vanessa Carpenter Lourie
                            4400 MacArthur Boulevard, N.W.
10                          Suite 205
                            Washington, D.C.  20007
11                          202.342.8000

12                          AWKARD & ASSOCIATES, CHARTERED
                            By:  Ms. Linda Nanline Awkard
13                          4201 Cathedral Avenue, N.W.
                            Suite 1416 West
14                          Washington, D.C.  20016
                            202.237.1535

15
       For the Defendants:  CROWLEY, HOGE & FEIN, P.C.
16     JOHN B. MANN         By:  Mr. Christopher C. Hoge
                            1710 Rhode Island Avenue, N.W.
17                          Suite 700
                            Washington, D.C.  20036
18                          202.483.2900

19     ROBERT B. PATTERSON  PRO SE
                            By:  Mr. Robert B. Patterson
20                          P.O. Box 3106
                            Reston, VA 20195
21                          571.278.7076

22     Court Reporter:      Catalina Kerr, RPR
                            U.S. District Courthouse
23                          Room 6716
                            Washington, D.C.  20001
24                          202.354.3258
       Proceedings recorded by mechanical stenography, transcript
25     produced by computer.
```

```
 1                    C O N T E N T S

 2   PLAINTIFF'S MOTION FOR DIRECTED VERDICT............   7

 3   COURT GRANTS DISMISSAL............................  16

 4   COURT REPORTER'S CERTIFICATE.....................  29

 5                     *-*-*-*-*-*

 6   EXHIBITS:                    OFFERED   ADMITTED

 7   Plaintiff's Exhibit 7           4          5

 8   Plaintiff's Exhibit 32          5          5

 9   Plaintiff's Exhibit 38          5          5

10   Plaintiff's Exhibit 42          5          5

11   Plaintiff's Exhibit 43          5          5

12   Plaintiff's Exhibit 44          5          5

13   Plaintiff's Exhibit 45          5          5

14   Plaintiff's Exhibit 46          5          5

15   Mann Exhibit 5                  6          6

16   Mann Exhibit 8                 5,6        5,6

17   Mann Exhibit 9                  6          6

18   Mann Exhibit 13                 6          6

19   Mann Exhibit 15                 6          6

20   Mann Exhibit 19                 6          6

21   Mann Exhibit 21                 6          6

22   Mann Exhibit 22                 6          6

23   Mann Exhibit 23                 6          6

24   Mann Exhibit 25                 6          6

25   Mann Exhibit 41                 6          6
```

1          C O N T E N T S  –  C O N T I N U E D

2    EXHIBITS:                    OFFERED    ADMITTED

3    Mann Exhibit 45                 6          6

4    Mann Exhibit 55                 6          6

5    Mann Exhibit 69                 6          6

6    Mann Exhibit 86                 5          5

7    Mann Exhibit 88                 6          6

8    Mann Exhibit 91                 6          6

9    Mann Exhibit 94                 5          5

10   Mann Exhibit 99                 6          6

11   Mann Exhibit 102                5          5

12   Mann Exhibit 111                5          5

13   Mann Exhibit 115                5          5

14   RP–30                           6          6

15

16

17

18

19

20

21

22

23

24

25

1          P–R–O–C–E–E–D–I–N–G–S

2          (10:08 A.M.; OPEN COURT; JURY NOT PRESENT.)

3          THE DEPUTY CLERK:  Civil Action 05-1186, Ellipso,

4    Inc. versus John B. Mann, et al.  Ms. Lourie and Ms. Awkard

5    for Plaintiff, Mr. Hoge for Defense and Mr. Patterson, pro se.

6          THE COURT:  All right.  Were there additional

7    exhibits that counsel need to move in?

8          MR. HOGE:  Yes, Your Honor, if you would just give

9    me one minute.

10         (PAUSE.)

11         MS. LOURIE:  Plaintiff's Exhibit No. 7, Your Honor.

12         THE COURT:  Go ahead and give me all the list and

13   I'll see if they object to any of them.

14         MS. LOURIE:  Well, these were exhibits that we had

15   talked about that there was no objection to on the record, or

16   in the prior discussion.

17         THE COURT:  Okay.  Let him see them and then just

18   give me the numbers we're going to admit without objection.

19         MR. HOGE:  No objection to No. 7.

20         THE COURT:  Just go through the whole stack with

21   them and then tell me which ones are not objected to.

22         MS. LOURIE:  Okay.

23         (PAUSE.)

24         MS. LOURIE:  Okay, Your Honor.  There are no

25   objections to Plaintiff's Exhibit No. 7, Plaintiff's Exhibit

1   No. 32, which is also Mann Exhibit No. 86; Plaintiff's Exhibit

2   No. 38; Plaintiff's Exhibit No. 42, which is also Mann 8;

3   Plaintiff's Exhibit No. 43, which is also Mann 94; Plaintiff's

4   Exhibit No. 44, which is also Mann 111; Plaintiff's Exhibit

5   No. 45, which is also Mann 115; and Plaintiff's Exhibit

6   No. 46, which is Mann 102.

7           THE COURT:  All right.  Any others?

8           MS. LOURIE:  That's all for Plaintiff, Your Honor.

9           THE COURT:  All right.  Additional exhibits for the

10  Defendants then?

11          MR. HOGE:  Yes, Your Honor.  We have a similar

12  exercise.  In fact, she mentioned some of the same ones that

13  we were planning to get in.

14          THE COURT:  Okay.  All of those that she had your

15  number and her number, I'll receive your numbers on all those

16  as well.

17          (PLAINTIFF'S EXHIBITS 7, 32, 38, 42, 43, 44, 45,

18  46, MANN EXHIBITS 86, 8, 94, 111, 115, 102 ADMITTED.)

19          MR. HOGE:  Right.  So I'll try to avoid duplication

20  here.

21          THE COURT:  Okay.

22          (PAUSE.)

23          MR. HOGE:  All right, Your Honor.  I believe there

24  is no objection to the following ones which were talked about

25  during the testimony, either during Ms. Lourie's questioning

1   or during my questioning, and that would be Mann Exhibit

2   No. 5, No. 8, No. 9, No. 13, No. 15, No. 19, No. 21, No. 22,

3   No. 23, No. 25, No. 41, No. 45, No. 55, No. 69, No., yeah, 86

4   but that's already in as Plaintiff's Exhibit No. 32.  No. 88,

5   No. 91, and No. 99.

6            THE COURT:  All right.  Without objection, they are

7   all received.

8            (MANN EXHIBITS 5, 8, 9, 13, 15, 19, 21, 22, 23, 25,

9   41, 45, 55, 69, 86, 88, 91, 99 ADMITTED.)

10            MR. HOGE:  Thank you, Your Honor.

11            THE COURT:  Mr. Patterson.

12            MR. PATTERSON:  Your Honor, it would be RP No. 30,

13   which is the -- which is the blank corporate resolution form.

14            THE COURT:  The --

15            MR. PATTERSON:  Blank corporate resolution form,

16   that's RP-30.

17            THE COURT:  Without objection, RP-30 is received.

18            (EXHIBIT RP-30 ADMITTED.)

19            THE COURT:  Does that complete everyone's exhibits

20   then?

21            All right.  I reserved on the Defendant's Rule 50

22   motion.  I'll entertain the Plaintiff's Rule 50 motion on the

23   counterclaims now, if you want to make one.

24            MS. LOURIE:  Did you say -- Oh, I'm sorry, Your

25   Honor.

1          And the Plaintiff does move for directed verdict on

2   the Defendant's counterclaim.  As I understand the Court's

3   order, what was left of the counterclaim was simply a claim

4   of -- as the court indicated, a very thin claim of false

5   representation related to the 881 loading.

6          For several reasons, I think that the Court should

7   enter directed verdict with respect to that last remaining

8   counterclaim.  The Plaintiff -- the Defendant provided very

9   little evidence to support that claim.  There's no mention of

10   the TRSC contract in the loan agreement which the Defendants

11   allege was part of the consideration.  The only testimony

12   related to whether the 881 was actually loaded, I believe,

13   came from Mr. Tomassoni, and he confirmed that it was actually

14   loaded prior to the TRSC contract.

15          There was no contradiction of Dr. Castiel's

16   testimony that he relied on KPN regarding the status of the

17   loading, and the Defendants acknowledge in their own e-mail

18   that they were two separate agreements and the two separate

19   agreements did not refer to each other at all.

20          And finally, based on the very basic issue that it

21   was an integrated contract which made no reference to it and

22   therefore we think that the Plaintiff should get directed

23   verdict on that issue.

24          MR. HOGE:  Your Honor, as to the two counts that

25   remain after the Court's ruling on summary judgment.  They're

1    both in the name of Mann Tech.  One is found in breach of the

2    loan agreement, breach of contract; the other one in fraud.

3           The evidence has been presented.  I'll start with

4    the fraud first, is that there were a number of

5    misrepresentations made by Dr. Castiel that either served to

6    induce Mann Tech to -- or John Mann because there was no Mann

7    Tech at the time, but eventually Mann Tech to enter into the

8    loan agreement, and among those representations was that the

9    881 service was up and ready to roll, essentially.

10          Ms. Lourie's reference to the fact that the 881

11   numbers were loaded, that doesn't get you where you need to

12   go.  Mr. Mann explained this in I would say excruciating

13   detail as to the difference between loading these numbers and

14   having the ability to use them, so there's definitely a

15   controversy at the very least in the testimony, if it's not

16   clear, that the testimony is in our favor that the 881

17   service, contrary to the representations made by Dr. Castiel,

18   was not ready for use until, at the very latest -- at the very

19   earliest, 10 months after the loan agreement was used -- was

20   entered into.

21          There were three --

22          THE COURT:  What did that have to do with the loan

23   agreement?  That has to do --

24          MR. HOGE:  It was inducement to enter into the loan.

25          THE COURT:  I'm sorry?

1          MR. HOGE:  It was an inducement to enter into the

2     loan agreement.  It's stated in the counterclaim that the only

3     reason Mann Tech entered into the loan agreement was because

4     they wanted to get involved in this 881 business, and there

5     were misrepresentations about the state of readiness of that

6     881 business.

7          But, Your Honor, there are three significant

8     misrepresentations in the loan agreement itself.

9          THE COURT:  I understand that.

10          MR. HOGE:  Yeah.  And just to state quickly what

11     they are, the collateral was freely transferable, clearly not

12     correct.  That there were no lawsuits pending; well, there was

13     Sahagen.  Dr. Castiel testified yesterday that most of the

14     Sahagen lawsuits were suits filed by Sahagen against Ellipso,

15     clearly should have been divulged, not to mention the Draim

16     case which involved both claims and counterclaims apparently

17     which are still pending before a magistrate court of this

18     court.  And also that there are no overdue debts by Ellipso,

19     and we know that wasn't true was well.  We know there were

20     unpaid legal bills, at the very least, because there were

21     checks drawn in UBS Account Document 165 to a law firm.

22          So Ellipso breached this agreement, you know.  There

23     is fraud and then there is a breach of an agreement.  There

24     were no interest payments that were made, there were

25     misrepresentations and false statements, which if you look at

1 the acts of default in the loan agreement, that itself

2 constitutes an act of default.  I believe that's what

3 Dr. Castiel was talking about when he said on the day they

4 signed it, they were in breach.  In fact, he's acknowledged

5 being in breach.

6    Then, of course, the ICO stock fell to less than

7 80 percent of the amount of the loan.  So, you know, there

8 are -- there's definitely a viable claim here, both for fraud

9 and breach of contract.

10    THE COURT:  All right.  And the damages are?  The

11 damages in the cost of the stock from when the loan agreement

12 was entered and the price it could have sold for in October?

13    MR. HOGE:  Yes, Your Honor, that would be one aspect

14 of it, and then we've done some calculations, which I'll share

15 with the jury and I'll certainly share with the Court.  There

16 were three missed interest payments, which were roughly $1200

17 a quarter.  That's about $3600.  Then of course the note

18 itself wasn't --

19    THE COURT:  Well, if you've got the collateral, why

20 does he get the interest, too?

21    MR. HOGE:  Because the loan agreement provides for

22 that.

23    THE COURT:  But the loan agreement is non-recourse,

24 so he gets the collateral.  He doesn't get the interest and

25 the collateral.

1          MR. HOGE:  It's non-recourse as to Dr. Castiel, but

2    it's not non-recourse as to Ellipso.  Non-recourse means that

3    you can't go against anybody who is not on the actual loan

4    agreement, I believe, but you can certainly go against

5    Ellipso, you know.

6          The whole concept of the non-recourse is that he

7    can't pierce through to the principals of Ellipso, so, you

8    know, in addition, Your Honor, you have their interest that

9    should have been paid since October 2004 and there is $100,000

10   that Mr. Mann had loaned.  Now, there is some credits that

11   need to be applied against that, and that would include the

12   money that came from the sale of the 25,000 shares that

13   happened in August.  That would be about $5,934.  And then

14   there would be credit for the value of the stock as of the

15   date that it was repossessed, which would have been, you know,

16   about 10 cents a share.

17         There was about 467,000 shares left after the 25,000

18   had been sold, so that gets you to about 46,700.  If you take

19   those credits away from what was owed on the loan, the

20   principal and the interest, I come out with a balance of about

21   $60,000, and that would be the damage that we would claim as a

22   result of the fraud and the breach of contract.

23         THE COURT:  All right.  Now, what's the Plaintiff's

24   theory of your damages?  What's your argument on your damages?

25         MS. LOURIE:  Your Honor, as I indicated yesterday, I

1  think we're sort of hampered because I think with the state of

2  evidence, the jury is aware of the purchase price -- I'm

3  sorry, the value of the stock on the date of the loan

4  agreement.  They also have evidence only that the loan was not

5  paid as of September 17th, October 21.  They have -- and the

6  evidence seems to support that the stock was of no value and

7  that the Defendants didn't recover any money.  I mean, that's

8  the state of the evidence.

9       So I think that we -- as indicated to The court,

10 we're only left with the amount of money that the stocks were

11 worth on the date of the actual loan agreement, and I --

12      THE COURT:  But then that's really giving you

13 rescission, isn't it?

14      MS. LOURIE:  I'm sorry?

15      THE COURT:  That's really giving you rescission

16 then, isn't it, which you can't get?

17      MS. LOURIE:  Well, no, it's not giving us

18 rescission, because I think that -- the standard is measuring

19 damages if the Plaintiff affirms the contract.  That's

20 basically it.  And so you have the quandary of how do you

21 measure damages when the property is the stock that goes up

22 and down in value.

23      Two things that were claimed, and that was No. 1,

24 that the stock was taken illegally.  I mean, that's not the

25 word, but that was forfeited in September 17th before

1   actually the end of the term of the amendment.  So I think

2   that there has been no evidence and the Court didn't allow any

3   evidence on any valuation of the stock even during that time

4   period.  It does nothing on the record as to the value of the

5   stock other than on the day of the loan sale.

6         So, I think that that works also against the

7   Defendant's argument that they're entitled to damages because

8   there's no proof of anything.  There's no evidence about

9   anything related to the value of the stock then.  There has

10   got to be a way to measure damages when you talk about stock

11   that goes up and down, and it's either the day the stock was

12   pledged as collateral, which we accept but we don't agree

13   with, but it's what we have, or it is the amount of money

14   recovered by the Defendants upon what we believe to be the

15   wrongful sale of the stock, which is a vastly different

16   number.

17         I don't know how, if you find fraud, the Defendants

18   are entitled to benefit from that fraud by selling the stock

19   and keeping any excess over and above the loan amount, and

20   that's where we are in this case right now.

21         THE COURT:  All right.  Now, let me ask you if you

22   would address also the issue of the -- how the Defendant was

23   damaged by the preliminary injunction.  I have her opposition.

24   How were you in fact damaged?

25         MR. HOGE:  Basically in two ways, Your Honor, and I

1   think we set it out in our motion for damages and costs.  And

2   basically, it breaks down into attorney's fees in A, defending

3   against the preliminary injunction; B, appealing the

4   injunction order; and C, developing and producing evidence

5   through a motion for summary judgment that ended up in the

6   lifting of the injunction.  And we've given you, as an

7   exhibit, a breakdown of what those costs were.

8                In addition, Your Honor, and we've also --

9                THE COURT:  Well, is her legal tests incorrect,

10  then, where she -- those aren't considerations?  Those legal

11  tests she sets in *National Kidney,* right?

12               MR. HOGE:  I'm sorry, Your Honor?

13               THE COURT:  Those aren't the legal tests that she

14  sets forth in *National Kidney*?

15               MR. HOGE:  I have to review -- frankly, I was not

16  expecting an argument on this particular motion at this

17  particular time because I was thinking that this was something

18  you were going to reserve on until after the trial, so I'm

19  going to confess that I have not recently read *National*

20  *Kidney*, and maybe it's -- I don't know if the Court -- is the

21  Court thinking in terms of submitting this issue to the jury?

22               THE COURT:  No, no, no, no.  But I'm thinking in

23  terms of not sending anything to the jury.

24               MR. HOGE:  Well, that's fine.  That would be fine

25  with us.  Your Honor, I would actually request a short

1   interlude to get up to speed on this particular motion,

2   because frankly, I've been thinking closing argument and

3   directed verdict and...

4   THE COURT:  Right.

5   MR. HOGE:  You know, basically, though, to respond

6   to your question, I think it breaks down into legal fees and

7   it breaks out into the differential, and I think we had case

8   law in our motion that talked about the measure of damages

9   with an improvidently or incorrectly issued injunction, is the

10  difference between the value of the asset that's being

11  enjoined against on the date of the injunction and on the date

12  that the injunction was lifted, and I think we had about a

13  50-cent or a dollar per share differential between those two

14  dates, and I cited the Court to case law that talked about --

15  talked about that issue.

16  I don't have that right in front of me.

17  THE COURT:  All right.

18  MR. HOGE:  I pulled the wrong thing out of my box.

19  THE COURT:  All right.  All right.  I get it.

20  MR. HOGE:  Your Honor, one other thing I just wanted

21  to mention to the Court, is that I don't know if we're going

22  to get to it in jury instructions, but I've drawn up a fourth

23  special jury instruction that has to do with representations

24  or allusions that were made both during both opening argument,

25  opening statement and during Dr. Castiel's testimony, things

1    like, "Mann made 1,000 percent profit on the stock."  I think

2    Dr. Castiel at one point said he got 700,000, which happens to

3    be incorrect, but these are things that are lingering in the

4    jury's mind, and in light of the Court's ruling on the motion

5    in limine, I think there needs to be a special jury

6    instruction that addresses that, and I've got one here --

7              THE COURT:  Okay.

8              MR. HOGE:  -- I can serve on Ms. Lourie, I prepared

9    last night.  I'll hand this to the Court.

10             THE COURT:  All right.  I'll take a short recess

11   before I rule on the Rule 50 motions.

12             MR. HOGE:  Thank you.

13             THE DEPUTY CLERK:  All rise.

14             (A BRIEF RECESS WAS TAKEN.)

15             (10:45 A.M.; OPEN COURT; JURY NOT PRESENT.)

16             THE DEPUTY CLERK:  Please be seated and come to

17   order.

18             THE COURT:  Pursuant to Federal Rule of Civil

19   Procedure 50(a), the Defendants, John Mann, Mann Technologies,

20   L.L.C. referred to as Mann Tech and Robert Patterson and

21   Counter-Defendant, Ellipso, Incorporated have all moved for

22   judgment as a matter of law in this case on each of the

23   respective claims and counterclaims brought against them.

24             Upon consideration of the entire record in the case

25   and the applicable law, the Court finds, for the reasons it

1   will set forth momentarily, the motions shall all be granted.

2   Rule 50(a) provides:  If a party has been fully

3   heard on an issue during a jury trial and the Court finds that

4   a reasonable juror would not have a legally sufficient

5   evidentiary basis to find for the party on that issue, the

6   Court may, (A) resolve the issue against the party; and (B)

7   grant a motion for judgment as a matter of law against the

8   party on a claim or defense that, under the controlling law,

9   can be maintained or defeated only with a favorable finding on

10  that issue.

11  The application of this rule mirrors that of a

12  court's evaluation of summary judgment motions, such that the

13  inquiry under each is the same, *Teneyck v. Omni Shoreham*

14  *Hotel*, 254 F.Supp.2d 17 at 19, D.D.C. 2003, quoting *Reeves v.*

15  *Sanderson Plumbing Products, Incorporated*, 530 U.S. 133 at

16  150, 2000; see *Borgo v. Goldin*, 204 F.3d 251 at 254, D.C.

17  Circuit 2000, citing *Anderson v. Liberty Lobby, Incorporated*,

18  477 U.S. 242 at 251, 1986, indicating that the primary

19  difference between the motions is procedural.

20  When assessing a Rule 50 motion, courts review all

21  evidence in the record but may not infringe on the jury's

22  province by making credibility determinations or weighing the

23  evidence, citing *Teneyck*, 254 F.Supp.2d at 19, citing *Reeves*,

24  530 U.S. at 150.

25  Further, courts view all evidence in a light most

1    favorable to the nonmoving party, *Borgo* 204 F.3d at 254.  And

2    where reasonable minds could differ as to the import of the

3    evidence, a verdict should not be directed, *Borgo* at 254 and

4    quoting *Liberty Lobby*, 477 U.S. at 250 to 251.

5          The Mann Defendants contend that Ellipso's claims

6    must fail because it cannot prove any cognizable damages.  The

7    Mann Defendants previously raised this issue in their motion

8    for reconsideration of the Court's order of April 1st, 2008,

9    which denied in part Mann's motion for summary judgment.

10   However, because the Court found that the damages argument

11   could have been raised in Mann's motion for summary judgment,

12   the issue was then not properly before the Court, as I

13   referenced in my order of May 23rd, at pages 7 to 8.  Today,

14   there is no such procedural barrier to this Court's assessing

15   the merits of the damages issue, and it is clear that Ellipso

16   makes no damages showing.

17         Of Ellipso's five remaining causes of action, two

18   are fraud claims, Count IV, fraudulent nondisclosure, and

19   Count VIII, common law fraud, and the other three counts,

20   Count IX, conversion; Count X, Trover/Replevin; and Count 11,

21   civil conspiracy, are derivative of the fraud claims.  Fraud

22   must be proved by clear and convincing evidence.  Even if the

23   lower typical civil burden of preponderance of the evidence

24   were applied, the Court's decision would be no different.

25         Ellipso does not approach meeting either standard,

1    but the standard I apply by law is clear and convincing

2    evidence.  See *Hercules & Company versus Shama Restaurant*

3    *Corporation*, 566 Atlantic 2d 31 at 39, note 16, D.C. Court of

4    Appeals, 1989.

5         A crucial component of any fraud claim is a showing

6    that provable damages resulted from the fraud, *Kitt v. Capital*

7    *Concerts, Incorporated*, 742 Atlantic 2d 856 at 860 to 861,

8    D.C. 1999, citing *Dresser versus Sunderland Apartments Tenants*

9    *Association*, 465, Atlantic 2d 835 at 839, D.C. 1983.

10        Further, there must be a causal connection between

11   the misrepresentation and the injury which a plaintiff

12   alleges, *Day v. Avery,* 548 F.2d 1018 at 1028, D.C. Circuit

13   1976, and the damages must be clearly defined and ascertained,

14   *Nartex Consulting Corporation v. Watt*, 722 F.2d 779 at 793,

15   note 22, D.D.C. 1983, citing 37 Am. Jur. 2d *Fraud and Deceit*,

16   Section 343 at 461.

17        They must not be speculative.  See *Jankins v. TDC*

18   *Management Corporation*, 21 F.3d 436 at 443, D.C. Circuit 1994,

19   citing *Alpo Petfoods, Incorporated versus Ralston Purina*

20   *Company*, 913 F.2d 958 at 969, D.C. Circuit 1990.

21        In this case, Ellipso has failed to set forth a

22   damages theory that would allow a reasonable jury to calculate

23   a damages award that would be clearly defined and ascertained

24   rather than merely speculative.  In its pretrial itemization

25   of damages, Ellipso detailed five categories of alleged

1    damages again the Mann Defendants in the amended joint

2    pretrial statement at pages 21 to 22.  As the Court now

3    explains, none of these categories can survive the Mann

4    Defendants' Rule 50 motion.

5         First, Ellipso has no equitable interest in the ICO

6    Global Communications Holding Limited stock.  See my prior

7    reporting opinion in *Ellipso v. Mann* at 541 F.Supp.2d, 365 at

8    377, dissolving the preliminary injunction because Ellipso had

9    no equitable interest in the shares.

10        Second, punitive damages are clearly improper in

11   this case as punitive damages are generally disfavored in this

12   district.  See *Feltman v. Sarbov*, 366 Atlantic 2d 137 at 140

13   D.C. 1976.  And Ellipso has utterly failed to submit the kind

14   of outrageous conduct such as maliciousness, wantonness, gross

15   fraud, recklessness and willful disregard of another's rights,

16   that would support a punitive damages award, *Chatman v.

17   Lawlor*, 831 Atlantic 2d 395 at 400, D.C. 2003.

18        Ellipso's other damages categories, loss of value,

19   consequential loss and opportunity loss, all suffer from the

20   same fatal defect.  They are the epitome of speculative

21   damages.

22        Specifically, Ellipso arrives at a speculative

23   $581,534 loss of value calculation by requiring one to assume

24   that absent fraud, Ellipso would have sold 315,853 shares and

25   retained 176,758 shares with a value of $3.29 per share,

1  apparently the average price since 2004.

2         Even if such a figure were otherwise reasonable,

3  which it is not, the Court finds that from Ellipso's

4  perspective, the relevant value of the shares would be the

5  October 2004 value, the date when Mann Tech foreclosed on the

6  collateral.  The Court finds that Ellipso's theoretical

7  recovery must be limited to the fair market value of the stock

8  on that date.  See *Simon versus Electrospace Corporation*, 28

9  New York 2d 136 at 145, New York 1971, citing 11 Williston on

10  Contracts, Third Edition, Section 1339, indicating that the

11  proper measure of damages for a securities seller is

12  determined by the loss sustained or gain prevented at the time

13  and place of the breach.  See also *Buford versus Wilmington*

14  *Trust Company*, 841 F.2d 51 at 56, Third Circuit 1988,

15  calculating damages for a seller's breach of contract to

16  deliver securities as the market value on the date the

17  securities should have been delivered.

18         The evidence in this case demonstrates that any

19  other measure based on some future trading price would be

20  overly speculative.  This relevant October 2004 value was so

21  low that the collateral was worth less than the $100,000 that

22  Ellipso received from Mann Tech.  Ellipso's consequential loss

23  and opportunity loss calculations are perhaps even more

24  speculative.  Ellipso claims at least $3,050,000 in

25  consequential damages because Mann Tech's possession of the

collateral allegedly forced Ellipso to generate cash by

disposing of the shares at the low price of 21 cents per

share; Ellipso claims further damages for lost business

opportunities due to its not having this $3,050,000 available

when needed.

While lost business opportunities are surely

possible in civil cases, they require specific opportunity

cost, or the return it could have made on an alternative

investment of the funds not spent on the foregoing

opportunity.  See *Alpo Petfoods*, 997 F.2d at 954, citing

*Fishman versus Estate of Wirtz*, 807, F.2d, 520 at 555, Seventh

Circuit 1986.

At trial, Ellipso offered no such alternative

investment that it forewent, and if the evidence presented of

Ellipso's historical investments is any indication of future

performance, it's likely that an alternative investment would

have fizzled.  Without this evidence, no reasonable jury could

find for Ellipso on its supposed lost business opportunity

damage claims.

Viewing the entire record in the light most

favorable to Ellipso, several key facts emerge.  (1) the loan

agreement generated over $100,000 for Ellipso, the original

90,000-dollar loan plus an additional $10,000 pursuant to the

August 2nd, 2004 amendment, and over $5,000 proceeds from

sale of the shares pursuant to that amendment; (2) at some

1  point, no later than June 2004, Ellipso knew of

2  Mr. Patterson's Mann Tech participation and subsequently

3  affirmed the loan agreement, nevertheless; (3) at the time of

4  forfeiture, the value of the collateral securing Ellipso's

5  loan had dipped significantly below the outstanding loan

6  amount; (4) the loan was non-recourse, meaning that Ellipso

7  could stop performing on the loan contract, walk away, and owe

8  Mann Tech nothing more than the shares for securing the loan;

9  (5) Ellipso was in default from the moment Castiel signed the

10 agreement.  See the Castiel testimony in the P.M. session on

11 July 30th; and (6) Ellipso chose to walk away from the loan

12 agreement; and (7) Mann Tech exercised its right to foreclose

13 on the collateral.  On these facts, no reasonable juror could

14 find that Ellipso has established provable damages.

15      As to Robert Patterson's Rule 50 motion, Ellipso has

16 several causes of action remaining against Robert Patterson:

17 Breach of contract, breach of fiduciary duty, civil conspiracy

18 and three counts of fraud.  However, the only evidence of

19 ascertainable damages introduced at trial as to Mr. Patterson

20 was the 4500-dollar commission Ellipso paid him pursuant to

21 the Patterson-Ellipso consulting agreement as a bonus for

22 successfully introducing a financier, Mr. Mann, to Ellipso.

23      Among other allegations, Ellipso contends that

24 Mr. Patterson fraudulently induced Ellipso into the consulting

25 agreement and that Mr. Patterson violated that agreement,

particularly by receiving commissions from both Mann Tech and Ellipso and by failing to make clear that Mr. Patterson was not in a condition to provide legal services to Ellipso.

However, the record is clear that at some point Ellipso became entirely aware of (1) Mr. Patterson's inability to practice law; (2) his so-called double dipping; and (3) the fact that he was a Mann Tech principal.

Mr. Castiel's direct examination revealed that even after Mr. Patterson returned from his so-called sabbatical in October 2003, their working relationship continued.  It was not until approximately three months later that the parties consummated their loan agreement.

For whatever reason, Ellipso continued to work with this Harvard trained ex-lawyer and even affirmed the Mann Tech loan agreement with full knowledge of all facts.  These actions are far from indicating that Ellipso wished to terminate its relationship with Mr. Patterson, or even to second-guess it, upon receiving full knowledge of Mr. Patterson's status.

Ellipso cannot plausibly seek return of the 4500-dollar commission merely because it now has the hindsight of knowing that the loan agreement's end result happened to provide greater gains to Mann Tech than to Ellipso.  That opportunity was waived long ago.

As to Ellipso's Rule 50 motion, John Mann once ended

1   an e-mail by citing a rule that it always gets darker just

2   before it goes completely black.  Although Mr. Mann attributed

3   this saying to Warren Buffett, I've been unable to

4   independently confirm that's the true source.  It could be.

5   That was Mann Trial Exhibit 118.  If that rule had been -- had

6   held true in this case, perhaps Mann Defendants' counterclaim

7   would have presented causes of action such that a reasonable

8   juror could have found in their favor.  However, rather than

9   fading to black, Mann Tech's shares skyrocketed after

10  October 2004.  In fact, while the stock traded at around 10

11  cents a share for a time in October 2004, making the

12  collateral securing the parties loan agreement worth less than

13  $50,000, the stock's later rebound permitted Mann to receive

14  $519,138 from the sale of the shares as of this court's

15  preliminary injunction of November 2nd, 2005.  According to

16  John Mann, Mann Tech was still in possession of 37,611 shares

17  on November 2nd, 2005, based on the Mann Declaration,

18  Exhibit 8, to the motion for damages suffered as a consequence

19  of the preliminary injunction.

20          Sale of those shares presumably later will lead to a

21  even greater windfall for the Mann Defendants, and I'm citing

22  there the Mann status report of April 10th at pages 2 to 3

23  for that sale price of the $519,138 received.  Such revenue

24  from $100,000 investment is certainly a great return.

25          At pretrial, the Court found that evidence of the

1   Mann Defendants' post-October 2004 disposition of the shares

2   would be more prejudicial than probative in this matter.  See

3   my final pretrial order at pages 1 and 2, and note 2.  While

4   this held true at trial, the Court cannot simply turn a blind

5   eye to Mann Tech's handsome profit and award additional

6   damages for its transaction gone awry.  If Plaintiff had

7   argued -- Well, I'll leave that footnote out.

8        Additionally, the Mann Tech Defendants seem to argue

9   that they're entitled to attorney's fees in conjunction with

10  what they call this frivolous litigation, noting the Joint

11  Amended Pretrial Statement at 23.  However, the Mann

12  Defendants did not present evidence on attorney's fees at

13  trial, and most importantly, they've set forth no

14  justification ignoring the general rule commonly known as the

15  American Rule, that each party in a lawsuit bears the cost of

16  its own attorney's fees, *Savoy v. D.C.*, 1997 U.S. District

17  Lexis 3106 at 4, D.D.C. March 11, 1997, citing *Alyeska*

18  *Pipeline Company v. Wilderness Society*, 421 U.S. 240, 1975.

19       For these reasons, no reasonable jury could find

20  that the Mann Defendants have established damages in their

21  counterclaim.

22       In conclusion, as trial of the case wore on into the

23  second week of testimony, the Court, well aware that damages

24  were an essential element to both Plaintiff and

25  Counter-Plaintiffs' claims, kept waiting for someone to

1  introduce a plausible damages theory.  That hour did not

2  arrive, now leaving this court in the regrettable position of

3  having exhausted seven days of valuable time of a jury

4  admirably fulfilling its civic duties by serving as members of

5  the jury.

6        The Court will issue a written order dismissing with

7  prejudice all counts of the complaint and counterclaims in

8  this case.  The sole remaining issue in the matter, Mann

9  Defendants' motion for damages suffered as a consequence of

10  preliminary injunction will be decided separately.  Once that

11  motion is ripe, I would like the Mann Defendants' reply to be

12  filed within three days so that I can address this matter

13  promptly on that one remaining issue then.

14        With that, I'll bring the jury and discharge them if

15  they're all here and ready to come in.

16        The oral ruling there will constitute the findings

17  of fact and conclusions of law supporting the Court's ruling

18  on the motion.

19        MR. HOGE:  I'm sorry, I missed that last thing.

20        THE COURT:  The oral ruling there will constitute my

21  findings of fact and conclusions of law on the Rule 50 issues.

22        (PAUSE.)

23        (JURY PRESENT.)

24        THE COURT:  Good morning, ladies and gentlemen.  You

25  may or may not be happy to hear this, but I have determined,

1 based on the legal issues this morning, that the trial is

2 concluded; that on legal grounds, I have determined that the

3 Plaintiff will take nothing and the Defendant will take

4 nothing on their counterclaim.  All parties will bear their

5 own cost and attorney's fees in bringing the litigation.

6    The case has been dismissed without further action

7 by the jury.  On behalf of the Court and the community, I

8 thank you very much for your service.  We could not fairly and

9 impartially administer justice in our community without good

10 citizens like you being here, being available, being sure we

11 get to this point in the trial where we made it all the way

12 through.  We will not need you to deliberate.  However, I've

13 determined as a legal matter there are no issues for you to

14 resolve and therefore you will be discharged with the thanks

15 and appreciation of the Court.

16    If you'll wait in the jury room for just a moment,

17 I'd like to thank each of you individually before you leave.

18    (JURY NOT PRESENT.)

19    THE COURT:  The Court will be in recess.

20    THE DEPUTY CLERK:  All rise.

21    (PROCEEDINGS END AT 11:06 A.M.)

22        *–*–*–*

23

24

25

1

2

3

4

5

6                     **CERTIFICATE OF REPORTER**

7            I, Catalina Kerr, certify that the foregoing is a

8    correct transcript from the record of proceedings in the

9    above-entitled matter.

10

11

12

13

14    _____    _____
      Catalina Kerr                       Date
15

16

17

18

19

20

21

22

23

24

25